UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
: 
JPMORGAN CHASE BANK, NATIONAL :
ASSOCIATION, LONDON BRANCH, :
: Case No. _____
Plaintiff, :
:
- against - : **COMPLAINT**
:
TESLA, INC., :
:
Defendant. :
:
------------------------------------- x

Plaintiff JPMorgan Chase Bank, National Association, London Branch ("JPMorgan"), by and through its undersigned attorneys, as and for its Complaint against Defendant Tesla, Inc. ("Tesla"), alleges, upon knowledge as to itself, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1. This is a breach of contract action to recover over $162 million dollars immediately due and payable by Tesla to JPMorgan. JPMorgan and Tesla entered into a series of warrant transactions, which required Tesla to deliver either shares of its stock or cash to JPMorgan if, at the time the warrants expired, Tesla's share price was above the contractual "strike price." The warrants did expire with Tesla's share price above that strike price. JPMorgan demanded the due shares or cash, but Tesla has flagrantly ignored its clear contractual obligation to pay JPMorgan in full. JPMorgan brings this action to enforce its right to payment.

2. The warrants Tesla sold to JPMorgan included standard provisions intended to protect the parties against the economic effects on the warrants of announcements of significant

corporate transactions involving Tesla. An issuer's announcement that it is exploring a going-private transaction is exactly the type of announcement contemplated by these provisions. These contractual provisions required JPMorgan, as the agreed-upon "Calculation Agent" responsible for making certain calculations under the governing agreements, to adjust the terms of the warrant transactions to account for the economic effects of such an announcement. As is market standard, the agreements granted the Calculation Agent broad discretion to determine both how to measure these economic effects and what adjustments to make as a result, so long as JPMorgan did so in good faith and in a commercially reasonable manner.

3. On August 7, 2018, Tesla's CEO Elon Musk announced such a significant corporate transaction via Twitter, tweeting "*Am considering taking Tesla private at $420. Funding secured.*" In the weeks that immediately followed the August 7 announcement, Tesla made additional statements and took various additional actions confirming it was considering a going-private transaction, including hiring advisors and forming a special committee of its board. Although the SEC later revealed—in a securities fraud complaint alleging that Mr. Musk's tweets were false and intended to mislead the market—that there had never been a firm offer to take Tesla private, that was not known at the time. Rather, Tesla's August 7 announcement caused immediate and significant economic effects as the market attempted to price in the likelihood of Tesla going private and making a tender offer at $420. Those economic effects substantially decreased the value of the warrants. As required by the terms of the governing agreements, JPMorgan appropriately reduced the warrant strike price on August 15 to maintain the same fair market value as the warrants had before Tesla's announcement.

4. On August 24, 2018, Tesla suddenly reversed course and announced it was abandoning the going-private transaction. Tesla's second announcement increased the value of

the warrants, and thus required a second adjustment under the governing agreements—this time a strike price increase that reversed some, but not all, of the initial reduction.  Other than a subsequent (mechanical) adjustment triggered by Tesla's 5-to-1 stock split in 2020, the resulting strike price remained the same until the warrants expired in June and July 2021, when Tesla's stock price was well above both the original and adjusted strike prices.

5. Even though JPMorgan's adjustments were appropriate and contractually required, Tesla has refused to settle at the contractual strike price and pay in full what it owes to JPMorgan.  Tesla is in flagrant breach of its contractual obligations.  As a result, more than $162 million is immediately due and payable to JPMorgan by Tesla.

## PARTIES

6. JPMorgan Chase Bank, N.A., London Branch (defined above as JPMorgan) is a U.K. branch of JPMorgan Chase Bank, N.A., a national banking association organized under the laws of the United States with its head office in Columbus, Ohio.  JPMorgan is a party to the Base Warrant Confirmation dated February 27, 2014 and the Additional Warrant Confirmation dated March 28, 2014 (the "Confirmations," and each a "Confirmation").

7. Defendant Tesla, Inc. (defined above as Tesla) is a corporation organized under the laws of Delaware with its principal place of business in Palo Alto, California.  Tesla is JPMorgan's counterparty to the Confirmations.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this District because in Section 8(r) of the Confirmations, the parties "irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, in the City of New York in any suit or proceeding arising out of or relating to the Agreement, this Confirmation or any transactions contemplated hereby." Venue is also proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

10. This Court has personal jurisdiction over Defendant pursuant to C.P.L.R. 302(a) and N.Y. General Obligations Law § 5-1402 because Defendant irrevocably consented to this Court's jurisdiction under Section 8(r) of the Confirmations and waived the right to object to this Court's jurisdiction.

