UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

− − − − − − − − − − − − − − − − − − − − − − − X

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, LONDON BRANCH,

                     Plaintiff,           Case No. 1:21-cv-09441-PGG

       - against -

                                   **ANSWER AND COUNTERCLAIM**

TESLA, INC.,

                     Defendant.

− − − − − − − − − − − − − − − − − − − − − − − X

      Defendant Tesla, Inc. ("Defendant" or "Tesla") submits this Answer and Counterclaim to

the Complaint filed by Plaintiff JPMorgan Chase Bank, National Association, London Branch

("Plaintiff" or "JPM").

<u>**COUNTERCLAIM**</u>

      Tesla, as and for its counterclaim against JPM, alleges as follows:

**PRELIMINARY STATEMENT**

      1.      Under Elon Musk's leadership, Tesla's financial performance has been nothing

short of legendary.  Through revolutionizing the automobile industry, Tesla has grown into one

of the world's few $1 trillion companies, with a market capitalization that has exceeded the next

ten largest automakers combined, and delivered hundreds of billions of dollars of gains to its

long-term investors.  JPM, the plaintiff in this action, has also benefitted from Tesla's meteoric

rise.  Last year, JPM obtained billions of dollars' worth of shares of Tesla's common stock for a

bargain price that the parties negotiated in 2014.  Not content with this multibillion-dollar gain,

JPM now seeks, through this cynical litigation, to extract an additional nine-figure windfall from

Tesla through illegitimate machinations under an option transaction.  JPM's conduct is not only

baldly rapacious, but is also in clear breach of the parties' agreement.  Tesla brings these counterclaims to redress those breaches and hold JPM accountable for its bad faith and avarice.

2.      The contract at issue governs JPM's acquisition in 2014 of more than 1.9 million warrants on Tesla's common stock (the "Warrants"), entitling JPM to acquire shares from Tesla for a pre-agreed "strike" price (the "Strike Price") of $560.6388 per share upon the Warrants' exercise dates in 2021.  As Tesla's stock price soared above the Strike Price, the Warrants became massively valuable to JPM, enabling the bank to acquire billions of dollars in Tesla shares for a fraction of their current market price.[1]

3.      Not satisfied to receive these enormous payouts based on the Strike Price that the parties agreed to, JPM put its thumb on the scale by purporting to **unilaterally reduce** the Strike Price of the Warrants, from $560.6388 to just $424.66 per share—and thereby receive a windfall of an even greater number of Tesla shares when the Warrants expired in 2021.  To do so, JPM took improper advantage of a Twitter post from August 7, 2018—nearly three years before the Warrants' exercise dates—in which Elon Musk stated that he was considering taking Tesla private.  Ten days after that tweet, JPM falsely asserted that the tweet constituted an announcement by Tesla of an extraordinary corporate transaction, or an "Announcement Event," as defined in the parties' agreement.  On that bad-faith pretext, JPM misused the tweet as an excuse to "adjust" the Strike Price **in its own favor**, purportedly to compensate itself for the "economic effect" of a potential take-private offer.  That purported "economic effect," according

---

[1]  The original Strike Price of $560.6388 is equivalent to a price of $112.12776 per share, after accounting for a five-for-one stock split that closed on August 31, 2020.  By comparison, the closing price of Tesla's common stock was $943.90 per share on January 1, 2022, equivalent to $4,719.50 prior to the five-for-one stock split, or 842% of the Strike Price.

to JPM, was based on nothing more than transient alleged fluctuations in the expected future volatility of the Warrants.

4.    JPM's manipulation of the Strike Price was entirely self-serving and in breach of the parties' agreement.  JPM dealt itself a pure windfall, drastically reducing the price it would ultimately pay Tesla for shares in connection with the Warrants, on the pretext that Tesla was on the verge of going private.  But Mr. Musk never announced a take-private proposal, and, less than three weeks after the initial tweet, he confirmed that no offer would be forthcoming. Despite this, JPM did not reverse its initial "adjustment" of the Strike Price, as any reasonable party would have done at that time.  Instead, following Mr. Musk's confirmation that Tesla would remain a public company, JPM raised the Strike Price only modestly, to $484.35 per share, thereby purporting to maintain a Strike Price substantially below the level the parties had agreed to.

5.    JPM's self-dealing was commercially unreasonable and carried out in bad faith at the expense of Tesla.  The undisputable reality is that, in August 2018, the Warrants were years away from their 2021 exercise dates, making Mr. Musk's brief consideration of a potential take-private offer immaterial to their economic value.  Although JPM purported to assume that the Warrants would exhibit reduced volatility from August 2018 forward, this assertion had no support in contemporaneous market data or common sense.  On the contrary, JPM pocketed enormous profits as Tesla's stock price, and the Warrants' implied volatility, soared to unprecedented heights through the Warrants' expiration dates in 2021.

6.    Despite these facts, when JPM ultimately exercised the Warrants in 2021, it purported to do so at a reduced Strike Price.  JPM demanded hundreds of thousands of additional shares—and later $162.2 million in cash—on the basis of a non-existent "economic effect" of a

buyout offer that Mr. Musk considered years earlier but never made.  JPM's bad-faith conduct is a breach of the Warrant's governing agreement and gives rise to multiple counterclaims.

7.      *First*, JPM's purported determination that Mr. Musk's tweet was a contractual "Announcement Event" meriting an adjustment of the Warrants was commercially unreasonable and made in bad faith.  Mr. Musk's personal consideration of a possible transaction to take Tesla private was not tantamount to a buyout announcement by the company.  JPM was alone in contending that it was:  no other dealer bank holding warrants on Tesla's stock took the position that Mr. Musk's tweet constituted an "Announcement Event."  Nor did any other dealer bank purport to adjust the terms of their respective warrant transactions with Tesla on such a basis.

