**Davis Polk**

Lawrence Portnoy
+1 212 450 4874
lawrence.portnoy@davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
davispolk.com

February 21, 2022

Re: *JPMorgan Chase Bank, National Association, London Branch v. Tesla, Inc.*,
 Case No. 1:21-cv-9441 (PGG)

Hon. Paul G. Gardephe
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe:

We represent Plaintiff JPMorgan Chase Bank, National Association, London Branch ("JPMorgan") in the above-captioned breach of contract action (the "Action") against Tesla, Inc. ("Tesla"). JPMorgan commenced the Action on November 15, 2021 seeking damages, and Tesla answered on January 24, 2022 and asserted two mirror image counterclaims for breach of contract and declaratory judgment.[1] JPMorgan has strong grounds to seek dismissal of Tesla's fatally flawed counterclaims, but JPMorgan instead has filed its answer and intends to seek a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). There is no need to waste the Court's or the parties' time and resources with discovery and trial when Tesla has not presented any plausible factual theory that would defeat JPMorgan's $162 million damages claim. The admitted facts are sufficient to establish as a matter of law that JPMorgan is entitled to payment in full, and Tesla's allegations are insufficient to establish any plausible defense or counterclaim. We therefore write pursuant to Rule IV(A) of Your Honor's Individual Rules of Practice to request a pre-motion conference. Given the nature of the motion, JPMorgan has not sought Tesla's consent.

*Background*

In 2014, JPMorgan and Tesla entered into a series of derivative transactions which included call option Warrants on Tesla stock. Essentially, in exchange for an upfront cash payment by JPMorgan, the Warrants required Tesla to deliver to JPMorgan a number of its shares whose value reflected the difference between Tesla's stock price and the strike price if, at the expiration of the Warrants, Tesla's share price exceeded the strike price. The Agreements designated JPMorgan as the "Calculation Agent" responsible for adjusting the terms of the Warrants (including the strike price) upon the occurrence of Announcement Events. In 2018, because of the occurrence of two such events, JPMorgan twice adjusted the strike price.

---

[1] All terms not defined herein shall have the meaning ascribed to them in Tesla's Counterclaim, Dkt. No. 17.

**Davis Polk**  Hon. Paul G. Gardephe

The Warrants expired "in the money" in June and July 2021.  Per the terms of the Agreements, Tesla was obligated to settle in full at the adjusted strike price, but rather than do so, Tesla delivered to JPMorgan $5 billion in shares, which reflected what Tesla referred to as the "undisputed" settlement amount calculated using the unadjusted strike price.[2]  Tesla refused to deliver the remaining amount due using the adjusted strike price.  JPMorgan thus declared Tesla in default, terminated the Agreements and determined that Tesla owed $162,216,628.81, based on the average price that JPMorgan paid to acquire replacement shares on the open market.

Tesla failed to pay and JPMorgan now sues for breach of contract.  In its counterclaims, Tesla asserts that it was JPMorgan's adjustments that violated the terms of the Agreements because, it asserts, there was no Announcement Event and JPMorgan did not act in good faith and in a commercially reasonable manner.  Because there are no material disputes of fact, this Court can and should resolve these issues on the pleadings.[3]

### *Tesla's Going-Private Announcement Was an Announcement Event as a Matter of Law*

Elon Musk was the CEO, Chairman, and largest shareholder of Tesla.  In a Form 8-K filed on November 5, 2013, Tesla designated Mr. Musk's Twitter account as an authoritative source of information about Tesla.  On August 7, 2018, Mr. Musk tweeted, "Am considering taking Tesla public at $420 per share. Funding secured."  The market immediately reacted to the tweet, and NASDAQ suspended trading because the tweet violated rules requiring advance notice of a going-private transaction.  That same day, Mr. Musk again tweeted, "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."  Tesla's head of investor relations confirmed that Mr. Musk had made a "firm offer" which was "as firm as it gets."  These disclosures caused an 11% rise in Tesla's share price and a 36% reduction in its implied volatility.  *See* Compl. ¶¶ 19–23, 25.

Tesla admits Mr. Musk and its employees made all these statements.  *See* Answer ¶¶ 19–23.  On this undisputed record, the Court should enter judgment finding that Tesla's 2018 going-private announcement is an Announcement Event.[4]  Under the operative agreements, an "Announcement Event" is: (i) "[t]he public announcement of any Merger Event or Tender Offer"; (ii) "the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer"; or (iii) "the public announcement by Issuer of an intention to solicit or enter into, or to explore

---

[2] Tesla therefore waived any purported claim or defense it might have had concerning the "undisputed" shares.  *See Dillion v. U-A Columbia Cablevisions of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2006) (holding that voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts").

