quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

February 28, 2022

Hon. Paul G. Gardephe
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *JPMorgan Chase Bank, N.A., London Branch v. Tesla, Inc.*,
      Case No. 1:21-cv-9441 (PGG)

Your Honor:

The pre-motion letter (ECF 23) filed by Plaintiff JPMorgan Chase Bank, N.A., London Branch ("JPM") requesting a conference concerning its intent to move for judgment on the pleadings under Fed. R. Civ. P. 12(c) is riddled with mischaracterizations of Defendant Tesla, Inc.'s counterclaim and only demonstrates the absence of meritorious grounds for JPM's contemplated motion.

To prevail over JPM's proposed motion, Tesla need only "'state a claim to relief that is plausible on its face,'" with "'all reasonable inferences [drawn] in [Tesla's] favor'" and without "weigh[ing] disputed factual allegations."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301–02 (2d Cir. 2021) (citations omitted).  "'[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery….'"  *Id.* at 301 (citation omitted).

Relying heavily on a one-sided view of disputed facts, JPM asks the Court to rule, as a matter of law, that it acted in good faith and in a commercially reasonable manner when it purported to adjust the strike price of warrants on Tesla's stock and later demanded more than $162 million in cash from Tesla.  Tesla has filed an extensive counterclaim (ECF 17) alleging, *inter alia*, that JPM purported to reduce the strike price in a manner that was brazenly self-serving, untethered to commercial reality, at odds with industry practice, and done in bad faith.  JPM's answer (ECF 22), by refusing to admit these well-pleaded allegations, demonstrates that JPM's proposal to resolve these complex, fact-bound issues on the pleadings is futile and a waste of judicial resources.

**Background.**  Tesla issued warrants to JPM and other banks, entitling them to acquire Tesla shares for a pre-agreed strike price.  The governing agreements contemplated the possibility that each

quinn emanuel urquhart & sullivan, llp
ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

bank, acting in good faith and in a commercially reasonable manner in its capacity as Calculation Agent, might adjust the warrants to account for the economic effect of an "Announcement Event," such as the public announcement by Tesla of a merger transaction or a takeover offer.

On August 7, 2018, Elon Musk wrote on Twitter that *he* was "considering taking Tesla private at $420," and explained in a blog post that he had been contemplating such a possibility in his "personal capacity." However, Mr. Musk decided *not* to pursue a take-private offer, and he stated on August 24, 2018, that he believed Tesla should remain a public company. On August 17, 2018, claiming an Announcement Event to have occurred, JPM purported to drastically reduce the warrants' strike price, an action that was irreconcilable with any potential effect of the tweet based on contemporaneous market data. JPM then improperly failed to restore the warrants to the agreed strike price after Mr. Musk disclosed he was no longer considering taking Tesla private.

JPM took these actions in a commercially unreasonable manner, exploiting Mr. Musk's tweet in bad faith as a pretext to deprive Tesla of the benefit of its bargain. No bank other than JPM asserted that Mr. Musk's tweet was an Announcement Event under the terms of the warrants. Moreover, even if JPM were correct that an Announcement Event occurred, JPM breached the contract, which required it to terminate the warrants rather than make commercially unreasonable adjustments.

JPM received billions of dollars' worth of shares from Tesla when the warrants expired in 2021. Not content with this enormous payout, JPM demanded an additional 228,775 shares to settle the warrants, based on its purported reduction of the strike price from 2018. When Tesla refused to countenance this improper windfall, JPM demanded the inflated sum of $162 million in cash as the purported fair market value of shares that were worth substantially less than that amount.

After JPM filed this lawsuit, Tesla served its counterclaim setting forth in detail the manner in which—as the factual record and expert testimony will establish—JPM acted in bad faith to obtain a commercially unreasonable windfall at Tesla's expense. JPM now seeks to pursue an ill-founded Rule 12(c) motion notwithstanding that the heart of this case requires resolution of inherently fact-bound issues, such as whether JPM acted in "good faith and in a commercially reasonable manner" so as to reach a "commercially reasonable result," which cannot be resolved without the benefit of substantial factual and expert discovery.

**JPM cannot establish as a matter of law that an "Announcement Event" occurred.** JPM's proposed motion would ask the Court to rule, as a matter of law, that JPM was entitled to adjust the strike price of the warrants based on Mr. Musk's tweet that he was "considering taking Tesla private at $420." JPM's arguments in support of that position fail.

