# EXHIBIT B

# 2002  ISDA

# Equity  Derivatives

# Definitions



INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.

Copyright © 2002 by
INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.
360 Madison Avenue
16th Floor
New York, N.Y. 10017

## TABLE OF CONTENTS

**Page**

INTRODUCTION TO THE 2002 ISDA EQUITY DERIVATIVES DEFINITIONS ................................. v

## ARTICLE 1

### CERTAIN GENERAL DEFINITIONS

| | | |
|---|---|---|
| SECTION 1.1. | Transaction | 1 |
| SECTION 1.2. | Option Transaction | 1 |
| SECTION 1.3. | Forward Transaction | 1 |
| SECTION 1.4. | Equity Swap Transaction | 1 |
| SECTION 1.5. | Index Transaction | 1 |
| SECTION 1.6. | Share Transaction | 1 |
| SECTION 1.7. | Index Basket Transaction | 2 |
| SECTION 1.8. | Share Basket Transaction | 2 |
| SECTION 1.9. | Basket Option Transaction | 2 |
| SECTION 1.10. | Basket Forward Transaction | 2 |
| SECTION 1.11. | Basket Swap Transaction | 2 |
| SECTION 1.12. | Confirmation | 2 |
| SECTION 1.13. | Index | 2 |
| SECTION 1.14. | Shares | 2 |
| SECTION 1.15. | Basket | 2 |
| SECTION 1.16. | Issuer | 2 |
| SECTION 1.17. | Trade Date | 2 |
| SECTION 1.18. | Buyer | 2 |
| SECTION 1.19. | Seller | 2 |
| SECTION 1.20. | Number of Shares | 2 |
| SECTION 1.21. | Number of Baskets | 3 |
| SECTION 1.22. | Multiplier | 3 |
| SECTION 1.23. | Relevant Price | 3 |
| SECTION 1.24. | Equity Notional Amount | 3 |
| SECTION 1.25. | Exchange | 3 |
| SECTION 1.26. | Related Exchange | 4 |
| SECTION 1.27. | Clearance System | 4 |
| SECTION 1.28. | Index Sponsor | 4 |
| SECTION 1.29. | Exchange Business Day | 4 |
| SECTION 1.30. | Scheduled Closing Time | 4 |
| SECTION 1.31. | Scheduled Trading Day | 4 |
| SECTION 1.32. | Currency Business Day | 4 |
| SECTION 1.33. | Settlement Currency | 5 |
| SECTION 1.34. | Euro | 5 |
| SECTION 1.35. | EC Treaty | 5 |
| SECTION 1.36. | Clearance System Business Day | 5 |
| SECTION 1.37. | Settlement Cycle | 5 |
| SECTION 1.38. | Cash-settled | 5 |
| SECTION 1.39. | Physically-settled | 5 |
| SECTION 1.40. | Calculation Agent | 5 |

i

SECTION 1.41.    ISDA Master Agreement ...................................................................................... 5
SECTION 1.42.    Knock-in Price ...................................................................................................... 5
SECTION 1.43.    Knock-out Price ..................................................................................................... 6
SECTION 1.44.    Knock-in Event ...................................................................................................... 6
SECTION 1.45.    Knock-out Event ..................................................................................................... 6
SECTION 1.46.    Knock-in Reference Security .................................................................................... 7
SECTION 1.47.    Knock-out Reference Security ................................................................................... 7
SECTION 1.48.    Knock-in Determination Day .................................................................................... 7
SECTION 1.49.    Knock-out Determination Day .................................................................................. 7
SECTION 1.50.    Knock-in Valuation Time ......................................................................................... 8
SECTION 1.51.    Knock-out Valuation Time ....................................................................................... 8

## ARTICLE 2

### GENERAL TERMS RELATING TO OPTION TRANSACTIONS

SECTION 2.1.    Certain Definitions and Provisions Relating to Option Transactions ......................... 8
SECTION 2.2.    Option Style ........................................................................................................... 9
SECTION 2.3.    Option Type ............................................................................................................ 9
SECTION 2.4.    Terms Relating to Premium ..................................................................................... 10

## ARTICLE 3

### EXERCISE OF OPTIONS

SECTION 3.1.    General Terms Relating to Exercise .......................................................................... 10
SECTION 3.2.    Procedure for Exercise ........................................................................................... 11
SECTION 3.3.    Multiple Exercise .................................................................................................... 12
SECTION 3.4.    Automatic Exercise ................................................................................................. 12

## ARTICLE 4

### GENERAL TERMS RELATING TO FORWARD TRANSACTIONS

SECTION 4.1.    Certain Definitions Relating to Forward Transactions ............................................... 13
SECTION 4.2.    Terms Relating to Prepayment ................................................................................. 14

## ARTICLE 5

### GENERAL TERMS RELATING TO EQUITY SWAP TRANSACTIONS

SECTION 5.1.    Equity Amount Payer ............................................................................................. 14
SECTION 5.2.    Equity Amount Receiver .......................................................................................... 14
SECTION 5.3.    Initial Exchange Amount ......................................................................................... 14
SECTION 5.4.    Initial Exchange Date .............................................................................................. 14
SECTION 5.5.    Final Exchange Amount ........................................................................................... 15
SECTION 5.6.    Final Exchange Date ............................................................................................... 15
SECTION 5.7.    Rate of Return ........................................................................................................ 15
SECTION 5.8.    Initial Price ............................................................................................................ 15
SECTION 5.9.    Final Price .............................................................................................................. 15
SECTION 5.10.    Equity Notional Reset ........................................................................................... 16

## ARTICLE 6

### VALUATION

SECTION 6.1.   Valuation Time ................................................................................................ 16
SECTION 6.2.   Valuation Date ................................................................................................. 16
SECTION 6.3.   General Terms Relating to Market Disruption Events ................................... 16
SECTION 6.4.   Disrupted Day .................................................................................................. 17
SECTION 6.5.   Scheduled Valuation Date ............................................................................... 17
SECTION 6.6.   Consequences of Disrupted Days ................................................................... 17
SECTION 6.7.   Averaging ......................................................................................................... 18
SECTION 6.8.   Futures Price Valuation .................................................................................. 20

## ARTICLE 7

### GENERAL TERMS RELATING TO SETTLEMENT

SECTION 7.1.   Settlement Method Election ............................................................................ 22
SECTION 7.2.   Settlement Method Election Date .................................................................... 22
SECTION 7.3.   Settlement Price .............................................................................................. 22

## ARTICLE 8

### CASH SETTLEMENT

SECTION 8.1.   Cash Settlement of Option Transactions ........................................................ 23
SECTION 8.2.   Option Cash Settlement Amount ..................................................................... 23
SECTION 8.3.   Strike Price Differential ................................................................................. 23
SECTION 8.4.   Cash Settlement of Forward Transactions ..................................................... 23
SECTION 8.5.   Forward Cash Settlement Amount .................................................................. 24
SECTION 8.6.   Cash Settlement of Equity Swap Transactions ............................................... 25
SECTION 8.7.   Equity Amount ................................................................................................. 25
SECTION 8.8.   Cash Settlement Payment Date ....................................................................... 25

## ARTICLE 9

### PHYSICAL SETTLEMENT

SECTION 9.1.    Physical Settlement of Option Transactions ................................................. 26
SECTION 9.2.    Physical Settlement of Forward Transactions ............................................... 26
SECTION 9.3.    Physical Settlement of Equity Swap Transactions ........................................ 27
SECTION 9.4.    Settlement Date .............................................................................................. 27
SECTION 9.5.    Number of Shares to be Delivered ................................................................ 28
SECTION 9.6.    Number of Baskets to be Delivered ............................................................... 28
SECTION 9.7     Fractional Share Amount ............................................................................... 29
SECTION 9.8.    Settlement Disruption Event .......................................................................... 30
SECTION 9.9.    Expenses .......................................................................................................... 30
SECTION 9.10.   Delivery Versus Payment ............................................................................... 30
SECTION 9.11.   Representation and Agreement ....................................................................... 30
SECTION 9.12.   Indemnification for Failure to Deliver. ......................................................... 30

**ARTICLE 10**

DIVIDENDS

SECTION 10.1.   Dividend Amount ........................................................................... 31
SECTION 10.2.   Dividend Payment Date .................................................................. 31
SECTION 10.3.   Dividend Period .............................................................................. 31
SECTION 10.4.   Re-investment of Dividends ........................................................... 32
SECTION 10.5.   Dividend Payment Obligations Relating to Physically-settled Option Transactions .................................................................................... 32
SECTION 10.6   Extraordinary Dividend ................................................................... 32
SECTION 10.7   Excess Dividend Amount ................................................................ 32

**ARTICLE 11**

ADJUSTMENTS AND MODIFICATIONS AFFECTING INDICES, SHARES AND TRANSACTIONS

SECTION 11.1.   Adjustments to Indices .................................................................... 33
SECTION 11.2.   Adjustments to Share Transactions and Share Basket Transactions ............. 34
SECTION 11.3.   Adjustments to Certain Share Transactions and Share Basket Transactions in European Currencies ...................................................................... 36
SECTION 11.4   Correction of Share Prices and Index Levels ................................. 36

**ARTICLE 12**

EXTRAORDINARY EVENTS

SECTION 12.1.   General Provisions Relating to Extraordinary Events ..................... 37
SECTION 12.2.   Consequences of Merger Events ...................................................... 39
SECTION 12.3.   Consequences of Tender Offers ...................................................... 40
SECTION 12.4.   Settlement Following a Merger Event or Tender Offer .................. 41
SECTION 12.5.   Composition of Combined Consideration ....................................... 42
SECTION 12.6.   Nationalization, Insolvency and Delisting ...................................... 43
SECTION 12.7.   Payment upon Certain Extraordinary Events .................................. 44
SECTION 12.8.   Cancellation Amount ...................................................................... 46
SECTION 12.9.   Additional Disruption Events .......................................................... 47

**ARTICLE 13**

MISCELLANEOUS

SECTION 13.1.   Non-Reliance .................................................................................. 52
SECTION 13.2.   Agreements and Acknowledgments Regarding Hedging Activities ......... 52
SECTION 13.3.   Index Disclaimer ............................................................................ 53
SECTION 13.4.   Additional Acknowledgments ......................................................... 53

INDEX OF TERMS ................................................................................................... 55

iv

## INTRODUCTION TO THE 2002 ISDA EQUITY DERIVATIVES DEFINITIONS

The 2002 ISDA Equity Derivatives Definitions (the "2002 Definitions") are intended for use in confirmations of individual equity derivatives transactions ("Confirmations") governed by agreements such as the 1992 ISDA Master Agreement or 2002 ISDA Master Agreement (the "ISDA Master Agreements") published by the International Swaps and Derivatives Association, Inc. ("ISDA"). Copies of the ISDA Master Agreements are available from the executive offices of ISDA and also from the ISDA web-site (www.isda.org). A sample form of letter agreement constituting a Confirmation can be obtained from ISDA's web-site.

The 2002 Definitions revise and expand the 1996 ISDA Equity Derivatives Definitions (the "1996 Definitions"). The 2002 Definitions extend the product range covered to include:

- forwards (which are the subject of a separate article, Article 4);
- barrier instruments; and
- Bermuda options.

The 2002 Definitions also rework key procedures, notably the consequences of Merger Events and the approach to disruptions of trading activity. More details on these and other changes are given below.

The 2002 Definitions are intended to provide a basic framework for documenting OTC equity derivative transactions. As with other product-specific definitions published by ISDA, however, parties using the 2002 Definitions to document privately negotiated equity derivatives transactions may adapt or supplement the standard provisions set out in these 2002 Definitions to reflect the specific economic terms agreed between the parties to the relevant Transaction.

These 2002 Definitions can be incorporated by reference into any Confirmation. Existing Confirmations that incorporate the 1996 Definitions (or their predecessor 1994 ISDA Equity Option Definitions) will not, without further action by the parties, be affected by the use of these 2002 Definitions for other Transactions.

These 2002 Definitions are intended to reflect a global market standard. It is recognized, however, that, in documenting a given Transaction, parties may see a need to address considerations specific to particular jurisdictions, and the 2002 Definitions reflect this fact too. For instance, the process of determining the effective date for a merger is not the same worldwide, and the role or potential role of the Calculation Agent is evident in a number of provisions as a result of such variations of local practice and the consequent need to accommodate various approaches within the 2002 Definitions.

Users of these 2002 Definitions should satisfy themselves that any particular term or provision suits their intention in a given Transaction, or they should amend the term or provision accordingly, which any party remains free to do.

### New Features – An Overview

A fundamental change from the 1996 Definitions relates to settlement provisions. These provisions were previously tied exclusively to options but, in the 2002 Definitions, have become generic, such that parties may choose to stipulate physical or cash settlement for any instrument, whether option, swap or forward.

v

There is also a provision (denoted Settlement Method Election) designed to support instruments whose terms permit, at some point during the life of the instrument, a choice between physical and cash settlement by one of the parties.

Regarding the Consequences of Merger Events, parties have a broader range of alternatives to choose from. In particular, under the Cancellation and Payment alternative for option transactions, parties have a further choice, between more structured and more flexible approaches. The 2002 Definitions also have elective provisions that are designed to deal with tender offers and a number of other circumstances, notably disruptions to hedging and stock borrowing.

Since the publication of the 1996 Definitions, use of electronic mail has grown considerably, among other things in the transmission of Confirmations. ISDA considers that such communications may constitute a form of written communication and has indicated this in Section 12(a) of the 2002 ISDA Master Agreement. These 2002 Definitions do not specifically mention use of electronic mail at those junctures where written notice is referred to. Parties are, however, advised that the 2002 ISDA Master Agreement specifically envisages the use of electronic mail in day-to-day communications, though excluding it for the purposes of notices under Section 5 (Events of Default and Termination Events) and Section 6 (Early Termination).

At the same time, these 2002 Definitions explicitly include 'non-reliance' language (see Article 13). The ISDA Equity Derivatives Committee indicated that this language should be available in support of equity derivatives transactions. It is accordingly envisaged that parties may invoke this language in Confirmations where an election to this effect is included. Article 13 also includes elective disclaimer provisions relating to hedging activities and the use of indices.

- **Specific Aspects of the 2002 Definitions.**   Below are more details on specific aspects of the 2002 ISDA Equity Derivatives Definitions.

  Examples of provisions for inclusion in Confirmations to document specific types of over-the-counter equity derivative transactions can be obtained from the ISDA web-site.

- **Forward Transactions.**   As mentioned above, the range of products covered by the 2002 Definitions builds on that in the 1996 Definitions. Perhaps the most fundamental addition involves forwards, which were deliberately omitted in the 1996 Definitions. A significant factor in their inclusion has been the range of forward products now traded by some counterparties, including prepaid and variable-obligation products.

- **Barrier Transactions.**   Barrier terms for equity derivatives transactions have grown in significance since the publication of the 1996 Definitions, and relevant terms have accordingly been included in the 2002 Definitions. Parties are advised to consider, among other things, the exact nature of the barrier Transaction concerned, and specifically whether the determination of a Knock-in Event or Knock-out Event is a function of the market at a particular time – as provided for in the 2002 Definitions – or of a 'one-touch' test involving the market price at any time on any Exchange Business Day that is also a Knock-in/Knock-out Determination Day. Barrier terms have been included in Article 1, so that they may be applied to any type of Transaction.

- **Basket Transactions.**   After careful consideration, there has been minimal change to the treatment of basket products. Thus, there continues to be an ability to isolate those components of a basket affected by a disruption for delayed valuation, while continuing to value those components that one

vi

can value. One additional provision is, however, worth noting: under Consequences of Merger Events (in Article 12.2), parties may now choose Partial Cancellation and Payment, which is a provision devised specifically for basket trades where only certain components of the basket may be directly affected by the event.

- **Business Days.** The 2002 Definitions support a finer distinction as to what constitutes an Exchange Business Day (and any disruptions to it). Specifically, they introduce the concept of Scheduled Trading Day, and amend accordingly the definition of Exchange Business Day. In particular, the term 'Scheduled' is designed to offer a clear yet flexible standard, reflecting the possibility that exchanges' schedules may change from time to time, for a variety of reasons, without market participants necessarily wanting to treat such changes as market disruptions.

  Separately, the term Currency Business Day has been updated to reflect the existence of the TARGET calendar associated with the euro.

- **Disruptions.** As indicated above, it is important in determining business days also to be able to determine what constitutes a disruption to such a day. The 2002 Definitions look to two main types of disruption in determining whether a Disrupted Day has occured: (a) failure to open or (b) Market Disruption Event. The latter is in turn a function of three possible occurrences: (1) Trading Disruption; (2) Exchange Disruption; or (3) early closing, though this last type of event is subject to a significant qualification as described further below.

  Of the three types of Market Disruption Event, Trading Disruption refers to a suspension or limitation of trading in shares (or, where relevant, a certain proportion of the shares in an index) or in related listed derivatives. This includes suspension or limitation by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange.

  Exchange Disruption refers to a more general category of event that affects the exchange with the consequence of affecting the shares or related listed derivatives, rather than specifically relating to them.

  Early closing is captured as a third form of Market Disruption Event, but does not apply if the closing is announced at least one hour before the closing in question or, if earlier, one hour before the submission deadline for orders to be entered for execution at the Valuation Time on that Exchange Business Day.

- **Consequences of Disruptions.** If there is a disruption which means that the prescribed valuation procedure cannot be followed, valuation may be delayed for up to eight Scheduled Trading Days after the originally scheduled Valuation Date. At the end of such period, the 2002 Definitions envisage that the Calculation Agent will determine the relevant valuation. The details of this contingency procedure are covered in Articles 6.6 – Consequences of Disrupted Days and 6.7, the latter dealing with disruptions to Averaging Dates. Similarly, there is a provision to delay an Expiration Date by up to eight Scheduled Trading Days after the originally scheduled Valuation Date. Exercise by notice, it should be noted, will still be binding, even if made on a Disrupted Day.

- **Merger Events.** A major objective in developing the 2002 Definitions was to ensure that the Consequences of Merger Events were updated to reflect the broad and diverse needs of parties in a variety of situations. This work involved a range of alterations to the 1996 Definitions. For example,

vii

one refinement has been to include Partial Cancellation and Payment, as described above. The 2002 Definitions also allow the application of relevant consequence provisions in the event of a Tender Offer (defined as an offer for more than 10% but fewer than 100% of the outstanding voting shares) affecting a share, as well as other events, including 'reverse' mergers.

Some Merger Event provisions will be familiar to users of the 1996 Definitions, including Alternative Obligation and Options Exchange Adjustment. There have, however, been fundamental changes to the way certain provisions operate. In particular, the mechanisms underlying Cancellation and Payment (including the new Partial Cancellation and Payment) have been reworked, with two alternatives available for option transactions. One alternative, Calculation Agent Determination, affords a significant degree of flexibility in relation to the determination of the amount payable in respect of a Cancellation and Payment. In the other, an Agreed Model sets out in considerable detail how the value of the Transaction upon cancellation should be determined, taking into account changes in the level of Implied Volatility and other specified factors relevant to the price of an option. These changes are determined at specified points in relation to the occurrence of the Merger Event.

This choice, between Agreed Model and Calculation Agent Determination for option transactions, is one to which users of these 2002 Definitions should consider carefully when selecting Cancellation and Payment or Partial Cancellation and Payment.

A further change concerns the addition of Calculation Agent Adjustment as a possible consequence specified for a Merger Event. Moreover, another new consequence has been introduced: Modified Calculation Agent Adjustment. The main difference between the two consequences is that, under Modified Calculation Agent Adjustment, the Calculation Agent may adjust the Transaction to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares but is prohibited from doing so under Calculation Agent Adjustment. Both elections allow the Calculation Agent to proceed to Cancellation and Payment (in which case the Calculation Agent Determination method will apply to option transactions and a Cancellation Amount will be determined by the Determining Party or Parties for forward and swap transactions) in the event that, in its view, no adjustment it could make to the Transaction would produce a commercially reasonable result.

Another alteration is that, with regards to a Share-for-Combined Merger Event, parties may specify "Component Adjustment", whereby they distinguish in terms of consequence between (a) that portion of the consideration that consists of New Shares and (b) the portion of the consideration that consists of Other Consideration. Under this provision, the consequence selected by the parties for a Share-for-Share Merger Event will apply to the former and that selected for a Share-for-Other Merger Event will apply to the latter.

Finally, with regards to Merger Events, users may wish to note that there is a certain amount of flexibility built into the determination of Merger Date. While specific standards apply in many jurisdictions, the evidence suggested that this was not consistent across jurisdictions and, in some instances, within them. A standard is therefore offered, but the need for flexibility is explicitly recognized too.