11. Under Section 8(s) of the Confirmations, both parties "irrevocably waive[d] any and all rights to trial by jury with respect to any legal proceeding arising out of or relating to the Agreement, this Confirmation or any transactions contemplated hereby."

## FACTUAL ALLEGATIONS

**I.   The Warrant Transactions**

12. On February 27, 2014 and March 28, 2014, Tesla Motors, Inc. (since renamed Tesla, Inc.) sold to JPMorgan a series of stock warrants expiring in 2021 (the "2021 Warrants"), as part of a larger capital markets transaction.[1] The 2021 Warrants are subject to agreements in the form of the 2002 ISDA Master Agreement (the "Master Agreement"), which sets forth the general terms of the parties' relationship. The specific terms of the 2021 Warrants are set forth in the Confirmations negotiated by Tesla and JPMorgan, which, in turn, incorporate by reference

---

[1] Concurrently with the sale of the 2021 Warrants, Tesla also issued certain convertible notes and purchased call options (known as a bond hedge) from JPMorgan. The bond hedge and warrant transactions, collectively, benefitted Tesla by mitigating the stock dilution resulting from Tesla's issuance of the convertible notes and were structured to allow Tesla to make certain federal income tax deductions.

the terms of the 2006 ISDA Definitions (the "2006 Definitions") and the 2002 ISDA Equity Derivative Definitions (the "2002 Equity Definitions," and collectively with the Master Agreement, the Confirmations, and the 2006 Definitions, the "Agreements").[2] Under Section 8(r) of the Confirmations, the Agreements are construed in accordance with New York law.

13. Each of the 2021 Warrants was a call option for Tesla's common stock. In exchange for a premium paid up front by JPMorgan to Tesla, the Agreements gave JPMorgan the right to purchase, on the warrant's designated expiration date, one share of Tesla common stock per underlying 2021 Warrant at a specified "strike price." The Confirmations divided the 2021 Warrants into forty individual tranches, each consisting of a specified number of underlying 2021 Warrants with a specified expiration date ("Expiration Date"). The Expiration Dates ranged from June 1, 2021 to July 27, 2021. For any tranche, if the 2021 Warrants expired "in the money," that is to say, if Tesla's stock price on the applicable Expiration Date exceeded the warrants' strike price, Tesla was required to settle on a net share basis by delivering a number of shares of common stock with a value equal to the product of X (the difference between Tesla's stock price and the strike price) and Y (the number of underlying 2021 Warrants comprising such tranche).[3] If the 2021 Warrants expired "out of the money," that is to say, if Tesla's stock price on the applicable Expiration Date was less than the strike price, no amounts would be due by either party.

14. The initial strike price for the 2021 Warrants was $560.6388 (the "Original Strike Price").

---

[2] In the event of any inconsistency between the 2006 Definitions and the 2002 Equity Definitions, the latter governs. In the event of any inconsistency between the Master Agreement and the Confirmations, the Confirmations govern. *See* Confirmations § 1.
[3] Alternatively, Tesla had the option of choosing to settle by paying this amount in cash, which it did not elect.

**II.     The Agreements Include Announcement Event Protection**

15.     Recognizing that announcements of significant corporate transactions involving Tesla could disrupt the markets and significantly impact the value of the 2021 Warrants, the parties agreed to include in the Agreements common provisions protecting the parties from the economic effects of such announcements on the 2021 Warrants.

16.     Specifically, Article 12 of the 2002 Equity Definitions establishes certain protections in the event of Extraordinary Events, including Merger Events and Tender Offers, and the Confirmations add an "Announcement Event" as an additional Extraordinary Event. An "Announcement Event" is defined in the Confirmations as:

> (i) The public announcement of any Merger Event or Tender Offer or *the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer*,
>
> (ii) *the public announcement by Issuer of an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer* or
>
> (iii) *any subsequent public announcement of a change to a transaction or intention* that is the subject of an announcement of the type described in clause (i) or (ii) of this sentence (*including*, without limitation, a new announcement relating to such a transaction or intention or *the announcement of a withdrawal from, or the abandonment or discontinuation of, such a transaction or intention*) (in each case, whether such announcement is made by Issuer or a third party);
>
> provided that, for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention.