8.      *Second*, by reducing the Strike Price, JPM engaged in unabashed self-dealing that was not justified by any purported "economic effect" on the Warrants.  Although JPM alleged that fluctuations in the Warrants' expected future volatility necessitated an adjustment to the Strike Price, JPM had no basis to conclude that any such fluctuations in 2018 would have any economic effect on the Warrants, which were not exercisable until 2021.  Indeed, when JPM announced its initial adjustment to the Strike Price, the Warrants' long-term implied volatility was far above the levels assumed in JPM's calculation.  As a result, JPM's adjustment to the Strike Price secured a commercially unreasonable profit for itself that was not reasonably related to any alleged effect of the tweet.

9.      *Third*, JPM knew at the time that it purported to reduce the Strike Price that its adjustment produced a commercially unreasonable result.  Under the circumstances in August 2018, a reduction of the Strike Price years before the Warrants' exercise dates would (and did) simply move the goalposts in JPM's favor, to a degree and in a manner that could not be justified by the contours of any take-private transaction, which had yet to be announced.  Indeed, JPM

knew that no adjustment it could make to the terms of the Warrants would produce a result that was commercially reasonable. Under the parties' agreement, JPM's determination that an "Announcement Event" had occurred (a determination that Tesla disputes) and that no adjustment would be commercially reasonable, would expressly require JPM to cancel the Warrants in 2018, rather than obtaining the multibillion-dollar payout that JPM received at the Warrants' expiration in 2021.

10.    *Fourth*, even after Mr. Musk stated on August 24, 2018, that Tesla would remain a public company, JPM purported to retain the bulk of the windfall it had dealt itself by failing to restore the Warrants to the agreed-upon Strike Price. JPM's failure to reverse its reduction of the Strike Price was commercially unreasonable, as it was clear that Mr. Musk's brief consideration of a take-private offer in August 2018 would have no effect on the Warrants expiring in 2021, or even on their implied volatility in the near term. Although JPM asserted that a revised Strike Price of $484.35 per share was appropriate to account for purported changes in expected future volatility, as shown in **Figure 1** below, the Warrants' implied volatility did not support any adjustment below the $560.6388 per share Strike Price that the parties agreed on in 2014, because after Mr. Musk's statement on August 24, 2018, Tesla options traded at implied volatilities similar to the levels seen shortly before August 7, 2018. Despite the absence of any evidence of a meaningful reduction in the value of these Warrants, JPM improperly purported to exercise the Warrants in 2021 at a discounted Strike Price—and receive more than one hundred million dollars' worth of additional Tesla shares based on a take-private offer that was never announced.

**Figure 1: August 2018 Implied Volatility**



11.     *Fifth*, JPM improperly continued to hold the Warrants below the agreed-upon Strike Price from August 2018 forward—purportedly because of a reduction in the Warrants' implied volatility—even as Tesla's implied volatility soared to unprecedented levels and even rose to approximately **double** the levels observed in August 2018.  These increases in implied volatility thoroughly discredited JPM's rationale for maintaining a reduced Strike Price. Nonetheless, JPM purported to maintain the Warrants below their original Strike Price, in order to obtain an improper windfall from Tesla when the Warrants expired.

12.     *Sixth*, after Tesla disputed JPM's demand for additional shares based on the reduced Strike Price, JPM retaliated by inflating its already wrongful demand even further.  The

parties' contract clearly provided that all shares deliverable pursuant to the Warrants were to be valued as of their originally scheduled delivery dates, which were the Warrants' contractual settlement dates in June and July of 2021.  Instead, in yet another brazen breach of the agreement, JPM waited until August 2021—following a substantial runup in Tesla's share price—to value the shares at issue, and on that basis demanded $162.2 million in cash from Tesla.  JPM's blatantly overreaching cash demand extends its pattern of willful disregard for the requirements of the parties' agreement.

13.     For these and other reasons set forth below, Tesla is entitled to a declaration that JPM breached the governing agreements, dismissal of the Complaint, and an order awarding damages, attorney's fees, and other relief requested herein.

## FACTUAL ALLEGATIONS

**I.      JPM Received 1,917,372 Warrants on Tesla's Stock and Millions of Dollars of Fees in Connection with a Convertible Notes Offering in 2014**

14.     On February 27, 2014, Tesla hired JPM and several other investment banks (collectively, the "Dealer Banks") to underwrite an offering of convertible senior notes (the "Convertible Notes"), with a closing date of March 5, 2014.  The Convertible Notes offering netted JPM millions of dollars in investment banking fees.

15.     On the closing date of the Convertible Notes offering, Tesla also entered into transactions with JPM and the other Dealer Banks to hedge against the potential dilution of Tesla's common stock upon the conversion of the Notes for shares of Tesla's common stock (the "Bond Hedge" transactions).  Tesla paid an upfront premium in the aggregate amount of $199 million to JPM for the Bond Hedge.  This was in addition to the millions of dollars in investment banking fees JPM received as part of underwriting the Convertible Notes.

16.     To partly offset the cost of the Bond Hedge, on March 5, 2014, Tesla sold warrants to JPM and the other Dealer Banks in the form of European-style call options on shares of Tesla's common stock, to be exercised on their respective expiration dates at a pre-agreed strike price.

17.     The Warrants issued to JPM (defined above as the "Warrants") were documented under a confirmation, dated February 27, 2014, that set forth their terms and conditions (the "Confirmation"), including the incorporation of the definitions and provisions, as amended or modified, of the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2002 ISDA Master Agreement (the "ISDA Master Agreement"), and other documents (together with the foregoing documents, the "Agreements").

18.     The Confirmation provided that JPM would have the option to exercise the Warrants on forty expiration dates between June 1, 2021, and July 27, 2021.  Following each expiration date, Tesla would deliver to JPM a number of shares of Tesla's common stock to be determined based on the excess of Tesla's volume-weighted average stock price over a Strike Price, which was set at $560.6388 per share.

II.     **JPM's Responsibilities as Calculation Agent for the Warrants**

19.     The Confirmation identified JPM as the "Calculation Agent" responsible for making certain calculations and determinations under the Warrants.

20.     Among other things, the Equity Definitions and the Confirmation enumerate certain extraordinary corporate actions following which the Calculation Agent may adjust the terms of the Warrants to account for the economic effect of such actions on the Warrants. Specifically, the Equity Definitions, as modified by the Confirmation, state that on or after the occurrence of an "Announcement Event" the Calculation Agent shall either:

(i)(A) make such adjustment to the exercise, settlement, payment, or any other terms of the Transaction … as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such [Announcement Event] (including adjustments to account for changes in volatility…) … or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case 'Cancellation and Payment' will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7 [of the Equity Definitions]….