[3] On a Fed. R. Civ. P. 12(c) motion, the Court may consider documents referenced in the pleadings without converting the motion into one for summary judgment under Rule 56.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422–23 (2d. Cir. 2011).

[4] Tesla only disputes whether the initial announcement of the going-private transaction constituted an Announcement Event, and does not appear to dispute that its subsequent abandonment of that transaction also would have been an Announcement Event if the initial announcement was one.

strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer." Confirmation at 9. Tesla's announcements need only satisfy one definition, and they meet all three as a matter of law.

First, Mr. Musk's tweets about the transaction constituted a "public announcement of [a] Merger Event or Tender Offer." Tesla argues that these tweets merely announced "Mr. Musk's personal consideration of a possible transaction to take Tesla private." Counterclaim ¶ 7. While that is disputed, it is irrelevant. An Announcement Event includes "[t]he public announcement of *any* Merger Event or Tender Offer" concerning Tesla, and a Merger Event and Tender Offer by definition includes "a takeover offer, tender offer, exchange offer, solicitation, proposal or other event *by any entity or person*." Equity Definitions §§ 12.1(b)(iii), (d) (emphasis added).

Second, the tweet and Tesla's related statements also constituted an "announcement by the Issuer of *any intention* to enter into a Merger Event or Tender Offer." Tesla concedes that Mr. Musk had such an intention, and the contract does not require "a buyout announcement by the company." Counterclaim ¶ 7. Further, Mr. Musk's tweet was an announcement by Tesla because it was made while Mr. Musk was Tesla's agent and "it relates to a matter within the scope of the agency."[5] *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992). In any event, Tesla admits making other statements confirming the accuracy of the tweet. *See* Answer ¶¶ 21–23.

Third, all of these statements announced Tesla's own "intention . . . to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer." Tesla admits that it announced that the Board was considering Mr. Musk's proposal and had formed a Special Committee for that purpose. Counterclaim ¶ 32. Tesla alleges that "the Board was merely preparing itself so it would be appropriately positioned to discharge its fiduciary duties to the company: to consider and respond to any proposal that might be announced" by Mr. Musk. Counterclaim ¶ 32. Rather than rebutting JPMorgan's claim, this allegation admits that Tesla intended to explore Mr. Musk's proposal, which "may include, a Merger Event or Tender Offer."

Tesla alleges that no Announcement Event could have occurred because JPMorgan supposedly knew "any deal is potentially far from being formally proposed." Counterclaim ¶ 33. This is irrelevant. Announcement Event protection by its explicit terms guards against the economic effects of *announcements*, not transactions. The announced transaction need not be consummated. Indeed, "any subsequent public announcement of a change to a transaction or intention," including the "announcement of a withdrawal from, or the abandonment or discontinuation of, such a transaction or intention" is a separate Announcement Event triggering an Adjustment. Confirmation 9. The Announcement Event provisions are thus agnostic to the

---

[5] The SEC and the court overseeing the related securities litigation both rejected Tesla's contention that it bears no responsibility for the content of Mr. Musk's tweet. *See SEC v. Tesla, Inc.*, 1:18-cv-8947 (S.D.N.Y. Sept. 29, 2018); *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 927 (N.D. Cal. 2020).

likely success or merit of the proposed transaction and concerned only with the market's reaction to the announcement.  Here, Tesla's own chart demonstrates that the announcement was material and caused a massive drop in the implied volatility of Tesla's stock, thereby reducing the value of the Warrants absent an Adjustment.  *See* Counterclaims at 6 fig. 1.

***Tesla Fails to Allege That JPMorgan Did Not Act in Good Faith or in a Commercially Reasonable Manner***

Because an Announcement Event occurred, JPMorgan, as the designated Calculation Agent, had broad discretion to make the Adjustments, *see* Equity Definitions § 12.3, which was limited only by its obligation to act "in good faith and in a commercially reasonable manner."  Confirmation § 3; Equity Definitions § 1.40.  The Warrants are governed by form International Swaps and Derivatives Association ("ISDA") agreements and definitions.  When the ISDA forms grant a party "discretion and flexibility," they are intended to promote "clarity, certainty, and predictability" and stave off the very type of second-guessing that Tesla tries to do here.  *In re Lehman Bros. Holdings, Inc.*, No. 08-cv-13555-SCC, 2015 WL 7194609, at *11–12 (S.D.N.Y. Sept. 16, 2015).  JPMorgan is entitled to judgment on the pleadings because Tesla has not plausibly alleged that JPMorgan did not act in good faith or in a commercially reasonable manner.  *See Citibank, N.A. v. Tormar Assocs. LLC*, No. 15-cv-1932-JPO, 2015 WL 7288652, at *6–7 (S.D.N.Y. Nov. 17, 2015) (granting judgment on the pleadings where counterclaim failed to plead that party to ISDA agreement did not act in good faith or in a commercially reasonable manner).