First, JPM asserts that "Mr. Musk's tweets … constituted a 'public announcement of [a] … Tender Offer'" as a matter of law. However, the agreement defines "Tender Offer" as a "takeover offer, tender offer, … proposal or other event … that results in [the offeror] purchasing, or otherwise obtaining or having the right to obtain … [a required percentage] of the outstanding voting shares of the Issuer," as evidenced by information such as "the making of filings with governmental or self-regulatory agencies." Equity Definitions § 12.1(d). Based upon a full factual record, Tesla will establish that, despite "considering" making a proposal to take Tesla private, Mr. Musk never announced a Tender Offer and decided less than three weeks later to suspend further consideration

and continue leading Tesla as a public company. Although JPM argues that "the announced transaction need not be consummated" to constitute an Announcement Event, here, a potential take-private offer by Mr. Musk was not only not consummated—it was never announced. Remarkably, JPM asks the Court to infer from disputed options market data that an Announcement Event must have occurred. Such arguments are the proper domain of expert testimony, not a motion under Rule 12(c).

Second, JPM asserts that Mr. Musk's tweet was, as a matter of law, "an announcement by Tesla" of an "'intention to enter into a … Tender Offer.'" On the contrary, as JPM knew days before making its first purported adjustment, Mr. Musk was acting in his "personal capacity," not on behalf of Tesla, when he tweeted that he was considering taking Tesla private. Nothing in the pleadings suggests, let alone establishes as a matter of law, that Tesla ever announced an intention to accept a take-private proposal. The decision that JPM seeks to rely on found that whether Mr. Musk's statements were attributable to Tesla was an issue of fact, not a legal question to be decided on a Rule 12 motion. *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 927 (N.D. Cal. 2020).

Third, JPM asks the Court to conclude that the formation of a special committee of Tesla's board of directors necessarily conveyed Tesla's "intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a … Tender Offer." Confirmation at 9. On the contrary, in forming the special committee, Tesla's board was discharging its fiduciary duty to ensure that independent directors were prepared to review any proposal that might be forthcoming. Counterclaim ¶ 32. JPM itself knew that "Tesla's Board of Directors [was not] even 'informally supportive' of any potential proposal." *Id.* ¶ 33. The full factual record will show that, by forming the special committee, Tesla was not announcing an intention to explore strategic alternatives or a "similar undertaking" contemplated by the definition of "Announcement Event."

In addition, JPM's strained arguments about the "Announcement Event" definition fail to grapple with the contract's provisions that "[w]henever a Calculation Agent is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner." Equity Definitions § 1.40. As Tesla alleges, apart from JPM, no Calculation Agent for warrants on Tesla's stock determined that Mr. Musk's tweet triggered an Announcement Event. Rather than setting up a judgment on the pleadings, JPM's answer purports to dispute all of Tesla's factual assertions concerning other Calculation Agents. *See, e.g.*, Answer to Counterclaim, ¶¶ 14, 15, 35, 42. It will be impossible for JPM to establish as a matter of law that its conduct, which was at odds with that of every other bank, was undertaken in good faith and in a commercially reasonable manner.

**JPM cannot establish as a matter of law that it acted in good faith and in a commercially reasonable manner in purporting to adjust the warrants' strike price.** JPM next asks the Court to rule, as a matter of law and without the benefit of expert testimony, that its reduction of the strike price from $560.64 to $424.66 based upon a two-sentence tweet was done in good faith and in a commercially reasonable manner to account for an economic effect on the warrants. These technical, factual questions are not amenable to adjudication as a matter of law given the detailed allegations in Tesla's counterclaim, including material allegations that JPM purports to dispute.

JPM first argues that it necessarily acted in good faith, relying on case law that "describ[es] good faith as a 'pledge that neither party shall do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract.'" *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 94 n.5 (2d Cir. 2013) (emphasis omitted) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).  However, Tesla alleges a breach of precisely this duty, explaining that "JPM deprived Tesla of the benefit of its bargain" when it "purported to eliminate much of the Call Spread payoff that Tesla had paid for in 2014," as part of "a classic 'heads I win, tails you lose' scheme…." Counterclaim ¶¶ 41, 53.  Tesla further alleges, *inter alia*, that JPM relied on a pretext concerning the supposed effect of Mr. Musk's tweet on the value of the warrants, a purported belief that "JPM could not have held … in good faith." *Id.* ¶ 49.  Indeed, rather than resolve the issue of good faith on the pleadings, JPM admits that it lacks "knowledge sufficient to form a belief as to … the state of mind of [the] 'responsible individuals….'" Answer to Counterclaim ¶ 34.  These detailed allegations are wholly unlike those at issue in the inapposite decisions relied upon by JPM.  *See DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *38 (S.D.N.Y. July 27, 2009) (brokerages acted in a manner "'consistent with [their] rights under [the] contract'") (citations omitted) (first alteration in original); *Gaia House*, 720 F.3d at 89 ("It is undisputed that [lender] did not violate any terms of the Agreement….").