- **Additional Events.** Alongside Merger Events, the 2002 Definitions introduce a series of Additional Disruption Events, namely: "Change in Law", "Failure to Deliver", "Insolvency Filing", "Hedging

Disruption", "Increased Cost of Hedging", "Loss of Stock Borrow" and "Increased Cost of Stock Borrow". Any of these events can be elected to apply to a Transaction, and may trigger termination of the Transaction.

The 1996 Definitions included Nationalization and Insolvency as events that could lead to either Negotiated Close-out or Cancellation and Payment. Not only has Partial Cancellation and Payment been introduced in the 2002 Definitions as a possible consequence, consistent with the treatment of Merger Events (including Tender Offers), but a further event has been identified, namely Delisting.

- **Potential Adjustment Events.** Potential Adjustment Events now expressly specify the triggering of any shareholder rights plan or arrangement directed against hostile takeovers and involving the distribution of securities at a below-market price – an arrangement sometimes referred to as a 'poison pill'.

- **Dividends.** Consideration was given to the question of more detailed provisions in relation to Dividends. In the end, due to the jurisdiction and Transaction-specific nature of Dividend issues, the revision was limited in scope. In particular, because of the difficulties of determining in advance in any formulaic way what would constitute an Extraordinary Dividend, the details of this are left to parties to state in their Confirmations. The 2002 Definitions do, however, provide for the selection of record date, ex-dividend date or payment date as relevant to determining the Dividend Amount.

  If Re-investment of Dividends is selected by the parties to be applicable in an Equity Swap Transaction, the parties should note that Dividends shall not be deemed re-invested until the next Cash Settlement Payment Date. This approach removes for the purposes of the Transaction any economic exposure to that variable – and to interest rates – for the amount of the Dividend, for the time between payment of the Dividend and the next Cash Settlement Payment Date.

- **Settlement.** The settlement provisions have also been amended. While the pattern of market activity may suggest that certain types of Transaction are more likely to be subject to a particular form of settlement, members agreed that there was sufficient benefit to making these provisions fully modular, in the interests of maximum flexibility. A further level of flexibility is supported in Settlement Method Election, designed for instruments where a party may, during the life of the instrument, choose between Physical and Cash Settlement. Here though, certain default provisions are included (except for Option Transactions), reflecting the typical market-activity patterns alluded to above.

- **The Euro.** As mentioned above (in relation to the term Currency Business Day), the 2002 Definitions reflect the existence of the TARGET holiday calendar for business in the euro. In addition, Article 11 ensures that the Calculation Agent can take account of changes in the currency of quotation of shares underlying an equity derivative transaction from a 'legacy' currency to the euro.

- **Calculation Agent.** A certain amount of flexibility has been built into a number of the provisions in these 2002 Definitions, entailing the involvement of the Calculation Agent in relation to a given Transaction. Users of the 2002 Definitions are advised that the conduct of the Calculation Agent is subject to a general standard of acting in good faith and in a commercially reasonable manner, as set out in Section 1.40. Section 1.40 also states that the Calculation Agent is not acting as a fiduciary or advisor to any party to a Transaction.

ix

- **Incorporation of the 2002 Definitions.** The 2002 Definitions are intended wherever possible to operate on a free-standing basis and therefore, for most equity derivative transactions, there is no need to incorporate any other ISDA definitions booklets into the Confirmation of an equity derivative transaction. For Equity Swap Transactions, however, parties may wish to incorporate the 2000 ISDA Definitions if one leg of the Transaction involves payments of Floating Amounts linked to interest rates or currency exchange rates.

## Conclusion

ISDA has provided these 2002 Definitions to assist the smooth and efficient functioning of the equity derivatives market by providing a common set of terms for parties to use in preparing Confirmations for privately negotiated equity derivative transactions. *However, the precise documentation of each individual Transaction remains the responsibility of the parties concerned. ISDA assumes no responsibility for any use to which these 2002 Definitions may be put, including, without limitation, any use of these 2002 Definitions in connection with any privately negotiated equity derivative transaction. Each party to a Transaction evidenced by a Confirmation referring to or incorporating these 2002 Definitions must satisfy itself that the 2002 Definitions are appropriate for the Transaction, have been properly used and/or adapted in the Confirmation for the Transaction and that the Confirmation has generally been properly drafted, in each case, to reflect the commercial intentions of the parties. It should be noted that Confirmations that incorporate the 1996 ISDA Equity Derivatives Definitions shall continue to be governed by the 1996 ISDA Equity Derivatives Definitions. By using these 2002 Definitions to document an equity derivative transaction, no inference shall be made as to the meaning of any provision in the 1996 ISDA Equity Derivatives Definitions.*

This Introduction is not part of the 2002 Definitions and is not offered as an interpretation of the 2002 Definitions.

# 2002 ISDA EQUITY DERIVATIVES DEFINITIONS

Any or all of the following definitions and provisions may be incorporated into a document by wording in the document indicating that, or the extent to which, the document is subject to the 2002 ISDA Equity Derivatives Definitions (as published by the International Swaps and Derivatives Association, Inc.). All definitions and provisions so incorporated in a document will be applicable to that document unless otherwise provided in that document, and all terms defined in these Definitions and used in any definition or provision that is incorporated by reference in a document will have the respective meanings set forth in these Definitions unless otherwise provided in that document. Any term used in a document will, when combined with the name of a party, have meaning in respect of the named party only.

## ARTICLE 1

### CERTAIN GENERAL DEFINITIONS

**Section 1.1.  Transaction.** "Transaction" means an Option Transaction, a Forward Transaction, an Equity Swap Transaction or any other transaction in relation to which the related Confirmation incorporates these Definitions.

**Section 1.2.  Option Transaction.** "Option Transaction" means a transaction that is (a) an over-the-counter ("OTC") equity option transaction relating to a single index (an "Index Option Transaction"), (b) an OTC equity option transaction relating to a single share or other security (a "Share Option Transaction"), (c) an OTC equity option transaction relating to a basket of indices (an "Index Basket Option Transaction") or (d) an OTC equity option transaction relating to a basket of shares or other securities (a "Share Basket Option Transaction").

**Section 1.3.  Forward Transaction.** "Forward Transaction" means a transaction that is (a) an OTC equity forward transaction relating to a single index (an "Index Forward Transaction"), (b) an OTC equity forward transaction relating to a single share or other security (a "Share Forward Transaction"), (c) an OTC equity forward transaction relating to a basket of indices (an "Index Basket Forward Transaction") or (d) an OTC equity forward transaction relating to a basket of shares or other securities (a "Share Basket Forward Transaction").

**Section 1.4.  Equity Swap Transaction.** "Equity Swap Transaction" means a transaction that is (a) an OTC equity swap transaction relating to a single index (an "Index Swap Transaction"), (b) an OTC equity swap transaction relating to a single share or other security (a "Share Swap Transaction"), (c) an OTC equity swap transaction relating to a basket of indices (an "Index Basket Swap Transaction") or (d) an OTC equity swap transaction relating to a basket of shares or other securities (a "Share Basket Swap Transaction").

**Section 1.5.  Index Transaction.** "Index Transaction" means an Index Option Transaction, Index Forward Transaction or Index Swap Transaction.

**Section 1.6.  Share Transaction.** "Share Transaction" means a Share Option Transaction, Share Forward Transaction or Share Swap Transaction.

**Section 1.7.  Index Basket Transaction.**  "Index Basket Transaction" means an Index Basket Option Transaction, Index Basket Forward Transaction or Index Basket Swap Transaction.

**Section 1.8.  Share Basket Transaction.**  "Share Basket Transaction" means a Share Basket Option Transaction, Share Basket Forward Transaction or Share Basket Swap Transaction.

**Section 1.9.  Basket Option Transaction.**  "Basket Option Transaction" means an Index Basket Option Transaction or Share Basket Option Transaction.

**Section 1.10.  Basket Forward Transaction.**  "Basket Forward Transaction" means an Index Basket Forward Transaction or Share Basket Forward Transaction.

**Section 1.11.  Basket Swap Transaction.**  "Basket Swap Transaction" means an Index Basket Swap Transaction or Share Basket Swap Transaction.

**Section 1.12.  Confirmation.**  "Confirmation" means, in respect of a Transaction, one or more documents and other confirming evidence exchanged between the parties or otherwise effective, which when taken together confirm or evidence all of the terms of a Transaction.

**Section 1.13.  Index.**  "Index" means, in respect of an Index Transaction or Index Basket Transaction, each index specified as such in the related Confirmation.

**Section 1.14.  Shares.**  "Shares" means, in respect of a Share Transaction or Share Basket Transaction, the shares or other securities specified as such in the related Confirmation.

**Section 1.15.  Basket.**  "Basket" means, in respect of an Index Basket Transaction, a basket composed of each Index specified in the related Confirmation in the relative proportions specified in the related Confirmation and, in respect of a Share Basket Transaction, a basket composed of Shares of each Issuer specified in the related Confirmation in the relative proportions or numbers of Shares of each Issuer specified in the related Confirmation.

**Section 1.16.  Issuer.**  "Issuer" means, in respect of Shares, the issuer of the relevant Shares.

**Section 1.17.  Trade Date.**  "Trade Date" means, in respect of a Transaction, the date specified in the related Confirmation.

**Section 1.18.  Buyer.**  "Buyer" means the party specified as such in the related Confirmation.

**Section 1.19.  Seller.**  "Seller" means the party specified as such in the related Confirmation.

**Section 1.20.  Number of Shares.**  "Number of Shares" means:

(a)      in respect of a Share Option Transaction, the number of Shares obtained by multiplying the Number of Options by the Option Entitlement;

(b)      in respect of a Share Forward Transaction or a Share Swap Transaction, the number of Shares specified as such in the related Confirmation; and

(c)     in respect of a Share Basket Transaction for the Shares of each Issuer comprised in the Basket, the number of such Shares per Basket specified or otherwise determined as provided in the related Confirmation.

**Section 1.21.  Number of Baskets.**  "Number of Baskets" means, in respect of an Index Basket Transaction or a Share Basket Transaction, the number of Baskets specified or determined as provided in the related Confirmation.

**Section 1.22.  Multiplier.**  "Multiplier" means the percentage or amount specified as such in the related Confirmation.

**Section 1.23.  Relevant Price.**  "Relevant Price" on any day means:

(a)     in respect of an Index, the level of such Index determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or Averaging Date, as the case may be, or, if no means for determining the Relevant Price are so provided, the level of the Index as of the Valuation Time on the Valuation Date or Averaging Date, as the case may be; and

(b)     in respect of a Share, the price per Share determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or Averaging Date, as the case may be, or, if no means for determining the Relevant Price are so provided: (i) in respect of any Share for which the Exchange is an auction or "open outcry" exchange that has a price as of the Valuation Time at which any trade can be submitted for execution, the Relevant Price shall be the price per Share as of the Valuation Time on the Valuation Date or Averaging Date, as the case may be, as reported in the official real-time price dissemination mechanism for such Exchange; and (ii) in respect of any Share for which the Exchange is a dealer exchange or dealer quotation system, the Relevant Price shall be the mid-point of the highest bid and lowest ask prices quoted as of the Valuation Time on the Valuation Date or Averaging Date, as the case may be, (or the last such prices quoted immediately before the Valuation Time) without regard to quotations that "lock" or "cross" the dealer exchange or dealer quotation system.

**Section 1.24.  Equity Notional Amount.**  "Equity Notional Amount" means, in respect of an Equity Swap Transaction, the amount specified as such (or, if no such amount is specified, the amount specified as a "Notional Amount") in the related Confirmation, adjusted, if applicable, as provided in Sections 5.10 and 10.4 and Article 11.

**Section 1.25.  Exchange.**  "Exchange" means:

(a)     in respect of an Index relating to an Index Transaction or Index Basket Transaction, each exchange or quotation system specified as such for such Index in the related Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Shares underlying such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the Shares underlying such Index on such temporary substitute exchange or quotation system as on the original Exchange); and

(b)     in respect of a Share relating to a Share Transaction or Share Basket Transaction, each exchange or quotation system specified as such for such Share in the related Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in

the Share has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to such Share on such temporary substitute exchange or quotation system as on the original Exchange).

**Section 1.26. Related Exchange.** "Related Exchange" means, subject to the proviso below, in respect of an Index relating to an Index Transaction or Index Basket Transaction or a Share relating to a Share Transaction or Share Basket Transaction, each exchange or quotation system specified as such for such Index or Share in the related Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Index or such Share has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Index or such Share on such temporary substitute exchange or quotation system as on the original Related Exchange), provided, however, that where "All Exchanges" is specified as the Related Exchange in the related Confirmation, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Index or such Share.

**Section 1.27. Clearance System.** "Clearance System" means, in respect of a Share relating to a Physically-settled Transaction, the clearance system specified as such for such Share in the related Confirmation or any successor to such clearance system as determined by the Calculation Agent. If the related Confirmation does not specify a Clearance System, the Clearance System will be the principal domestic clearance system customarily used for settling trades in the relevant Share on the Settlement Date. If the Clearance System ceases to settle trades in such Share, the parties will negotiate in good faith to agree on another manner of delivery.

**Section 1.28. Index Sponsor.** "Index Sponsor" means the corporation or other entity that (a) is responsible for setting and reviewing the rules and procedures and the methods of calculation and adjustments, if any, related to the relevant Index and (b) announces (directly or through an agent) the level of the relevant Index on a regular basis during each Scheduled Trading Day.

**Section 1.29. Exchange Business Day.** "Exchange Business Day" means any Scheduled Trading Day on which each Exchange and each Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time.

**Section 1.30. Scheduled Closing Time.** "Scheduled Closing Time" means, in respect of an Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours.

**Section 1.31. Scheduled Trading Day.** "Scheduled Trading Day" means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions.

**Section 1.32. Currency Business Day.** "Currency Business Day" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the principal financial center for the relevant currency. In respect of any Transaction in

4

which the Settlement Currency is the euro, any day on which the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) system is open shall be a Currency Business Day.

**Section 1.33. Settlement Currency.** "Settlement Currency" means, in respect of a Transaction, the currency specified as such in the related Confirmation.

**Section 1.34. Euro.** "Euro" and "euro" each mean the lawful currency of the member states of the European Union that adopt the single currency in accordance with the EC Treaty.

**Section 1.35. EC Treaty.** "EC Treaty" means the Treaty establishing the European Community (signed in Rome on March 25, 1957), as amended by the Treaty on European Union (signed in Maastricht on February 7, 1992) and as amended by the Treaty of Amsterdam (signed in Amsterdam on October 2, 1997), as further amended from time to time.

**Section 1.36. Clearance System Business Day.** "Clearance System Business Day" means, in respect of a Clearance System, any day on which such Clearance System is (or, but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions.

**Section 1.37. Settlement Cycle.** "Settlement Cycle" means, in respect of an Index or Share, the period of Clearance System Business Days following a trade in the shares underlying such Index or such Shares, as the case may be, on the Exchange in which settlement will customarily occur according to the rules of such Exchange (or, if there are multiple Exchanges in respect of an Index, the longest such period), and in respect of an Exchange-traded Contract, the period of Exchange Business Days following a trade in such Exchange-traded Contract on the Exchange in which settlement will customarily occur according to the rules of such Exchange.

**Section 1.38. Cash-settled.** "Cash-settled" means, in respect of a Transaction, that Cash Settlement is applicable to that Transaction.

**Section 1.39. Physically-settled.** "Physically-settled" means, in respect of a Transaction, that Physical Settlement is applicable to that Transaction.

**Section 1.40. Calculation Agent.** "Calculation Agent" means the person or entity specified as such in the related Confirmation.   Whenever a Calculation Agent is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner.   Furthermore, each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to such party in respect of its duties as Calculation Agent in connection with any Transaction.

**Section 1.41. ISDA Master Agreement.** "ISDA Master Agreement" means one of the standard form master agreements published by the International Swaps and Derivatives Association, Inc.   The terms "Event of Default", "Affiliate" and "Early Termination Date" will have the meanings given to those terms in the ISDA Master Agreement.

**Section 1.42. Knock-in Price.** "Knock-in Price" means, in respect of a Transaction that is subject to a Knock-in Event, the level, price or amount specified as such in the related Confirmation.

Section 1.43. **Knock-out Price.** "Knock-out Price" means, in respect of a Transaction that is subject to a Knock-out Event, the level, price or amount specified as such in the related Confirmation.

Section 1.44. **Knock-in Event.**

(a)     If "Knock-in Event" is specified as applicable to a Transaction, then unless otherwise specified in the related Confirmation, a party's right to exercise an Option under an Option Transaction and its right to receive, or its obligation to make, a payment or delivery under an Option Transaction (once exercised or deemed exercised), a Forward Transaction or Equity Swap Transaction where such right or obligation is subject to a Knock-in Event shall be conditional upon the occurrence of the Knock-in Event on any Knock-in Determination Day as of the time of such exercise, deemed exercise, payment or delivery, and the parties shall have any other rights and obligations set forth in the related Confirmation from and after the occurrence of the Knock-in Event.

(b)     "Knock-in Event" means the event or occurrence specified as such in the related Confirmation. In the event that the related Confirmation does not specify such an event or occurrence but specifies a Knock-in Reference Security and/or a Knock-in Price, a Knock-in Event shall occur for a Transaction for which such Knock-in Reference Security is also the Index, Share or Basket specified in the related Confirmation: (i) where, on the Trade Date, the Knock-in Price is greater than the Initial Price, Strike Price, Forward Price or other initial level set for the Transaction, when the level, price or amount of the Knock-in Reference Security is also the Index, Share or Basket specified in the related Confirmation: (i) where, on the Trade Date, the Knock-in Price is greater than the Initial Price, Strike Price, Forward Price or other initial level set for the Transaction, when the level, price or amount of the Knock-in Reference Security determined as of the Knock-in Valuation Time on any Knock-in Determination Day is greater than or equal to the Knock-in Price; and (ii) where, on the Trade Date, the Knock-in Price is less than the Initial Price, Strike Price, Forward Price or other initial level set for the Transaction, when the level, price or amount of the Knock-in Reference Security determined as of the Knock-in Valuation Time on any Knock-in Determination Day is less than or equal to the Knock-in Price. In the event of a dispute between the parties as to whether a Knock-in Event has occurred, the Calculation Agent shall determine whether a Knock-in Event has occurred.

Section 1.45. **Knock-out Event.**

(a)     If "Knock-out Event" is specified as applicable to a Transaction, then unless otherwise specified in the related Confirmation, a party's right to exercise an Option under an Option Transaction and its right to receive, or its obligation to make, a payment or delivery under an Option Transaction (once exercised or deemed exercised), a Forward Transaction or Equity Swap Transaction where such right or obligation is subject to a Knock-out Event shall be conditional upon the Knock-out Event not having occurred on any Knock-out Determination Day as of the time of such exercise, deemed exercise, payment or delivery, and the parties shall have any other rights and obligations set forth in the related Confirmation from and after the occurrence of the Knock-out Event.

(b)     "Knock-out Event" means the event or occurrence specified as such in the related Confirmation. In the event that the related Confirmation does not specify such an event or occurrence but specifies a Knock-out Reference Security and/or a Knock-out Price, a Knock-out Event shall occur for a Transaction for which such Knock-out Reference Security is also the Index, Share or Basket specified in the related Confirmation: (i) where, on the Trade Date, the Knock-out Price is greater than the Initial Price, Strike Price, Forward Price or other initial level set for the Transaction, when the level, price or amount of the Knock-out Reference Security determined as of the Knock-out Valuation Time on any Knock-out Determination Day is greater than or equal to the Knock-out Price; and (ii) where, on the Trade Date, the Knock-out Price is less than the Initial Price, Strike Price, Forward Price or other initial

level set for the Transaction, when the level, price or amount of the Knock-out Reference Security determined as of the Knock-out Valuation Time on any Knock-out Determination Day is less than or equal to the Knock-out Price. In the event of a dispute between the parties as to whether a Knock-out Event has occurred, the Calculation Agent shall determine whether a Knock-out Event has occurred.

**Section 1.46. Knock-in Reference Security.** "Knock-in Reference Security" means, in respect of a Transaction for which a Knock-in Event is specified as being applicable, the index, share, other security or basket specified as such in the related Confirmation. In the event that the related Confirmation does not specify a Knock-in Reference Security, the Knock-in Reference Security will be deemed to be the same Index, Share or Basket, as the case may be, specified in the related Confirmation.