17.     The Confirmations further specified that the "Consequence[] of [an] Announcement Event[]" is a "Modified Calculation Agent Adjustment as set forth in Section 12.3(d)" of the 2002 Equity Definitions. That section provides (as modified pursuant to the Confirmations) that:

> on or after the relevant date of the Announcement Event, the Issuer and the Shares will not change, but the Calculation Agent *shall* either

(i)(A) ***make such adjustment to the exercise, settlement, payment or any other terms of the Transaction*** (including, without limitation, the spread) ***as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Announcement Event*** (including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Announcement Event by an options exchange to options on the relevant Shares traded on such options exchange ***and (B) determine the effective date of that adjustment***, or

(ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case "Cancellation and Payment" will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7, and in respect of an Option Transaction, the Calculation Agent shall determine the amount of such payment as if "Calculation Agent Determination" applied to the Option Transaction.

18. The parties designated JPMorgan as the Calculation Agent in Section 3 of the Confirmations.

### III. Tesla Announces Its Consideration of a Going-Private Transaction

19. On August 7, 2018, during trading hours and without any prior warning, Tesla's Chief Executive Officer Elon Musk tweeted, ***"Am considering taking Tesla private at $420. Funding secured."***

20. At the time, Mr. Musk was not only Tesla's CEO, but also the chair of its board of directors and its largest shareholder. In a Form 8-K filed on November 5, 2013, Tesla had identified Mr. Musk's personal Twitter account as a source of material public information about the company and encouraged investors to review that account. Because the tweet violated Nasdaq rules requiring at least 10 minutes' advance notice before a listed corporation publicly disclosed a going-private transaction, Nasdaq temporarily halted trading in Tesla's stock following Mr. Musk's tweet, evidencing that the exchange considered the tweet to constitute an announcement by the company itself.

7

21. After Mr. Musk's tweet, Tesla's Chief Financial Officer, its head of communications, and its General Counsel drafted an email—attributed to Mr. Musk—detailing the going-private plan. The email was sent to Tesla employees and published the same day on both Mr. Musk's Twitter account and Tesla's blog (which Tesla had also designated as a source of material public information about the company). In the email, and in a series of tweets responding to his Twitter followers, Mr. Musk elaborated on his plans to take Tesla private. He concluded in a tweet that "Investor support is confirmed. ***Only reason why this is not certain is that it's contingent on a shareholder vote***."

22. That same day, in response to various inquiries from research analysts, Tesla's head of investor relations confirmed that Mr. Musk's tweet signified a "***firm offer***" to take Tesla private that was "***as firm as it gets.***" Specifically, she wrote in response to press inquiries about the tweet:

- "I can only say that the first Tweet clearly stated that 'financing is secured.' ***Yes, there is a firm offer.***"

- "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else. ***I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct.***"

- "The very first tweet simply mentioned 'Funding secured' ***which means there is a firm offer***. Elon did not disclose details of who the buyer is . . . . I actually don't know [whether there is a commitment letter or a verbal agreement], but I would assume that ***given we went full-on public with this, the offer is as firm as it gets***."

23. The next day, on August 8, Tesla's board of directors issued a press release confirming that, even prior to the tweet, it had already begun exploring a plan to go private: "Last week, Elon [Musk] opened a discussion with the board about taking the company private. This included discussion as to how being private could better serve Tesla's long-term interests,

and also addressed the funding for this to occur. The board has met several times over the last week and is taking the appropriate next steps to evaluate this."

24. In the days following Mr. Musk's tweets, the Tesla blog post, and the statement from Tesla's board, Tesla and Mr. Musk, on its behalf, continued to make statements that confirmed they were seriously exploring a going-private transaction. For example, on August 13, Mr. Musk tweeted, "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private." And on August 14, the Tesla board issued a press release announcing the creation of a special committee to evaluate a going-private transaction.