21.     The Confirmation defines "Announcement Event" as:

(i) The public announcement of any Merger Event or Tender Offer or the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer, (ii) the public announcement by Issuer of an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer or (iii) any subsequent public announcement of a change to a transaction or intention that is the subject of an announcement of the type described in clause (i) or (ii) of this sentence (including, without limitation, a new announcement relating to such a transaction or intention or the announcement of a withdrawal from, or the abandonment or discontinuation of, such a transaction or intention) (in each case, whether such announcement is made by Issuer or a third party); provided that, for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention.

22.     In turn, the Equity Definitions, as modified by the Confirmation, define "Tender Offer" as:

a takeover offer, tender offer, exchange offer, solicitation, or proposal or other event … that results in" the offeror "purchasing, or otherwise obtaining or having the right to obtain … greater than 10% [or 20% in the case of a self-tender by the Issuer, *i.e.*, Tesla] … of the outstanding voting shares of the Issuer, as determined by the Calculation Agent based upon the making of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant.

23.     The Confirmation provides that "all determinations made by the Calculation Agent shall be made in good faith and in a commercially reasonable manner."  The Equity Definitions similarly provide that "[w]henever a Calculation Agent is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable

manner." In addition, under the Equity Definitions any adjustments to the terms of the Warrants following an Announcement Event were required to "produce a commercially reasonable result."

24.     In the event that Tesla failed to deliver any shares required to be delivered under the terms of the Confirmation, the ISDA Master Agreement required JPM to determine the fair market value of any undelivered shares "as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures."

## III.    In August 2018, Elon Musk and Certain Investors Considered Taking Tesla Private But Never Announced a Tender Offer

25.     On August 7, 2018, Mr. Musk informed fellow Tesla shareholders via Twitter that he was "considering taking Tesla private at $420."

26.     On August 13, 2018, Mr. Musk wrote in a blog post that he had been considering a potential take-private transaction in his "***personal*** capacity" and had been "speaking for [him]self as a potential bidder," not on behalf of the company (emphasis added).

27.     Mr. Musk further stated in the August 13 blog post that a special committee of the Board of Directors would undertake "an appropriate evaluation process" only "***[i]f and when*** a final proposal is presented" (emphasis added). Mr. Musk emphasized that "it would be premature" to "present[] a detailed proposal to an independent board committee" because he was still having "discussions with a number of … investors."

28.     Mr. Musk's consideration of a potential take-private transaction never resulted in the announcement of an offer, or any decision by Tesla to solicit such a proposal. Instead, on August 23, 2018, Mr. Musk advised Tesla's Board of Directors that he believed Tesla should remain a public company. Mr. Musk publicized his intentions in a blog post on August 24, 2018, and the Board immediately dissolved the special committee.

29.     Mr. Musk's consideration of a potential take-private transaction did not constitute or otherwise result in an Announcement Event under the Warrants.  Tesla did not announce a Tender Offer or any intention to enter into or solicit a Tender Offer.  Nor did Tesla announce any intention to solicit, enter into, or explore strategic alternatives that might include, a Tender Offer, as defined in the Equity Definitions.

## IV.     Alone Among the Dealer Banks, JPM Purported to Make a Self-Serving, Commercially Unreasonable Adjustment to the Warrants' Strike Price

30.     On August 17, 2018, JPM sent a letter to Tesla (the "First Adjustment Notice") stating that, "as a result of the public statements with respect to the Issuer and the Shares beginning on August 7, 2018," JPM purportedly determined that a contractual "Announcement Event" had occurred and that "the appropriate adjustment to each 2021 Warrant Transaction [was] a reduction of the Strike Price from $560.6388 to $424.66," effective August 15, 2018 (the "First Adjustment").

### A.     JPM's Purported Determination that an "Announcement Event" Occurred Was Not Made in Good Faith or in a Commercially Reasonable Manner

31.     JPM's purported determination that "public statements with respect to the Issuer and the Shares beginning on August 7" constituted an Announcement Event was not made in good faith and in a commercially reasonable manner as required by the Agreements.

32.     No Announcement Event occurred.  Mr. Musk's decision to publicize the fact that he was considering a potential take-private transaction was not tantamount to an announcement by Tesla that a buyout offer had been made or solicited, or that the company was evaluating strategic alternatives.  By forming a special committee to review any proposal that might be forthcoming, Tesla's Board of Directors was not soliciting such a proposal or undertaking to explore a buyout or other strategic alternatives.  Rather, as was known to JPM and widely recognized at the time, the Board was merely preparing itself so it would be appropriately

positioned to discharge its fiduciary duties to the company:  to consider and respond to any proposal that might be announced.

33.     For its part, JPM did not have a good faith belief that Tesla had announced a Tender Offer or an undertaking to explore strategic alternatives so as to constitute an Announcement Event.  Based on information available prior to JPM's issuance of the First Adjustment Notice, JPM's equity research department reported that no "formal proposal had been received," nor was Tesla's Board of Directors even "informally supportive" of any potential proposal.  Accordingly, JPM's equity research department had determined that it was premature to ascribe any economic effect to Mr. Musk's statement.  JPM concluded that "any deal is potentially far from even being formally proposed," and on that basis decided to "remove the 50% [probability] weighting [JPM] had briefly assigned to a going private transaction."

34.     On information and belief, responsible individuals in JPM's Equity-Linked Capital Markets division and across the bank reached similar conclusions, including the individuals tasked with performing JPM's function as Calculation Agent for the Warrants.  Such considerations rendered it commercially **un**reasonable to construe Mr. Musk's tweet as an Announcement Event, let alone to make significant adjustments to the Warrants on such a basis.

35.     Consistent with those views, no Dealer Bank besides JPM designated an Announcement Event, on the basis of Mr. Musk's consideration of a potential take-private transaction.  Thus, JPM's actions were not only unreasonable, but contrary to JPM's own assessment of the facts and the assessments of other relevant market participants.