JPMorgan simply exercised the broad discretion Tesla had given it to adjust the strike price if Tesla made an announcement about a major corporation transaction.  "Under New York law, the duty of good faith prohibits parties from exercising their contract rights [only] as part of a 'scheme to deprive the other party of the fruit of its bargain.'"  *Citibank*, 2015 WL 7288652, at *7 (citation omitted).  Tesla alleges no such scheme, because JPMorgan had absolutely no control over whether Tesla made any announcement about going private.  Moreover, "[t]he principle of good faith constrains a party's actions, not a party's motives for those actions."  *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93–94 n.5 (2d Cir. 2013).  Tesla's accusations that JPMorgan was motivated by spite are thus irrelevant.  Counterclaim ¶ 55.  So, too, is Tesla's bald allegation that the Adjustments were designed to result in "a pure windfall" for JPMorgan.  Counterclaim ¶¶ 4, 8.  Even if that were true, "acting in [one's] own self-interest consistent with [its] rights under a contract" and "seeking to maximize . . . profits" does not amount to bad faith.  *DeBlasio v. Merrill Lynch & Co.*, No. 07-cv-318-RJS, 2009 WL 2242605, at *38 (S.D.N.Y. July 27, 2009) (citation omitted); *accord Gaia House Mezz LLC*, 720 F.3d at 93–94.  It is not enough to complain that there were adjustments JPMorgan could have made that would have been more favorable to Tesla without any factual allegations about why the method JPMorgan employed was unreasonable.  *See Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*, No. 11-cv-7686-KBF, 2012 WL 2850997, at *8 (S.D.N.Y. July 9, 2012) ("[W]hether the manner in which [the Calculation Agent] performed [] could have been done differently,

**Davis Polk**   Hon. Paul G. Gardephe

more comprehensively, even better—that does not raise a triable issue."). There is simply nothing in Tesla's answer or counterclaims to support the contention that JPMorgan's actions were in bad faith or commercially unreasonable.

### *Tesla's Counterclaims Should Be Dismissed*

Because Announcement Events did occur, and Tesla has not even alleged facts supporting a claim that JPMorgan failed to act in good faith or a commercially reasonable manner, JPMorgan is entitled to judgment in its favor on Tesla's breach of contract claim. Tesla's counterclaims are also "fatally deficient" because Tesla does not allege any actual damages as a result of JPMorgan's supposed breach. *See ERE LLP v. Spanierman Gallery, LLC*, 94 A.D.3d 492, 493 (1st Dep't 2012). Moreover, Tesla has no need for declaratory relief because "the litigation on [JPMorgan's] main claims will necessarily offer that relief." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311–12 (S.D.N.Y. 2010).

### *JPMorgan Is Entitled to Judgment in the Full Early Termination Amount*

Tesla accuses JPMorgan of "retaliat[ing]" against Tesla by inflating the Early Termination Amount. Specifically, Tesla complains that JPMorgan was required to value the undelivered shares only at their fair market value on the originally scheduled delivery dates rather than by using the average price JPMorgan actually paid to buy replacement shares to close out its hedging position. Tesla is once again wrong. The Early Termination Amount is comprised of both the Unpaid Amounts and the Close-Out Amount. While the Unpaid Amount is determined based on "fair market value . . . as of the originally scheduled date for delivery," JPMorgan is also entitled to "consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Termination Transaction." ISDA Master Agreement §§ 6(e)(i), 14. Accordingly, the difference between the amount JPMorgan paid to acquire replacement shares to close out its short hedge position and the value of those shares on the original due date is recoverable as a Close-Out Amount. JPMorgan is therefore entitled to an immediate judgment against Tesla on the pleadings, in the full amount of $162 million, plus prejudgment interest and contractual indemnification of its attorneys' fees and costs.

Respectfully submitted,

*/s/ Lawrence Portnoy*

Lawrence Portnoy

cc:   All counsel of record (via ECF)