JPM's assertion that Tesla has not pleaded "any factual allegations about why the method [it] employed was unreasonable" is devoid of merit.  Tesla's counterclaim does far more than satisfy its pleading burden, to provide "a short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Tesla sets forth numerous reasons why JPM's first adjustment, which drastically reduced the strike price, "was unsupported by the market data" and "out of proportion with any alleged 'economic effect'" on the warrants.  Counterclaim ¶¶ 39–40.  As to JPM's second adjustment, Tesla explains in detail how JPM's method, *inter alia*, improperly "measured only the marginal change in implied volatility after Mr. Musk confirmed the market's expectation that a take-private offer would not be announced." *Id.* ¶ 48.  Tesla further describes how "JPM completely ignored the large increase in implied volatility of Tesla options that was observed in the market after August 2018," which reached levels that were "approximately **double** the levels assumed by the Second Adjustment." *Id.* ¶ 52.  Finally, in August 2021, JPM "inflated its demand by millions of dollars, by valuing all of the shares as of August 3, 2021, to exploit a significant rise in Tesla's share price." *Id.* ¶ 58.  JPM's attempt to dismiss these allegations as merely contending "there were adjustments [JPM] could have made that would have been more favorable to Tesla" is a gross mischaracterization of Tesla's counterclaim, which instead goes to the heart of whether JPM complied with its contractual duties to account for the economic effect of any Announcement Event in good faith and in a commercially reasonable manner.  Rather than admitting Tesla's allegations for adjudication as a matter of law, JPM's pleadings acknowledge that the parties have material fact disputes. *See, e.g.*, Answer to Counterclaim ¶¶ 34–55.

**JPM cannot set forth any valid grounds to dismiss Tesla's counterclaim.**  There is no merit to JPM's cursory assertions that Tesla does not allege "actual damages" or a "need for declaratory relief."  As to Tesla's damages, JPM relies on a state court decision requiring plaintiffs to "'demonstrate how the … alleged breach … caused [them] any injury.'" *ERE LLP v. Spanierman Gallery, LLC*, 94 A.D.3d 492, 493 (1st Dep't 2012) (citation omitted).  However, it is well-settled that "a '[g]eneral pleading that [plaintiff] suffered damages is sufficient'" to prevail over a motion under Rule 12. *WiAV Sols. Inc. v. HTC Corp.*, 2020 WL 2216657, at *7 (S.D.N.Y. May 7, 2020) (alterations in original) (citations omitted).  Tesla's counterclaim readily satisfies this standard, including based on: the "multibillion-dollar payout … at Tesla's expense" that JPM received as a

result of its failure to adjust the strike price upward after August 24, 2018 (Counterclaim ¶ 53) or to cancel the warrants as a consequence of any alleged Announcement Event (*id.* ¶ 9); as well as Tesla's entitlement to indemnification under the ISDA Master Agreement (*id.* ¶ 65).  JPM's assertion that "Tesla has no need for declaratory relief" is likewise deficient.  Tesla does not just seek dismissal of JPM's claim for the alleged Early Termination Amount.  Rather, Tesla seeks a declaration to "clarify[] or settl[e]" and "offer relief from uncertainty" as to the terms of the warrants and JPM's default under the parties' agreement.  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).  Contrary to JPM's bare assertions, these issues may not be resolved by the "litigation on [JPM's] main claims."

JPM's argument that Tesla's counterclaim is barred by the voluntary payment doctrine does not bear scrutiny.  JPM cherry-picks from a single decision to suggest that the doctrine "bars recovery of payments voluntarily made with full knowledge of the facts."  *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2006).  However, *Dillon* makes clear that the doctrine requires not just full knowledge of the facts but also "the absence of fraud or mistake of material fact or law."  *Id.*  Here, Tesla paid billions of dollars of shares to JPM based on the belief that there was no Announcement Event.  If the Court finds that an Announcement Event occurred, Tesla will, accordingly, establish that it paid JPM on the basis of a material mistake of fact or law, and the doctrine would be no bar to Tesla's claim for relief on that basis.

**JPM cannot demonstrate that it properly calculated its $162 million cash demand.**  JPM asserts, for the first time in its pre-motion letter, that it is entitled to recover $162 million from Tesla as a "Close-out Amount" under the parties' agreement, purportedly because that is the amount that JPM "actually paid to buy replacement shares to close out its hedging position."  These disputed factual assertions appear nowhere in the pleadings and cannot be considered on a motion pursuant to Rule 12(c).  This branch of JPM's motion is futile for this reason alone.  Even if the Court were to consider it, it could not be resolved as a matter of law, especially in light of JPM's contradictory representation in its demand letter to Tesla that "the Close-out Amount *is zero*."  Moreover, the parties' agreement required JPM to value any undelivered shares of Tesla's stock "as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures."  ISDA Master Agreement § 14.  JPM's calculation plainly breached this obligation by instead valuing the shares of Tesla stock as of a date well after the scheduled date for delivery.

JPM's letter demonstrates that it cannot satisfy its burden under Rule 12(c).  Accordingly, JPM's attempt to avoid an adjudication based on a full factual record is futile and must be denied.

Respectfully submitted,

Alex Spiro

5