**Section 1.47. Knock-out Reference Security.** "Knock-out Reference Security" means, in respect of a Transaction for which a Knock-out Event is specified as being applicable, the index, share, other security or basket specified as such in the related Confirmation. In the event that the related Confirmation does not specify a Knock-out Reference Security, the Knock-out Reference Security will be deemed to be the same Index, Share or Basket, as the case may be, specified in the related Confirmation.

**Section 1.48. Knock-in Determination Day.** "Knock-in Determination Day" means, in respect of a Transaction for which a Knock-in Event is specified as being applicable, each Scheduled Trading Day specified as such in the related Confirmation, unless such day is a Disrupted Day due to the occurrence of an event giving rise to a Disrupted Day prior to the Knock-in Valuation Time on such day. If such day is a Disrupted Day due to the occurrence of such an event, then the Knock-in Determination Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the original date that, but for the occurrence of a Disrupted Day, would have been the Knock-in Determination Day is a Disrupted Day. In that case, that eighth Scheduled Trading Day shall be deemed to be the Knock-in Determination Day, notwithstanding the fact that such day is a Disrupted Day, and the Calculation Agent shall determine the level, price or amount of the Knock-in Reference Security in the same manner that it would determine a level, price or amount of an Index, Share or Basket on a deemed Valuation Date that is also a Disrupted Day in accordance with the provisions of Section 6.6(a)(ii), (b) or (c), as the case may be. In the event that the related Confirmation does not specify any Knock-in Determination Days, each Scheduled Trading Day from and including the Trade Date to and including the final Valuation Date, the Expiration Date or, if there is no such Valuation Date or Expiration Date, the date that is one Settlement Cycle prior to the final Settlement Date in relation to the Transaction (adjusted, if applicable, as provided in Sections 3.1(f) and 6.6) shall be deemed to be Knock-in Determination Days in relation to the Transaction.

**Section 1.49. Knock-out Determination Day.** "Knock-out Determination Day" means, in respect of a Transaction for which a Knock-out Event is specified as being applicable, each Scheduled Trading Day specified as such in the related Confirmation, unless such day is a Disrupted Day due to the occurrence of an event giving rise to a Disrupted Day prior to the Knock-out Valuation Time on such day. If such day is a Disrupted Day due to the occurrence of such an event, then the Knock-out Determination Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the original date that, but for the occurrence of a Disrupted Day, would have been the Knock-out Determination Day is a Disrupted Day. In that case, that eighth Scheduled Trading Day shall be deemed to be the Knock-out Determination Day, notwithstanding the fact that such day is a Disrupted Day, and the Calculation Agent shall determine the level, price or amount of the Knock-out Reference Security in the same manner that it would determine a

level, price or amount of an Index, Share or Basket on a deemed Valuation Date that is a Disrupted Day in accordance with the provisions of Section 6.6(a)(ii), (b) or (c), as the case may be. In the event that the related Confirmation does not specify any Knock-out Determination Days, each Scheduled Trading Day from and including the Trade Date to and including the final Valuation Date, the Expiration Date or, if there is no such Valuation Date or Expiration Date, the date that is one Settlement Cycle prior to the final Settlement Date in relation to the Transaction (adjusted, if applicable, as provided in Sections 3.1(f) and 6.6) shall be deemed to be Knock-out Determination Days in relation to the Transaction.

Section 1.50. **Knock-in Valuation Time.** "Knock-in Valuation Time" means, in respect of a Transaction that provides for a right to receive, or obligation to make, a payment or delivery that is subject to a Knock-in Event, the time on any Knock-in Determination Day specified as such in the related Confirmation. In the event that the related Confirmation does not specify a Knock-in Valuation Time, the Knock-in Valuation Time shall be the Valuation Time specified in the related Confirmation, or if no Valuation Time is specified, the Scheduled Closing Time on the relevant exchange for the Knock-in Reference Security on any Knock-in Determination Day, in relation to the index, share, other security or basket to be valued. If the relevant exchange closes prior to its Scheduled Closing Time and the specified Knock-in Valuation Time is after the actual closing time for its regular trading session, then the Knock-in Valuation Time shall be such actual closing time.

Section 1.51. **Knock-out Valuation Time.** "Knock-out Valuation Time" means, in respect of a Transaction that provides for a right to receive, or obligation to make, a payment or delivery that is subject to a Knock-out Event, the time on any Knock-out Determination Day specified as such in the related Confirmation. In the event that the related Confirmation does not specify a Knock-out Valuation Time, the Knock-out Valuation Time shall be the Valuation Time specified in the related Confirmation, or if no Valuation Time is specified, the Scheduled Closing Time on the relevant exchange for the Knock-out Reference Security on any Knock-out Determination Day, in relation to the index, share, other security or basket to be valued. If the relevant exchange closes prior to its Scheduled Closing Time and the specified Knock-out Valuation Time is after the actual closing time for its regular trading session, then the Knock-out Valuation Time shall be such actual closing time.

## ARTICLE 2

### GENERAL TERMS RELATING TO OPTION TRANSACTIONS

Section 2.1. **Certain Definitions and Provisions Relating to Option Transactions.** When used in relation to an Option Transaction, the following terms have the indicated meanings:

(a)    **Commencement Date.** "Commencement Date" means, in respect of an American Option Transaction, the date specified as such in the related Confirmation or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day. If no such date is specified, the Commencement Date shall be the Trade Date.

(b)    **Number of Options.** "Number of Options" means the number specified as such in the related Confirmation, being the number of Options comprised in the relevant Option Transaction.

(c)    **Option Entitlement.** "Option Entitlement" means, in respect of a Share Option Transaction, the number of Shares per Option specified as such in the related Confirmation and, in

8

respect of a Share Basket Option Transaction, the number of Baskets per Option specified as such in the related Confirmation. In the event that no Option Entitlement is specified in the related Confirmation, the Option Entitlement in respect of any Share Option Transaction shall be one Share per Option, and in respect of any Share Basket Option Transaction shall be one Basket per Option.

(d)  **Option.** "Option" means, in respect of an Option Transaction, each unit into which the Option Transaction is divided for purposes of exercise, valuation or settlement.

(e)  **Strike Price.** "Strike Price" means:

(i)  in respect of an Index Option Transaction, the level of the relevant Index specified or otherwise determined as provided in the related Confirmation;

(ii)  in respect of a Share Option Transaction, the price per Share specified or otherwise determined as provided in the related Confirmation;

(iii)  in respect of an Index Basket Option Transaction, the amount per Basket specified or otherwise determined as provided in the related Confirmation; and

(iv)  in respect of a Share Basket Option Transaction, the amount per Basket specified or otherwise determined as provided in the related Confirmation.

**Section 2.2.  Option Style.**

(a)  **American Option.** "American Option" means an Option Transaction, other than a Bermuda Option, pursuant to which the right or rights granted are exercisable on any Scheduled Trading Day during an Exercise Period that consists of more than one Scheduled Trading Day.

(b)  **Bermuda Option.** "Bermuda Option" means an Option Transaction pursuant to which the right or rights granted are exercisable only on the Potential Exercise Dates during the Exercise Period and on the Expiration Date.

(c)  **European Option.** "European Option" means an Option Transaction pursuant to which the right or rights granted are exercisable only on the Expiration Date.

**Section 2.3.  Option Type.**

(a)  **Call.** "Call" means an Option Transaction entitling Buyer upon exercise:

(i)  where "Cash Settlement" is applicable, to receive from Seller an Option Cash Settlement Amount if the Settlement Price exceeds the Strike Price; and

(ii)  where "Physical Settlement" is applicable, to purchase Shares or Baskets of Shares from Seller at the Settlement Price per Share or Basket,

in each case as more particularly provided in or pursuant to these Definitions and the related Confirmation.

9

(b)     **Put.** "Put" means an Option Transaction entitling Buyer upon exercise:

(i)     where "Cash Settlement" is applicable, to receive from Seller an Option Cash Settlement Amount if the Strike Price exceeds the Settlement Price; and

(ii)    where "Physical Settlement" is applicable, to sell Shares or Baskets of Shares to Seller at the Settlement Price per Share or Basket,

in each case as more particularly provided in or pursuant to these Definitions and the related Confirmation.

**Section 2.4. Terms Relating to Premium.**

(a)     **Payment of Premium.** In respect of an Option Transaction, Buyer shall pay Seller the Premium on the Premium Payment Date.

(b)     **Premium.** "Premium" means, in respect of an Option Transaction, the amount specified or otherwise determined as provided in the related Confirmation. If a Premium per Option is specified in the related Confirmation, the Premium shall be the product of the Premium per Option and the Number of Options.

(c)     **Premium Payment Date.** "Premium Payment Date" means, in respect of an Option Transaction, the date specified or otherwise determined as provided in the related Confirmation or, if such date is not a Currency Business Day for the currency in which the Premium is payable, the next following Currency Business Day. If the Premium Payment Date is not specified in the related Confirmation, the Premium Payment Date will fall on the date that is one Settlement Cycle following the Trade Date, or if such date is not a Currency Business Day, the next following Currency Business Day.

**ARTICLE 3**

EXERCISE OF OPTIONS

**Section 3.1. General Terms Relating to Exercise.**

(a)     **Exercise Period.** "Exercise Period" means, unless otherwise specified in the related Confirmation, (i) in respect of an American Option, all Scheduled Trading Days from, and including, the Commencement Date to, and including, the Expiration Date between 9:00 a.m. and the Latest Exercise Time, (ii) in respect of a Bermuda Option, each Potential Exercise Date between 9:00 a.m. and the Latest Exercise Time and the Expiration Date between 9:00 a.m. and the Latest Exercise Time, and (iii) in respect of a European Option, the Expiration Date between 9:00 a.m. and the Expiration Time. All times specified in this paragraph shall be, unless otherwise specified in the related Confirmation, local time in the location specified in the related Confirmation for receipt by Seller of notices relating to the Transaction or, where an agent is designated by Seller for the purpose of receiving notice of exercise ("Seller's Agent"), local time in the specified location of Seller's Agent or, where no such location is specified in the related Confirmation, local time in the jurisdiction of the Exchange.

10

(b)     **Exercise Date.**  "Exercise Date" means, in respect of an Option Transaction, the Scheduled Trading Day during the Exercise Period on which such Option is, or is deemed to be, exercised.

(c)     **Potential Exercise Date.**  "Potential Exercise Date" means, in respect of a Bermuda Option, each date specified as such in the related Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day), unless such date is a Disrupted Day due to the occurrence of an event giving rise to a Disrupted Day prior to the Latest Exercise Time on such date. If such date is a Disrupted Day due to the occurrence of such an event, then the Potential Exercise Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the original date that, but for the occurrence of a Disrupted Day, would have been the Potential Exercise Date is a Disrupted Day. In that case, that eighth Scheduled Trading Day shall be deemed to be the Potential Exercise Date, notwithstanding the fact that such day is a Disrupted Day.  Notwithstanding the foregoing, if an Option Transaction is exercised on a Scheduled Trading Day that would have been a Potential Exercise Date prior to the occurrence of an event giving rise to a Disrupted Day, such Scheduled Trading Day shall be deemed to be the Potential Exercise Date for the purpose of determining whether an Exercise Date has occurred during the Exercise Period.

(d)     **Latest Exercise Time.**  "Latest Exercise Time" means, in respect of an Option Transaction, the time specified as such in the related Confirmation, provided that on the Expiration Date the Latest Exercise Time shall be the Expiration Time.  If no such time is specified, the Latest Exercise Time shall be the Expiration Time.

(e)     **Expiration Time.**  "Expiration Time" means, in respect of an Option Transaction, the time specified as such in the related Confirmation.  If no such time is specified, the Expiration Time shall be the Valuation Time.

(f)     **Expiration Date.**  "Expiration Date" means, in respect of an Option Transaction, the date specified as such in the related Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day), unless such date is a Disrupted Day due to the occurrence of an event giving rise to a Disrupted Day prior to the Latest Exercise Time on such date.  If such date is a Disrupted Day due to the occurrence of such an event, then the Expiration Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the original date that, but for the occurrence of a Disrupted Day, would have been the Expiration Date is a Disrupted Day.  In that case, that eighth Scheduled Trading Day shall be deemed to be the Expiration Date, notwithstanding the fact that such day is a Disrupted Day. Notwithstanding the foregoing, if an Option Transaction is exercised on a Scheduled Trading Day that would have been an Expiration Date but for the occurrence of an event giving rise to a Disrupted Day, such Scheduled Trading Day shall be deemed to be the Expiration Date for the purpose of determining whether an Exercise Date has occurred during the Exercise Period.

**Section 3.2.  Procedure for Exercise.**  Except when Automatic Exercise applies, Buyer must give irrevocable notice (which will be oral telephonic notice if practicable, and otherwise written notice) during the Exercise Period to Seller, or, if applicable, Seller's Agent, of its exercise of an Option. In the case of an American Option, if the notice of exercise is given after the Latest Exercise Time on a Scheduled Trading Day, then that notice will be deemed given on the next following Scheduled Trading Day, if any, in the Exercise Period.  In the case of an American Option or a Bermuda Option to which

11

Multiple Exercise is applicable, Buyer must specify in the notice the number of Options being exercised on the relevant Exercise Date. Buyer will execute and deliver to Seller, or, if applicable, Seller's Agent, a written confirmation confirming the substance of any telephonic notice within one Scheduled Trading Day of that notice. Without limiting the obligation of Buyer to provide such written confirmation, failure by Buyer to provide it will not affect the validity of the telephonic notice.

**Section 3.3.  Multiple Exercise.**

(a)     If "Multiple Exercise" is specified to be applicable to an American Option or a Bermuda Option, Buyer may exercise all or less than all the unexercised Options on one or more Scheduled Trading Days during the Exercise Period but (except as set forth below) on any such Scheduled Trading Day may not exercise less than the Minimum Number of Options or more than the Maximum Number of Options and, if a number is specified as the "Integral Multiple" in the related Confirmation, the number of exercised Options must be equal to, or be an integral multiple of, the number so specified.  Except as set forth below, any attempt to exercise on any such Scheduled Trading Day:

(i)     more than the Maximum Number of Options will be deemed to be an exercise of the Maximum Number of Options (the number of Options exceeding the Maximum Number of Options being deemed to remain unexercised);

(ii)    less than the Minimum Number of Options will be ineffective; and

(iii)   an amount of Options not equal to or an integral multiple of the Integral Multiple will be deemed to be an exercise of a number of Options equal to the next lowest integral multiple of the Integral Multiple (the number of Options exceeding that number being deemed to remain unexercised).

(b)     Notwithstanding the foregoing, on any such Scheduled Trading Day Buyer may exercise any number of Options that does not exceed the Maximum Number of Options if it exercises all the Options remaining unexercised.  On the Expiration Date, Buyer may exercise any number of Options remaining unexercised.

(c)     "Minimum Number of Options" means, in respect of an Option Transaction to which Multiple Exercise is applicable, the number specified as such in the related Confirmation.

(d)     "Maximum Number of Options" means, in respect of an Option Transaction to which Multiple Exercise is applicable, the number specified as such in the related Confirmation.

**Section 3.4.  Automatic Exercise.**  If "Automatic Exercise" is specified to be applicable to an Option Transaction, then each Option not previously exercised under that Option Transaction will be deemed to be automatically exercised:

(a)     where "Cash Settlement" is applicable, at the Expiration Time on the Expiration Date unless Buyer notifies Seller or, if applicable, Seller's Agent (by telephone or in writing) prior to the Expiration Time on the Expiration Date that it does not wish Automatic Exercise to occur, in which case Automatic Exercise will not apply; and

(b)      where "Physical Settlement" is applicable, at the Expiration Time on the Expiration Date if at such time the Option is In-the-Money, as determined by the Calculation Agent, unless Buyer notifies Seller or, if applicable, Seller's Agent (by telephone or in writing) prior to the Expiration Time on the Expiration Date that it does not wish Automatic Exercise to occur, in which case Automatic Exercise will not apply.

(c)      "In-the-Money" means (i) in respect of a Call, that (A) the Reference Price is equal to or greater than the price for a Share at which any Related Exchange would automatically exercise a Physically-settled option with the Strike Price relating to such Share, or (B) if no options relating to such Share are listed on any Related Exchange or no Related Exchange is specified in the related Confirmation, the Reference Price is greater than the Strike Price; and (ii) in respect of a Put, that (A) the Reference Price is equal to or less than the price for a Share at which any Related Exchange would automatically exercise a Physically-settled option with the Strike Price relating to such Share, or (B) if no options relating to such Share are listed on any Related Exchange or no Related Exchange is specified in the related Confirmation, the Reference Price is less than the Strike Price.

(d)      "Reference Price" means the price per Share or amount per Basket determined as provided in the related Confirmation as of the Expiration Time on the Expiration Date or, if no means of determining such price or amount are so provided, in respect of a Share Option Transaction, the Relevant Price of the Share (for which purpose the Valuation Time and the Valuation Date will be the Expiration Time and the Expiration Date, respectively) and, in respect of a Share Basket Option Transaction, the sum of the values calculated as of the Expiration Time on the Expiration Date for the Shares of each Issuer as the product of the Relevant Price of such Share (for which purpose the Valuation Time and the Valuation Date will be the Expiration Time and the Expiration Date, respectively) and the relevant Number of Shares comprised in the Basket.

## ARTICLE 4

### GENERAL TERMS RELATING TO FORWARD TRANSACTIONS

**Section 4.1.  Certain Definitions Relating to Forward Transactions.** When used in respect of a Forward Transaction, the following terms have the indicated meanings:

(a)      **Forward Price.**  "Forward Price" means:

(i)      in respect of an Index Forward Transaction, the level of the relevant Index specified or otherwise determined as provided in the related Confirmation;

(ii)      in respect of a Share Forward Transaction, the price per Share specified or otherwise determined as provided in the related Confirmation;

(iii)      in respect of an Index Basket Forward Transaction, the amount per Basket specified or otherwise determined as provided in the related Confirmation; and

(iv)      in respect of a Share Basket Forward Transaction, the amount per Basket specified or otherwise determined as provided in the related Confirmation.

13

(b)     **Forward Floor Price.** "Forward Floor Price" means the level of the Index, price per Share or amount per Basket, as applicable, specified or otherwise determined as provided in the related Confirmation.

(c)     **Forward Cap Price.** "Forward Cap Price" means the level of the Index, price per Share or amount per Basket, as applicable, specified or otherwise determined as provided in the related Confirmation.

**Section 4.2.  Terms Relating to Prepayment.**

(a)     **Payment of the Prepayment Amount.** In respect of a Forward Transaction to which "Prepayment" is specified as applicable in the related Confirmation, Buyer shall pay Seller the Prepayment Amount on the Prepayment Date.

(b)     **Prepayment Amount.** "Prepayment Amount" means the amount specified or otherwise determined as provided in the related Confirmation.

(c)     **Prepayment Date.** "Prepayment Date" means the date specified or otherwise determined as provided in the related Confirmation, or, if such date is not a Currency Business Day, the next following Currency Business Day.   If the Prepayment Date is not specified in the related Confirmation, the Prepayment Date will fall on the date that is one Settlement Cycle following the Trade Date, or if such date is not an Exchange Business Day that is a Currency Business Day, the next following Exchange Business Day that is a Currency Business Day.

## ARTICLE 5

### GENERAL TERMS RELATING TO EQUITY SWAP TRANSACTIONS

**Section 5.1.  Equity Amount Payer.** "Equity Amount Payer" means, in respect of an Equity Swap Transaction, the party or parties specified as such in the related Confirmation.

**Section 5.2.  Equity Amount Receiver.** "Equity Amount Receiver" means, in respect of an Equity Swap Transaction, the party or parties specified as such in the related Confirmation. If a party is not specified as such in the related Confirmation, then in respect of an Equity Amount Payer, the Equity Amount Receiver shall be the other party to the Equity Swap Transaction.

**Section 5.3.  Initial Exchange Amount.** "Initial Exchange Amount", if applicable, means, in respect of an Equity Swap Transaction and a party, an amount that is specified as such in the related Confirmation for that party and is payable by that party on the Initial Exchange Date.

**Section 5.4.  Initial Exchange Date.** "Initial Exchange Date" means the date specified as such or otherwise determined as provided in the related Confirmation, or, if such date is not an Exchange Business Day that is a Currency Business Day, the next following Exchange Business Day that is a Currency Business Day.

14

Section 5.5. **Final Exchange Amount.** "Final Exchange Amount", if applicable, means, in respect of an Equity Swap Transaction and a party, an amount that is specified as such in the related Confirmation for that party and is payable by that party on the Final Exchange Date.