IV.  **JPMorgan Makes the First Adjustment**

25. Tesla's August 7 announcement regarding the proposed going-private transaction caused an 11% spike in Tesla's stock price based on market expectations of a tender offer or buyout at $420 per share. Conversely, that expectation caused the implied volatility of Tesla's stock on August 7 to drop 16.69 points, a reduction of ***36%*** from the previous day's value, thereby materially reducing the fair value of the 2021 Warrants.[4]

26. Tesla's announced intention to pursue a going-private transaction constituted an Announcement Event under the Agreements; it was either "the announcement by the Issuer of ***any intention to enter into a Merger Event or Tender Offer***," or at the very least, certainly "the

---

[4] Implied volatility is the expected volatility of a stock (in this case, Tesla's common stock) over the life of the relevant stock option (in this case, the call options represented by the 2021 Warrants). It is a critical input to the Black-Scholes models typically used to value options like the 2021 Warrants. The other four inputs to the Black-Scholes models are the price of the underlying asset (in this case, Tesla's stock), the strike price of the option, the time until expiration of the option, and the risk-free interest rate. All other things being equal, the higher the implied volatility, the higher the value of an option to the option-holder. For example, the 16.69 point drop in the value of the implied volatility following Tesla's announcement, a reduction of 36%, would have caused the 2021 Warrants' then-fair market value at the time of the announcement to drop approximately $80.9 million, without any corresponding change in the strike price and based on Tesla's then-current stock price.

9

public announcement by Issuer of *an intention* to solicit or enter into, or *to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer*." As a result, JPMorgan, as Calculation Agent, was obligated under the terms of the Agreements to adjust the terms of the 2021 Warrants to account for the economic effect of Tesla's announcement.

27. As Calculation Agent, JPMorgan was granted broad and sole discretion in making any determination it was called upon to make under the Agreements—including the determinations of both the economic effect of Tesla's announcement with respect to its going-private plans and the appropriate adjustment to account for that effect—subject only to the requirement that its determinations "be made in good faith and in a commercially reasonable manner."

28. Following its standard practice, JPMorgan determined the economic effect of Tesla's announcement by looking to the resulting change in the average implied volatility of publicly listed options on Tesla's common stock with a maturity and strike price similar to the 2021 Warrants. Rather than use the 36% day-on-day change in Tesla's implied volatility from August 6 to August 7, JPMorgan's approach looked to the *average* implied volatility over a period of time to limit the impact of statistical anomalies, and thereby avoid penalizing Tesla for what may have been an outsized day-on-day change in implied volatility. In this case, JPMorgan looked at the *average* implied volatility prior to the announcement (from June 25 through August 6) and compared it to the *average* implied volatility after the announcement (from August 7 through August 15). Based on these calculations, JPMorgan concluded that the average implied volatility dropped by 12.41 points, a reduction of 26.4%.

29. Next, consistent with its standard practice, JPMorgan determined that the appropriate adjustment to account for this economic effect would be a change to the strike price of the 2021 Warrants that preserved their fair value in light of this reduction in average implied volatility, keeping all other pricing inputs constant. Following a methodology that takes into account the differences between the bespoke 2021 Warrants and the listed Tesla options for which implied volatility data is publicly available—a methodology that, like the use of an average implied volatility, would tend to result in adjustments more favorable to Tesla— JPMorgan determined that the strike price had to be reduced from $560.6388 to $424.66 (the "First Adjustment") to maintain the same fair value for the 2021 Warrants as they had before the Announcement Event. JPMorgan made the First Adjustment effective August 15 and modified its hedge positions the same day.

30. Although the Confirmations do not specifically require JPMorgan to provide notice of such an adjustment, JPMorgan notified Tesla of the First Adjustment by letter on August 17, 2018. Shortly after the notice, Tesla contacted JPMorgan to inquire about the First Adjustment. The parties scheduled a call to discuss the adjustment for Friday, August 24, but at the last minute and without explanation, Tesla postponed that call.

## V. Tesla Suddenly Abandons Its Going-Private Plans and JPMorgan Makes the Second Adjustment

31. After the close of trading on August 24, Tesla published a blog post, attributed to Mr. Musk, announcing that Tesla was abandoning the going-private proposal. JPMorgan treated Tesla's August 24 announcement as it was contractually required to—as a new Announcement Event requiring JPMorgan, in its capacity as Calculation Agent, to adjust the strike price for the 2021 Warrants to account for the economic effect of this second announcement.

32. Tesla's August 24 announcement was itself also an Announcement Event because it was a "***subsequent public announcement of a change to a transaction or intention*** that is the subject of an announcement of the type described in clause (i) or (ii) of this sentence (including, without limitation, a new announcement relating to such a transaction or intention or ***the announcement of a withdrawal from, or the abandonment or discontinuation of, such a transaction or intention***)." The definition of Announcement Event is clear that "the occurrence of an Announcement Event with respect to any transaction or intention ***shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention***." Accordingly, although Tesla made two announcements concerning the same going-private transaction relatively close in time to each other, they were, under the clear language of the Confirmation, two distinct Announcement Events requiring two distinct and independent adjustments.