**B.     JPM's Calculation of the First Adjustment Was Commercially Unreasonable And Done In Bad Faith**

36.     JPM's notification on August 17, 2018, that it had reduced the Strike Price from $560.6388 to $424.66 per share was unreasonable on its face and unsupported by existing market

data.  JPM purportedly based its adjustment on an alleged dip in expected future volatility implied by prices for Tesla call options between August 7–15, 2018.  Yet, as an initial matter, JPM could not reasonably conclude in good faith that alleged short-term fluctuations in volatility in 2018 were indicative of an "economic effect" of a purported Announcement Event.  For the reasons described above—and by JPM's own equity research department—JPM could not reasonably ascribe any "economic effect" to a buyout offer that had not even been announced.

37.     JPM's decision to drastically reduce the Warrants' Strike Price in response to a transient alleged fluctuation in volatility was not reasonably related to any "economic effect" on Warrants that were not exercisable until their expiration dates in 2021, nearly three years in the future.  Under the Confirmation, the economic value of the Warrants was based on the excess of Tesla's volume-weighted average stock price in 2021 in comparison to the Strike Price, which was not affected by any brief alleged fluctuations in volatility in 2018.  JPM itself did not expect any economic effects to persist through 2021, as evidenced by JPM's own announcement, on the following business day, that its equity research department was reverting to a "fundamentals-based valuation approach" that assigned no probability to a going-private transaction.

38.     JPM purportedly calculated the First Adjustment using a self-serving procedure that relied on the simple averages of implied volatilities derived from standard call option prices during a 30-day period before and a 7-day period after August 7, 2018.  But the contemporaneous market data only further demonstrates the unreasonableness of JPM's methodology.  Through its averaging approach, JPM purportedly determined that implied volatility, based on certain call options on Tesla's stock, had fallen from approximately 47% to 35% after Mr. Musk's tweet on August 7, 2018.  JPM then used the alleged drop in expected future volatility to rationalize its calculation of the purported First Adjustment in Strike Price

from $560.6388 to $424.66 per share.  However, as shown in **Figure 2** below, on the date of the

First Adjustment Notice, the implied volatility of the call options used by JPM to explain its

calculation were in fact trading at approximately 42%, or more than 7 percentage points higher

than the levels assumed by JPM in connection with the First Adjustment.

**Figure 2: August 17, 2018 Implied Volatility**



39.     By drastically overestimating any alleged change in Tesla's implied volatility,

JPM calculated a First Adjustment that was commensurately inflated.  JPM's purported

determination that Tesla had undergone a significant, enduring drop in volatility bore no

relationship to commercial reality.  Indeed, JPM's use of a multi-day averaging approach

resulted in a First Adjustment for a purported decline in option market-implied volatility that was

unsupported by the market data on the day the notice was sent.

14

40.     The result of the First Adjustment was commercially unreasonable.  By significantly reducing the Strike Price in response to a short-term fluctuation in option prices, JPM secured an increase in the value of its trading position in the Warrants that was out of proportion with any alleged "economic effect."  As of August 6, 2018, the day before Mr. Musk's tweet, Tesla's stock price would have had to rise 64% through middle of 2021 to reach the original Strike Price of $560.6388 per share.  As of August 15, 2018, the First Adjustment closed more than half of that gap: Tesla's stock would need to rise by just 25% to reach the adjusted Strike Price of $424.66.  The effect of this change was to net JPM a multimillion-dollar windfall having no relationship to any economic effect from Mr. Musk's tweet.

41.     JPM's purported adjustment of the Strike Price turned the economics of its relationship with Tesla on its head.  At the time of Tesla's Convertible Notes offering in 2014, JPM sold Tesla call options (the Bond Hedge) at a lower strike price than the Strike Price of the Warrants (the difference between the strike prices, the "Call Spread").  Tesla made a net payment of tens of millions of dollars to JPM in 2014 in consideration for the Call Spread to protect Tesla if its share price were to rise significantly above the conversion price of the Convertible Notes.  However, by unilaterally reducing the Strike Price in 2018 and failing to restore the Strike Price to its agreed-upon level after August 24, 2018, JPM purported to eliminate much of the Call Spread payoff that Tesla had paid for in 2014.  In a stroke, JPM deprived Tesla of the benefit of its bargain.  Nothing about Mr. Musk's statements on August 7, 2018, justified such a self-serving and commercially unreasonable result, and JPM could not have believed in good faith that it was appropriate.

**C.      JPM Improperly Issued the First Adjustment Knowing that No Adjustment It Could Make Would Produce a Commercially Reasonable Result**

42.      On information and belief, when JPM issued the First Adjustment Notice, it knew that no adjustment it could make under the terms of the Agreements would produce a commercially reasonable result.  Rather, consistent with the conclusions of its own equity research team, JPM believed that it was "premature" to make *any* adjustment to JPM's initial valuation model based on the probability of a take-private transaction.  Also consistent with that view, no other relevant market participant, including the other Dealer Banks, determined that an adjustment to the terms of warrants or other options on Tesla's stock would be appropriate.

43.      Because the alleged fluctuations in implied volatility after August 7, 2018, bore no relationship to the economic effect of a buyout offer on Warrants expiring in 2021, JPM knew when it issued the First Adjustment Notice that any adjustment it could make would only deliver a commercially unreasonable windfall to JPM.  Under the parties' agreement, even if JPM concluded that the Agreements required it to make an adjustment to the Strike Price—which Tesla disputes—then JPM should have determined that no adjustment it could make would produce a commercially reasonable result.

44.      Under such circumstances, the Equity Definitions required JPM to "notify the parties that the relevant consequence shall be the termination of the [Warrants]" in 2018. Instead, JPM held the Warrants until their expiration in 2021, when it purported to exercise the Warrants at a reduced Strike Price and demanded billions of dollars' worth of Tesla's common stock.  Thus, JPM breached the parties' agreement by improperly purporting to declare an "Announcement Event" and failing to notify Tesla that the relevant consequence under the Equity Definitions should be the termination of the Warrants.