Section 5.6. **Final Exchange Date.** "Final Exchange Date" means the date specified as such or otherwise determined as provided in the related Confirmation, or, if such date is not an Exchange Business Day that is a Currency Business Day, the next following Exchange Business Day that is a Currency Business Day.

Section 5.7. **Rate of Return.** "Rate of Return" means, in respect of each Cash Settlement Payment Date, a rate determined by the Calculation Agent as of the relevant Valuation Date to which the Cash Settlement Payment Date relates on a formula basis as follows:

$$\frac{\text{Final Price - Initial Price}}{\text{Initial Price}} \text{ x Multiplier (if any).}$$

Section 5.8. **Initial Price.** "Initial Price" means, in respect of the first Valuation Date under an Equity Swap Transaction, the price specified as such or otherwise determined as provided in the related Confirmation, and in respect of each subsequent Valuation Date, the Final Price for the Valuation Date immediately preceding such Valuation Date.

Section 5.9. **Final Price.** "Final Price" means, in respect of each Valuation Date:

(a)     in respect of an Index Swap Transaction, the level of the Index determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or, if no means for determining the Final Price are so provided, the level of the Index as of the Valuation Time on the Valuation Date;

(b)     in respect of a Share Swap Transaction, the price per Share determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or, if no means for determining the Final Price are so provided: (i) in respect of any Share for which the Exchange is an auction or "open outcry" exchange that has a price as of the Valuation Time at which any trade can be submitted for execution, the Final Price shall be the price per Share as of the Valuation Time on the Valuation Date, as reported in the official real-time price dissemination mechanism for such Exchange; and (ii) in respect of any Share for which the Exchange is a dealer exchange or dealer quotation system, the Final Price shall be the mid-point of the highest bid and lowest ask prices quoted as of the Valuation Time on the Valuation Date (or the last such prices quoted immediately before the Valuation Time), without regard to quotations that "lock" or "cross" the dealer exchange or dealer quotation system;

(c)     in respect of an Index Basket Swap Transaction, an amount for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on the Valuation Date or, if no means for determining the Final Price are so provided, an amount for the Basket equal to the sum of the Relevant Prices (weighted or adjusted in relation to each Index as provided in the related Confirmation) for the Indices comprised in the Basket; and

(d)     in respect of a Share Basket Swap Transaction, an amount for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on the

15

Valuation Date or, if no means for determining the Final Price are so provided, an amount for the Basket equal to the sum of the values for the Shares of each Issuer as the product of (i) the Relevant Price of such Share and (ii) the relevant Number of Shares comprised in the Basket.

**Section 5.10.  Equity Notional Reset.**  In respect of each Cash Settlement Payment Date for an Equity Amount Payer under an Equity Swap Transaction, if "Equity Notional Reset" is specified as applicable in the related Confirmation, then:

(a)    the Equity Notional Amount applicable in respect of the first Cash Settlement Payment Date for that Equity Amount Payer under the relevant Equity Swap Transaction will be the amount specified as such in the related Confirmation;

(b)    the Equity Notional Amount applicable in respect of each subsequent Cash Settlement Payment Date will be the sum of (i) the Equity Notional Amount in respect of the prior Cash Settlement Payment Date and (ii) the Equity Amount, whether positive or negative, in respect of the prior Cash Settlement Payment Date; and

(c)    if a "Notional Amount" has been specified in the related Confirmation in relation to the other party, the Notional Amount will be adjusted, unless otherwise specified in the related Confirmation, as provided in sub-clauses (a) and (b) above as though it were an Equity Notional Amount.

## ARTICLE 6

## VALUATION

**Section 6.1.  Valuation Time.**  "Valuation Time" means the time on the relevant Valuation Date or Averaging Date, as the case may be, specified as such in the related Confirmation or, if no such time is specified, the Scheduled Closing Time on the relevant Exchange on the relevant Valuation Date or Averaging Date, as the case may be, in relation to each Index or Share to be valued.  If the relevant Exchange closes prior to its Scheduled Closing Time and the specified Valuation Time is after the actual closing time for its regular trading session, then the Valuation Time shall be such actual closing time.

**Section 6.2.  Valuation Date.**  "Valuation Date" means, in respect of an Option Transaction, each Exercise Date and, in respect of a Forward Transaction or an Equity Swap Transaction, each date specified as such or otherwise determined as provided in the related Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day), in each case, subject to the provisions of Section 6.6 below.

**Section 6.3.  General Terms Relating to Market Disruption Events.**

(a)    **Market Disruption Event.**  "Market Disruption Event" means in respect of a Share or an Index, the occurrence or existence of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be, or (iii) an Early Closure.  For the purposes of determining whether a Market Disruption Event in respect of an Index exists at any time, if a Market Disruption Event occurs in respect of a security included in the Index at any time, then the relevant percentage contribution of that security

16

to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that security and (y) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event.

(b)   **Trading Disruption.**   "Trading Disruption" means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) relating to the Share on the Exchange (or in the case of an Index Transaction or Index Basket Transaction on any relevant Exchange(s) relating to securities that comprise 20 percent or more of the level of the relevant Index), or (ii) in futures or options contracts relating to the Share or the relevant Index on any relevant Related Exchange.

(c)   **Exchange Disruption.**   "Exchange Disruption" means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, the Shares on the Exchange (or in the case of an Index Transaction or Index Basket Transaction, on any relevant Exchange(s) in securities that comprise 20 percent or more of the level of the relevant Index), or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Share or the relevant Index on any relevant Related Exchange.

(d)   **Early Closure.**   "Early Closure" means the closure on any Exchange Business Day of the relevant Exchange (or in the case of an Index Transaction or Index Basket Transaction, any relevant Exchange(s) relating to securities that comprise 20 percent or more of the level of the relevant Index) or any Related Exchange(s) prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day.

**Section 6.4.   Disrupted Day.**   "Disrupted Day" means any Scheduled Trading Day on which a relevant Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties or other party, as the case may be, of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been an Averaging Date, a Valuation Date, a Potential Exercise Date, a Knock-in Determination Day, a Knock-out Determination Day or an Expiration Date. Without limiting the obligation of the Calculation Agent to notify the parties as set forth in the preceding sentence, failure by the Calculation Agent to notify the parties of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day on any Transaction.

**Section 6.5.   Scheduled Valuation Date.**   "Scheduled Valuation Date" means any original date that, but for the occurrence of an event causing a Disrupted Day, would have been a Valuation Date (ignoring for the purposes of this Section 6.5 any postponement of the Potential Exercise Date or Expiration Date as a result of the occurrence of a Disrupted Day and assuming that the original Potential Exercise Date or original Expiration Date, as the case may be, would have been a Valuation Date).

**Section 6.6.   Consequences of Disrupted Days.**   If any Valuation Date is a Disrupted Day, then:

17

(a)      in the case of an Index Transaction or Share Transaction, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day. In that case, (i) that eighth Scheduled Trading Day shall be deemed to be the Valuation Date, notwithstanding the fact that such day is a Disrupted Day, and (ii) the Calculation Agent shall determine:

(A)      in respect of an Index Transaction, the level of the Index as of the Valuation Time on that eighth Scheduled Trading Day in accordance with the formula for and method of calculating the Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on that eighth Scheduled Trading Day of each security comprised in the Index (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant security on that eighth Scheduled Trading Day, its good faith estimate of the value for the relevant security as of the Valuation Time on that eighth Scheduled Trading Day); and

(B)      in respect of a Share Transaction, its good faith estimate of the value for the Share as of the Valuation Time on that eighth Scheduled Trading Day;

(b)      in the case of an Index Basket Transaction, the Valuation Date for each Index not affected by the occurrence of a Disrupted Day shall be the Scheduled Valuation Date, and the Valuation Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to that Index, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day relating to that Index. In that case, (i) that eighth Scheduled Trading Day shall be deemed to be the Valuation Date for the relevant Index, notwithstanding the fact that such day is a Disrupted Day, and (ii) the Calculation Agent shall determine the level of that Index as of the Valuation Time on that eighth Scheduled Trading Day in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on that eighth Scheduled Trading Day of each security comprised in that Index (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant security on that eighth Scheduled Trading Day, its good faith estimate of the value for the relevant security as of the Valuation Time on that eighth Scheduled Trading Day); and

(c)      in the case of a Share Basket Transaction, the Valuation Date for each Share not affected by the occurrence of a Disrupted Day shall be the Scheduled Valuation Date, and the Valuation Date for each Share affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to that Share, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day relating to that Share. In that case, (i) that eighth Scheduled Trading Day shall be deemed to be the Valuation Date for the relevant Share, notwithstanding the fact that such day is a Disrupted Day, and (ii) the Calculation Agent shall determine its good faith estimate of the value for that Share as of the Valuation Time on that eighth Scheduled Trading Day.

**Section 6.7. Averaging.** If Averaging Dates are specified in the related Confirmation, then notwithstanding any other provisions of these Definitions, the following provisions will apply to the valuation of the relevant Index, Share or Basket in respect of a Valuation Date:

(a)     **Averaging Date.**  "Averaging Date" means, in respect of each Valuation Date, each date specified or otherwise determined as provided in the related Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day).

(b)     **Settlement Price and Final Price.**  For purposes of determining the Settlement Price or the Final Price, as the case may be, in respect of a Valuation Date, the Settlement Price or the Final Price will be:

(i)     in respect of an Index Transaction or Cash-settled Share Transaction, the arithmetic mean of the Relevant Prices of the Index or the Shares on each Averaging Date;

(ii)     in respect of an Index Basket Transaction, the arithmetic mean of the amounts for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on each Averaging Date or, if no means for determining the Settlement Price or the Final Price are so provided, the arithmetic mean of the amounts for the Basket calculated on each Averaging Date as the sum of the Relevant Prices of each Index comprised in the Basket (weighted or adjusted in relation to each Index as provided in the related Confirmation); and

(iii)     in respect of a Cash-settled Share Basket Transaction, the arithmetic mean of the amounts for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on each Averaging Date or, if no means for determining the Settlement Price or the Final Price are so provided, the arithmetic mean of the amounts for the Basket calculated on each Averaging Date as the sum of the values calculated for the Shares of each Issuer as the product of (A) the Relevant Price of such Share and (B) the relevant Number of Shares comprised in the Basket.

(c)     **Averaging Date Disruption.**  If any Averaging Date is a Disrupted Day, then, if under "Averaging Date Disruption" the consequence specified in the related Confirmation is:

(i)     "Omission", then such Averaging Date will be deemed not to be a relevant Averaging Date for purposes of determining the relevant Settlement Price or Final Price.  If through the operation of this provision no Averaging Date would occur with respect to the relevant Valuation Date, then Section 6.6 will apply for purposes of determining the relevant level, price or amount on the final Averaging Date in respect of that Valuation Date as if such final Averaging Date were a Valuation Date that was a Disrupted Day;

(ii)     "Postponement", then Section 6.6 will apply for purposes of determining the relevant level, price or amount on that Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day irrespective of whether, pursuant to such determination, that deferred Averaging Date would fall on a date that already is or is deemed to be an Averaging Date for the Transaction; or

(iii)     "Modified Postponement", then:

(A)     in the case of an Index Transaction or a Share Transaction, the Averaging Date shall be the first succeeding Valid Date.  If the first succeeding Valid Date has not occurred as of the Valuation Time on the eighth Scheduled Trading Day

immediately following the original date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been the final Averaging Date in respect of the relevant Scheduled Valuation Date, then (1) that eighth Scheduled Trading Day shall be deemed the Averaging Date (irrespective of whether that eighth Scheduled Trading Day is already an Averaging Date), and (2) the Calculation Agent shall determine the relevant level or price for that Averaging Date in accordance with Section 6.6;

(B)    in the case of an Index Basket Transaction or a Share Basket Transaction, the Averaging Date for each Index or Share not affected by the occurrence of a Disrupted Day shall be the date specified in the Confirmation as an Averaging Date in respect of the relevant Valuation Date and the Averaging Date for an Index or Share affected by the occurrence of a Disrupted Day shall be the first succeeding Valid Date in relation to such Index or Share. If the first succeeding Valid Date in respect of such Index or Share has not occurred as of the Valuation Time on the eighth Scheduled Trading Day immediately following the original date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been the final Averaging Date in relation to the relevant Scheduled Valuation Date, then (1) that eighth Scheduled Trading Day shall be deemed to be the Averaging Date (irrespective of whether that eighth Scheduled Trading Day is already an Averaging Date) in respect of such Index or Share, and (2) the Calculation Agent shall determine the relevant level, price or amount for that Averaging Date in accordance with Section 6.6; and

(C)    "Valid Date" shall mean a Scheduled Trading Day that is not a Disrupted Day and on which another Averaging Date in respect of the relevant Valuation Date does not or is not deemed to occur.

(d)    If any Averaging Dates in relation to a Valuation Date occur after that Valuation Date as a result of the occurrence of a Disrupted Day, then (i) the relevant Cash Settlement Payment Date or Settlement Date, as the case may be, or (ii) the occurrence of an Extraordinary Event or a Potential Adjustment Event shall be determined by reference to the last such Averaging Date as though it were that Valuation Date.

(e)    **Adjustments to Indices.**  If (i) on or prior to any Averaging Date in respect of an Index Transaction or Index Basket Transaction an Index Modification or Index Cancellation occurs, or (ii) on any Averaging Date in respect of an Index Transaction or Index Basket Transaction an Index Disruption occurs, then the consequence specified in respect of Index Adjustment Events for the purpose of Section 11.1(b) shall apply to such Index Transaction or Index Basket Transaction.

**Section 6.8.  Futures Price Valuation.**  If "Futures Price Valuation" is specified as applicable in respect of an Index in the related Confirmation of an Index Transaction, then notwithstanding any other provisions of these Definitions the following provisions will apply to the valuation of that Index on a Valuation Date:

(a)    **Valuation Date.**  For the purpose of this Section 6.8 only, "Valuation Date" shall mean a day on which the Official Settlement Price is published and, in all cases except for Section 6.8(e), irrespective of whether such day is a Disrupted Day.

(b)     **Additional Definitions Relating to Futures Price Valuation.**

(i)     "Exchange-traded Contract" in relation to an Index means a contract specified as such for that Index in the related Confirmation. For this purpose, the parties shall specify the futures or options contract by reference to (A) the Index to which it relates, (B) the delivery month of such contract and (C) the exchange on which it is traded.

(ii)    "Official Settlement Price" means the official settlement price (however described under the rules of the relevant Exchange or its clearing house) of any of the relevant Exchange-traded Contracts published by the Exchange or its clearing house.

(c)     **Settlement Price and Final Price.** For purposes of determining the Settlement Price or the Final Price, as the case may be, on a Valuation Date:

(i)     in respect of an Index Transaction, the Settlement Price or the Final Price will be the Official Settlement Price on that Valuation Date; and

(ii)    in respect of an Index Basket Transaction, the Settlement Price or the Final Price will be determined as otherwise provided in these Definitions, provided, however, that in relation to each Index for which Futures Price Valuation is applicable, the Relevant Price will be the Official Settlement Price (weighted or adjusted in relation to that Index as provided in the related Confirmation) on that Valuation Date.

(d)     **Adjustments of the Exchange-traded Contract.** Without duplication of Section 11.1 (which shall govern in the event of any conflict), in the event that the terms of the Exchange-traded Contract are changed or modified by the Exchange, the Calculation Agent shall, if necessary, adjust one or more of the Strike Price, the Number of Options, the Initial Price, the Forward Price, the Forward Floor Price, the Forward Cap Price, the Knock-in Price, the Knock-out Price and/or any other variable relevant to the settlement terms of the Transaction to preserve for each party the economic equivalent of any payment or payments (assuming satisfaction of each applicable condition precedent) by the parties in respect of the Transaction that would have been required after the date of such change.

(e)     **Non-Commencement or Discontinuance of the Exchange-traded Contract.** If there is no Official Settlement Price as a result of the fact that trading in the Exchange-traded Contract never commences or is permanently discontinued at any time on or prior to a Valuation Date, the Official Settlement Price for that Valuation Date shall be deemed to be the level of the relevant Index at the close of the regular trading session on the relevant Exchange on the Valuation Date. If this Section 6.8(e) applies, then the Expiration Date, in respect of an Option Transaction, or the relevant Valuation Date, in respect of a Forward Transaction or an Equity Swap Transaction, shall mean the date that, but for the non-commencement or permanent discontinuance of the Exchange-traded Contract, would have been the date of publishing the relevant Official Settlement Price unless such day is a Disrupted Day, in which case the provisions of Sections 3.1(f) or 6.6, as applicable, will apply.

(f)     **Corrections of the Official Settlement Price.** If the Official Settlement Price for any Valuation Date is corrected and the correction is published by the relevant exchange within one Settlement Cycle for the related Exchange-traded Contract after the original publication, either party may notify the other party of that correction and the Calculation Agent will determine the amount that is

payable as a result of that correction and, to the extent necessary, will adjust the terms of such Transaction to account for such correction.

## ARTICLE 7

### GENERAL TERMS RELATING TO SETTLEMENT

**Section 7.1. Settlement Method Election.** If "Settlement Method Election" is specified in the related Confirmation to be applicable to a Transaction, then the party specified as entitled to make the election (or, if no party is so specified, Buyer or the Equity Amount Receiver, as the case may be where applicable) (the "Electing Party") must give irrevocable notice (which will be oral telephonic notice if practicable, and otherwise written notice) to the other party, or, if applicable, to the other party's agent designated for the purpose of receiving such notice, of its election to have Cash Settlement or Physical Settlement apply to such Transaction. Such notice will be given on or prior to the relevant Settlement Method Election Date and the Electing Party will execute and deliver to the other party or, if applicable, such agent, a written confirmation confirming the substance of any telephonic notice within one Scheduled Trading Day of that notice. Without limiting a party's obligation to provide such written confirmation, failure to provide it will not affect the validity of the telephonic notice. In the event that the Electing Party does not deliver any notice to the other party of the settlement method it has elected with respect to such Transaction, the settlement method shall be the default settlement method (the "Default Settlement Method") specified in the related Confirmation, or if no Default Settlement Method is specified, the settlement method in respect of an Index Transaction or an Equity Swap Transaction shall be Cash Settlement and the settlement method in respect of a Share Forward Transaction or a Share Basket Forward Transaction shall be Physical Settlement.

**Section 7.2. Settlement Method Election Date.** "Settlement Method Election Date" means the date specified as such in the related Confirmation, or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

**Section 7.3. Settlement Price.** "Settlement Price" means, in relation to a Valuation Date:

(a)      in respect of a Cash-settled Share Option Transaction or a Share Forward Transaction, the price per Share determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or, if no means for determining the Settlement Price are so provided (i) in respect of any Share for which the Exchange is an auction or "open outcry" exchange that has a price as of the Valuation Time at which any trade can be submitted for execution, the Settlement Price shall be the price per Share as of the Valuation Time on the Valuation Date as reported in the official real-time price dissemination mechanism for such Exchange; and (ii) in respect of any Share for which the Exchange is a dealer exchange or dealer quotation system, the Settlement Price shall be the mid-point of the highest bid and lowest ask prices quoted as of the Valuation Time on the Valuation Date (or the last such prices quoted immediately before the Valuation Time) without regard to quotations that "lock" or "cross" the dealer exchange or dealer quotation system;

(b)      in respect of a Cash-settled Share Basket Option Transaction or a Share Basket Forward Transaction, an amount for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on the Valuation Date or, if no means for determining the Settlement Price are so provided, an amount for the Basket equal to the sum of the values for the

22

Shares of each Issuer as the product of (i) the Relevant Price of such Share and (ii) the relevant Number of Shares comprised in the Basket;

(c)    in respect of a Physically-settled Share Option Transaction or a Physically-settled Share Basket Option Transaction, the Strike Price;

(d)    in respect of an Index Option Transaction or Index Forward Transaction, the level of the Index determined by the Calculation Agent as provided in the related Confirmation as of the Valuation Time on the Valuation Date or, if no means for determining the Settlement Price are so provided, the level of the Index as of the Valuation Time on the Valuation Date; and

(e)    in respect of an Index Basket Option Transaction or Index Basket Forward Transaction, an amount for the Basket determined by the Calculation Agent as provided in the related Confirmation as of the relevant Valuation Time(s) on the Valuation Date or, if no means for determining the Settlement Price are so provided, an amount for the Basket equal to the sum of the Relevant Prices (weighted or adjusted in relation to each Index as provided in the related Confirmation) for the Indices comprised in the Basket.

## ARTICLE 8

### CASH SETTLEMENT

**Section 8.1.  Cash Settlement of Option Transactions.**  In respect of each Exercise Date under an Option Transaction for which "Cash Settlement" is applicable, Seller shall pay to Buyer the Option Cash Settlement Amount, if any, on the relevant Cash Settlement Payment Date for all Options exercised or deemed exercised on that Exercise Date.