33. Because JPMorgan, as Calculation Agent, was obligated to adjust the terms "to account for the economic effect on the Transaction ***of such Announcement Event***," 2002 Equity Definitions § 12.3(d); Confirmation § 2 at 9, JPMorgan had to determine the actual economic effect of Tesla's second announcement. JPMorgan thus employed the same methodology as it had for its First Adjustment, comparing the average implied volatility before the second announcement (from August 16, the first day after the effective date of the First Adjustment, through Friday, August 24) to the average implied volatility after that announcement (from Monday, August 27 through August 29).

34. Based on these calculations, JPMorgan concluded that the average implied volatility increased by 5.74 points, or 14.3%, as a result of the August 24 announcement, and determined that increasing the strike price to $484.35 was the appropriate adjustment to maintain

the same pre-announcement fair value for the 2021 Warrants (the "Second Adjustment" and, together with the First Adjustment, the "Adjustments"). JPMorgan made the Second Adjustment effective August 29 and modified its hedge positions the same day.

35. After receiving notice from JPMorgan of the Second Adjustment on August 29, Tesla protested that no adjustment should be necessary at all because it had so quickly abandoned its going-private plans. Consistent with its obligations under the Agreements, JPMorgan shared a written explanation describing its calculations, including supporting market data and quotations, and held several conference calls with Tesla to explain its calculations. Tesla did not provide any specific objection to JPMorgan's explanations on these calls, and following these calls, Tesla did not communicate further with JPMorgan regarding the Adjustments for six months. Accordingly, JPMorgan continued to hedge the Warrants based on the adjusted strike price.

36. In the meantime, it was revealed that there had never been a serious going-private proposal and that Tesla's original August 7 announcement was knowingly false. On September 27 and 29, 2018, the Securities and Exchange Commission ("SEC") filed civil complaints against Mr. Musk and Tesla, respectively, alleging that Mr. Musk's August 7 tweets had been fraudulent and that Tesla did not have adequate controls and procedures in place to ensure the information published on Mr. Musk's Twitter account was accurate and complete. According to the SEC's complaint against Mr. Musk, which was based on its investigation of Tesla and interviews with Mr. Musk, there was no agreement, either formal or informal, about the terms of any going-private offer or the price of such a transaction prior to Mr. Musk's August 7 Tweet, and funding was far from secured. Mr. Musk had merely discussed the possibility of taking Tesla private with a Saudi investment fund on July 31, but they had never discussed even the

most fundamental terms of such a proposal. Mr. Musk had unilaterally settled on the $420 price without discussing it with any sources of funding or any relevant stakeholders. Mr. Musk had also informed the Tesla board of directors by phone on August 3 of the Saudi fund's expression of interest in taking Tesla private, and the board identified several difficulties with such a transaction. Mr. Musk admitted to the SEC that, prior to his August 7 tweet, he believed there was "a lot of uncertainty" and only a 50% chance the going-private transaction would occur. Nevertheless, according to the SEC, Musk had a motive to falsely tweet about the going-private transaction because artificially driving up Tesla's stock price would harm those shorting Tesla stock.

37. Tellingly, Tesla and Mr. Musk swiftly settled with the SEC on the same day it filed its complaint against Tesla. Tesla and Mr. Musk agreed that *each* would pay a $20 million fine, Mr. Musk would be removed as chair of Tesla's board of directors for three years, and Tesla would establish new controls and procedures to oversee Mr. Musk's communications. By November 2018, nine private securities fraud class action lawsuits also had been filed against Tesla and Mr. Musk, premised largely on the SEC's allegations. The Northern District of California eventually denied Tesla's motion to dismiss those consolidated securities class actions, concluding in relevant part that "Plaintiff has adequately pled that Mr. Musk made false or materially misleading statements in the scope of his role as CEO of Tesla, with knowledge of the inaccuracies of his statements—or was, at minimum, deliberately reckless when making such public disclosures," and that these statements and Mr. Musk's scienter were attributable to Tesla.