**D.** **JPM Improperly Failed to Reverse the First Adjustment After Mr. Musk Decided Not to Formulate a Take-Private Offer**

45.     Even if JPM's First Adjustment had been proper (which it was not), JPM should have reversed the First Adjustment after Mr. Musk's announcement via blog post mere days later on August 24, 2018, that he believed Tesla should remain a public company and Tesla's Board of Directors' confirmation that there was no need for a special committee.  Those events confirmed what JPM already believed to be the case: that Mr. Musk's brief consideration of a take-private transaction would not have an economic effect on the Warrants expiring in 2021.

46.     Yet, instead of properly reversing the First Adjustment in its entirety, on August 29, 2018, JPM notified Tesla "of the occurrence of an Announcement Event … as a result of the public statement with respect to the Issuer and the Shares on August 24, 2018," and that "we [JPM] have determined … the appropriate adjustment to each 2021 Warrant Transaction to be an increase of the Strike Price from $424.66 to $484.35," effective August 29, 2018 (the "Second Adjustment Notice").  Perversely, JPM applied a massive adjustment to the Strike Price on August 17, 2018, when no take-private offer had yet been announced, based on alleged short-term fluctuations in implied volatility—but only modestly readjusted the Strike Price after Mr. Musk stated *definitively* on August 24, 2018, that no such announcement would be forthcoming.

47.     JPM's purported determination that the August 24, 2018 announcement merited an adjustment from $424.66 to just $484.35 (the "Second Adjustment")—still far below the original $560.6388 Strike Price—was not made in good faith or in a commercially reasonable manner.

48.     Mechanically, JPM reached this nonsensical result by purporting to measure the "economic effect" of Mr. Musk's statement by comparing the implied volatility of certain exchange-traded call options in the days before and shortly after August 24, 2018.  By design,

17

JPM's methodology guaranteed that the First Adjustment would not be reversed, because it measured only the marginal change in implied volatility after Mr. Musk confirmed the market's expectation that a take-private offer would not be announced.

49.     In purportedly maintaining the Strike Price at $484.35, JPM assumed that Mr. Musk's brief and definitively abandoned consideration of a hypothetical take-private transaction would have a permanent downward effect on the value of the Warrants.  But JPM could not have held that belief in good faith.  As shown in **Figure 1** above, there was no significant difference between Tesla's implied volatility in the weeks preceding Mr. Musk's August 7, 2018, tweet and the weeks following his August 24, 2018, blog post.  JPM's determination to maintain an adjusted Strike Price of $484.35, far below $560.6388 per share, was thus commercially unreasonable and could not be justified by any actual economic effect on the Warrants.

### E.     From August 2018 Forward, JPM Improperly Maintained the Discounted Strike Price, Even as Implied Volatility Soared to Unprecedented Levels

50.     JPM's commercially unreasonable failure to fully reverse the purported First Adjustment became even more indefensible with time, as volatility rose to levels not seen during or prior to August 2018.  As shown in **Figure 3** below, Tesla's option-implied volatilities traded at elevated levels for months after August 2018 and exploded to unprecedented levels in 2020 and 2021.  Tesla's soaring implied volatility gave the lie to JPM's bad-faith contention that it was entitled to a lower Strike Price due to the Warrants' supposedly muted implied volatility.



Figure 3: Historical Implied Volatility

51.     As Tesla's long-term implied volatility soared after August 2018, so, too, did its stock price.  As shown in **Figure 4** below, Tesla's stock price rocketed past the Strike Price, resulting in JPM obtaining billions of dollars' worth of Tesla shares when the Warrants expired in 2021.  There is, and was, no basis for JPM's assertion that it was entitled to a lower Strike Price to compensate for subdued movements in Tesla's stock price.

**Figure 4: Historical Share Price**



52.     JPM's conduct between August 2018 and 2021 was entirely self-serving and intended to gain JPM the improper benefit of a discount on the price of Tesla shares that were gaining rapidly in value.  In blithe disregard for its obligations as Calculation Agent, JPM stood idly by as the Warrants' implied volatility rose ever higher.  For example, implied volatility observed in the Tesla options market exceeded 80% in August 2020—approximately ***double*** the levels assumed by the Second Adjustment.  Yet, rather than perform an adjustment tied to changes in volatility as it purported to do in August 2018, JPM completely ignored the large increase in implied volatility of Tesla options that was observed in the market after August 2018.

20

53.     JPM's failure to increase the Strike Price to reflect Tesla's heightened implied volatility was irreconcilable with the parties' agreement and the logic of JPM's decision to lower the Strike Price in August 2018.  JPM's conduct was a classic 'heads I win, tails you lose' scheme, in which the net effect of JPM's adjustments was to purportedly *reduce* the Strike Price even as Tesla's stock price saw *higher* volatility, resulting in a multibillion-dollar payout for JPM, at Tesla's expense, as Tesla's stock price soared above a Strike Price that was not adjusted for increases in volatility.

### F.     In 2021, JPM Demanded An Additional $162 Million Cash Windfall from Tesla by Deliberately Misvaluing the Shares at Issue

54.     When the Warrants began expiring on June 1, 2021, Tesla performed its contractual obligations in full by delivering a number of shares calculated based on the excess of Tesla's volume-weighted average stock price over the Warrants' Strike Price in accordance with the formula set forth in the Confirmation.

55.     Relying on the improperly reduced Strike Price, JPM demanded that Tesla deliver 228,775 additional shares.  For the reasons described above, the windfall JPM demanded bore no relationship to any purported economic effect on the Warrants.  On information and belief, JPM pressed its exorbitant demand as an act of retaliation against Tesla both for it having passed over JPM in major business deals and out of senior JPM executives' animus toward Mr. Musk.

56.     When Tesla refused JPM's improper demand, JPM wrongfully purported to declare an Event of Default under the ISDA Master Agreement and to demand a cash payment from Tesla in lieu of the undelivered shares.

57.     Had Tesla owed JPM an additional 228,775 shares when the Warrants expired (it did not), under the terms of the ISDA Master Agreement, JPM would have been required to

value the undelivered shares "as of the originally scheduled date for delivery in good faith and using commercially reasonable procedures."