**Section 8.2.  Option Cash Settlement Amount.**  "Option Cash Settlement Amount" means, unless otherwise provided in the related Confirmation, in respect of each Valuation Date:

(a)    under an Index Option Transaction or Index Basket Option Transaction, an amount equal to the number of Options exercised or deemed exercised on the relevant Exercise Date multiplied by the Strike Price Differential multiplied by one unit of the Settlement Currency multiplied by the Multiplier, if any; and

(b)    under a Share Option Transaction or Share Basket Option Transaction, an amount equal to the number of Options exercised or deemed exercised on the relevant Exercise Date multiplied by the Option Entitlement multiplied by the Strike Price Differential.

**Section 8.3.  Strike Price Differential.**  "Strike Price Differential" means, unless otherwise provided in the related Confirmation, in respect of each Valuation Date, an amount equal to the greater of (a) the excess of (i) in the case of a Call, the relevant Settlement Price over the Strike Price or (ii) in the case of a Put, the Strike Price over the relevant Settlement Price, and (b) zero.

**Section 8.4.  Cash Settlement of Forward Transactions.**  In respect of each Cash Settlement Payment Date under a Forward Transaction for which "Cash Settlement" is applicable:

(a)    if "Prepayment" is not applicable:

(i)    if the Forward Cash Settlement Amount is a positive number, then Seller shall pay to Buyer the Forward Cash Settlement Amount on the relevant Cash Settlement Payment Date; and

(ii)    if the Forward Cash Settlement Amount is a negative number, then Buyer shall pay to Seller the absolute value of the Forward Cash Settlement Amount on the relevant Cash Settlement Payment Date; and

(b)    if "Prepayment" is applicable, then Seller will pay to Buyer on the relevant Cash Settlement Payment Date the sum of the Forward Cash Settlement Amount and the Excess Dividend Amount, if any.

**Section 8.5.  Forward Cash Settlement Amount.** "Forward Cash Settlement Amount" means, unless otherwise provided in the related Confirmation, in respect of each Valuation Date:

(a)    under an Index Forward Transaction or Index Basket Forward Transaction to which "Prepayment" is not applicable, an amount equal to the Settlement Price minus the Forward Price multiplied by one unit of the Settlement Currency multiplied by the Multiplier, if any;

(b)    under an Index Forward Transaction or Index Basket Forward Transaction to which "Prepayment" is applicable, an amount equal to the Settlement Price multiplied by one unit of the Settlement Currency multiplied by the Multiplier, if any;

(c)    under a Share Forward Transaction or Share Basket Forward Transaction to which "Prepayment" is not applicable and "Variable Obligation" is not applicable, an amount equal to the Number of Shares or the Number of Baskets, as the case may be, multiplied by an amount equal to the Settlement Price minus the Forward Price;

(d)    under a Share Forward Transaction or Share Basket Forward Transaction to which "Prepayment" is applicable and "Variable Obligation" is not applicable, an amount equal to the Number of Shares or the Number of Baskets, as the case may be, multiplied by the Settlement Price;

(e)    under a Share Forward Transaction or Share Basket Forward Transaction to which "Prepayment" is not applicable and "Variable Obligation" is applicable, an amount equal to the Number of Shares or the Number of Baskets, as the case may be, multiplied by:

(i)    if the Settlement Price is less than or equal to the Forward Floor Price, an amount equal to the Settlement Price minus the Forward Floor Price;

(ii)    if the Settlement Price is greater than the Forward Floor Price but less than or equal to the Forward Cap Price, zero; and

(iii)    if the Settlement Price is greater than the Forward Cap Price, an amount equal to the Settlement Price minus the Forward Cap Price; and

24

(f)     under a Share Forward Transaction or Share Basket Forward Transaction to which both "Prepayment" and "Variable Obligation" are applicable, an amount equal to the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be and in either case determined without regard to rounding, multiplied by the Settlement Price.

**Section 8.6.   Cash Settlement of Equity Swap Transactions.**   In respect of each Cash Settlement Payment Date for an Equity Amount Payer under an Equity Swap Transaction for which "Cash Settlement" is applicable:

(a)     if the Type of Return specified in the related Confirmation is "Price Return", then:

(i)     if the Equity Amount determined by the Calculation Agent in relation to that Equity Amount Payer is a positive number, then that Equity Amount Payer will pay (in addition to any other amounts payable by that Equity Amount Payer) to the Equity Amount Receiver the Equity Amount on the relevant Cash Settlement Payment Date; and

(ii)     if the Equity Amount determined by the Calculation Agent in relation to that Equity Amount Payer is a negative number, then the Equity Amount Receiver will pay (in addition to any other amounts payable by that Equity Amount Receiver) to the Equity Amount Payer the absolute value of the Equity Amount on the relevant Cash Settlement Payment Date;

(b)     if the Type of Return specified in the related Confirmation is "Total Return" and "Re-investment of Dividends" is not applicable, then Section 8.6(a) will apply as though Price Return were the applicable Type of Return and, in addition, on each Dividend Payment Date, the relevant Equity Amount Payer will pay to the Equity Amount Receiver the relevant Dividend Amount (if any) owed by such Equity Amount Payer on that Dividend Payment Date; and

(c)     if the Type of Return specified in the related Confirmation is "Total Return" and "Re-investment of Dividends" is applicable, then Section 8.6(a) will apply as though Price Return were the applicable Type of Return, provided that for purposes of determining the relevant Equity Amount for each subsequent Cash Settlement Payment Date the Calculation Agent shall make the adjustment provided for in Section 10.4.

**Section 8.7.   Equity Amount.** "Equity Amount" means, in respect of each Cash Settlement Payment Date and an Equity Amount Payer, an amount, determined by the Calculation Agent as of the Valuation Time on the Valuation Date to which the Cash Settlement Payment Date relates, equal to the product of the Equity Notional Amount and the Rate of Return.

**Section 8.8.   Cash Settlement Payment Date.** "Cash Settlement Payment Date" means any date specified or otherwise determined as provided in the related Confirmation or, if any such date is not a Currency Business Day, the next following Currency Business Day. If no such date is specified in the related Confirmation, the Cash Settlement Payment Date will fall on the date that is one Settlement Cycle following the Valuation Date, or if such date is not a Currency Business Day, the next following Currency Business Day. In the case of an Index Basket Transaction or Share Basket Transaction, if as a result of the occurrence of a Disrupted Day there is more than one Valuation Date with respect to Indices or Shares comprised in the Basket, then the relevant Cash Settlement Payment Date shall be determined by reference to the Valuation Date which is the last to occur.

**ARTICLE 9**

PHYSICAL SETTLEMENT

**Section 9.1. Physical Settlement of Option Transactions.** In respect of each Exercise Date under an Option Transaction for which "Physical Settlement" is applicable, on the relevant Settlement Date:

(a)     in the case of a Call, Buyer will pay to Seller the Settlement Price multiplied by the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be, (in either case determined without regard to rounding) and Seller will deliver to Buyer the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be, and will pay to Buyer the Fractional Share Amount, if any;

(b)     in the case of a Put, Buyer will deliver to Seller the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be, and will pay to Seller the Fractional Share Amount, if any, and Seller will pay to Buyer the Settlement Price multiplied by the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be (in either case determined without regard to rounding); and

(c)     such payment and such delivery will be made on the relevant Settlement Date through the relevant Clearance System(s) at the accounts specified in the related Confirmation.

**Section 9.2. Physical Settlement of Forward Transactions.** In respect of a Settlement Date under a Forward Transaction for which "Physical Settlement" is applicable, on the relevant Settlement Date:

(a)     in respect of a Share Forward Transaction:

(i)     if "Prepayment" is not applicable and "Variable Obligation" is not applicable, then Buyer will pay to Seller an amount equal to the Forward Price multiplied by the Number of Shares, and Seller will deliver to Buyer the Number of Shares to be Delivered and will pay to Buyer the Fractional Share Amount, if any;

(ii)     if "Prepayment" is not applicable and "Variable Obligation" is applicable, then Buyer will pay to Seller an amount equal to the Forward Floor Price multiplied by the Number of Shares, and Seller will deliver to Buyer the Number of Shares to be Delivered and will pay to Buyer the Fractional Share Amount, if any; and

(iii)     if "Prepayment" is applicable, then Seller will deliver to Buyer the Number of Shares to be Delivered and will pay to Buyer the Excess Dividend Amount, if any, and the Fractional Share Amount, if any; and

(b)     in respect of a Share Basket Forward Transaction:

(i)     if "Prepayment" is not applicable and "Variable Obligation" is not applicable, then Buyer will pay to Seller an amount equal to the Forward Price multiplied by the Number of

26

Baskets, and, in respect of each Issuer comprising the Basket, Seller will deliver to Buyer the Number of Shares of such Issuer multiplied by the Number of Baskets to be Delivered (rounded as provided in Section 9.6) and will pay to Buyer the Fractional Share Amount, if any;

(ii)   if "Prepayment" is not applicable and "Variable Obligation" is applicable, then Buyer will pay to Seller an amount equal to the Forward Floor Price multiplied by the Number of Baskets, and, in respect of each Issuer comprising the Basket, Seller will deliver to Buyer the Number of Shares of such Issuer multiplied by the Number of Baskets to be Delivered (rounded as provided in Section 9.6) and will pay to Buyer the Fractional Share Amount, if any; and

(iii)   if "Prepayment" is applicable, then, in respect of each Issuer comprising the Basket, Seller will deliver to Buyer the Number of Shares of such Issuer multiplied by the Number of Baskets to be Delivered (rounded as provided in Section 9.6) and will pay to Buyer the Excess Dividend Amount, if any, and the Fractional Share Amount, if any.

Any such payment and/or such delivery will be made through the relevant Clearance System(s) to the accounts of the Buyer or the Seller, as the case may be, specified in the related Confirmation.

**Section 9.3.  Physical Settlement of Equity Swap Transactions.**  In respect of each Settlement Date for an Equity Amount Payer under an Equity Swap Transaction for which "Physical Settlement" is applicable, on the relevant Settlement Date the Equity Amount Payer will deliver to the Equity Amount Receiver the Number of Shares to be Delivered or the Number of Baskets to be Delivered, as the case may be, and will pay to the Equity Amount Receiver the Fractional Share Amount, if any, and the Equity Amount Receiver will pay to the Equity Amount Payer the Equity Notional Amount. Such payment and such delivery will be made on the relevant Settlement Date through the relevant Clearance System(s) at the accounts specified in the related Confirmation.

**Section 9.4.  Settlement Date.**  "Settlement Date" means (a) in respect of Shares to be delivered in respect of an Exercise Date under an Option Transaction, the date that falls one Settlement Cycle following that Exercise Date (or, if such date is not a Clearance System Business Day, the next following Clearance System Business Day), and (b) in respect of Shares to be delivered under a Forward Transaction or an Equity Swap Transaction, the date specified as such in the related Confirmation or if none is specified, the date that falls one Settlement Cycle following the Valuation Date (or, if such date is not a Clearance System Business Day, the next following Clearance System Business Day), in each case unless a Settlement Disruption Event prevents delivery of such Shares on that date. If a Settlement Disruption Event does prevent delivery on that date, then the Settlement Date will be the first succeeding date on which delivery of the Shares can take place through the relevant Clearance System unless a Settlement Disruption Event prevents settlement on each of the eight relevant Clearance System Business Days immediately following the original date that, but for the Settlement Disruption Event, would have been the Settlement Date. In that case, (x) if such Shares can be delivered in any other commercially reasonable manner, then the Settlement Date will be the first date on which settlement of a sale of Shares executed on that eighth relevant Clearance System Business Day customarily would take place using such other commercially reasonable manner of delivery (which other manner of delivery will be deemed the relevant Clearance System for the purposes of delivery of the relevant Shares), and (y) if such Shares cannot be delivered in any other commercially reasonable manner, then the Settlement Date will be postponed until delivery can be effected through the relevant Clearance System or in any other commercially reasonable manner. In the case of a Share Basket Transaction, if as a result of a Settlement Disruption Event some but not all of the Shares comprised in a Basket are affected, the Settlement Date

for Shares not affected by the Settlement Disruption Event will be the original Settlement Date and the Settlement Date for the Shares that are affected by the Settlement Disruption Event shall be determined as provided above. In the event that a Settlement Disruption Event will result in the delivery on a Settlement Date of some but not all of the Shares comprised in a Basket, the Calculation Agent shall determine in its discretion the appropriate pro rata portion of the amount payable to be paid by the relevant party in respect of that partial settlement.

**Section 9.5. Number of Shares to be Delivered.** "Number of Shares to be Delivered" means the number of Shares calculated as set out below:

(a)     in respect of an Exercise Date under a Share Option Transaction, a number of Shares equal to the number of Options exercised or deemed exercised on that Exercise Date multiplied by the Option Entitlement;

(b)     under a Share Forward Transaction for which "Variable Obligation" is not applicable, the Number of Shares;

(c)     under a Share Forward Transaction for which "Variable Obligation" is applicable:

(i)     if the Settlement Price is less than or equal to the Forward Floor Price, the Number of Shares;

(ii)     if the Settlement Price is greater than the Forward Floor Price but less than or equal to the Forward Cap Price, a number of Shares equal to:

$$\frac{\text{Foward Floor Price}}{\text{Settlement Price}} \text{ x Number of Shares}$$

and

(iii)     if the Settlement Price is greater than the Forward Cap Price, a number of Shares equal to:

$$\frac{\text{Forward Floor Price} + (\text{Settlement Price} - \text{Forward Cap Price})}{\text{Settlement Price}} \text{ x Number of Shares}$$

and

(d)     under a Share Swap Transaction, the Number of Shares.

In the event that the number of Shares calculated as set out above comprises any fractional Share, the Number of Shares to be Delivered will include only whole Shares and a Fractional Share Amount will be payable by the relevant party in lieu of such fractional Share.

**Section 9.6. Number of Baskets to be Delivered.** "Number of Baskets to be Delivered" means:

(a)     in respect of an Exercise Date under a Share Basket Option Transaction, the number of Baskets equal to the number of Options exercised or deemed exercised on that Exercise Date multiplied by the Option Entitlement;

28

(b)      under a Share Basket Forward Transaction for which "Variable Obligation" is not applicable, the Number of Baskets;

(c)      under a Share Basket Forward Transaction for which "Variable Obligation" is applicable:

(i)      if the Settlement Price is less than or equal to the Forward Floor Price, the Number of Baskets;

(ii)      if the Settlement Price is greater than the Forward Floor Price but less than or equal to the Forward Cap Price, a number of Baskets equal to:

$$\frac{\text{Forward Floor Price}}{\text{Settlement Price}} \times \text{Number of Baskets}$$

and

(iii)      if the Settlement Price is greater than the Forward Cap Price, a number of Baskets equal to:

$$\frac{\text{Forward Floor Price} + (\text{Settlement Price} - \text{Forward Cap Price})}{\text{Settlement Price}} \times \text{Number of Baskets}$$

and

(d)      under a Share Basket Swap Transaction, the Number of Baskets.

In respect of an Issuer comprising the Basket, if the aggregate number of Shares of such Issuer calculated by multiplying the relevant Number of Shares by the Number of Baskets to be Delivered comprises a fractional Share, then the aggregate number of Shares of such Issuer that is delivered will include only whole Shares and a Fractional Share Amount will be payable by the relevant party in lieu of such fractional Share.

**Section 9.7. Fractional Share Amount.** "Fractional Share Amount" means an amount in the Settlement Currency representing the fractional Share resulting from the calculation of the Number of Shares to be Delivered or the Number of Baskets to be Delivered in respect of a Transaction as determined by the Calculation Agent multiplied by:

(a)      in respect of a Share Option Transaction or a Share Basket Option Transaction, the Settlement Price attributable to the relevant Share on the Exercise Date (determined assuming Cash Settlement were applicable and the Exercise Date were the Valuation Date);

(b)      in respect of a Share Forward Transaction or a Share Basket Forward Transaction, the Settlement Price attributable to the relevant Share on the Valuation Date related to the relevant Settlement Date (or, if there is no such Valuation Date, the date that is one Settlement Cycle prior to the relevant Settlement Date); and

(c)     in respect of a Share Swap Transaction or a Share Basket Swap Transaction, the Final Price attributable to the relevant Share on the Valuation Date related to the relevant Settlement Date (or, if there is no such Valuation Date, the date that is one Settlement Cycle prior to the relevant Settlement Date).

**Section 9.8.  Settlement Disruption Event.**  "Settlement Disruption Event," means, in respect of a Share, an event beyond the control of the parties as a result of which the relevant Clearance System cannot clear the transfer of such Share.

**Section 9.9.  Expenses.**  All expenses relating to the transfer of Shares to be delivered under a Transaction (such as any stamp duty, stock exchange tax or local tax) will be payable by the party that would pay such expenses according to market practice for a sale of such Shares under such Transaction to be settled through the relevant Clearance System in one Settlement Cycle.

**Section 9.10.  Delivery Versus Payment.**  In respect of any Settlement Date on which there is a corresponding payment obligation, if the relevant Clearance System permits settlement to occur on a delivery versus payment basis, then settlement shall occur on such basis.

**Section 9.11.  Representation and Agreement.**  A party required to deliver Shares under a Transaction agrees that it will convey, and, on any date that it delivers such Shares, represents that it has conveyed, good title to the Shares it is required to deliver, free from (i) any lien, charge, claim or other encumbrance (other than a lien routinely imposed on all securities by the relevant Clearance System) and any other restrictions whatsoever, including any restrictions under applicable securities laws, without any obligation on the part of the receiver of such Shares in connection with that party's subsequent sale of such Shares to deliver an offering document, or comply with any volume or manner of sale restrictions, (ii) any and all restrictions that any sale, assignment or other transfer of such Shares be consented to or approved by any person or entity, including without limitation, the Issuer or any other obligor thereon, (iii) any limitations on the type or status, financial or otherwise, of any purchaser, pledgee, assignee or transferee of such Shares, (iv) any requirement of the delivery of any certificate, approval, consent, agreement, opinion of counsel, notice or any other document of any person or entity to the Issuer of, any other obligor on or any registrar or transfer agent for, such Shares, prior to the sale, pledge, assignment or other transfer of such Shares, and (v) any registration or qualification requirement or prospectus delivery requirement for such Shares pursuant to applicable securities laws.  A party required to deliver Shares under a Transaction also represents that to the extent appropriate for the relevant Clearance System, the Shares are properly in book-entry form.

**Section 9.12.  Indemnification for Failure to Deliver.**  If, in respect of any obligation to deliver Shares under a Transaction, prior to the occurrence or effective designation of an Early Termination Date in respect of that Transaction, a party fails to perform any obligation required to be settled by delivery, it will indemnify the other party on demand for any costs, losses or expenses (including the costs of borrowing the relevant Shares, if applicable) resulting from such failure.  A certificate signed by the deliveree setting out such costs, losses or expenses in reasonable detail will be conclusive evidence that they have been incurred.  Notwithstanding the foregoing, unless the parties otherwise agree to the contrary expressly and in writing in the related Confirmation, a party shall not be responsible for any special, indirect or consequential damages, even if informed of the possibility thereof.

ARTICLE 10

DIVIDENDS

**Section 10.1. Dividend Amount.** "Dividend Amount" means, in respect of the relevant Share, the related Dividend Period and the related Dividend Payment Date, the Record Amount, the Ex Amount or the Paid Amount, as specified in the related Confirmation, or any other amount determined as provided in the related Confirmation or included as part of an adjustment pursuant to Section 11.2.

(a) **Record Amount.** "Record Amount" means, in relation to a Dividend Amount, 100% of the gross cash dividend per Share declared by the Issuer to holders of record of a Share on any record date occurring during the relevant Dividend Period.

(b) **Ex Amount.** "Ex Amount" means, in relation to a Dividend Amount, 100% of the gross cash dividend per Share declared by the Issuer to holders of record of a Share where the date that the Shares have commenced trading ex-dividend on the Exchange occurs during the relevant Dividend Period.

(c) **Paid Amount.** "Paid Amount" means, in relation to a Dividend Amount, 100% of the gross cash dividend per Share paid by the Issuer during the relevant Dividend Period to holders of record of a Share.