38. Despite these serious allegations of fraud, Tesla sent a letter to JPMorgan about the 2021 Warrants on February 13, 2019 arguing that the Adjustments made by JPMorgan pursuant to the terms of the Warrants were "unreasonably swift and represented an opportunistic

attempt to take advantage of changes in volatility in Tesla's stock." Tesla's letter, however, did not dispute that Announcement Events had occurred, did not challenge any of the specific calculations or supporting materials JPMorgan had provided six months earlier, and did not offer any support for its assertion that JPMorgan's methodology was unreasonable.

39. Contrary to Tesla's accusation that JPMorgan's adjustment was "unreasonably swift," the Agreements call for an adjustment either "***on or after*** the relevant date of such Announcement Event." 2002 Equity Definitions § 12.3(d); Confirmation at 9. Thus, the Agreements would have permitted an adjustment immediately on August 7—which, as noted above, would have resulted in an even greater reduction of the strike price—but JPMorgan instead waited more than a week, allowing time for the market to absorb Tesla's announcement and for JPMorgan to gather a robust data set to calculate the economic effect of the announcement. JPMorgan was not required to wait any longer, and it obviously had no clue that Tesla's announcement was based on a lie or that those announced plans would be abandoned mere days after the announced hiring of multiple significant financial and legal advisors.[5]

40. Accordingly, JPMorgan sent Tesla a response rejecting all of its allegations with regard to the Adjustments. Tesla never bothered to respond to JPMorgan's letter, and in fact, did not raise any further objection to the Adjustments for two years. Indeed, Tesla had no response even when JPMorgan provided Tesla with notice of a third adjustment on August 28, 2020,

---

[5] Tesla also claimed that none of its three other warrant dealers had made similar adjustments. But Tesla has never substantiated that claim. Moreover, even if it were true, it has no bearing on whether JPMorgan acted in good faith, or whether its methods for calculating the adjustment were commercially reasonable. Tesla's other warrant dealers generally held fewer warrants, and thus had less exposure, than JPMorgan. In addition, according to Tesla's August 24 blog post, two of Tesla's other warrant dealers were advising Mr. Musk on his going-private proposal. The third dealer may have been under consideration to serve as financial advisor to the special committee of Tesla's board, but even if it was not involved in the going-private transaction, that dealer was working on a major financial transaction with Tesla that closed on or about August 21, 2018, just days before the going-private transaction was publicly abandoned. Thus, each of the other dealers may have been privy to non-public information about the going-private transaction, or otherwise may have declined to adjust their warrants for business reasons having nothing to do with the contractual terms or the reasonableness of JPMorgan's adjustments.

which further reduced the strike price from $484.35 to $96.87 (the "Adjusted Strike Price") to account for the economic effect of Tesla's 5-to-1 stock split on August 31, 2020. Accordingly, JPMorgan continued to hedge based on the newly adjusted strike price until maturity.

### VI.     Tesla Fails to Settle in Full

41.     By June 1, 2021, Tesla's stock price had soared to $623.90 per share (equivalent to $3,119.50 per share before the stock split), resulting in the 2021 Warrants being "in the money" by a substantial amount.[6] When JPMorgan contacted Tesla to coordinate the logistics for settling the 2021 Warrants, Tesla renewed its objections to the Adjustments, but the parties agreed that Tesla should at least settle the undisputed number of shares. JPMorgan warned Tesla, however, that failure to settle at the Adjusted Strike Price would, if not cured after notice, constitute an Event of Default.

42.     Under Section 5(a)(i) of the Master Agreement, the "[f]ailure by [a] party to make, when due, any payment under this Agreement or delivery . . . required to be made by it" constitutes an Event of Default if the failure is not remedied within one business day after "notice of such failure is given to the party." Under Section 6(a), if an Event of Default occurs with respect to a party and is continuing, the Non-Defaulting Party may elect to designate an Early Termination Date at any time and terminate all remaining transactions.

43.     The 2021 Warrants settled in tranches on each of the forty trading days between June 3 and July 29. For each tranche, Tesla settled only the undisputed portion of the 2021 Warrants, but refused to settle in full. In total, Tesla failed to deliver 228,775 shares of its common stock, leaving JPMorgan with an open hedge position equal to that shortfall.

---

[6] JPMorgan fulfilled its own contractual obligations under the related bond hedge in March 2021 by delivering to Tesla net shares of Tesla stock exceeding the total amount that Tesla owed to JPMorgan under the 2021 Warrants even at the Adjusted Strike Price. JPMorgan made that delivery under the bond hedge with the expectation that Tesla would fulfill its contractual obligations upon expiration of the 2021 Warrants in June and July 2021.