58.   However, instead of valuing the shares at issue as of the original settlement dates under the Warrants, JPM further inflated its demand by millions of dollars, by valuing all of the shares as of August 3, 2021, to exploit a significant rise in Tesla's share price, as shown in **Figure 5** below.  Thus, JPM's $162.2 million cash demand was yet another brazen violation of the parties' agreement.

**Figure 5: June–August 2021 Share Price**



59.     Since August 2018, Tesla has disputed JPM's purported adjustments to the Strike Price and has given JPM numerous opportunities to provide a satisfactory explanation for its actions or to cure its breaches of the Agreements.

60.     JPM refused to remedy its breaches and instead filed a preemptive lawsuit seeking to protect its $162.2 million windfall on top of the billions of dollars' worth of shares that Tesla had already delivered to JPM.  Tesla brings these counterclaims to seek redress for JPM's breaches of the Agreements.

## FIRST CAUSE OF ACTION

### Breach of Contract

61.     Tesla repeats and realleges each of the above allegations as if fully set forth herein.

62.     Tesla and JPM are parties to the Agreements, which constituted valid and binding contracts governed by the laws of New York that required JPM to act in good faith and in a commercially reasonable manner as Calculation Agent for the Warrants.

63.     Tesla timely and fully performed all of the conditions, covenants, delivery obligations, and promises required of it under the Agreements, including delivering to JPM all of the shares.

64.     JPM breached the Agreements by purporting to provide notice that an adjustment-triggering event occurred under the Warrants on August 7, 2018, failing to make that determination in good faith and in a commercially reasonable manner, and purporting to reduce the Strike Price of the Warrants below $560.6388 per share.  In the alternative, even if an adjustment-triggering event occurred under the Warrants on August 7, 2018, which Tesla disputes, JPM breached the Agreements by:

a.  failing to notify Tesla that the relevant consequence of the purported
Announcement Event where no commercially reasonable adjustment could be
made was the termination of the Warrants;

b.  failing to calculate the First Adjustment in good faith and in a commercially
reasonable manner to produce a commercially reasonable result;

c.  failing to reverse the First Adjustment consistent with JPM's duty to act in good
faith and in a commercially reasonable manner to produce a commercially
reasonable result;

d.  failing to calculate the Second Adjustment to the Warrants in good faith and in a
commercially reasonable manner to produce a commercially reasonable result;

e.  failing to adjust the Strike Price of the Warrants upward following the Second
Adjustment;

f.  improperly demanding an inflated number of shares based on the purported Strike
Price of the Warrants on each of the Warrants' exercise dates;

g.  purporting to declare an Event of Default and Early Termination Date in respect
of the Warrants based on Tesla's refusal to deliver the windfall shares; and

h.  failing to determine the fair market value of the windfall shares as of the
originally scheduled delivery dates, in good faith and using commercially
reasonable procedures.

65.    As a result of JPM's breaches under the Agreements, JPM is the Defaulting Party
under the ISDA Master Agreement and is required to indemnify and hold harmless Tesla for and
against all reasonable out-of-pocket expenses, including legal fees and costs of collection, as set
forth in Section 11 of the ISDA Agreement.

66.     As a result of JPM's breaches, Tesla has suffered damages and seeks damages in an amount to be determined at trial, plus interest, together with its reasonable attorney's fees, costs, and other out-of-pocket expenses as provided by the ISDA Master Agreement.

## SECOND CAUSE OF ACTION

### Declaratory Judgment

67.     Tesla repeats and realleges each of the above allegations as if fully set forth herein.

68.     As a result of the foregoing, a justiciable controversy exists among the parties with regard to the occurrence of one or more Announcement Events or Potential Adjustment Events under the Warrants, any adjustments to the Strike Price of the Warrants, the occurrence of an Event of Default and Early Termination Date with respect to the Warrants, and the amount, if any, payable in respect of that purported Early Termination Date.

69.     Tesla therefore seeks a declaration that: no Announcement Event occurred under the Confirmation on August 7, 2018; JPM's breaches of the parties' Agreements each constituted an Event of Default under the ISDA Master Agreement; the purported First Adjustment Notice is null, void, and ineffective; the purported Second Adjustment Notice was null, void, and invalid, to the extent it did not reverse the First Adjustment; and the Strike Price at the Warrants' expiration dates was not less, or significantly higher, than $112.12776 per share (*i.e.*, $560.6388 adjusted for Tesla's five-to-one stock split), the precise level to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Tesla requests that the Court enter judgment in favor of Tesla and against JPM as follows:

a)  dismissing the Complaint with prejudice;

b)  declaring that JPM breached the parties' Agreements and that its actions

constituted an Event of Default under the ISDA Master Agreement;

c)  declaring that JPM's purported First and Second Adjustment Notices are void and

invalid to the extent they purport to have adjusted the Strike Price to a level below

$560.6388 per share;

d)  awarding Tesla damages in an amount to be determined at trial, plus interest;

e)  awarding Tesla reasonable attorney's fees, costs, and other out-of-pocket

expenses as provided by the ISDA Master Agreement; and

f)  awarding such other and further relief that the Court may deem appropriate.

## ANSWER

Tesla hereby responds to the numbered allegations in the Complaint, with knowledge as

to its own acts and upon information and belief as to the acts of others.  All allegations not

expressly admitted herein are denied.

## NATURE OF THE ACTION[2]

1.     To the extent that allegations contained in Paragraph 1 set forth legal conclusions,

no response is required.  Tesla admits that JPM purports to bring a breach of contract action for

over $162 million but denies that such amount is due and payable by Tesla to JPM.  Tesla admits

that the second sentence of Paragraph 1 generally describes the mechanics of the parties' warrant

transactions and respectfully refers the Court to the governing agreements for their contents.

Tesla admits that Tesla's share price exceeded the strike price when the warrants expired.  Tesla

denies the allegations contained in the third sentence of Paragraph 1 except admits that JPM

---

[2]  Tesla uses the headings used in the Complaint verbatim solely for ease of reference.
To the extent any headings are construed to make allegations, Tesla denies those allegations.

demanded shares and later cash from Tesla.  Tesla denies the allegations contained in the remainder of Paragraph 1.