Any "gross cash dividend" shall represent a sum before the withholding or deduction of taxes at the source by or on behalf of any applicable authority having power to tax in respect of such a dividend, and shall exclude any imputation or other credits, refunds or deductions granted by any applicable authority having power to tax in respect of such dividend and any taxes, credits, refunds or benefits imposed, withheld, assessed or levied thereon. In addition, "gross cash dividends" shall exclude Extraordinary Dividends and Excess Dividend Amounts, if any, unless otherwise provided in the related Confirmation.

**Section 10.2. Dividend Payment Date.** "Dividend Payment Date" means, in respect of a Dividend Period, each date specified or otherwise determined as provided in the related Confirmation or, if such date is not a Currency Business Day, the next following Currency Business Day. If no such date is specified in the related Confirmation, the Dividend Payment Date shall be the Cash Settlement Payment Date or Settlement Date, as the case may be, relating to the end of the relevant Dividend Period.

**Section 10.3. Dividend Period.** "Dividend Period" means the First Period or the Second Period, as specified in the related Confirmation, or such other period determined as provided in the related Confirmation. If no Dividend Period is specified in the related Confirmation, the Dividend Period will be the Second Period.

(a) **First Period.** "First Period" means each period from, and including, one Cash Settlement Payment Date or Settlement Date, as the case may be, to, but excluding, the next following Cash Settlement Payment Date or Settlement Date, as the case may be, except that (i) the initial Dividend Period will commence on, and include, the Clearance System Business Day that is one Settlement Cycle following the Trade Date and (ii) the final Dividend Period will end on, but exclude, the final Cash Settlement Payment Date or Settlement Date, as the case may be.

31

(b)      **Second Period.** "Second Period" means each period from, but excluding, one Valuation Date to, and including, the next Valuation Date, except that (i) the initial Dividend Period will commence on, but exclude, the Trade Date and (ii) the final Dividend Period will end on, and include, the final Valuation Date or, in respect of a Physically-settled Forward Transaction to which Variable Obligation is not applicable, the date that is one Settlement Cycle prior to the Settlement Date.

**Section 10.4.   Re-investment of Dividends.**   If "Re-investment of Dividends" is specified as applicable in the related Confirmation in respect of an Equity Amount Payer in relation to each relevant Dividend Payment Date, the Calculation Agent shall, for purposes of each subsequent Cash Settlement Payment Date, adjust the Equity Notional Amount relating to that Equity Amount Payer by adding to the Equity Notional Amount the Dividend Amount relating to that Equity Amount Payer and that Dividend Payment Date.

**Section 10.5.    Dividend Payment Obligations Relating to Physically-settled Option Transactions.**   All dividends on Shares to be delivered under a Physically-settled Option Transaction will be payable to the party that would receive such dividends according to market practice for a sale of such Shares to be settled through the relevant Clearance System on the relevant Exercise Date.

**Section 10.6.   Extraordinary Dividend.** "Extraordinary Dividend" means an amount per Share specified or otherwise determined as provided in the related Confirmation. If no Extraordinary Dividend is specified in or otherwise determined as provided in the related Confirmation, the characterization of a dividend or portion thereof as an Extraordinary Dividend shall be determined by the Calculation Agent.

**Section 10.7.    Excess Dividend Amount.** "Excess Dividend Amount" means, in respect of a Dividend Period, the Record Amount, the Ex Amount or the Paid Amount, as specified in the related Confirmation, or any other amount determined as provided in the related Confirmation.

(a)      **Record Amount.** "Record Amount" means, in relation to an Excess Dividend Amount, 100% of the Extraordinary Dividend per Share declared by the Issuer to holders of record of a Share on any record date occurring during the relevant Dividend Period.

(b)      **Ex Amount.** "Ex Amount" means, in relation to an Excess Dividend Amount, 100% of the Extraordinary Dividend per Share declared by the Issuer to holders of record of a Share where the date that the Shares have commenced trading ex-dividend on the Exchange occurs during the relevant Dividend Period.

(c)      **Paid Amount.** "Paid Amount" means, in relation to an Excess Dividend Amount, 100% of the Extraordinary Dividend per Share paid by the Issuer during the relevant Dividend Period to holders of record of a Share.

**ARTICLE 11**

ADJUSTMENTS AND MODIFICATIONS AFFECTING INDICES, SHARES AND TRANSACTIONS

**Section 11.1. Adjustments to Indices.**

(a)     If, in respect of an Index Transaction or Index Basket Transaction, a relevant Index is (i) not calculated and announced by the Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case that index (the "Successor Index") will be deemed to be the Index.

(b)     If (i) on or prior to any Valuation Date in respect of an Index Transaction or Index Basket Transaction, a relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating that Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain that Index in the event of changes in constituent stock and capitalization and other routine events) (an "Index Modification") or permanently cancels the Index and no Successor Index exists (an "Index Cancellation") or (ii) on any Valuation Date in respect of an Index Transaction or Index Basket Transaction, the Index Sponsor fails to calculate and announce a relevant Index (an "Index Disruption" and together with an Index Modification and an Index Cancellation, each an "Index Adjustment Event"), then:

(A)     if "Calculation Agent Adjustment" is specified in the related Confirmation as the consequence of any such Index Adjustment Event, then the Calculation Agent shall determine if such Index Adjustment Event has a material effect on the Index Transaction and, if so, shall calculate the relevant Settlement Price, Final Price, Strike Price, Forward Price, Forward Floor Price, Forward Cap Price, Knock-in Price or Knock-out Price, as the case may be, using, in lieu of a published level for that Index, the level for that Index as at that Valuation Date as determined by the Calculation Agent in accordance with the formula for and method of calculating that Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event;

(B)     if "Negotiated Close-out" is specified in the related Confirmation as the consequence of any such Index Adjustment Event, then the parties may, but are not obliged to, terminate the Transaction on mutually acceptable terms and if they do not agree to terminate the Transaction, then it continues on the terms and subject to the conditions, formulas and calculation methods in effect as of any relevant time at which calculations may be made; or

(C)     if "Cancellation and Payment" is specified in the related Confirmation as the consequence of any such Index Adjustment Event, then (1) in the case of an Index Disruption, the Transaction will be cancelled on the Valuation Date, (2) in the case of an Index Cancellation, the Transaction will be cancelled on the later of the Exchange Business Day immediately prior to the effectiveness of the Index Cancellation and the date the Index Cancellation is announced by the Index Sponsor, and (3) in the case of an Index Modification, either party may elect, upon two Scheduled Trading Days' notice or such lesser notice as may be required so that termination occurs not later than the effective date of the Index Modification, to cancel the Transaction at any time following the announcement of the Index Modification but no later than the Scheduled

33

Trading Day prior to the effectiveness of such Index Modification and (X) in the case of an Index Option Transaction or an Index Basket Option Transaction, Seller will pay to Buyer the amount specified in Section 12.7(b)(ii) and (Y) in the case of an Index Swap Transaction, an Index Basket Swap Transaction, an Index Forward Transaction or an Index Basket Forward Transaction, an amount calculated in accordance with Section 12.7(c) will be paid by one party to the other. Any Transaction cancelled as a result of an Index Adjustment Event will be valued using the formula or method to calculate the Index in effect immediately prior to such Index Adjustment Event.

**Section 11.2. Adjustments to Share Transactions and Share Basket Transactions.**

(a)    "Method of Adjustment" means a method for determining the appropriate adjustment to make to the terms of a Share Transaction or Share Basket Transaction upon the occurrence of an event having, in the determination of the Calculation Agent, a diluting or concentrative effect on the theoretical value of the relevant Shares.

(b)    If "Options Exchange Adjustment" is specified as the Method of Adjustment in the related Confirmation of a Share Transaction or Share Basket Transaction, then following each adjustment to the exercise, settlement, payment or other terms of options on any relevant Shares traded on any Options Exchange, the Calculation Agent will make the corresponding adjustments, if any, to any one or more of:

(i)    in respect of a Share Option Transaction or a Share Basket Option Transaction, the Strike Price, the Number of Options, the Option Entitlement, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

(ii)    in respect of a Share Forward Transaction or a Share Basket Forward Transaction, the Forward Price, the Forward Floor Price, the Forward Cap Price, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

(iii)    in respect of a Share Swap Transaction or a Share Basket Swap Transaction, the Initial Price, the Equity Notional Amount, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

and, in any case, any other variable relevant to the exercise, settlement, payment or other terms of that Transaction, as determined by the Calculation Agent, which adjustment will be effective as of the date determined by the Calculation Agent to be the effective date of the corresponding adjustment made by the Options Exchange. If options on the relevant Shares are not traded on the Options Exchange, the Calculation Agent will make such adjustment, if any, to any one or more of the relevant variables referred to above or any other variable relevant to the exercise, settlement, payment or other terms of the Transaction as the Calculation Agent determines appropriate, with reference to the rules of and precedents (if any) set by the Options Exchange, to account for the diluting or concentrative effect of any event that, in the determination of the Calculation Agent, would have given rise to an adjustment by the Options Exchange if such options were so traded.

(c)    If "Calculation Agent Adjustment" is specified as the Method of Adjustment in the related Confirmation of a Share Transaction or Share Basket Transaction (or if no Method of Adjustment is specified in the related Confirmation for such Transaction), then following the declaration by the

Issuer of the terms of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant Shares and, if so, will (i) make the corresponding adjustment(s), if any, to any one or more of:

(A) in respect of a Share Option Transaction or a Share Basket Option Transaction, the Strike Price, the Number of Options, the Option Entitlement, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

(B) in respect of a Share Forward Transaction or a Share Basket Forward Transaction, the Forward Price, the Forward Floor Price, the Forward Cap Price, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

(C) in respect of a Share Swap Transaction or a Share Basket Swap Transaction, the Initial Price, the Equity Notional Amount, the Knock-in Price, the Knock-out Price, and the relevant Number of Shares;

and, in any case, any other variable relevant to the exercise, settlement, payment or other terms of that Transaction as the Calculation Agent determines appropriate to account for that diluting or concentrative effect (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Share) and (ii) determine the effective date(s) of the adjustment(s). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of such Potential Adjustment Event made by an options exchange to options on the relevant Shares traded on such options exchange.

(d) "Options Exchange" means the exchange or quotation system specified as such in the related Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in options contracts relating to the relevant Share has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to such options contracts on such temporary substitute exchange or quotation system as on the original Options Exchange) or, if no such exchange or quotation system is specified in the related Confirmation, the Related Exchange (if such Related Exchange trades options contracts relating to the relevant Share) or, if more than one such Related Exchange is specified in the related Confirmation, the Related Exchange selected by the Calculation Agent as the primary market for listed options contracts relating to the relevant Share.

(e) "Potential Adjustment Event" means any of the following:

(i) a subdivision, consolidation or reclassification of relevant Shares (unless resulting in a Merger Event), or a free distribution or dividend of any such Shares to existing holders by way of bonus, capitalization or similar issue;

(ii) a distribution, issue or dividend to existing holders of the relevant Shares of (A) such Shares, or (B) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Issuer equally or proportionately with such payments to holders of such Shares, or (C) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Issuer as a result of a spin-off or other similar transaction, or (D) any other type of securities, rights or warrants or other assets, in any case for payment (cash

35

or other consideration) at less than the prevailing market price as determined by the Calculation Agent;

      (iii)    an Extraordinary Dividend;

      (iv)    a call by the Issuer in respect of relevant Shares that are not fully paid;

      (v)    a repurchase by the Issuer or any of its subsidiaries of relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

      (vi)    in respect of the Issuer, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

      (vii)    any other event that may have a diluting or concentrative effect on the theoretical value of the relevant Shares.

**Section 11.3.  Adjustments to Certain Share Transactions and Share Basket Transactions in European Currencies.**  In respect of a Share Transaction or Share Basket Transaction relating to Shares originally quoted, listed and/or dealt as of the Trade Date in a currency of a member state of the European Union that has not adopted the single currency in accordance with the EC Treaty, if such Shares are at any time after the Trade Date quoted, listed and/or dealt exclusively in euro on the relevant Exchange or, where no Exchange is specified, the principal market on which those Shares are traded, then the Calculation Agent will adjust any one or more of the Strike Price, the Forward Price, the Forward Floor Price, the Forward Cap Price, the Knock-in Price, the Knock-out Price, the Settlement Price, the Initial Price, the Final Price and any other variable relevant to the terms of the Transaction as the Calculation Agent determines appropriate to preserve the economic terms of the Transaction.  The Calculation Agent will make any conversion necessary for purposes of any such adjustment as of the Valuation Time at an appropriate mid-market spot rate of exchange determined by the Calculation Agent prevailing as of the Valuation Time.  No adjustments under this Section 11.3 will affect the currency denomination of any payment obligation arising out of the Transaction.

**Section 11.4.  Correction of Share Prices and Index Levels.**  In the event that any price or level published on the Exchange or by the Index Sponsor and which is utilized for any calculation or determination made under a Transaction is subsequently corrected and the correction is published by the Exchange or the Index Sponsor within one Settlement Cycle after the original publication, either party may notify the other party of that correction and the Calculation Agent will determine the amount that is payable or deliverable as a result of that correction, and, to the extent necessary, will adjust the terms of such Transaction to account for such correction.

## ARTICLE 12

## EXTRAORDINARY EVENTS

**Section 12.1.  General Provisions Relating to Extraordinary Events.**

(a)     "Extraordinary Event" means a Merger Event, Tender Offer, Index Adjustment Event, Nationalization, Insolvency, Delisting or any applicable Additional Disruption Event, as the case may be.

(b)     "Merger Event" means, in respect of any relevant Shares, any (i) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (ii) consolidation, amalgamation, merger or binding share exchange of the Issuer with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which such Issuer is the continuing entity and which does not result in a reclassification or change of all of such Shares outstanding), (iii) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100% of the outstanding Shares of the Issuer that results in a transfer of or an irrevocable commitment to transfer all such Shares (other than such Shares owned or controlled by such other entity or person), or (iv) consolidation, amalgamation, merger or binding share exchange of the Issuer or its subsidiaries with or into another entity in which the Issuer is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50% of the outstanding Shares immediately following such event (a "Reverse Merger"), in each case if the Merger Date is on or before, (A) in the case of a Physically-settled Option Transaction the later to occur of the Expiration Date or the final Settlement Date, (B) in the case of a Physically-settled Forward Transaction or a Physically-settled Equity Swap Transaction, the relevant Settlement Date or, (C) in any other case, the final Valuation Date.

(c)     "Merger Date" means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Calculation Agent.

(d)     "Tender Offer" means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10% and less than 100% of the outstanding voting shares of the Issuer, as determined by the Calculation Agent, based upon the making of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant.

(e)     "Tender Offer Date" means, in respect of a Tender Offer, the date on which voting shares in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Calculation Agent).

(f)     "Share-for-Share" means (i) in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists (or, at the option of the holder of such Shares, will consist) solely of New Shares, and (ii) a Reverse Merger.

(g)     "Share-for-Other" means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists solely of Other Consideration.

(h)     "Share-for-Combined" means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists of Combined Consideration.

(i)     "New Shares" means ordinary or common shares, whether of the entity or person (other than the Issuer) involved in the Merger Event or the making of the Tender Offer or a third party, that are, or that as of the Merger Date or Tender Offer Date are promptly scheduled to be, (i) publicly quoted, traded or listed on an exchange or quotation system located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union) and (ii) not subject to any currency exchange controls, trading restrictions or other trading limitations.

(j)     "Other Consideration" means cash and/or any securities (other than New Shares) or assets (whether of the entity or person (other than the Issuer) involved in the Merger Event or the making of the Tender Offer or a third party).

(k)     "Combined Consideration" means New Shares in combination with Other Consideration.

(l)     "Announcement Date" means, in respect of an Extraordinary Event, (i) in the case of a Merger Event, the date of the first public announcement of a firm intention to engage in a transaction (whether or not subsequently amended) that leads to the Merger Event, (ii) in the case of a Tender Offer, the date of the first public announcement of a firm intention to purchase or otherwise obtain the requisite number of voting shares (whether or not subsequently amended) that leads to the Tender Offer, (iii) in the case of an Index Disruption or Index Cancellation, the date of the first public announcement by the Index Sponsor of any adjustment or cancellation as described in Section 11.1(b) that leads to the Index Disruption or Index Cancellation and in the case of an Index Modification, the Exchange Business Day immediately prior to the effective date of the Index Modification, (iv) in the case of a Nationalization, the date of the first public announcement to nationalize (whether or not subsequently amended) that leads to the Nationalization, (v) in the case of an Insolvency, the date of the first public announcement of the institution of a proceeding or presentation of a petition or passing of a resolution (or other analogous procedure in any jurisdiction) that leads to the Insolvency and (vi) in the case of a Delisting, the date of the first public announcement by the Exchange that the Shares will cease to be listed, traded or publicly quoted in the manner described in Section 12.6(a)(iii).  In respect of any Extraordinary Event other than an Index Disruption, if the announcement of such Extraordinary Event is made after the actual closing time for the regular trading session on the relevant Exchange, without regard to any after hours or any other trading outside of such regular trading session hours, the Announcement Date shall be deemed to be the next following Scheduled Trading Day.

(m)     "Implied Volatility" means for any Exchange Business Day, the mid-market implied volatility of the relevant Shares, as determined by the Calculation Agent by interpolating or extrapolating from the most comparable listed put or call option (which shall be of the same Option Type as the Option Transaction being cancelled) on the relevant Shares as determined by the Calculation Agent taking into account the nearest strike price, maturity and "in-the-money" or "out-of-the-money" amount, as the case may be, and such other factors that the Calculation Agent deems appropriate.  To the extent that such a listed option does not exist or the Calculation Agent determines that the market for such listed option is not sufficiently liquid for the purpose of the relevant calculation, the Implied Volatility will be determined by the Calculation Agent by whatsoever means it deems appropriate.

(n)    "Affected Shares" means Shares affected by a Merger Event or a Tender Offer, as the case may be.

**Section 12.2. Consequences of Merger Events.**

In respect of any Merger Event if, under "Consequences of Merger Events" in relation to "Share-for-Share", "Share-for-Other" or "Share-for-Combined", the consequence specified in the related Confirmation is:

(a)    "Alternative Obligation", then except in respect of a Reverse Merger, on or after the relevant Merger Date, the New Shares and/or the amount of Other Consideration, if applicable (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable), and their issuer (if any) will be deemed the "Shares" and the "Issuer", respectively, the number of New Shares and/or the amount of Other Consideration, if applicable, (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of the relevant Number of Shares immediately prior to the occurrence of the Merger Event would be entitled upon consummation of the Merger Event will be deemed the relevant "Number of Shares" and, if necessary, the Calculation Agent will adjust any relevant terms, provided, however, that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or the Transaction;

(b)    "Cancellation and Payment", then (i) in the case of an Option Transaction, the Option Transaction will be cancelled as of the Merger Date and Seller will pay to Buyer the amount calculated in accordance with Section 12.7(b), and (ii) in the case of a Forward Transaction or an Equity Swap Transaction, the Forward Transaction or the Equity Swap Transaction will be cancelled as of the Merger Date and an amount calculated in accordance with 12.7(c) will be paid by one party to the other;

(c)    "Options Exchange Adjustment", then following each adjustment to the settlement terms of options on any relevant Shares traded on any Options Exchange, the Calculation Agent will make one or more adjustments as provided in Section 11.2(b) (without regard to the words "diluting or concentrative" in the second sentence);

(d)    "Calculation Agent Adjustment", then, on or after the relevant Merger Date, the Calculation Agent shall either (i)(A) make such adjustment to the exercise, settlement, payment or any other terms of the Transaction as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Merger Event (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date of that adjustment, or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case "Cancellation and Payment" will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7, and in respect of an Option Transaction, the Calculation Agent shall determine the amount of such payment as if "Calculation Agent Determination" applied to the Option Transaction;

39

(e)    "Modified Calculation Agent Adjustment", then, on or after the relevant Merger Date, the Calculation Agent shall either (i)(A) make such adjustment to the exercise, settlement, payment or any other terms of the Transaction (including, without limitation, the spread) as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Merger Event (including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustments(s) made in respect of such Merger Event by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date of that adjustment, or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case "Cancellation and Payment" will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7, and in respect of an Option Transaction, the Calculation Agent shall determine the amount of such payment as if "Calculation Agent Determination" applied to the Option Transaction;

(f)    "Partial Cancellation and Payment", then, in respect of a Share Basket Transaction, that portion of the Share Basket Transaction represented by Affected Shares will be cancelled as of the Merger Date, the amount calculated in accordance with Section 12.7 in respect of such Affected Shares will be paid by one party to the other, the remainder of the Share Basket Transaction will continue with the Basket comprising Shares that are not Affected Shares, and the Calculation Agent will adjust any relevant terms if necessary to preserve as nearly as practicable the economic terms of the Transaction for the remaining Shares; or

(g)    "Component Adjustment", then, in respect of a Share-for-Combined Merger Event, the consequence specified opposite "Share-for-Share" shall apply to that portion of the consideration that consists of New Shares (as determined by the Calculation Agent) and the consequence specified opposite "Share-for-Other" shall apply to that portion of the consideration that consists of Other Consideration (as determined by the Calculation Agent).