44. JPMorgan provided Tesla with regular and timely notice that each deficient settlement delivery would, if not cured within one business day, constitute an Event of Default. Tesla failed to cure any of these deficient deliveries in response to JPMorgan's notices.

45. Following the conclusion of the Settlement Period, when it became clear that Tesla had no intention of curing any of the 40 deficient deliveries, on July 30, 2021, JPMorgan provided notice that multiple Events of Default had occurred and were continuing, and that JPMorgan was exercising its rights under the Master Agreement to declare an Early Termination Date for the 2021 Warrants and specified August 2, 2021 as the Early Termination Date.

46. After designating the Early Termination Date, JPMorgan calculated the "Early Termination Amount" due in respect of the 2021 Warrant transactions. Under Section 6(e)(1) of the Master Agreement, the Early Termination Amount is determined by the Non-Defaulting Party as the sum of any "Close-Out Amount" (an amount reflecting any losses incurred as a result of the termination, including on related hedges, future expected payments not yet due, or the replacement value of the terminated contract) and the fair market value of any "Unpaid Amounts" due prior to the Early Termination Date. JPMorgan calculated the Early Termination Amount as $162,216,628.81, because Tesla had failed to deliver an aggregate of 228,775 shares due prior to the Early Termination Date, and JPMorgan had paid an average of $709.07 per share to acquire replacement shares on the open market to close out its corresponding short hedge position. Accordingly, on August 4, 2021, JPMorgan provided a further notice that Tesla owed JPMorgan an Early Termination Amount of $162,216,628.81, which was due on August 5, 2021.

47. Tesla failed to pay the Early Termination Amount on August 5 or at any time thereafter. Instead, weeks later, on August 26, 2021, Tesla belatedly sent a letter rejecting JPMorgan's designation of an Event of Default and an Early Termination Date.

48. JPMorgan now brings this action to recover the Early Termination Amount plus accruing interest. In addition, under Section 11 of the Master Agreement, Tesla, as the Defaulting Party, is obligated to "indemnify and hold harmless [JPMorgan] for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by [JPMorgan] by reason of the enforcement and protection of its rights under this Agreement . . . or by reason of the early termination of any Transaction, including, but not limited to, costs of collections." Thus, JPMorgan also seeks to recover its costs and attorneys' fees in bringing this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

49. JPMorgan repeats and incorporates the above allegations as if set forth fully herein.

50. As described above, JPMorgan and Tesla are parties to the Agreements, which constitute valid and binding contracts governed by the laws of New York.

51. JPMorgan timely and fully performed all of the conditions, covenants, and promises required of it under the Agreements, including adjusting the strike price of the 2021 Warrants in good faith and in a commercially reasonable manner upon the occurrence of Tesla's Announcement Events on August 7, 2018 and August 24, 2018, as required by the Agreements.

52. Tesla has breached the Agreements by failing to settle the 2021 Warrants at the Adjusted Strike Price upon expiration; by failing to cure its Potential Events of Default after notice from JPMorgan; and by failing to pay the Early Termination Amount when due on August 5, 2021.

53. As a result of these breaches, JPMorgan seeks its contractual entitlement of $162,216,628.81, plus interest, attorneys' fees, and expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, JPMorgan respectfully requests that this Court enter judgment in favor of JPMorgan and against Tesla as follows:

A. Determining that Tesla breached the parties' Agreements and its actions constituted an Event of Default;

B. Awarding JPMorgan its contractual entitlement of $162,216,628.81, plus accruing interest;

C. Awarding JPMorgan reasonable attorney's fees, costs, expert fees, expenses, and all other sums expended by JPMorgan in connection with the prosecution of this Action, as set forth in Section 11 of the Master Agreement; and

D. Such other and further relief as the Court may deem just and proper.

DATED: New York, New York
November 15, 2021

DAVIS POLK & WARDWELL LLP

By: */s/ Lawrence Portnoy*
Lawrence Portnoy
Greg D. Andres
Craig T. Cagney
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
lawrence.portnoy@davispolk.com
greg.andres@davispolk.com
craig.cagney@davispolk.com

*Attorneys for JPMorgan Chase Bank, National Association, London Branch*