2.      Tesla denies the allegations contained in Paragraph 2, except admits the existence of the agreements with JPM and respectfully refers the Court to the governing agreements for their contents.

3.      Tesla denies the allegations contained in Paragraph 3, except (i) admits to the existence but not the characterization of the tweet quoted in the first sentence of Paragraph 3, and (ii) admits to the existence but not the characterization of a complaint by the Securities and Exchange Commission.  Tesla respectfully refers the Court to both documents for their contents.

4.      Tesla denies the allegations contained in the first sentence of Paragraph 4, except admits to the existence but not the characterization of a page entitled "Staying Public" posted on Tesla's website on August 24, 2018.  Tesla denies the allegations contained in the second sentence of Paragraph 4, except admits that JPM's purported second adjustment reversed some, but not all, of the initial reduction.  Tesla admits the allegations contained in the last sentence of Paragraph 4, except to the extent that they allege legal conclusions.

5.      Tesla denies the allegations contained in Paragraph 5.

## PARTIES

6.      Tesla admits the allegations contained in Paragraph 6.

7.      Tesla admits the allegations contained in Paragraph 7 except denies that its principal place of business is in Palo Alto, California.

## JURISDICTION AND VENUE

8.      The allegations contained in Paragraph 8 set forth legal conclusions to which no response is required.

9.      The allegations contained in Paragraph 9 set forth legal conclusions to which no response is required.

10.     The allegations contained in Paragraph 10 set forth legal conclusions to which no response is required.

11.     The allegations contained in Paragraph 11 set forth legal conclusions to which no response is required.  Tesla respectfully refers the Court to the Confirmations for their terms.

## FACTUAL ALLEGATIONS

12.     Tesla admits that the first sentence of Paragraph 12, including Footnote 1, generally describes the mechanics of the parties' transactions and respectfully refers the Court to the governing agreements for their contents, except Tesla denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Footnote 1.  The allegations contained in the remainder of Paragraph 12, including Footnote 2, set forth legal conclusions to which no response is required.  Tesla respectfully refers the Court to the governing agreements as to their terms.

13.     The allegations contained in Paragraph 13, including Footnote 3, set forth legal conclusions to which no response is required.  Tesla respectfully refers the Court to the governing agreements as to their terms.  Tesla admits that Tesla did not elect cash settlement.

14.     Tesla admits the allegations contained in Paragraph 14.

15.     The allegations contained in Paragraph 15 are too vague and ambiguous for Tesla to frame a proper response.  Tesla respectfully refers the Court to the Agreements for their terms and otherwise denies the allegations contained in Paragraph 15.

16.     The allegations contained in Paragraph 16 set forth legal conclusions to which no response is required.  Tesla respectfully refers the Court to the Equity Definitions and the Confirmations for their terms.

17.     The allegations contained in Paragraph 17 set forth legal conclusions to which no response is required.  Tesla respectfully refers the Court to the Equity Definitions and the Confirmations for their terms.

18.     The allegations contained in Paragraph 18 set forth legal conclusions to which no response is required.  Tesla admits that the Confirmations designate JPM as the Calculation Agent and respectfully refers the Court to the Confirmations for their terms.

19.     Tesla denies the allegations contained in Paragraph 19, except admits to the existence but not the characterization of the tweet quoted in Paragraph 19.

20.     Tesla denies the allegations contained in Paragraph 20, except (i) admits that Mr. Musk was Tesla's CEO, the chairman of Tesla's Board of Directors, and Tesla's largest shareholder and (ii) admits that Tesla filed a Form 8-K on November 5, 2013, and respectfully refers the Court to the Form 8-K for its contents.

21.     Tesla denies the allegations contained in the first sentence of Paragraph 21 except admits, on information and belief, that Tesla's Chief Financial Officer, Vice President of Communications, and General Counsel participated in the drafting of a communication from Mr. Musk relating to Mr. Musk's tweet.  Tesla denies the remaining allegations contained in Paragraph 21, except admits to the existence but not the characterization of the referenced email and tweets and respectfully refers the Court to the referenced email and tweets for their contents.

22.     Tesla denies the allegations contained in Paragraph 22, except admits that Tesla's head of investor relations received and responded to inquiries and refers the Court to the responses for their contents.

23.     Tesla denies the allegations contained in Paragraph 23, except admits the existence but not the characterization of a statement by certain of Tesla's directors dated August 8, 2018, and respectfully refers the Court to the statement for its contents.

24.     Tesla denies the allegations contained in Paragraph 24, but except admits to the existence but not the characterization of the referenced August 13 tweet and August 14 press release and respectfully refers the Court to the same for their contents.

25.     Tesla denies the allegations contained in Paragraph 25, except admits to the existence but not the characterization of the variables of the Black-Scholes model referenced in Footnote 4.

26.     Tesla denies the allegations contained in Paragraph 26.

27.     The allegations contained in Paragraph 27 set forth legal conclusions to which no response is required.  Tesla respectfully refers to the Court to the Agreements for their terms.

28.     Tesla lacks information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and denies such allegations.

29.     Tesla lacks information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 and denies such allegations, except admits that JPM purported to reduce the strike price from $560.6388 to $424.66 per share, effective August 15, 2018.

30.     The allegations contained in the first sentence of Paragraph 30 set forth legal conclusions to which no response is required, except Tesla admits that JPM notified Tesla of the purported First Adjustment by letter dated August 17, 2018, and respectfully refers the Court to

the letter for its contents.  Tesla admits the allegations contained in the second sentence of Paragraph 30.  Tesla denies the allegations contained in the remainder of Paragraph 30 except admits that the parties scheduled a call to discuss the adjustment and avers that the parties conducted several calls to discuss the adjustment.

31.     Tesla admits the existence but not the characterization of the blog post referenced in the first sentence of Paragraph 31 and respectfully refers the Court to the post for its contents. Tesla denies the remaining allegations contained in Paragraph 31 except admits that JPM asserted that the blog post constituted an Announcement Event.

32.     The allegations contained in Paragraph 32 set forth legal conclusions to which no response is required and Tesla denies such allegations.