**Section 12.3. Consequences of Tender Offers.** If "Tender Offer" is specified in the related Confirmation to be applicable to a Transaction, then if, under "Consequences of Tender Offers" in relation to "Share-for-Share", "Share-for-Other" or "Share-for-Combined", the consequence specified in the related Confirmation is:

(a)    "Cancellation and Payment", then (i) in the case of an Option Transaction, the Option Transaction will be cancelled as of the Tender Offer Date and Seller will pay to Buyer the amount calculated in accordance with Section 12.7(b), and (ii) in the case of a Forward Transaction or an Equity Swap Transaction, the Forward Transaction or the Equity Swap Transaction will be cancelled as of the Tender Offer Date and an amount calculated in accordance with Section 12.7(c) will be paid by one party to the other;

(b)    "Options Exchange Adjustment", then following each adjustment to the settlement terms of options on any relevant Shares traded on any Options Exchange, the Calculation Agent will make one or more adjustments as provided in Section 11.2(b) (without regard to the words "diluting or concentrative" in the second sentence);

(c)    "Calculation Agent Adjustment", then, on or after the relevant Tender Offer Date the Issuer and the Shares will not change, but the Calculation Agent shall either (i)(A) make such adjustment

to the exercise, settlement, payment or any other terms of the Transaction as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Tender Offer (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date of that adjustment, or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case "Cancellation and Payment" will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7, and in respect of an Option Transaction, the Calculation Agent shall determine the amount of such payment as if "Calculation Agent Determination" applied to the Option Transaction;

(d)     "Modified Calculation Agent Adjustment" then, on or after the relevant Tender Offer Date, the Issuer and the Shares will not change, but the Calculation Agent shall either (i)(A) make such adjustment to the exercise, settlement, payment or any other terms of the Transaction (including, without limitation, the spread) as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Tender Offer (including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date of that adjustment, or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction, in which case "Cancellation and Payment" will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with Section 12.7, and in respect of an Option Transaction, the Calculation Agent shall determine the amount of such payment as if "Calculation Agent Determination" applied to the Option Transaction;

(e)     "Partial Cancellation and Payment", then, in respect of a Share Basket Transaction, that portion of the Share Basket Transaction represented by Affected Shares will be cancelled as of the Tender Offer Date, the amount calculated in accordance with Section 12.7 in respect of such Affected Shares will be paid by one party to the other, the remainder of the Share Basket Transaction will continue with the Basket comprising Shares that are not Affected Shares, and the Calculation Agent will adjust any relevant terms if necessary to preserve as nearly as practicable the economic terms of the Transaction for the remaining Shares; or

(f)     "Component Adjustment", then, in respect of a Share-for-Combined Tender Offer, the consequence specified opposite "Share-for-Share" shall apply to that portion of the consideration that consists of New Shares (as determined by the Calculation Agent) and the consequence specified opposite "Share-for-Other" shall apply to that portion of the consideration that consists of Other Consideration (as determined by the Calculation Agent).

### Section 12.4. Settlement Following a Merger Event or Tender Offer.

(a)     If Other Consideration is required to be valued in relation to a Cash-settled Transaction that has been adjusted following a Merger Event or Tender Offer, the Other Consideration will be valued

41

by the Calculation Agent on each Valuation Date or Averaging Date, as the case may be. For the avoidance of doubt, the provisions of these Definitions relating to Market Disruption Events will not apply to Other Consideration.

(b)     If New Shares are required to be delivered in relation to a Physically-settled Transaction that has been adjusted following a Merger Event or Tender Offer, then the deliveror will deliver the relevant New Shares in accordance with the terms of settlement set out in the related Confirmation, provided that if on the relevant Settlement Date a holder of the Shares would not yet have received the New Shares to which it is entitled, the Settlement Date with respect to such New Shares will be postponed to the first Clearance System Business Day falling on or after the first day on which a holder of the relevant Shares, having received the New Shares, would be able to deliver such New Shares to the other party.

(c)     If Other Consideration is required to be delivered in relation to a Physically-settled Transaction that has been adjusted following a Merger Event or Tender Offer, then the deliveror will deliver the relevant Other Consideration to the other party in a commercially reasonable manner in accordance with the reasonable directions of the other party as soon as reasonably practicable after the later of (i) the relevant Settlement Date and (ii) the first day on which a holder of the relevant Shares, having received the Other Consideration, would be able to deliver such Other Consideration to the other party.

**Section 12.5.  Composition of Combined Consideration.**  In respect of any Share-for-Combined Merger Event or Tender Offer:

(a)     If "Composition of Combined Consideration" is specified as applicable in the related Confirmation, then:

(i)     to the extent that the composition of the Combined Consideration could be determined by a holder of Shares equal to the relevant Option Entitlement or Number of Shares, and a holder could receive New Shares as part of the Combined Consideration, the Combined Consideration shall be deemed to be New Shares to the maximum value permitted; and

(ii)     if a holder could make any other election with respect to the composition of Combined Consideration other than New Shares, the composition of the Combined Consideration shall be determined as follows: (A) the deliveree or payee may determine the composition if notice is given to the deliveror or payor at least two Scheduled Trading Days before the last time when an election of the Combined Consideration by such holder could be timely made; and (B) otherwise the deliveror or payor will, in its sole discretion, determine the composition.

(b)     If "Composition of Combined Consideration" is not specified as applicable in the related Confirmation, then:

(i)     to the extent that the composition of the Combined Consideration could be determined by a holder of Shares equal to the relevant Option Entitlement or Number of Shares and a holder of Shares could receive New Shares as part of the Combined Consideration, the Combined Consideration shall be deemed to be New Shares to the maximum value permitted; and

42

(ii)    if a holder could make any other election with respect to the composition of Combined Consideration other than New Shares, the Calculation Agent will, in its sole discretion, determine the composition.

**Section 12.6. Nationalization, Insolvency and Delisting.**

(a)    The following terms have the meanings given below:

(i)    "Nationalization" means that all the Shares or all or substantially all the assets of an Issuer are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

(ii)    "Insolvency" means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceeding affecting an Issuer, (A) all the Shares of that Issuer are required to be transferred to a trustee, liquidator or other similar official or (B) holders of the Shares of that Issuer become legally prohibited from transferring them; and

(iii)    "Delisting" means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union).

(b)    Either party will, upon becoming aware of the occurrence of a Nationalization, Insolvency or Delisting, promptly notify the other party of such event.

(c)    For the purpose of determining the consequence of any Nationalization, Insolvency or Delisting:

(i)    "Negotiated Close-out" means that the parties may, but are not obliged, to terminate the Transaction on mutually acceptable terms and if the parties do not agree to terminate the Transaction, then it continues on the terms and subject to the conditions then in effect, provided, that any Physically-settled Transaction will, at the election of either party, become a Transaction to which Cash Settlement is applicable, except that if a Scheduled Valuation Date is a Disrupted Day, the Calculation Agent will ignore the provisions of Section 6.6 relating to Disrupted Days and will instead determine its good faith estimate of the Settlement Price or Final Price as of the Valuation Time on that Valuation Date;

(ii)    "Cancellation and Payment" means that the Transaction will be cancelled as of the Announcement Date and (A) in the case of an Option Transaction, Seller will pay to Buyer the amount calculated in accordance with Section 12.7(b), and (B) in the case of a Forward Transaction or an Equity Swap Transaction, an amount calculated in accordance with Section 12.7(c) will be paid by one party to the other; and

(iii)    "Partial Cancellation and Payment" means that in respect of a Share Basket Transaction, that portion of the Share Basket Transaction represented by Affected Shares will be

43

cancelled as of the Announcement Date, the amount calculated in accordance with Section 12.7 in respect of such Affected Shares, will be paid by one party to the other, the remainder of the Share Basket Transaction will continue with the Basket comprising Shares that are not Affected Shares, and the Calculation Agent will adjust any relevant terms if necessary to preserve as nearly as practicable the economic terms of the Transaction for the remaining Shares.

**Section 12.7.  Payment upon Certain Extraordinary Events.**

(a)      If, in respect of an Extraordinary Event, "Cancellation and Payment" or "Partial Cancellation and Payment" applies or is deemed to apply to the relevant Transaction (or a portion thereof), then an amount will be paid by one party to the other determined as provided in clause (b) or (c) below, such payment to be made not later than three Currency Business Days following the date that notice of the determination by the Calculation Agent or the Determining Party, as the case may be, of such amount (denominated in the currency for settlement of the Transaction as determined by the Calculation Agent or the Determining Party, as the case may be) and which party shall pay such amount is effective, which notice shall be provided promptly following such determination.

(b)      In respect of an Option Transaction, the amount to be paid by Seller to Buyer will be as agreed promptly (and in any event within five Exchange Business Days) by the parties after the Merger Date, the Tender Offer Date, the date of cancellation in respect of an Index Adjustment Event or the date of occurrence of any event described in Section 12.6, as the case may be (each such date, the "Closing Date").  If the parties are unable to agree on the amount, then:

(i)      if "Agreed Model" is specified in the related Confirmation to be applicable to such Transaction, then the amount will be determined by the Calculation Agent as the sum of the Unadjusted Value and the Adjustment Value.  For the avoidance of doubt, the Buyer shall not be required to pay any amount to the Seller as a result of the cancellation of the Option Transaction other than any unpaid Premium which Buyer will be obliged to pay to Seller as of the date that the amount determined in this Section 12.7(b)(i) is paid.

(A)      "Unadjusted Value" means an amount determined by the Calculation Agent as the value of the Option Transaction (or portion thereof) on the Closing Date based on:

(1)      a volatility equal to the average of the Implied Volatilities of the relevant Shares on each of the 15 Exchange Business Days ending on and including the Closing Date;

(2)      expected dividends for the time period from the Closing Date until the Expiration Date based on, and payable on the same dates as, (a) amounts to have been paid in respect of gross ordinary cash dividends on the relevant Shares in the one-year period ending on the Closing Date or (b) in the event of an Issuer published change to dividend policies on the relevant Shares (as determined by the Calculation Agent) prior to the Closing Date, the expected dividends determined in accordance with such published change, in each case excluding Extraordinary Dividends;

44

(3)      a value ascribed to the relevant Shares as determined by the Calculation Agent and, if applicable, equal to the value of the consideration, if any, paid or delivered in respect of such Shares to holders of such Shares at the time of the Extraordinary Event;

(4)      a combined interest rate and stock loan rate as specified in the related Confirmation for the period from, and including, the Closing Date to, but excluding, the Expiration Date; and

(5)      a term of the Option Transaction from the Closing Date to the Expiration Date.

(B)      "Adjustment Value" means the difference between the amounts determined pursuant to (B)(1) and (B)(2) below:

(1)      a value of the Option Transaction (or portion thereof) determined by the Calculation Agent based on:

(a)      a volatility equal to the average of the Implied Volatilities of the relevant Shares on each of the 15 Exchange Business Days ending on but excluding the Announcement Date;

(b)      expected dividends for the time period from the Announcement Date until the Expiration Date based on, and payable on the same dates as, (x) amounts to have been paid in respect of gross ordinary cash dividends on the relevant Shares in the one-year period ending on the Announcement Date or (y) in the event of an Issuer published change to dividend policies on the relevant Shares (as determined by the Calculation Agent) prior to the Announcement Date, the expected dividends determined in accordance with such published change, in each case excluding Extraordinary Dividends;

(c)      a value ascribed to the relevant Shares equal to the Settlement Price (assuming Cash Settlement were applicable) of the relevant Shares as of the Valuation Time (for which purpose the Valuation Date will be the Announcement Date);

(d)      a combined interest rate and stock loan rate as specified in the related Confirmation for the period from, and including, the Announcement Date to, but excluding, the Expiration Date; and

(e)      a term of the Option Transaction from the Announcement Date to the Expiration Date.

(2)      a value for the Option Transaction (or portion thereof) based on the factors listed in (1)(a)-(e) above, except with a volatility equal to the average of the Implied Volatilities of the relevant Shares on each of the 15 Exchange Business Days commencing on and including the Announcement Date.

45

(ii)     If "Calculation Agent Determination" is specified in the related Confirmation to be applicable to such Transaction, then the amount will be determined by the Calculation Agent, which determination may, but need not, be based on the factors and adjustments set forth in paragraph (i) above.

(c)     For any Forward Transaction or Equity Swap Transaction, such Transaction shall be cancelled and the relevant party or parties (as specified below) shall determine the Cancellation Amount in respect of such cancelled Transaction.

(i)     In respect of a cancelled Transaction where there is one Determining Party, the Determining Party will calculate the Cancellation Amount and will determine which party will pay such amount.

(ii)     In respect of a cancelled Transaction where there are two Determining Parties, each party will calculate a Cancellation Amount and an amount will be payable equal to one-half of the difference between the Cancellation Amount of the party with the higher Cancellation Amount ("X") and the Cancellation Amount of the party with the lower Cancellation Amount ("Y") and Y shall pay it to X.

**Section 12.8.  Cancellation Amount.**

(a)     "Cancellation Amount" means, with respect to a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realized under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (i) the material terms of the relevant Transaction, including the payments and deliveries by the parties under the ISDA Master Agreement in respect of the relevant Transaction that would, but for the occurrence of the Extraordinary Event, have been required on or after the date that the Transaction is, or is deemed to have been, terminated or cancelled (assuming satisfaction of any applicable conditions precedent in the ISDA Master Agreement) and (ii) the option rights of the parties in respect of the relevant Transaction.

(b)     Any Cancellation Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result.  Each Cancellation Amount will be determined as of the date that the Transaction terminated or cancelled or, if that would not be commercially reasonable, as of the date or dates following the date that the Transaction terminated or cancelled as would be commercially reasonable.

(c)     In determining a Cancellation Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:

(i)     quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the current creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)     information of the types described in (i) or (ii) above from internal sources (including any Affiliates of the Determining Party) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

(d)      The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to Section 12.8(c)(i) above or relevant market data pursuant to Section 12.8(c)(ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in Section 12.8(c)(i), (c)(ii) or (c)(iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilized. Third parties supplying quotations pursuant to Section 12.8(c)(i) above or market data pursuant to Section 12.8(c)(ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

(e)      Without duplication of amounts calculated based on information described in Section 12.8(c)(i), 12.8(c)(ii) or 12.8(c)(iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Cancellation Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to such Transaction (or any gain resulting from any of them).

(f)      "Determining Party" means the party or parties specified as such in the related Confirmation.

(g)      Commercially reasonable procedures used in determining a Cancellation Amount may include the following:

(i)      application to relevant market data from third parties pursuant to Section 12.8(c)(ii) above or information from internal sources pursuant to Section 12.8(c)(iii) above of pricing or other valuation models that are, at the time of the determination of the Cancellation Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the relevant Transaction; and

(ii)      application of different valuation methods to the relevant Transaction depending on the type, complexity or size of the relevant Transaction.

**Section 12.9. Additional Disruption Events.**

(a)      Each of the following terms shall have the meaning set forth below:

(i)     "Additional Disruption Event" means any of the events set forth in paragraphs (ii) through (viii) below;

(ii)    "Change in Law" means that, on or after the Trade Date of any Transaction (A) due to the adoption of or any change in any applicable law or regulation (including, without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), a party to such Transaction determines in good faith that (X) it has become illegal to hold, acquire or dispose of Shares relating to such Transaction, or (Y) it will incur a materially increased cost in performing its obligations under such Transaction (including, without limitation, due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position);

(iii)   "Failure to Deliver" means the failure of a party to deliver, when due, the relevant Shares under that Transaction, where such failure to deliver is due to illiquidity in the market for such Shares;

(iv)    "Insolvency Filing" means that the Issuer institutes or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, provided that proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing;

(v)     "Hedging Disruption" means that the Hedging Party is unable, after using commercially reasonable efforts, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the relevant Transaction, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s);

(vi)    "Increased Cost of Hedging" means that the Hedging Party would incur a materially increased (as compared with circumstances existing on the Trade Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the relevant Transaction, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s), provided that any such materially increased amount that is incurred solely due to the deterioration of the creditworthiness of the Hedging Party shall not be deemed an Increased Cost of Hedging;

(vii)   "Loss of Stock Borrow" means that the Hedging Party is unable, after using commercially reasonable efforts, to borrow (or maintain a borrowing of) Shares with respect to such Transaction in an amount equal to the Hedging Shares (not to exceed the number of Shares underlying the Transaction) at a rate equal to or less than the Maximum Stock Loan Rate;

48

(viii)   "Increased Cost of Stock Borrow" means that the Hedging Party would incur a rate to borrow Shares in respect of such Transaction that is greater than the Initial Stock Loan Rate;

(ix)   "Hedging Party" means the party specified in the related Confirmation as the Hedging Party or, if no Hedging Party is specified, either party to the Transaction;

(x)   "Hedging Shares" means the number of Shares that the Hedging Party deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to a Transaction to which "Loss of Stock Borrow" or "Increased Cost of Stock Borrow" is applicable;

(xi)   "Lending Party" means a third party that the Hedging Party considers to be a satisfactory counterparty (acting in good faith and in a commercially reasonable manner in light of other transactions that the Hedging Party may have entered into with such party);

(xii)   "Non-Hedging Party" means the party that is not the Hedging Party;

(xiii)   "Maximum Stock Loan Rate" means, in respect of a Transaction to which "Loss of Stock Borrow" is applicable, the stock loan rate specified as such in the related Confirmation;

(xiv)   "Initial Stock Loan Rate" means, in respect of a Transaction to which "Increased Cost of Stock Borrow" is applicable, the stock loan rate specified as such in the related Confirmation; and

(xv)   "Price Adjustment" means an adjustment to the Strike Price, Initial Price, Forward Price, Forward Floor Price, Forward Cap Price, Knock-in Price, Knock-out Price, spread or other variable with respect to the relevant Transaction.

(b)   For the purpose of determining the consequence of an Additional Disruption Event:

(i)   If "Change in Law" or "Insolvency Filing" is specified in the related Confirmation to be applicable to a Transaction, then upon the occurrence of such an event either party may elect to terminate the Transaction upon at least two Scheduled Trading Days' notice to the other party specifying the date of such termination (or such lesser notice as may be required to comply with the Change in Law), in which event the Transaction will terminate and the Determining Party will determine the Cancellation Amount payable by one party to the other.

(ii)   If "Failure to Deliver" is specified in the related Confirmation to be applicable to a Transaction, then such event shall not constitute an Event of Default under the ISDA Master Agreement, but upon the occurrence of such an event, the party required to deliver the relevant Shares (the "Delivering Party") shall (A) give the other party (the "Receiving Party") notice that a Failure to Deliver has occurred within one Clearance System Business Day of the relevant Exercise Date in the case of an Option Transaction and at least one Settlement Cycle prior to the Settlement Date in the case of a Forward Transaction or Equity Swap Transaction and (B) deliver on the Settlement Date to the Receiving Party such number of Shares that it can deliver on such date. The Receiving Party's obligation to make any corresponding payment or delivery to the Delivering Party shall be reduced in proportion to the number of Shares it receives from the

Delivering Party. In respect of a European Option or a Forward Transaction, the Receiving Party may then elect to terminate the Transaction by giving notice to the Delivering Party and the Transaction will terminate on the date that such notice is effective. The Receiving Party (who shall be the Determining Party) shall determine the Cancellation Amount payable in relation to such terminated Transaction (after consideration of any partial delivery). In respect of an American Option or a Bermuda Option, the Receiving Party may then elect to terminate that part of the Transaction consisting of the exercised Options by giving notice to the Delivering Party. On the date that such notice is effective, a Transaction consisting of the exercised Options only shall be terminated and the Receiving Party (who shall be the Determining Party) shall determine the Cancellation Amount payable in relation to such terminated Transaction (after consideration of any partial delivery). In respect of an Equity Swap Transaction, the Receiving Party may then elect to terminate that part of the Transaction consisting of the Number of Shares to be Delivered or Number of Baskets to be Delivered, as the case may be, on that Settlement Date by giving notice to the Delivering Party. On the date that such notice is effective, a Transaction consisting of the Number of Shares to be Delivered or Number of Baskets to be Delivered, as the case may be, on that Settlement Date only shall be deemed to have been terminated on such Settlement Date and the Receiving Party (who shall be the Determining Party) shall determine the Cancellation Amount payable in relation to such terminated Transaction (after consideration of any partial delivery). In respect of an American Option or a Bermuda Option, in each case to which Multiple Exercise is applicable and upon which less than all Options have been exercised or deemed exercised on the relevant Exercise Date, or in respect of an Equity Swap Transaction in relation to which one or more Settlement Dates have not occurred, the Receiving Party may elect within one Settlement Cycle of the Settlement Date on which the Transaction was partially terminated to terminate the remaining Transaction upon two Scheduled Trading Days' notice to the Delivering Party, in which event the Transaction shall terminate on the date that such notice is effective and the Receiving Party (who shall be the Determining Party) shall determine the Cancellation Amount payable in relation to such terminated Transaction.