33.     The allegations contained in the first sentence of Paragraph 33 set forth legal conclusions to which no response is required and Tesla denies such allegations.  Tesla denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 33.

34.     Tesla denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34, except admits that JPM purported to raise the strike price to $484.35 effective August 29, 2018.

35.     Tesla denies the allegations contained in Paragraph 35, except admits that JPM and Tesla had communications regarding the warrants after August 29, 2018, and respectfully refers the Court to those communications for their contents.

36.     Tesla denies the allegations contained in Paragraph 36, but admits to the existence but not the characterization of proceedings commenced by the Securities and Exchange Commission.

37.     Tesla admits to the existence but not the characterization of a settlement with the Securities and Exchange Commission and various class actions.  Tesla admits that the U.S. District Court for the Northern District of California denied a motion to dismiss filed by Tesla and respectfully refers the Court to that order for its contents.

38.     Tesla denies the allegations contained in Paragraph 38, except admits that Tesla sent a letter to JPM regarding the 2021 Warrants on February 13, 2019, and respectfully refers the Court to that letter for its contents.

39.     The allegations contained in Paragraph 39 set forth legal conclusions to which no response is required and Tesla denies such allegations.  Tesla admits the allegation contained in Footnote 5 that Tesla advised JPM that none of its other warrant dealers made similar adjustments.  Tesla denies knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Footnote 5 and denies such allegations.

40.     Tesla denies the allegations contained in the first three sentences of Paragraph 40, except admits that JPM sent a letter to Tesla and respectfully refers the Court to the letter for its contents.  Tesla denies knowledge sufficient to form a belief as to the truth of the allegations contained in the last sentence of Paragraph 40 and denies such allegations.

41.     Tesla denies the allegations contained in Paragraph 41, except admits that Tesla's stock price exceeded the strike price when the warrants expired, admits that Tesla settled the undisputed number of shares, and admits that the parties discussed Tesla's objections to the Adjustments and respectfully refers the Court to those communications for their contents.

42.     The allegations contained in Paragraph 42 set forth legal conclusions to which no response is required and Tesla denies such allegations.  Tesla respectfully refers the Court to the Master Agreement for its contents.

43.     Tesla admits the allegations contained in the first sentence of Paragraph 43.  Tesla denies the remaining allegations contained in Paragraph 43, except admits that Tesla settled only the undisputed portion of the 2021 Warrants.

44.     Tesla denies the allegations contained in Paragraph 44, except admits to the existence but not the characterization of the referenced communications and respectfully refers the Court to the communications for their contents.

45.     Tesla denies the allegations contained in Paragraph 45, except admits to the existence but not the characterization of the referenced communications and respectfully refers the Court to the communications for their contents.

46.     Tesla denies the allegations contained in Paragraph 46, except admits to the existence but not the characterization of the referenced communications and respectfully refers the Court to the communications for their contents.

47.     Tesla denies the allegations contained in Paragraph 47, except (i) admits that Tesla has not paid the purported Early Termination Amount, to which JPM is not legally entitled, and (ii) admits that Tesla sent a letter to JPM on August 26, 2021, and respectfully refers the Court to the letter for its contents.

48.     The allegations contained in Paragraph 48 are legal conclusions or characterizations of pleadings to which no response is required, and Tesla denies such allegations.

**FIRST CAUSE OF ACTION**

49.     Tesla repeats and incorporates the above responses as if set forth fully herein.

50.     The allegations contained in Paragraph 50 are legal conclusions to which no response is required.

51.     Tesla denies the allegations contained in Paragraph 51.

52.     Tesla denies the allegations contained in Paragraph 52.

53.     Tesla denies the allegations contained in Paragraph 53.

## PRAYER FOR RELIEF

The remaining paragraphs of the Complaint consist of JPM's prayer for relief, to which no response is required.  To the extent JPM's prayer for relief is construed to make allegations, Tesla denies those allegations.

## AFFIRMATIVE DEFENSES

Tesla asserts the following affirmative defenses without assuming any burden of proof or persuasion that would otherwise remain with JPM, and without waiving (and hereby expressly reserving) the right to assert any other defenses at such time and to the extent discovery establishes a basis therefor, Tesla hereby asserts the following affirmative defenses to the claims asserted in the Complaint:

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

JPM is not entitled to the relief it seeks under the governing agreements.

### THIRD AFFIRMATIVE DEFENSE

JPM's claims are barred because it has not suffered any injury or damages.

### FOURTH AFFIRMATIVE DEFENSE

JPM's claims are barred because its purported damages are unduly speculative.

### FIFTH AFFIRMATIVE DEFENSE

JPM's claims are barred, in whole or in part, by the doctrines of unjust enrichment and unclean hands, and by JPM's failure to perform its contractual obligations to Tesla.

## SIXTH AFFIRMATIVE DEFENSE

JPM's claims are barred, in whole or in part, by its failure to mitigate any damages.

## SEVENTH AFFIRMATIVE DEFENSE

JPM's claims are barred, in whole or in part, by the doctrines of laches, waiver, and estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

JPM's claim is barred, in whole or in part, because the damages it seeks would constitute an unenforceable penalty.

## NINTH AFFIRMATIVE DEFENSE

JPM's claim is barred, in whole or in part, by the doctrines of setoff and recoupment.

## RESERVATION OF RIGHTS

Tesla gives notice that it intends to rely upon any other claim or defense that may become available or appear during the pre-trial proceedings, based upon evidence developed in discovery or otherwise, and reserves the right to amend this Answer to assert any such claims or defenses.

Dated:     New York, New York          Respectfully submitted,
           January 24, 2022

Alex Spiro
Andrew J. Rossman
Jonathan E. Pickhardt
Christopher D. Kercher
Nathan Goralnik
Jesse Bernstein
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel:  212-849-7000
Fax: 212-849-7100
alexspiro@quinnemanuel.com
andrewrossman@quinnemanuel.com
jonpickhardt@quinnemanuel.com
christopherkercher@quinnemanuel.com
nathangoralnik@quinnemanuel.com
jessebernstein@quinnemanuel.com

*Counsel for Tesla, Inc.*