(iii)  If "Hedging Disruption" is specified in the related Confirmation to be applicable to a Transaction, then upon the occurrence of such an event the Hedging Party may elect, while the Hedging Disruption is continuing, to terminate the Transaction, upon at least two Scheduled Trading Days' notice to the Non-Hedging Party specifying the date of such termination, in which event the Determining Party will determine the Cancellation Amount payable by one party to the other.

(iv)  If "Loss of Stock Borrow" is specified in the related Confirmation to be applicable to a Transaction, then upon the occurrence of such an event the Hedging Party may give notice that a Loss of Stock Borrow has occurred to the Non-Hedging Party, who may (A) lend the Hedging Party, subject to the conditions below, Shares in an amount equal to the Hedging Shares at a rate equal to or less than the Maximum Stock Loan Rate or (B) refer the Hedging Party to a Lending Party that will lend the Hedging Party Shares in an amount equal to the Hedging Shares at a rate equal to or less than the Maximum Stock Loan Rate, in each case within two Scheduled Trading Days of receipt of the notice of Loss of Stock Borrow. If neither the Non-Hedging Party nor the Lending Party lends Shares in the amount of the Hedging Shares or a satisfactory Lending Party is not identified within this period, the Hedging Party may give notice that it elects to terminate the Transaction, specifying the date of such termination, which may be the same day that the notice of termination is effective. The Determining Party will then determine the Cancellation Amount payable by one party to the other.

50

(v)     If "Increased Cost of Stock Borrow" is specified in the related Confirmation to be applicable to a Transaction, then upon the occurrence of such an event the Hedging Party will give prompt notice to the Non-Hedging Party that an Increased Cost of Stock Borrow has occurred and that a Price Adjustment will be made to the Transaction. The Non-Hedging Party shall, within two Scheduled Trading Days of receipt of the notice of Increased Cost of Stock Borrow and corresponding Price Adjustment, notify the Hedging Party that it elects to (A) agree to amend the relevant Transaction to take into account the Price Adjustment, (B) pay the Hedging Party an amount determined by the Calculation Agent that corresponds to the Price Adjustment or (C) terminate the Transaction as of that second Scheduled Trading Day. If such notice is not given by the end of that second Scheduled Trading Day, then the Hedging Party may give notice that it elects to terminate the Transaction, specifying the date of such termination, which may be the same day that the notice of termination is effective. If either party elects to terminate the Transaction, the Determining Party will determine the Cancellation Amount payable by one party to the other. Within this period, the Non-Hedging Party may, in order to avoid a Price Adjustment or termination with respect to the Transaction, (X) lend the Hedging Party, subject to the conditions below, Shares in an amount equal to the Hedging Shares at a rate equal to or less than the Initial Stock Loan Rate or (Y) refer the Hedging Party to a Lending Party that lends the Hedging Party Shares in an amount equal to the Hedging Shares at a rate equal to or less than the Initial Stock Loan Rate.

(vi)    If "Increased Cost of Hedging" is specified in the related Confirmation to be applicable to a Transaction, then upon the occurrence of such an event the Hedging Party will give prompt notice to the Non-Hedging Party that such increased costs have been incurred and that a Price Adjustment will be made to the Transaction. The Non-Hedging Party shall, within two Scheduled Trading Days of receipt of the notice of Increased Cost of Hedging and corresponding Price Adjustment, notify the Hedging Party that it elects to (A) agree to amend the relevant Transaction to take into account the Price Adjustment, (B) pay the Hedging Party an amount determined by the Calculation Agent that corresponds to the Price Adjustment or (C) terminate the Transaction as of that second Scheduled Trading Day. If such notice is not given by the end of that second Scheduled Trading Day, then the Hedging Party may give notice that it elects to terminate the Transaction, specifying the date of such termination, which may be the same day that the notice of termination is effective. If either party elects to terminate the Transaction, the Determining Party will determine the Cancellation Amount payable by one party to the other.

(vii)   If both "Hedging Disruption" and "Loss of Stock Borrow" are specified to be applicable to a Transaction and an event or circumstance that would otherwise constitute or give rise to a Hedging Disruption also constitutes a Loss of Stock Borrow, it will be treated as a Loss of Stock Borrow and will not constitute a Hedging Disruption.

(viii)  Any Shares provided by the Non-Hedging Party or the Lending Party, as the case may be, in respect of a Loss of Stock Borrow or Increased Cost of Stock Borrow shall be in book-entry form and freely tradable without any restrictions under relevant law and the lending of such Shares shall be documented under documentation acceptable to the Hedging Party.

(ix)    Any Cancellation Amount payable by one party to the other shall be paid by the party to pay such amount not later than three Currency Business Days following the date that

notice of the determination by the Determining Party of such amount (denominated in the currency for settlement of the Transaction as determined by the Determining Party) and the party to pay such amount is effective, which notice shall be provided promptly following such determination.

## ARTICLE 13

### MISCELLANEOUS

**Section 13.1. Non-Reliance.** If "Non-Reliance" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction represents to the other party that: (a) it is entering into such Transaction as principal (and not as agent or in any other capacity); (b) neither the other party nor any of its Affiliates or agents are acting as a fiduciary for it; (c) it is not relying upon any representations except those expressly set forth herein or in the ISDA Master Agreement (including the related Confirmations between them); (d) it has consulted with its own legal, regulatory, tax, business, investments, financial, and accounting advisors to the extent that it has deemed necessary, and it has made its own investments, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party or any of its Affiliates or agents; and (e) it is entering into such Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks.

**Section 13.2. Agreements and Acknowledgments Regarding Hedging Activities.**

(a)     If "Agreements and Acknowledgments Regarding Hedging Activities" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction agrees and acknowledges that (i) when entering into, or continuing to maintain, such Transaction, neither party is relying on (A) the manner or method in which the other party or any of its Affiliates may establish, maintain, adjust or unwind its Hedge Positions, (B) any communication, whether written or oral, between the parties or any of their respective Affiliates with respect to any Hedging Activities of the other party or any of its Affiliates, or (C) any representation, warranty or statement being made by such party or any of its Affiliates as to whether, when, how or in what manner or method such party or any of its Affiliates may engage in any Hedging Activities and that (ii) (A) each party and its Affiliates may, but are not obliged to, hedge any Transaction on a dynamic, static or portfolio basis, by holding a corresponding position in the securities or indices referenced by or underlying such Transaction or in any other securities or indices or by entering into any Hedge Position; (B) any Hedge Position established by either party or any of its Affiliates is a proprietary trading position and activity of such party or such Affiliate; (C) each party or such Affiliate is not holding the Hedge Positions or engaging in the Hedging Activities on behalf or for the account of or as agent or fiduciary for the other party, and the other party will not have any direct economic or other interest in, or beneficial ownership of, the Hedge Positions or Hedging Activities; and (D) the decision to engage in Hedging Activities is in the sole discretion of each party, and each party and its Affiliates may commence or, once commenced, suspend or cease the Hedging Activities at any time as it may solely determine.

52

(b)      "Hedge Positions" means any purchase, sale, entry into or maintenance of one or more (i) positions or contracts in securities, options, futures, derivatives or foreign exchange, (ii) stock loan transactions or (iii) other instruments or arrangements (howsoever described) by a party in order to hedge, individually or on a portfolio basis, a Transaction.

(c)      "Hedging Activities" means any activities or transactions undertaken in connection with the establishment, maintenance, adjustment or termination of a Hedge Position.

**Section 13.3.  Index Disclaimer.**  If "Index Disclaimer" is specified as applicable in the related Confirmation, then each party to a Transaction entered into and subject to these Definitions agrees and acknowledges that such Transaction is not sponsored, endorsed, sold, or promoted by the Index or the Index Sponsor and no Index Sponsor makes any representation whatsoever, whether express or implied, either as to the results to be obtained from the use of the Index and/or the levels at which the Index stands at any particular time on any particular date or otherwise.  No Index or Index Sponsor shall be liable (whether in negligence or otherwise) to any person for any error in the Index and the Index Sponsor is under no obligation to advise any person of any error therein.  No Index Sponsor is making any representation whatsoever, whether express or implied, as to the advisability of purchasing or assuming any risk in connection with entering into any Transaction.  Neither party to any Transaction shall have any liability to the other party for any act or failure to act by the Index Sponsor in connection with the calculation, adjustment or maintenance of the Index. Except as disclosed prior to the Trade Date, neither party nor its Affiliates has any affiliation with or control over the Index or Index Sponsor or any control over the computation, composition or dissemination of the Indices.  Although the Calculation Agent will obtain information concerning the Indices from publicly available sources it believes reliable, it will not independently verify this information.  Accordingly, no representation, warranty or undertaking (express or implied) is made and no responsibility is accepted by either party, its Affiliates or the Calculation Agent as to the accuracy, completeness and timeliness of information concerning the Indices.

**Section 13.4.  Additional Acknowledgments.**  If "Additional Acknowledgments" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction acknowledges that:

(a)      neither the other party nor its Affiliates provides investment, tax, accounting, legal or other advice in respect of such Transaction;

(b)      it has been given the opportunity to obtain information from the other party concerning the terms and conditions of such Transaction necessary in order for it to evaluate the merits and risks of the Transaction. Notwithstanding the foregoing, it and its advisors are not relying on any communication (written or oral and including, without limitation, opinions of third party advisors) of the other party or its Affiliates as (i) legal, regulatory, tax, business, investments, financial, accounting or other advice, (ii) a recommendation to enter into such Transaction or (iii) an assurance or guarantee as to the expected results of such Transaction; it being understood that information and explanations related to the terms and conditions of such Transaction are made incidental to the other party's business and shall not be considered (A) legal, regulatory, tax, business, investments, financial, accounting or other advice, (B) a recommendation to enter into such Transaction or (C) an assurance or guarantee as to the expected results of such Transaction.  Any such communication should not be the basis on which the recipient has entered into such Transaction, and should be independently confirmed by the recipient and its advisors prior to entering into the Transaction; and

(c)      the other party and/or its Affiliates may have banking or other commercial relationships with the issuer of the shares underlying such Transaction and may engage in proprietary trading in the Shares or the Index(es) (as applicable) or options, futures, derivatives or other instruments relating to the Shares or the Index(es) (as applicable) (including such trading as such party and/or its Affiliates deem appropriate in their sole discretion to hedge their market risk on such Transaction and other transactions relating to the Shares or the Index(es) (as applicable) between each party and/or its Affiliates and the other party or with third parties), and that such trading may affect the price of the Shares or the Index(es) (as applicable) and consequently the amounts payable or deliverable under such Transaction.  Such trading may be effected at any time, including on or near the Valuation Date(s).

## INDEX OF TERMS

| Term | Page |
| --- | --- |
| Additional Disruption Event | 48 |
| Adjustment Value | 45 |
| Affected Shares | 39 |
| Agreed Model | 44 |
| Alternative Obligation | 39 |
| American Option | 9 |
| Announcement Date | 38 |
| Automatic Exercise | 12 |
| Averaging Date | 19 |
| Averaging Date Disruption | 19 |
| Basket | 2 |
| Basket Forward Transaction | 2 |
| Basket Option Transaction | 2 |
| Basket Swap Transaction | 2 |
| Bermuda Option | 9 |
| Buyer | 2 |
| Calculation Agent | 5 |
| Calculation Agent Adjustment | 33, 34, 39, 40 |
| Calculation Agent Determination | 46 |
| Call | 9 |
| Cancellation Amount | 46 |
| Cancellation and Payment | 33, 39, 40, 43 |
| Cash Settlement Payment Date | 25 |
| Cash-settled | 5 |
| Change in Law | 48 |
| Clearance System | 4 |
| Clearance System Business Day | 5 |
| Closing Date | 44 |
| Combined Consideration | 38 |
| Commencement Date | 8 |
| Component Adjustment | 40, 41 |
| Composition of Combined Consideration | 42 |
| Confirmation | 2 |
| Currency Business Day | 4 |
| Default Settlement Method | 22 |
| Delisting | 43 |
| Determining Party | 47 |
| Disrupted Day | 17 |
| Dividend Amount | 31 |
| Dividend Payment Date | 31 |
| Dividend Period | 31 |
| Early Closure | 17 |
| EC Treaty | 5 |
| Electing Party | 22 |

Equity Amount ...................................................................................................... 25
Equity Amount Payer .......................................................................................... 14
Equity Amount Receiver ..................................................................................... 14
Equity Notional Amount ....................................................................................... 3
Equity Notional Reset ........................................................................................ 16
Equity Swap Transaction ...................................................................................... 1
euro ....................................................................................................................... 5
Euro ...................................................................................................................... 5
European Option .................................................................................................. 9
Ex Amount ..................................................................................................... 31, 32
Excess Dividend Amount ................................................................................... 32
Exchange ............................................................................................................... 3
Exchange Business Day ........................................................................................ 4
Exchange Disruption .......................................................................................... 17
Exchange-traded Contract .................................................................................. 21
Exercise Date ...................................................................................................... 11
Exercise Period ................................................................................................... 10
Expiration Date ................................................................................................... 11
Expiration Time .................................................................................................. 11
Extraordinary Dividend ...................................................................................... 32
Extraordinary Event ........................................................................................... 37
Failure to Deliver ............................................................................................... 48
Final Exchange Amount ..................................................................................... 15
Final Exchange Date ........................................................................................... 15
Final Price ........................................................................................................... 15
First Period ......................................................................................................... 31
Forward Cap Price .............................................................................................. 14
Forward Cash Settlement Amount ..................................................................... 24
Forward Floor Price ............................................................................................ 14
Forward Price ...................................................................................................... 13
Forward Transaction ............................................................................................ 1
Fractional Share Amount .................................................................................... 29
Futures Price Valuation ...................................................................................... 20
gross cash dividend ............................................................................................ 31
Hedge Positions .................................................................................................. 53
Hedging Activities .............................................................................................. 53
Hedging Disruption ............................................................................................ 48
Hedging Party ..................................................................................................... 49
Hedging Shares ................................................................................................... 49
Implied Volatility ............................................................................................... 38
Increased Cost of Hedging ................................................................................. 48
Increased Cost of Stock Borrow ......................................................................... 49
Index ..................................................................................................................... 2
Index Adjustment Event ..................................................................................... 33
Index Basket Forward Transaction ...................................................................... 1
Index Basket Option Transaction ......................................................................... 1
Index Basket Swap Transaction ........................................................................... 1
Index Basket Transaction ..................................................................................... 2

Index Cancellation ............................................................................................................... 33
Index Disruption .................................................................................................................. 33
Index Forward Transaction .................................................................................................... 1
Index Modification .............................................................................................................. 33
Index Option Transaction ....................................................................................................... 1
Index Sponsor ........................................................................................................................ 4
Index Swap Transaction .......................................................................................................... 1
Index Transaction .................................................................................................................. 1
Initial Exchange Amount ...................................................................................................... 14
Initial Exchange Date ........................................................................................................... 14
Initial Price .......................................................................................................................... 15
Initial Stock Loan Rate ........................................................................................................ 49
Insolvency ............................................................................................................................ 43
Insolvency Filing .................................................................................................................. 48
Integral Multiple .................................................................................................................. 12
In-the-Money ........................................................................................................................ 13
ISDA Master Agreement ......................................................................................................... 5
Issuer ...................................................................................................................................... 2
Knock-in Determination Day .................................................................................................. 7
Knock-in Event ....................................................................................................................... 6
Knock-in Price ........................................................................................................................ 5
Knock-in Reference Security .................................................................................................. 7
Knock-in Valuation Time ........................................................................................................ 8
Knock-out Determination Day ................................................................................................ 7
Knock-out Event ..................................................................................................................... 6
Knock-out Price ...................................................................................................................... 6
Knock-out Reference Security ................................................................................................. 7
Knock-out Valuation Time ...................................................................................................... 8
Latest Exercise Time ............................................................................................................ 11
Lending Party ....................................................................................................................... 49
Loss of Stock Borrow ........................................................................................................... 48
Market Disruption Event ...................................................................................................... 16
Maximum Number of Options .............................................................................................. 12
Maximum Stock Loan Rate .................................................................................................. 49
Merger Date .......................................................................................................................... 37
Merger Event ........................................................................................................................ 37
Method of Adjustment .......................................................................................................... 34
Minimum Number of Options .............................................................................................. 12
Modified Calculation Agent Adjustment ........................................................................ 40, 41
Modified Postponement ........................................................................................................ 19
Multiple Exercise .................................................................................................................. 12
Multiplier ................................................................................................................................ 3
Nationalization ..................................................................................................................... 43
Negotiated Close-out ...................................................................................................... 33, 43
New Shares ........................................................................................................................... 38
Non-Hedging Party .............................................................................................................. 49
Notional Amount .................................................................................................................... 3
Number of Baskets .................................................................................................................. 3

Number of Baskets to be Delivered ..................................................................28
Number of Options ...........................................................................................8
Number of Shares .............................................................................................2
Number of Shares to be Delivered ..................................................................28
Official Settlement Price ..................................................................................21
Omission .........................................................................................................19
Option ...............................................................................................................9
Option Cash Settlement Amount .....................................................................23
Option Entitlement ............................................................................................8
Option Transaction ............................................................................................1
Options Exchange ............................................................................................35
Options Exchange Adjustment ...........................................................34, 39, 40
OTC ...................................................................................................................1
Other Consideration ........................................................................................38
Paid Amount ...............................................................................................31, 32
Partial Cancellation and Payment .........................................................40, 41, 43
Physically-settled ..............................................................................................5
Postponement ..................................................................................................19
Potential Adjustment Event .............................................................................35
Potential Exercise Date ...................................................................................11
Premium ..........................................................................................................10
Premium Payment Date ...................................................................................10
Prepayment .....................................................................................................14
Prepayment Amount ........................................................................................14
Prepayment Date .............................................................................................14
Price Adjustment .............................................................................................49
Price Return ....................................................................................................25
Put ...................................................................................................................10
Rate of Return .................................................................................................15
Record Amount ..........................................................................................31, 32
Reference Price ...............................................................................................13
Re-investment of Dividends ............................................................................32
Related Exchange ..............................................................................................4
Relevant Price ...................................................................................................3
Reverse Merger ...............................................................................................37
Scheduled Closing Time ....................................................................................4
Scheduled Trading Day ......................................................................................4
Scheduled Valuation Date ...............................................................................17
Second Period .................................................................................................32
Seller ................................................................................................................2
Seller's Agent ..................................................................................................10
Settlement Currency ..........................................................................................5
Settlement Cycle ...............................................................................................5
Settlement Date ...............................................................................................27
Settlement Disruption Event ...........................................................................30
Settlement Method Election ............................................................................22
Settlement Method Election Date ...................................................................22
Settlement Price ..............................................................................................22

Share Basket Forward Transaction ............................................................................... 1
Share Basket Option Transaction ................................................................................ 1
Share Basket Swap Transaction .................................................................................. 1
Share Basket Transaction............................................................................................ 2
Share Forward Transaction ......................................................................................... 1
Share Option Transaction ........................................................................................... 1
Share Swap Transaction.............................................................................................. 1
Share Transaction ....................................................................................................... 1
Share-for-Combined................................................................................................... 38
Share-for-Other.......................................................................................................... 38
Share-for-Share .......................................................................................................... 37
Shares.......................................................................................................................... 2
Strike Price.................................................................................................................. 9
Strike Price Differential ............................................................................................. 23
Successor Index .......................................................................................................... 33
Tender Offer ............................................................................................................... 37
Tender Offer Date....................................................................................................... 37
Total Return ................................................................................................................ 25
Trade Date................................................................................................................... 2
Trading Disruption...................................................................................................... 17
Transaction.................................................................................................................. 1
Type of Return ............................................................................................................ 25
Unadjusted Value ....................................................................................................... 44
Valid Date ................................................................................................................... 20
Valuation Date ....................................................................................................... 16, 20
Valuation Time ........................................................................................................... 16