# EXHIBIT D

Execution Version

**THE SECURITIES REPRESENTED HEREBY (THE "WARRANTS") WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE WARRANTS MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.**

Opening Transaction

JPMorgan Chase Bank, National Association

London Branch
25 Bank Street
Canary Wharf
London E14 5JP
England

**To:**     Tesla Motors, Inc.
3500 Deer Creek Road
Palo Alto, CA 94304

**Re:**     Base Issuer Warrant Transaction – 2021 Expiry

**Date:**   February 27, 2014

---

Dear Ladies and Gentlemen:

The purpose of this communication (this "**Confirmation**") is to set forth the terms and conditions of the above-referenced transaction entered into on the Trade Date specified below (the "**Transaction**") between JPMorgan Chase Bank, National Association, London Branch ("**Dealer**") and Tesla Motors, Inc. ("**Issuer**"). This communication constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1. This Confirmation is subject to, and incorporates, the definitions and provisions of the 2006 ISDA Definitions (the "**2006 Definitions**") and the definitions and provisions of the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the 2006 Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). In the event of any inconsistency between the 2006 Definitions and the Equity Definitions, the Equity Definitions will govern. For purposes of the Equity Definitions, each reference herein to a Warrant shall be deemed to be a reference to a Call Option or an Option, as context requires.

Each party is hereby advised, and each such party acknowledges, that the other party has engaged in, or refrained from engaging in, substantial financial transactions and has taken other material actions in reliance upon the parties' entry into the Transaction to which this Confirmation relates on the terms and conditions set forth below.

This Confirmation evidences a complete and binding agreement between Dealer and Issuer as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall be subject to an agreement (the "**Agreement**") in the form of the 2002 ISDA Master Agreement as if Dealer and Issuer had executed an agreement in such form on the date hereof (but without any Schedule except for (i) the election of US Dollars ("**USD**") as the Termination Currency and (ii) the election that the "Cross Default" provisions of Section 5(a)(vi) of the Agreement shall apply to Issuer (a) with a "Threshold Amount" of

JPMorgan Chase Bank, National Association
Organised under the laws of the United States as a National Banking Association.
Main Office 1111 Polaris Parkway, Columbus, Ohio 43240
Registered as a branch in England & Wales branch No. BR000746
Registered Branch Office 25 Bank Street, Canary Wharf, London, E14 5JP
Authorised and regulated by the Financial Services Authority

USD150 million, (b) the phrase "or becoming capable at such time of being declared" shall be deleted from clause (1) of such Section 5(a)(vi)), and (c) the following language shall be added to the end thereof: "Notwithstanding the foregoing, a default under subsection (2) hereof shall not constitute an Event of Default if (x) the default was caused solely by error or omission of an administrative or operational nature; (y) funds were available to enable the party to make the payment when due; and (z) the payment is made within two Local Business Days of such party's receipt of written notice of its failure to pay."

All provisions contained in, or incorporated by reference to, the Agreement will govern this Confirmation except as expressly modified herein.  In the event of any inconsistency between this Confirmation and either the Definitions or the Agreement, this Confirmation shall govern.

The Transaction hereunder shall be the sole Transaction under the Agreement.  If there exists any ISDA Master Agreement between Dealer and Issuer or any confirmation or other agreement between Dealer and Issuer pursuant to which an ISDA Master Agreement is deemed to exist between Dealer and Issuer, then notwithstanding anything to the contrary in such ISDA Master Agreement, such confirmation or agreement or any other agreement to which Dealer and Issuer are parties, the Transaction shall not be considered a Transaction under, or otherwise governed by, such existing or deemed ISDA Master Agreement.

2.   The Transaction is a Warrant Transaction, which shall be considered a Share Option Transaction for purposes of the Equity Definitions.  The terms of the particular Transaction to which this Confirmation relates are as follows:

General Terms:

| | |
|---|---|
| Trade Date: | February 27, 2014 |
| Effective Date: | March 5, 2014, or such other date as agreed between the parties, subject to Section 8(k) below. |
| Components: | The Transaction will be divided into individual Components, each with the terms set forth in this Confirmation, and, in particular, with the Number of Warrants and Expiration Date set forth in this Confirmation.  The payments and deliveries to be made upon settlement of the Transaction will be determined separately for each Component as if each Component were a separate Transaction under the Agreement. |
| Warrant Style: | European |
| Warrant Type: | Call |
| Seller: | Issuer |
| Buyer: | Dealer |
| Shares: | The Common Stock of Issuer, par value USD0.001 (Ticker Symbol: "TSLA"). |
| Number of Warrants: | For each Component, as provided in Annex A to this Confirmation. |
| Warrant Entitlement: | One Share per Warrant |
| Strike Price: | USD 560.6388 |
| Number of Shares: | As of any date, a number of Shares equal to the product of the Number of Warrants and the Warrant Entitlement. |

| | |
|---|---|
| Premium: | USD 111,600,000.00 |
| Premium Payment Date: | The Effective Date |
| Exchange: | NASDAQ Global Select Market |
| Related Exchange: | All Exchanges; *provided* that Section 1.26 of the Equity Definitions shall be amended to add the words "United States" before the word "exchange" in the tenth line of such Section. |

Procedures for Exercise:

*In respect of any Component:*

| | |
|---|---|
| Expiration Time: | Valuation Time |
| Expiration Date: | As provided in <u>Annex A</u> to this Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day that is not already an Expiration Date for another Component); *provided* that if that date is a Disrupted Day, the Expiration Date for such Component shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day and is not or is not deemed to be an Expiration Date in respect of any other Component of the Transaction hereunder; and *provided further* that if the Expiration Date has not occurred pursuant to the preceding proviso as of the Final Disruption Date, the Calculation Agent shall have the right to elect, in its reasonable discretion, that the Final Disruption Date shall be the Expiration Date (irrespective of whether such date is an Expiration Date in respect of any other Component for the Transaction) and, notwithstanding anything to the contrary in this Confirmation or the Equity Definitions, the VWAP Price for such Expiration Date shall be the prevailing market value per Share determined by the Calculation Agent in a commercially reasonable manner. Notwithstanding the foregoing and anything to the contrary in the Equity Definitions, if a Market Disruption Event occurs on any Expiration Date, the Calculation Agent may determine that such Expiration Date is a Disrupted Day only in part, in which case the Calculation Agent shall make reasonable adjustments to the Number of Warrants for the relevant Component for which such day shall be the Expiration Date, shall designate the Scheduled Trading Day determined in the manner described in the immediately preceding sentence as the Expiration Date for the remaining Warrants for such Component and may determine the VWAP Price based on transactions in the Shares on such Disrupted Day taking into account the nature and duration of such Market Disruption Event on such day. Any Scheduled Trading Day on which, as of the date hereof, the Exchange is scheduled to close prior to its normal close of trading shall be deemed not to be a Scheduled Trading Day; if a closure of the Exchange |

<table>
<tr><td></td><td>prior to its normal close of trading on any Scheduled Trading Day is scheduled following the date hereof, then such Scheduled Trading Day shall be deemed to be a Disrupted Day in full. Section 6.6 of the Equity Definitions shall not apply to any Valuation Date occurring on an Expiration Date. "<strong>Final Disruption Date</strong>" means August 9, 2019.</td></tr>
</table>

| Market Disruption Event: | Section 6.3(a) of the Equity Definitions is hereby amended (A) by deleting the words "during the one hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be," in clause (ii) thereof and (B) by replacing the words "or (iii) an Early Closure." therein with "(iii) an Early Closure, or (iv) a Regulatory Disruption." |
|---|---|
| | Section 6.3(d) of the Equity Definitions is hereby amended by deleting the remainder of the provision following the term "Scheduled Closing Time" in the fourth line thereof. |
| Regulatory Disruption: | Any event that Dealer, in its reasonable discretion, determines makes it appropriate, with regard to any legal, regulatory or self-regulatory requirements or related policies and procedures generally applicable to transactions of the type of the Transactions contemplated hereby and consistently applied, for Dealer to refrain from or decrease any market activity in connection with the Transaction. Dealer shall notify Issuer as soon as reasonably practicable (but in no event later than two Scheduled Trading Days after such Regulatory Disruption was invoked) that a Regulatory Disruption has occurred and the Expiration Dates affected by it. |
| Automatic Exercise: | Applicable; and means that the Number of Warrants for the corresponding Expiration Date will be deemed to be automatically exercised at the Expiration Time on such Expiration Date unless Dealer notifies Seller (by telephone or in writing) prior to the Expiration Time on such Expiration Date that it does not wish Automatic Exercise to occur, in which case Automatic Exercise will not apply to such Expiration Date. |
| Issuer's Telephone Number and Telex and/or Facsimile Number and Contact Details for purpose of Giving Notice: | As provided in Section 6(a) below. |

Settlement Terms:

*In respect of any Component:*

| Settlement Currency: | USD |
|---|---|
| Settlement Method Election : | Applicable; *provided* that: |

(i) Issuer may elect Cash Settlement only if, on or prior to the Settlement Method Election Date, Issuer delivers written notice to Dealer stating that Issuer has elected that Cash Settlement apply with respect to every Component of the Transaction;

(ii) on such notice delivery date, Issuer shall represent and warrant to Dealer in writing that, as of such notice delivery date:

(A) none of Issuer and its officers or directors, or any person that controls, potentially controls, or otherwise exercises influence over, Issuer's decision to elect Cash Settlement is aware of any material nonpublic information regarding Issuer or the Shares;

(B) Issuer is electing Cash Settlement in good faith and not as part of a plan or scheme to evade compliance with the federal securities laws;

(C) the assets of Issuer at their fair valuation exceed the liabilities of Issuer, including contingent liabilities;

(D) the capital of Issuer is adequate to conduct the business of Issuer;

(E) Issuer has the ability to pay its debts and obligations as such debts mature and does not intend to, or does not believe that it will, incur debt beyond its ability to pay as such debts mature;

(F) Issuer would be able to purchase the Number of Shares in compliance with the laws of Issuer's jurisdiction or organization;

(G) Issuer has the power to make such election and to execute and deliver any documentation relating to such election that it is required by this Confirmation to deliver and to perform its obligations under this Confirmation and has taken all necessary action to authorize such election, execution, delivery and performance;

(H) such election and performance of its obligations under this Confirmation do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; and

(I) any transaction that Dealer makes with respect to the Shares during the period beginning at the time that Issuer delivers notice of its Cash Settlement election and ending at the close of business on the final day of the Settlement Period shall be made by Dealer at Dealer's sole discretion for Dealer's own account and Issuer shall not have, and shall not attempt to exercise, any influence over how, when, whether or at what price Dealer effects such

transactions, including, without limitation, the prices paid or received by Dealer per Share pursuant to such transactions, or whether such transactions are made on any securities exchange or privately; and

(iii) no event of default has occurred and is continuing under any indebtedness of the Issuer or its subsidiaries in an aggregate principal amount of USD50 million or more.

At any time prior to making a Settlement Method Election, Issuer may, without the consent of Dealer, amend this Confirmation by notice to Dealer to eliminate Issuer's right to elect Cash Settlement.

| | |
|---|---|
| Electing Party: | Issuer |
| Settlement Method Election Date: | The tenth (10th) Scheduled Trading Day immediately preceding the scheduled Expiration Date for the Component with the earliest scheduled Expiration Date. |
| Default Settlement Method: | Net Share Settlement |
| Net Share Settlement: | If applicable, on each Settlement Date, Issuer shall deliver to Dealer a number of Shares equal to the Number of Shares to be Delivered for such Settlement Date to the account specified by Dealer and cash in lieu of any fractional Share valued at the Relevant Price on the Valuation Date corresponding to such Settlement Date.  If, in the reasonable opinion of Issuer or Dealer, based on advice of counsel, for any reason, the Shares deliverable upon Net Share Settlement would not be immediately freely transferable by Dealer under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**"), then Dealer may elect to either (x) accept delivery of such Shares notwithstanding any restriction on transfer or (y) have the provisions set forth in Section 8(b) below apply. |
| | The Number of Shares to be Delivered shall be delivered by Issuer to Dealer no later than 12:00 noon (local time in New York City) on the relevant Settlement Date. |
| Number of Shares to be Delivered: | In respect of any Exercise Date, subject to the last sentence of Section 9.5 of the Equity Definitions, the product of (i) the number of Warrants exercised or deemed exercised on such Exercise Date, (ii) the Warrant Entitlement and (iii) (A) the excess of the VWAP Price on the Valuation Date occurring in respect of such Exercise Date over the Strike Price (or, if there is no such excess, zero) *divided by* (B) such VWAP Price. |
| VWAP Price: | For any Exchange Business Day, as determined by the Calculation Agent based on the NASDAQ Volume Weighted Average Price per Share for the regular trading session (including any extensions |

thereof) of the Exchange on such Exchange Business Day (without regard to pre-open or after hours trading outside of such regular trading session), as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Exchange Business Day, on Bloomberg page "TSLA. Q <Equity> AQR" (or any successor thereto) (the "**Nasdaq VWAP**") (or if such published volume weighted average price is unavailable or is manifestly incorrect, the market value of one Share on such Exchange Business Day, as reasonably determined by the Calculation Agent using a volume weighted method substantially similar to the method for determining the Nasdaq VWAP).

|  |  |
|---|---|
| Other Applicable Provisions: | The provisions of Sections 9.1(c), 9.4, 9.8, 9.9, 9.10, 9.11 and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction; *provided* that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws that exist as a result of the fact that Issuer is the issuer of the Shares. |
| Option Cash Settlement Amount : | For any Exercise Date, the product of (i) the number of Warrants exercised or deemed exercised on such Exercise Date, (ii) the Warrant Entitlement and (iii) the excess of the VWAP Price on the Valuation Date occurring in respect of such Exercise Date over the Strike Price (or, if there is no such excess, zero). |

Adjustments:

*In respect of any Component:*

|  |  |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment; *provided* that in respect of an Extraordinary Dividend, "Calculation Agent Adjustment" shall be as described in the provision below; *provided further* that the parties agree that open market Share repurchases at prevailing market price or accelerated share repurchases, forward contracts or similar transactions (including without limitation any discount to average VWAP prices) that are entered into at prevailing market prices and in accordance with customary market terms for transactions of such type to repurchase the Issuer's Shares, in each case, with respect to a number of Shares not to exceed 10% (measured at the time of purchase or execution) of the outstanding Shares in any one-year period, shall not be considered Potential Adjustment Events. For the avoidance of doubt, Calculation Agent Adjustment (including, without limitation, in respect of Extraordinary Dividends) shall continue to apply until the obligations of the parties (including any |

<table>
<tr><td></td><td>obligations of Issuer pursuant to Section 8(e) below) under the Transaction have been satisfied in full.</td></tr>
</table>

| | |
|---|---|
| Extraordinary Dividend: | Any cash dividend or distribution on the Shares with an ex-dividend date occurring on or after the Trade Date and on or prior to the Expiration Date (or, if any Deficit Shares are owed pursuant to Section 8(e) below, such later date on which Issuer's obligations under this Transaction have been satisfied in full). |
| Extraordinary Dividend Adjustment: | If at any time during the period from and including the Trade Date, to and including the Expiration Date for the Component with the latest Expiration Date (or, if any Deficit Shares are owed pursuant to Section 8(e) below, such later date on which Issuer's obligations under this Transaction have been satisfied in full), an ex-dividend date for an Extraordinary Dividend occurs or is deemed to occur, then the Calculation Agent will make reasonable adjustments to any one or more of the Strike Price, the Number of Warrants, the Warrant Entitlement and/or any other variable relevant to the exercise, settlement, payment or other terms of the Transaction as it reasonably determines appropriate to account for the economic effect on the Transaction of such Extraordinary Dividend. |
| Extraordinary Events: | |
| New Shares: | In the definition of New Shares in Section 12.1(i) of the Equity Definitions, the text in clause (i) thereof shall be deleted in its entirety and replaced with "publicly quoted, traded or listed on any of The New York Stock Exchange, The NASDAQ Global Market or The NASDAQ Global Select Market (or their respective successors) and of an entity or person organized under the laws of the United States, any State thereof or the District of Columbia". |
| Consequences of Merger Events: | |
| (a) Share-for-Share: | Modified Calculation Agent Adjustment |
| (b) Share-for-Other: | Cancellation and Payment (Calculation Agent Determination) |
| (c) Share-for-Combined: | Cancellation and Payment (Calculation Agent Determination); *provided* that the Calculation Agent may elect Component Adjustment for all or part of the Transaction. |
| Tender Offer: | Applicable; *provided* that for purposes of Section 12.3(d) of the Equity Definitions, only in the case of a self-tender by the Issuer, references in the definition of Tender Offer under the Equity Definitions to 10% shall be replaced with 20%. |
| Consequences of Tender Offers: | |
| (a) Share-for-Share: | Modified Calculation Agent Adjustment |
| (b) Share-for-Other: | Modified Calculation Agent Adjustment |

| | |
|---|---|
| (c)   Share-for-Combined: | Modified Calculation Agent Adjustment |
| Consequences of Announcement Events: | Modified Calculation Agent Adjustment as set forth in Section 12.3(d) of the Equity Definitions; *provided* that, in respect of an Announcement Event, references to "Tender Offer" shall be replaced by references to "Announcement Event" and references to "Tender Offer Date" shall be replaced by references to "date of such Announcement Event". An Announcement Event shall be an "Extraordinary Event" for purposes of the Equity Definitions, to which Article 12 of the Equity Definitions is applicable. |
| Announcement Event: | (i) The public announcement of any Merger Event or Tender Offer or the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer, (ii) the public announcement by Issuer of an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer or (iii) any subsequent public announcement of a change to a transaction or intention that is the subject of an announcement of the type described in clause (i) or (ii) of this sentence (including, without limitation, a new announcement relating to such a transaction or intention or the announcement of a withdrawal from, or the abandonment or discontinuation of, such transaction or intention) (in each case, whether such announcement is made by Issuer or a third party); *provided* that, for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention. |
| Modified Calculation Agent Adjustment: | If, in respect of any Merger Event to which Modified Calculation Agent Adjustment applies, the adjustments to be made in accordance with Section 12.2(e)(i) of the Equity Definitions would result in Issuer being different from the issuer of the Shares, then with respect to such Merger Event, as a condition precedent to the adjustments contemplated in Section 12.2(e)(i) of the Equity Definitions, Issuer and the issuer of the Shares shall, prior to the Merger Date, have entered into such documentation containing representations, warranties and agreements relating to securities law and other issues as requested by Dealer that Dealer has determined, in its reasonable discretion, to be reasonably necessary or appropriate to allow Dealer to continue as a party to the Transaction, as adjusted under Section 12.2(e)(i) of the Equity Definitions, and to preserve its hedging or hedge unwind activities in connection with the Transaction in a manner compliant with applicable legal, regulatory or self-regulatory |

requirements, or with related policies and procedures generally applicable to transactions of the type of the Transactions contemplated hereby and consistently applied to Dealer, and if such conditions are not met or if the Calculation Agent reasonably determines that no adjustment that it could make under Section 12.2(e)(i) of the Equity Definitions will produce a commercially reasonable result, then the consequences set forth in Section 12.2(e)(ii) of the Equity Definitions shall apply.

Nationalization, Insolvency or Delisting:

Cancellation and Payment (Calculation Agent Determination); *provided* that in addition to the provisions of Section 12.6(a)(iii) of the Equity Definitions, it will also constitute a Delisting if the Shares are not immediately re-listed, re-traded or re-quoted on any of the New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or their respective successors); if the Shares are immediately re-listed, re-traded or re-quoted on any such exchange or quotation system, such exchange or quotation system shall thereafter be deemed to be the Exchange.

Additional Disruption Events:

(a)  Change in Law:

Applicable; *provided* that Section 12.9(a)(ii) of the Equity Definitions is hereby amended by (i) replacing the phrase "the interpretation" in the third line thereof with the phrase ", or public announcement of, the formal or informal interpretation", (ii) by adding the phrase "and/or Hedge Position" after the word "Shares" in clause (X) thereof and (iii) by immediately following the word "Transaction" in clause (X) thereof, adding the phrase "in the manner contemplated by the Hedging Party on the Trade Date"; *provided, further* that any determination as to whether (A) the adoption of or any change in any applicable law or regulation (including, for the avoidance of doubt and without limitation, (x) any tax law or (y) adoption or promulgation of new regulations authorized or mandated by existing statute) or (B) the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), in each case, constitutes a "Change in Law" shall be made without regard to Section 739 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or any similar legal certainty provision in any legislation enacted, or rule or regulation promulgated, on or after the Trade Date.

(b)  Failure to Deliver:

Not Applicable

(c)  Insolvency Filing:

Applicable

| | | |
|---|---|---|
| (d) | Hedging Disruption: | Applicable; *provided* that Section 12.9(a)(v) of the Equity Definitions is hereby modified by inserting the following two phrases at the end of such Section: |
| | | "For the avoidance of doubt, the term "equity price risk" shall be deemed to include, but shall not be limited to, stock price and volatility risk. And, for the further avoidance of doubt, the transactions or assets referred to in phrases (A) or (B) above must be available on commercially reasonable pricing and other terms." |
| (e) | Increased Cost of Hedging: | Applicable |
| (f) | Loss of Stock Borrow: | Applicable |
| | Maximum Stock Loan Rate: | 200 basis points per annum |
| (g) | Increased Cost of Stock Borrow: | Applicable |
| | Initial Stock Loan Rate: | 50 basis points per annum |

| | |
|---|---|
| Hedging Party: | Dealer for all applicable Additional Disruption Events. |
| Determining Party: | Dealer for all applicable Additional Disruption Events. |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

3.  Calculation Agent:   Dealer;  *provided* that all determinations made by the Calculation Agent shall be made in good faith and in a commercially reasonable manner; *provided further* that, upon receipt of written request from Issuer, the Calculation Agent shall promptly provide Issuer with a written explanation describing in reasonable detail any calculation, adjustment or determination made by it (including any quotations, market data or information from internal or external sources used in making such calculation, adjustment or determination, as the case may be, but without disclosing Dealer's proprietary models or other information that may be proprietary or subject to contractual, legal or regulatory obligations to not disclose such information), and shall use commercially reasonable efforts to provide such written explanation within five (5) Exchange Business Days from the receipt of such request.

4.  Account Details:

Dealer Payment Instructions:

| | |
|---|---|
| Bank: | JPMorgan Chase Bank, N.A. |
| ABA#: | 021000021 |
| Acct No.: | 099997979 |
| Beneficiary: | JPMorgan Chase Bank, N.A. New York |
| Ref: | Derivatives |

Account for delivery of Shares to Dealer:  DTC 0060

Issuer Payment Instructions:  To be provided by Issuer.

5.  Offices:

The Office of Dealer for the Transaction is:

London

11

The Office of Issuer for the Transaction is:

> 3500 Deer Creek Road, Palo Alto, CA 94304

6.  <u>Notices</u>: For purposes of this Confirmation:

(a)      Address for notices or communications to Issuer:

|  |  |
|---|---|
| To: | Tesla Motors, Inc. |
| Attn: | Rex Liu |
|  | 3500 Deer Creek Road |
|  | Palo Alto, CA 94304 |
| Telephone: | 650-681-5423 |
| Facsimile: | 650-681-5202 |

With a copy to:

|  |  |
|---|---|
|  | Wilson Sonsini Goodrich & Rosati |
| Attn: | Mark Baudler |
|  | 650 Page Mill Road |
|  | Palo Alto, California 94304 |
| Telephone: | 650-493-9300 |
| Facsimile: | 650-493-6811 |

(b)      Address for notices or communications to Dealer:

JPMorgan Chase Bank, National Association
EDG Marketing Support

|  |  |
|---|---|
| Email: | edg_notices@jpmorgan.com |
|  | edg_ny_corporate_sales_support@jpmorgan.com |
| Facsimile No: | 1-866-886-4506 |

With a copy to:

|  |  |
|---|---|
| Attention: | Santosh Sreenivasan |
| Title: | Managing Director, Head of Equity-Linked Capital Markets, Americas |
| Telephone No: | 1-212-622-5604 |
| Facsimile No: | 1-212-622-6037 |

7.  <u>Representations, Warranties and Agreements</u>:

(a)      In addition to the representations and warranties in the Agreement and those contained elsewhere herein, Issuer represents and warrants to and for the benefit of, and agrees with, Dealer as follows:

(i)      On the Trade Date and as of the date of any election by Issuer of the Share Termination Alternative under (and as defined in) Section 8(a) below, (A) none of Issuer and its officers and directors is aware of any material nonpublic information regarding Issuer or the Shares and (B) all reports and other documents filed by Issuer with the Securities and Exchange Commission ("**SEC**") pursuant to the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), when considered as a whole (with the more recent such reports and documents deemed to amend inconsistent statements contained in any earlier such reports and documents), do not contain any untrue statement of a material fact or any omission of a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading.

(ii)      Without limiting the generality of Section 13.1 of the Equity Definitions, Issuer acknowledges that neither Dealer nor any of its affiliates is making any representations or warranties or taking any position or expressing any view with respect to the treatment of the Transaction under any accounting standards including ASC Topic 260, *Earnings Per Share*, ASC Topic 815, *Derivatives and Hedging*, or ASC Topic 480, *Distinguishing Liabilities from Equity* and ASC 815-40, *Derivatives and Hedging – Contracts in Entity's Own Equity* (or any successor issue statements).

(iii)      Prior to the Trade Date, Issuer shall deliver to Dealer a resolution of Issuer's board of directors authorizing the Transaction and such other certificate or certificates as Dealer shall reasonably request.

(iv)      Issuer is not entering into this Confirmation to create actual or apparent trading activity in the Shares (or any security convertible into or exchangeable for Shares) or to raise or depress or otherwise manipulate the price of the Shares (or any security convertible into or exchangeable for Shares) or otherwise in violation of the Exchange Act.

(v)      Issuer is not, and after giving effect to the transactions contemplated hereby will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(vi)      On the Trade Date and the Premium Payment Date (A) the assets of Issuer at their fair valuation exceed the liabilities of Issuer, including contingent liabilities, (B) the capital of Issuer is adequate to conduct the business of Issuer and (C) Issuer has the ability to pay its debts and obligations as such debts mature and does not intend to, or does not believe that it will, incur debt beyond its ability to pay as such debts mature.

(vii)      Issuer shall not take any action to decrease the number of Available Shares below the Capped Number (each as defined below).

(viii)      The representations and warranties of Issuer set forth in Section 3 of the Agreement and Section 1 of the Underwriting Agreement dated as of the Trade Date among Issuer and Goldman, Sachs & Co., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC and Deutsche Bank Securities Inc. as the Underwriters party thereto (the "**Underwriting Agreement**") are true and correct as of the Trade Date and the Effective Date and are hereby deemed to be repeated to Dealer as if set forth herein.

(ix)      On the Trade Date, Issuer is not engaged in any "distribution," as such term is defined in Regulation M under the Exchange Act ("**Regulation M**"), other than (A) a distribution meeting the requirements of the exceptions set forth in sections 101(b)(10) and 102(b)(7) of Regulation M and (B) the distribution of 0.25% Convertible Senior Notes due 2019 and the 1.25% Convertible Senior Notes due 2021 (the "**Convertible Securities**") and the concurrent distribution of the Shares described in the prospectus supplement relating to the Convertible Securities.

(x)      During the Settlement Period and on any other Exercise Date, neither Issuer nor any "affiliate" or "affiliated purchaser" (each as defined in Rule 10b-18 of the Exchange Act ("**Rule 10b-18**")) shall directly or indirectly (including, without limitation, by means of any cash-settled or other derivative instrument) purchase, offer to purchase, place any bid or limit order that would effect a purchase of, or commence any tender offer relating to, any Shares (or an equivalent interest, including a unit of beneficial interest in a trust or limited partnership or a depository share) or any security convertible into or exchangeable or exercisable for Shares, except through Dealer.

(xi)      Issuer agrees that it (A) will not during the Settlement Period make, or permit to be made, any public announcement (as defined in Rule 165(f) under the Securities Act) of any Merger Transaction or potential Merger Transaction unless such public announcement is made prior to the opening or after the close of the regular trading session on the Exchange for the Shares; (B) shall promptly (but in any event prior to the next opening of the regular trading session on the Exchange) notify Dealer following any such announcement that such announcement has been made; and (C) shall promptly (but in any event prior to the next opening of the regular

trading session on the Exchange) provide Dealer with written notice specifying (i) Issuer's average daily Rule 10b-18 Purchases (as defined in Rule 10b-18) during the three full calendar months immediately preceding the announcement date that were not effected through Dealer or its affiliates and (ii) the number of Shares purchased pursuant to the proviso in Rule 10b-18(b)(4) under the Exchange Act for the three full calendar months preceding the announcement date. Such written notice shall be deemed to be a certification by Issuer to Dealer that such information is true and correct in all material respects.   In addition, Issuer shall promptly notify Dealer following any public announcement of such event of the earlier to occur of the completion of such transaction and the completion of the vote by target shareholders.   "**Merger Transaction**" means any merger, acquisition or similar transaction involving a recapitalization as contemplated by Rule 10b-18(a)(13)(iv) under the Exchange Act.

(xii)    The Shares of Issuer initially issuable upon exercise of the Warrant (the "**Warrant Shares**") have been reserved for issuance by all required corporate action of Issuer. The Warrant Shares have been duly authorized and, when delivered against payment therefor (which may include Net Share Settlement in lieu of cash) and otherwise as contemplated by the terms of the Warrant following the exercise of the Warrant in accordance with the terms and conditions of the Warrant, will be validly issued, fully-paid and non-assessable, and the issuance of the Warrant Shares will not be subject to any preemptive or similar rights.

(xiii)    No state or local law, rule, regulation or regulatory order in the State of Delaware or California applicable to the Shares would give rise to any reporting, consent, registration or other requirement (including without limitation a requirement to obtain prior approval from any person or entity) as a result of Dealer or its affiliates owning, holding (however defined) or having a right to acquire Shares.

(xiv)    Issuer (i) is an "institutional account" as defined in FINRA Rule 4512(c), (ii) is capable of evaluating investment risks independently, both in general and with regard to all transactions and investment strategies involving a security or securities, and will exercise independent judgment in evaluating the recommendations of Dealer or its associated persons, and (iii) will notify Dealer if any of the statements contained in clause (i) or (ii) of this Section 8(a)(xiv) ceases to be true.

(b)    Each of Dealer and Issuer agrees and represents that it is an "eligible contract participant" as defined in Section 1a(18) of the U.S. Commodity Exchange Act, as amended, and is entering into the Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise) and not for the benefit of any third party.

(c)    Each of Dealer and Issuer acknowledges that the offer and sale of the Transaction to it is intended to be exempt from registration under the Securities Act, by virtue of Section 4(a)(2) thereof. Accordingly, Dealer represents and warrants to Issuer that (i) it has the financial ability to bear the economic risk of its investment in the Transaction and is able to bear a total loss of its investment and its investments in and liabilities in respect of the Transaction, which it understands are not readily marketable, are not disproportionate to its net worth, and it is able to bear any loss in connection with the Transaction, including the loss of its entire investment in the Transaction, (ii) it is an "accredited investor" as that term is defined in Regulation D as promulgated under the Securities Act, (iii) it is entering into the Transaction for its own account and without a view to the distribution or resale thereof, (iv) the assignment, transfer or other disposition of the Transaction has not been and will not be registered under the Securities Act and is restricted under this Confirmation, the Securities Act and state securities laws, and (v) its financial condition is such that it has no need for liquidity with respect to its investment in the Transaction and no need to dispose of any portion thereof to satisfy any existing or contemplated undertaking or indebtedness and is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(d)    Each of Dealer and Issuer agrees and acknowledges that Dealer is a "financial institution," "swap participant" and "financial participant" within the meaning of Sections 101(22), 101(53C) and 101(22A) of Title 11 of the United States Code (the "**Bankruptcy Code**").  The parties hereto further agree and acknowledge (A) that this Confirmation is (i) a "securities contract," as such term is defined in Section 741(7) of the Bankruptcy Code, with respect to which each payment and delivery

hereunder or in connection herewith is a "termination value," "payment amount" or "other transfer obligation" within the meaning of Section 362 of the Bankruptcy Code and a "settlement payment" within the meaning of Section 546 of the Bankruptcy Code, and (ii) a "swap agreement," as such term is defined in Section 101(53B) of the Bankruptcy Code, with respect to which each payment and delivery hereunder or in connection herewith is a "termination value," "payment amount" or "other transfer obligation" within the meaning of Section 362 of the Bankruptcy Code and a "transfer" within the meaning of Section 546 of the Bankruptcy Code, and (B) that Dealer is entitled to the protections afforded by, among other sections, Sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(g), 546(j), 548(d)(2), 555, 560 and 561 of the Bankruptcy Code.

(e)     As a condition to the effectiveness of the Transaction, Issuer shall deliver to Dealer (i) an incumbency certificate, dated as of the Trade Date, of Issuer in customary form and (ii) an opinion of counsel, dated as of the Trade Date and reasonably acceptable to Dealer in form and substance, as to the due incorporation, existence and good standing of Issuer in Delaware, its qualifications as a foreign corporation and good standing in California, the due authorization, execution and delivery of this Confirmation, the absence of conflict of the execution, delivery and performance of this Confirmation with any material agreement required to be filed as an exhibit to Issuer's Annual Report on Form 10-K and Issuer's charter documents, and that the Capped Number of Shares have been duly authorized by all necessary corporate action on the part of Issuer and reserved for issuance and when issued and delivered in accordance with the terms of this Confirmation would, if issued on the date of such opinion, be validly issued, fully paid and nonassessable and free of preemptive rights under Issuer's certificate of incorporation and bylaws and Delaware law.

(f)     Issuer understands that notwithstanding any other relationship between Issuer and Dealer and its affiliates, in connection with this Transaction and any other over-the-counter derivative transactions between Issuer and Dealer or its affiliates, Dealer or its affiliate is acting as principal and is not a fiduciary or advisor in respect of any such transaction, including any entry, exercise, amendment, unwind or termination thereof.

(g)     Issuer acknowledges that the board of directors of Issuer has granted the approval necessary to cause the restrictions set forth in Section 203 of the Delaware General Corporation Law (the "**Business Combinations Statute**") to be inapplicable to the Transaction, including, without limitation, transactions in, or linked to Issuer's securities to be effected by Dealer in connection with hedging the Transaction, and as a result neither Dealer nor any of its affiliates or associates shall be subject to the restrictions in the Business Combinations Statute as an "interested stockholder" of Issuer by virtue of (i) its entry into the Transaction or (ii) any act that Dealer may take in furtherance of the Transaction (including without limitation the hedging transactions to be effected by Dealer or its affiliates in connection with the Transaction).

8.     Other Provisions:

(a)     *Alternative Calculations and Payment on Early Termination and on Certain Extraordinary Events*.  If at any time an Early Termination Date occurs and Issuer would be required to make a payment pursuant to Section 6 of the Agreement or an Extraordinary Event occurs and Issuer would be required to make a payment pursuant to Article 12 of the Equity Definitions (a "Payment Obligation"), Issuer shall have the right, in its sole discretion, to satisfy any such Payment Obligation by the Share Termination Alternative (as defined below) by giving irrevocable telephonic notice to Dealer, confirmed in writing within two Scheduled Trading Days, no later than 9:30 A.M., New York City time, on the Merger Date, Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Extraordinary Event, as applicable ("Notice of Share Termination"); provided that if Issuer does not elect to satisfy its Payment Obligation by the Share Termination Alternative, Dealer shall have the right, in its reasonable discretion, to elect to require Issuer to satisfy its Payment Obligation by the Share Termination Alternative, notwithstanding Issuer's failure to elect or election to the contrary; and provided further that Issuer shall not have the right to so elect (but, for the avoidance of doubt, Dealer shall have the right to so elect) in the event of (i) an Insolvency, a Nationalization, a Tender Offer or a Merger Event, in each case, in which the consideration or proceeds to be paid to holders of Shares consists solely of cash or (ii) an Event of Default in which Issuer is the Defaulting Party or a Termination Event in

which Issuer is the Affected Party, which Event of Default or Termination Event resulted from an event or events within Issuer's control.  Upon such Notice of Share Termination, the following provisions shall apply on the Scheduled Trading Day immediately following the Merger Date, the Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Extraordinary Event, as applicable:

| | |
|---|---|
| Share Termination Alternative: | Applicable and means that Issuer shall deliver to Dealer the Share Termination Delivery Property on the date on which the Payment Obligation would otherwise be due pursuant to Section 12.2, 12.3, 12.6, 12.7 or 12.9 of the Equity Definitions or Section 6(d)(ii) of the Agreement, as applicable (the "**Share Termination Payment Date**"), in satisfaction of the Payment Obligation. |
| Share Termination Delivery Property: | A number of Share Termination Delivery Units, as calculated by the Calculation Agent, equal to the Payment Obligation divided by the Share Termination Unit Price.  The Calculation Agent shall adjust the Share Termination Delivery Property by replacing any fractional portion of the aggregate amount of a security therein with an amount of cash in the Settlement Currency equal to the value of such fractional security based on the values used to calculate the Share Termination Unit Price. |
| Share Termination Unit Price: | The value of property contained in one Share Termination Delivery Unit on the date such Share Termination Delivery Units are to be delivered as Share Termination Delivery Property, as determined by the Calculation Agent in its reasonable discretion by commercially reasonable means and notified by the Calculation Agent to Issuer at the time of notification of the Payment Obligation. |
| Share Termination Delivery Unit: | In the case of a Termination Event, Event of Default, Delisting or Additional Disruption Event, one Share or, in the case of an Insolvency, Nationalization, Merger Event or Tender Offer, one Share or a unit consisting of the number or amount of each type of property received by a holder of one Share (without consideration of any requirement to pay cash or other consideration in lieu of fractional amounts of any securities) in such Insolvency, Nationalization, Merger Event or Tender Offer.  If such Insolvency, Nationalization, Merger Event or Tender Offer involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash. |
| Failure to Deliver: | Applicable |
| Other Applicable Provisions: | If Share Termination Alternative is applicable, the provisions of Sections 9.1(c), 9.8, 9.9, 9.10, 9.11 and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction, except that all references to "Shares" shall be read as references to "Share Termination Delivery Units"; *provided* that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws as a result of the fact that Issuer is the issuer of any Share Termination Delivery Units (or any security forming a part thereof). If, in the reasonable opinion of Issuer or Dealer, based on advice of counsel, for any reason, any securities comprising the Share Termination Delivery Units deliverable pursuant to this Section 8(a) would not be immediately freely transferable by Dealer under Rule 144 under the Securities Act, then Dealer may elect to either (x) permit |

delivery of such securities notwithstanding any restriction on transfer or (y) have the provisions set forth in Section 8(b) below apply.

(b)      *Registration/Private Placement Procedures*.  (i) With respect to the Transaction, the following provisions shall apply to the extent provided for above opposite the caption "Net Share Settlement" in Section 2 or in paragraph (a) of this Section 8.  If so applicable, then, at the election of Issuer by notice to Dealer within one Exchange Business Day after the relevant delivery obligation arises, but in any event at least two Exchange Business Days prior to the date on which such delivery obligation is due, either (A) all Shares or Share Termination Delivery Units, as the case may be, delivered by Issuer to Dealer  shall be, at the time of such delivery, covered by an effective registration statement of Issuer for immediate resale by Dealer (such registration statement and the corresponding prospectus (the "**Prospectus**") (including, without limitation, any sections describing the plan of distribution) in form and content commercially reasonably satisfactory to Dealer) or (B) Issuer shall deliver additional Shares or Share Termination Delivery Units, as the case may be, so that the value of such Shares or Share Termination Delivery Units, as determined by the Calculation Agent to reflect an appropriate liquidity discount, equals the value of the number of Shares or Share Termination Delivery Units that would otherwise be deliverable if such Shares or Share Termination Delivery Units were freely tradeable (without prospectus delivery) upon receipt by Dealer (such value, the "**Freely Tradeable Value**"); *provided* that, if requested by Dealer, Issuer shall make the election described in this clause (B) with respect to Shares delivered on all Settlement Dates no later than one Exchange Business Day prior to the first Exercise Date, and the applicable procedures described below shall apply to all Shares delivered on the Settlement Dates on an aggregate basis.  (For the avoidance of doubt, as used in this paragraph (b) only, the term "Issuer" shall mean the issuer of the relevant securities, as the context shall require.)

(ii)      If Issuer makes the election described in clause (b)(i)(A) above:

(A)      Dealer (or an affiliate of Dealer designated by Dealer) shall be afforded a reasonable opportunity to conduct a due diligence investigation with respect to Issuer that is customary in scope for underwritten offerings of equity securities of companies of comparable size, maturity and lines of business and that yields results that are commercially reasonably satisfactory to Dealer or such affiliate, as the case may be, in its discretion subject to execution by such recipients of customary confidentiality agreements reasonably acceptable to Issuer; and

(B)      Dealer (or an affiliate of Dealer designated by Dealer) and Issuer shall enter into an agreement (a "**Registration Agreement**") on commercially reasonable terms in connection with the public resale of such Shares or Share Termination Delivery Units, as the case may be, by Dealer or such affiliate substantially similar to underwriting agreements customary for underwritten offerings of equity securities of companies of comparable size, maturity and lines of business, in form and substance commercially reasonably satisfactory to Dealer or such affiliate and Issuer, which Registration Agreement shall include, without limitation, provisions substantially similar to those contained in such underwriting agreements of companies of comparable size, maturity and lines of business relating to the indemnification of, and contribution in connection with the liability of, Dealer and its affiliates and Issuer, shall provide for the payment by Issuer of all reasonable expenses in connection with such resale, including all registration costs and all reasonable fees and expenses of counsel for Dealer, and in connection with an underwritten offering of such Shares or Share Termination Delivery Units shall use its commercially reasonable efforts to provide for the delivery of accountants' "comfort letters" to Dealer or such affiliate in customary form and substance of companies of comparable size, maturity and lines of business with respect to the financial statements and certain financial information contained in or incorporated by reference into the Prospectus.

(iii)      If Issuer makes the election described in clause (b)(i)(B) above:

(A)      Dealer (or an affiliate of Dealer designated by Dealer) and any potential institutional purchaser of any such Shares or Share Termination Delivery Units, as the case may be, from Dealer or such affiliate identified by Dealer shall be afforded a commercially reasonable opportunity to conduct a due diligence investigation in compliance with applicable law with respect to Issuer customary in scope for private placements of equity securities of companies of comparable size, maturity and lines of business (including, without limitation, the right to have

made available to them for inspection all financial and other records, pertinent corporate documents and other information reasonably requested by them), subject to execution by such recipients of customary confidentiality agreements reasonably acceptable to Issuer;

(B)     Dealer (or an affiliate of Dealer designated by Dealer) and Issuer shall enter into an agreement (a "**Private Placement Agreement**") on commercially reasonable terms in connection with the private placement of such Shares or Share Termination Delivery Units, as the case may be, by Issuer to Dealer or such affiliate and the private resale of such shares by Dealer or such affiliate, substantially similar to private placement purchase agreements customary for private placements of equity securities, in form and substance commercially reasonably satisfactory to Dealer and Issuer, which Private Placement Agreement shall include, without limitation, provisions substantially similar to those contained in such private placement purchase agreements relating to the indemnification of, and contribution in connection with the liability of, Dealer and its affiliates and Issuer, shall provide for the payment by Issuer of all reasonable expenses in connection with such resale, including all reasonable fees and expenses of counsel for Dealer (which fees and expenses may be paid by the Issuer in cash or Shares at Issuer's election), shall contain representations, warranties and agreements of Issuer reasonably necessary or advisable to establish and maintain the availability of an exemption from the registration requirements of the Securities Act for such resales, and shall use commercially reasonable efforts to provide for the delivery of accountants' "comfort letters" to Dealer or such affiliate with respect to the financial statements and certain financial information contained in or incorporated by reference into the offering memorandum prepared for the resale of such Shares as are customarily requested in comfort letters covering private placements of equity securities of companies of comparable size, maturity and lines of business;

(C)     Issuer agrees that any Shares or Share Termination Delivery Units so delivered to Dealer, (i) may be transferred by and among Dealer and its affiliates, and Issuer shall effect such transfer without any further action by Dealer and (ii) after the minimum "holding period" within the meaning of Rule 144(d) under the Securities Act has elapsed with respect to such Shares or any securities issued by Issuer comprising such Share Termination Delivery Units, Issuer shall promptly remove, or cause the transfer agent for such Shares or securities to remove, any legends referring to any such restrictions or requirements from such Shares or securities upon delivery by Dealer (or such affiliate of Dealer) to Issuer or such transfer agent of any seller's and broker's representation letters customarily delivered by Dealer in connection with resales of restricted securities pursuant to Rule 144 under the Securities Act, without any further requirement for the delivery of any certificate, consent, agreement, opinion of counsel, notice or any other document, any transfer tax stamps or payment of any other amount or any other action by Dealer (or such affiliate of Dealer); and

(D)     Issuer shall not take, or cause to be taken, any action that would make unavailable either the exemption pursuant to Section 4(a)(2) of the Securities Act for the sale by Issuer to Dealer (or any affiliate designated by Dealer) of the Shares or Share Termination Delivery Units, as the case may be, or the exemption pursuant to Section 4(a)(1) or Section 4(a)(3) of the Securities Act for resales of the Shares or Share Termination Delivery Units, as the case may be, by Dealer (or any such affiliate of Dealer).

(c)     *Make-whole Shares*. If Issuer makes the election described in clause (i)(B) of paragraph (b) of this Section 8, then Dealer or its affiliates may sell (which sale shall be made in a commercially reasonable manner) such Shares or Share Termination Delivery Units, as the case may be, during a period (the "**Resale Period**") commencing on the Exchange Business Day following delivery of such Shares or Share Termination Delivery Units, as the case may be, and ending on the Exchange Business Day on which Dealer or its affiliates completes the sale of all such Shares or Share Termination Delivery Units, as the case may be, or a sufficient number of Shares or Share Termination Delivery Units, as the case may be, so that the realized net proceeds of such sales exceed the Freely Tradeable Value.  If any of such delivered Shares or Share Termination Delivery Units remain after such realized net proceeds exceed the Freely Tradeable Value, Dealer shall return such remaining Shares or Share Termination Delivery Units to Issuer. If the Freely Tradeable Value exceeds the realized net proceeds from such resale, Issuer shall transfer to Dealer by the open of the regular trading session on the Exchange on the Exchange Trading Day

immediately following the last day of the Resale Period the amount of such excess (the "**Additional Amount**") in cash or in a number of additional Shares or Share Termination Delivery Units, at the Issuer's option, as the case may be, ("**Make-whole Shares**") in an amount that, based on the Relevant Price on the last day of the Resale Period (as if such day was the "Valuation Date" for purposes of computing such Relevant Price), has a dollar value equal to the Additional Amount. The Resale Period shall continue to enable the sale of the Make-whole Shares in the manner contemplated by this Section 8(c). This provision shall be applied successively until the Additional Amount is equal to zero, subject to Section 8(e).

(d)       *Beneficial Ownership*.  Notwithstanding anything to the contrary in the Agreement or this Confirmation, in no event shall Dealer be entitled to receive, or shall be deemed to receive, any Shares if, immediately upon giving effect to such receipt of such Shares, (i) the "beneficial ownership" (within the meaning of Section 13 of the Exchange Act and the rules promulgated thereunder) of Shares by Dealer, any of its affiliates subject to aggregation with Dealer for purposes of the "beneficial ownership" test under Section 13 of the Exchange Act and all persons who may form a "group" (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) with Dealer with respect to "beneficial ownership" of any Shares (collectively, "**Dealer Group**") would be equal to or greater than 9.5 % or more of the outstanding Shares on the date of determination or (ii) Dealer, Dealer Group or any person whose ownership position would be aggregated with that of Dealer or Dealer Group (Dealer, Dealer Group or any such person, a "**Dealer Person**") under the Business Combinations Statute or other federal, state or local law, rule, regulation or regulatory order or organizational documents or contracts of Issuer applicable to ownership of Shares ("**Applicable Restrictions**"), would own, beneficially own, constructively own, control, hold the power to vote or otherwise meet a relevant definition of ownership in excess of a number of Shares equal to (x) the number of Shares that would give rise to reporting or registration obligations or other requirements (including obtaining prior approval by a state or federal regulator) of a Dealer Person under Applicable Restrictions and with respect to which such requirements have not been met or the relevant approval has not been received or that would subject a Dealer Person to restrictions (including restrictions relating to business combinations and other designated transactions) under Applicable Restrictions *minus* (y) 1.0% of the number of Shares outstanding on the date of determination (either such condition described in clause (i) or (ii), an "**Excess Ownership Position**"). If any delivery owed to Dealer hereunder is not made, in whole or in part, as a result of this provision, Issuer's obligation to make such delivery shall not be extinguished and Issuer shall make such delivery as promptly as practicable after, but in no event later than three Exchange Business Days after, Dealer gives notice to Issuer that such delivery would not result in the existence of an Excess Ownership Position.

(e)       *Limitations on Settlement by Issuer*.   Notwithstanding anything herein or in the Agreement to the contrary, in no event shall Issuer be required to deliver Shares in connection with the Transaction in excess of 3,334,560 Shares (as such number may be adjusted from time to time in accordance with the provisions hereof resulting from actions of Issuer or events within Issuer's control) (the "**Capped Number**"). Issuer represents and warrants to Dealer (which representation and warranty shall be deemed to be repeated on each day that the Transaction is outstanding) that the Capped Number is equal to or less than the number of authorized but unissued Shares of the Issuer that are not reserved for future issuance in connection with transactions in the Shares (other than the Transaction) on the date of the determination of the Capped Number (such Shares, the "**Available Shares**"). In the event Issuer shall not have delivered the full number of Shares otherwise deliverable as a result of this Section 8(e) (the resulting deficit, the "**Deficit Shares**"), Issuer shall be continually obligated to deliver Shares, from time to time until the full number of Deficit Shares have been delivered pursuant to this paragraph, when, and to the extent, that (A) Shares are repurchased, acquired or otherwise received by Issuer or any of its subsidiaries after the Trade Date (whether or not in exchange for cash, fair value or any other consideration), (B) authorized and unissued Shares reserved for issuance in respect of other transactions prior to such date which prior to the relevant date become no longer so reserved and (C) Issuer additionally authorizes any unissued Shares that are not reserved for other transactions (such events as set forth in clauses (A), (B) and (C) above, collectively, the "**Share Issuance Events**"). Issuer shall promptly notify Dealer of the occurrence of any of the Share Issuance Events (including the number of Shares subject to clause (A), (B) or (C) and the corresponding number of Shares to be delivered) and, as promptly as reasonably practicable, deliver such Shares thereafter. Issuer shall not, until Issuer's obligations under the Transaction have been satisfied in full, use any Shares that become available for potential delivery to Dealer as a result of any Share Issuance Event for the settlement or satisfaction of any transaction or obligation other than the

Transaction or reserve any such Shares for future issuance for any purpose other than to satisfy Issuer's obligations to Dealer under the Transaction.

(f)      *Equity Rights*.  Dealer acknowledges and agrees that this Confirmation is not intended to convey to it rights with respect to the Transaction that are senior to the claims of common stockholders in the event of Issuer's bankruptcy.  For the avoidance of doubt, the parties agree that the preceding sentence shall not apply at any time other than during Issuer's bankruptcy to any claim arising as a result of a breach by Issuer of any of its obligations under this Confirmation or the Agreement.  For the avoidance of doubt, the parties acknowledge that the obligations of Issuer under this Confirmation are not secured by any collateral that would otherwise secure the obligations of Issuer herein under or pursuant to any other agreement.

(g)      *Amendments to Equity Definitions*.  The following amendments shall be made to the Equity Definitions:

(i)      The first sentence of Section 11.2(c) of the Equity Definitions, prior to clause (A) thereof, is hereby amended to read as follows: '(c) If "Calculation Agent Adjustment" is specified as the Method of Adjustment in the related Confirmation of a Share Option Transaction, then following the announcement or occurrence of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has a material effect on the theoretical value of the relevant Shares or options on the Shares and, if so, will (i) make appropriate adjustment(s), if any, to any one or more of:' and, the portion of such sentence immediately preceding clause (ii) thereof is hereby amended by deleting the words "diluting or concentrative" and the words "(provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares)" and replacing such latter phrase with the words "(provided that, solely in the case of Sections 11.2(e)(i), (ii)(A), (iv) and (v), no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares but, for the avoidance of doubt, solely in the case of Sections 11.2(e)(ii)(B) through (D), (iii) (vi) and (vii) adjustments may be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares)"; and

(ii)      Sections 11.2(a) and 11.2(e)(vii) of the Equity Definitions are hereby amended by deleting the words "diluting or concentrative" and replacing them with "material" and adding the phrase "or options on the Shares" at the end of the sentence;

(iii)      Section 12.9(b)(iv) of the Equity Definitions is hereby amended by (A) deleting (1) subsection (A) in its entirety, (2) the phrase "or (B)" following subsection (A) and (3) the phrase "in each case" in subsection (B); (B) replacing "will lend" with "lends" in subsection (B); and (C) deleting the phrase "neither the Non-Hedging Party nor the Lending Party lends Shares in the amount of the Hedging Shares or" in the penultimate sentence; "**Lending Party**" means a third party that is not the Issuer or an affiliate of the Issuer that Dealer considers to be an acceptable counterparty (acting in good faith and in a reasonable manner in light of (x) other transactions that Dealer (or its agent or affiliate) may have entered into with such party and (y) any legal, regulatory or self-regulatory requirements or related policies and procedures (whether or not such requirements or related policies and procedures are imposed by law or have been voluntarily adopted by Dealer) that apply generally to transactions of a nature and kind similar to the transactions contemplated with such party);

(iv)      Section 12.9(b)(v) of the Equity Definitions is hereby amended by (A) adding the word "or" immediately before subsection "(B)" and deleting the comma at the end of subsection (A); and (B)(1) deleting subsection (C) in its entirety, (2) deleting the word "or" immediately preceding subsection (C), (3) replacing in the penultimate sentence the words "either party" with "the Hedging Party" and (4) deleting clause (X) in the final sentence; and

(v)      Section 12.7(b) of the Equity Definitions is hereby amended by deleting the words "(and in any event within five Exchange Business Days) by the parties after" appearing after the words "agreed promptly" and replacing with the words "by the parties on or prior to".

(h)     *Transfer and Assignment*.  Dealer may transfer or assign its rights and obligations hereunder and under the Agreement, in whole or in part, at any time without the consent of Issuer, subject to the restrictions set forth in the legend appearing at the top of this Confirmation; provided that, Issuer would not, as a result of such transfer and assignment, reasonably be expected to be required to pay the transferee on any payment date an amount under Section 2(d)(i)(4) of the Agreement greater than an amount that Issuer would have been required to pay to Dealer in the absence of such transfer and assignment, and Dealer shall have caused the transferee to make such Payee Tax Representations and to provide such tax documentation as may be reasonably requested by Issuer to permit Issuer to determine that such transfer and assignment complies with the first clause of this sentence.  Dealer shall as soon as reasonably practicable notify Issuer of such transfer or assignment.

(i)     *Disclosure*.  Effective from the date of commencement of discussions concerning the Transaction, Issuer and each of its employees, representatives, or other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Issuer relating to such tax treatment and tax structure.

(j)     *Additional Termination Events*.  The occurrence of any of the following shall constitute an Additional Termination Event with respect to which the Transaction shall be the sole Affected Transaction and Issuer shall be the sole Affected Party and Dealer shall be the party entitled to designate an Early Termination Date pursuant to Section 6(b) of the Agreement and to determine the amount payable pursuant to Section 6(e) of the Agreement; *provided* that with respect to any Additional Termination Event, Dealer may choose to treat part of the Transaction as the sole Affected Transaction, and, upon the termination of the Affected Transaction, a Transaction with terms identical to those set forth herein except with a Number of Warrants equal to the unaffected number of Warrants shall be treated for all purposes as the Transaction, which shall remain in full force and effect:

(i)     Dealer reasonably determines that it is advisable to terminate a portion of the Transaction so that Dealer's related hedging activities will comply with applicable securities laws, rules or regulations or related policies and procedures of Dealer (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by Dealer), or Dealer, despite using commercially reasonable efforts, is unable or reasonably determines that it is impractical or illegal to hedge its obligations pursuant to this Transaction in the public market without registration under the Securities Act or as a result of any legal, regulatory or self-regulatory requirements;

(ii)     at any time at which any Excess Ownership Position occurs, Dealer, in its discretion, is unable to effect a transfer or assignment to a third party of the Transaction or any other transaction between the parties after using its commercially reasonable efforts on pricing and terms and within a time period reasonably acceptable to Dealer such that an Excess Ownership Position no longer exists; *provided* that Dealer shall treat only that portion of the Transaction as the Affected Transaction as necessary so that such Excess Ownership Position no longer exists;

(iii)     any "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than Issuer, its wholly owned subsidiaries or its or their employee benefit plans, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the common equity of Issuer representing more than 50% of the voting power of such common equity.  Notwithstanding the foregoing, any transaction or transactions set forth in this clause (iii) shall not constitute an Additional Termination Event if (x) at least 90% of the consideration received or to be received by holders of the Shares (excluding cash payments for fractional Shares or pursuant to statutory appraisal rights) in connection with such transaction or transactions consists of shares of common stock or depositary receipts representing common equity interests, in each case, that are listed or quoted on any of the NASDAQ Global Select Market, NASDAQ Global Market or New York Stock Exchange (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions (these securities being referred to as "publicly traded securities"), and

21

(y) as a result of such transaction or transactions, the Shares will consist of such publicly traded securities, excluding cash payments for fractional Shares or pursuant to statutory appraisal rights;

(iv)     the consummation of (a) any recapitalization, reclassification or change of the Shares (other than changes resulting from a subdivision or combination) as a result of which the Shares would be converted into, or exchanged for, cash, securities or other property or assets or (b) any consolidation, merger, combination, statutory or binding share exchange or similar transaction involving Issuer pursuant to which the Shares will be converted into cash, securities or other property or assets; or (c) any sale, conveyance, lease or other transfer or similar transaction in one transaction or a series of related transactions of all or substantially all of the consolidated assets of Issuer and its subsidiaries, taken as a whole, to any person other than one or more of Issuer's wholly-owned subsidiaries; *provided, however*, that if in any such transaction the holders of more than 50% of the shares of Issuer's voting stock immediately prior to such transaction, own, directly or indirectly, more than 50% of all shares of the voting stock of the continuing or surviving person or transferee or the parent thereof immediately after such transaction, such event shall not constitute an Additional Termination Event under this clause (ii). Notwithstanding the foregoing, any transaction or transactions set forth in this clause (iv) shall not constitute an Additional Termination Event if (x) at least 90% of the consideration received or to be received by holders of the Shares, excluding cash payments for fractional Shares or pursuant to statutory appraisal rights, in connection with such transaction or transactions consists of shares of common stock, depositary receipts representing common equity interests or other certificates representing common equity interests, in each case, that are listed or quoted on any of the New York Stock Exchange, the NASDAQ Global Select Market or the NASDAQ Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions, and (y) as a result of such transaction or transactions, the Shares will consist of such consideration, excluding cash payments for fractional Shares or pursuant to statutory appraisal rights;

(v)     Issuer or any Significant Subsidiary (as defined below) of Issuer shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to Issuer or such Significant Subsidiary or its debts under any bankruptcy, insolvency or similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of Issuer or such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or an involuntary case or other proceeding shall be commenced against Issuer or any Significant Subsidiary of Issuer seeking liquidation, reorganization or other relief with respect to Issuer or such Significant Subsidiary or its debts under any bankruptcy, insolvency or similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of Issuer or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 consecutive calendar days.   A "**Significant Subsidiary**" is a subsidiary that is a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X promulgated by the SEC; *provided* that in the case of a subsidiary that meets the criteria of clause (3) thereof but not clause (1) or (2) thereof, such subsidiary shall not be a "significant subsidiary" unless such subsidiary's income from continuing operations   before income taxes, extra items and cumulative effect of changes in accounting principles exclusive of amounts attributable to any non-controlling interests for the last completed fiscal year prior to the date of such determination exceeds $150 million; or

(vi)     the Shares ceases to be listed or quoted on any of the NASDAQ Global Select Market, NASDAQ Global Market or New York Stock Exchange (or any of their respective successors).

(k)     *Effectiveness*.  If, on or prior to the Effective Date, Dealer reasonably determines that it is advisable to cancel the Transaction because of concerns that Dealer's related hedging activities could be viewed as not complying with applicable securities laws, rules or regulations, the Transaction shall be

cancelled and shall not become effective, and neither party shall have any obligation to the other party in respect of the Transaction.

(l)     *Extension of Settlement*.  Dealer may divide any Component into additional Components and designate the Expiration Date and the Number of Warrants for each such Component if Dealer determines, in its commercially reasonable discretion, that such further division is necessary or advisable to preserve Dealer's hedging or hedge unwind activity hereunder in light of existing liquidity conditions in the cash market or stock loan market or to enable Dealer to effect purchases of Shares in connection with its hedging activity hereunder in a manner that would, if Dealer were Issuer or an affiliated purchaser of Issuer, be compliance with applicable legal, regulatory and self-regulatory requirements or with related policies and procedures applicable to Dealer; *provided* that any such extension pursuant to this clause shall not exceed 30 Exchange Business Days.

(m)     *Repurchase Notices*.  Issuer shall, at least five Scheduled Trading Days prior to any day on which Issuer intends to effect any repurchase of Shares, give Dealer a written notice of such repurchase (a "**Repurchase Notice**") on such day if, following such repurchase, the number of outstanding Shares on such day, subject to any adjustments provided herein, is (i) less than 121,960,018 Shares (as such number may be adjusted from time to time in accordance with the provisions hereof) in the case of the first such notice or (ii) thereafter more than 1% less than the number of Shares outstanding as of the date of the immediately preceding Repurchase Notice.  Issuer agrees to indemnify and hold harmless Dealer and its affiliates and their respective officers, directors, employees, affiliates, advisors, agents and controlling persons (each, an "**Indemnified Person**") from and against any and all losses (including losses relating to Dealer's hedging activities as a consequence of becoming, or of the risk of becoming, a Section 16 "insider", including without limitation, any forbearance from hedging activities or cessation of hedging activities and any losses in connection therewith with respect to the Transaction), claims, damages, judgments, liabilities and reasonable expenses (including reasonable attorney's fees), joint or several, which an Indemnified Person actually incurs as a result of Issuer's failure to provide Dealer with a Repurchase Notice on the day and in the manner specified in this paragraph.  If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against the Indemnified Person as a result of Issuer's failure to provide Dealer with a Repurchase Notice in accordance with this paragraph, such Indemnified Person shall promptly notify Issuer in writing, and Issuer, upon request of the Indemnified Person, shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others Issuer may designate in such proceeding and shall pay the fees and expenses of such counsel related to such proceeding.  Issuer shall be relieved from liability to the extent that the Indemnified Person fails promptly to notify Issuer of any action commenced against it in respect of which indemnity may be sought hereunder; *provided* that failure to notify Issuer (x) shall not relieve Issuer from any liability hereunder to the extent it is not materially prejudiced as a result thereof and (y) shall not, in any event, relieve Issuer from any liability that it may have otherwise than on account of the Transaction.  Issuer shall not be liable for any settlement of any proceeding contemplated by this paragraph that is effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, Issuer agrees to indemnify any Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  Issuer shall not, without the prior written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding contemplated by this paragraph that is in respect of which any Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement includes an unconditional release of such Indemnified Person from all liability on claims that are the subject matter of such proceeding on terms reasonably satisfactory to such Indemnified Person.  If the indemnification provided for in this paragraph is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then Issuer, in lieu of indemnifying such Indemnified Person hereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities.  The remedies provided for in this paragraph are not exclusive and shall not limit any rights or remedies which may otherwise be available to any Indemnified Person at law or in equity.  The indemnity and contribution agreements contained in this paragraph shall remain operative and in full force and effect regardless of the termination of the Transaction.

(n)      *No Netting and Set-off*.  The provisions of Section 2(c) of the Agreement shall not apply to the Transaction.  Each party waives any and all rights it may have to set-off delivery or payment obligations it owes to the other party under the Transaction against any delivery or payment obligations owed to it by the other party, whether arising under the Agreement, under any other agreement between parties hereto, by operation of law or otherwise.

(o)      *Delivery of Cash*.  For the avoidance of doubt, nothing in this Confirmation shall be interpreted as requiring the Issuer to deliver cash in respect of the settlement of the Transaction, except in circumstances where the required cash settlement thereof is permitted for classification of the contract as equity by ASC 815-40, *Derivatives and Hedging – Contracts in Entity's Own Equity*, as in effect on the relevant Trade Date (including, without limitation, where the Issuer so elects to deliver cash or fails timely to elect to deliver Shares or Share Termination Delivery Property in respect of such settlement).

(p)      *Payments by Dealer upon Early Termination*.  The parties hereby agree that, notwithstanding anything to the contrary herein, in the Definitions or in the Agreement, following the payment of the Premium, in the event that an Early Termination Date (whether as a result of an Event of Default or a Termination Event) occurs or is designated with respect to the Transaction or the Transaction is terminated or cancelled pursuant to Article 12 of the Equity Definitions and, as a result, Dealer would owe to Issuer an amount calculated under Section 6(e) of the Agreement or Article 12 of the Equity Definitions, such amount shall be deemed to be zero.

(q)      *Illegality*.  The parties agree that, for the avoidance of doubt, for purposes of Section 5(b)(i) of the Agreement, "any applicable law" shall include the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, any rules and regulations promulgated thereunder and any similar law or regulation, without regard to Section 739 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or any similar legal certainty provision in any legislation enacted, or rule or regulation promulgated, on or after the Trade Date, and the consequences specified in the Agreement, including without limitation, the consequences specified in Section 6 of the Agreement, shall apply to any Illegality arising from any such act, rule or regulation.

(r)      *Governing Law*.  **THE AGREEMENT, THIS CONFIRMATION AND ALL MATTERS ARISING IN CONNECTION WITH THE AGREEMENT AND THIS CONFIRMATION SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CHOICE OF LAW DOCTRINE, OTHER THAN TITLE 14 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK IN ANY SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THE AGREEMENT, THIS CONFIRMATION OR ANY TRANSACTIONS CONTEMPLATED HEREBY.**

(s)      *Waiver of Right to Trial by Jury*.  **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE AGREEMENT, THIS CONFIRMATION OR ANY TRANSACTIONS CONTEMPLATED HEREBY.**

(t)      *Amendment*.  This Confirmation and the Agreement may not be modified, amended or supplemented, except in a written instrument signed by Issuer and Dealer.

(u)      *Counterparts*.  This Confirmation may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(v)      *Role of Agent.*  Each party agrees and acknowledges that (i) J.P. Morgan Securities LLC, an affiliate of JPMorgan ("**JPMS**"), has acted solely as agent and not as principal with respect to the Transaction and (ii) JPMS has no obligation or liability, by way of guaranty, endorsement or otherwise, in any manner in respect of the Transaction (including, if applicable, in respect of the settlement thereof). Each party agrees it will look solely to the other party (or any guarantor in respect thereof) for performance of such other party's obligations under the Transaction.

(w)      *Designation*.   Notwithstanding any other provision in this Confirmation to the contrary requiring or allowing Dealer to purchase, sell, receive or deliver any Shares or other securities, or make or receive any payment in cash, to or from Company, Dealer may designate any of its affiliates to purchase, sell, receive or deliver such Shares or other securities, or make or receive such payment in cash, and otherwise to perform Dealer's obligations in respect of the Transaction and any such designee may assume such obligations. Dealer shall be discharged of its obligations to Company to the extent of any such performance.

J.P.Morgan

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to J.P. Morgan Securities LLC, 383 Madison Ave, New York, NY 10179, and by email to EDG_Notices@jpmorgan.com and EDG_NY_Corporate_Sales_Support@jpmorgan.com

Very truly yours,

**J.P. Morgan Securities LLC, as agent for JPMorgan Chase Bank, National Association**

By: _____
Authorized Signatory
Name:    Santosh Sreenivasan

Accepted and confirmed
as of the Trade Date:

**Tesla Motors, Inc.**

By: _____
Authorized Signatory
Name:

JPMorgan Chase Bank, National Association
Organised under the laws of the United States as a National Banking Association.
Main Office 1111 Polaris Parkway, Columbus, Ohio 43240
Registered as a branch in England & Wales branch No. BR000746
Registered Branch Office 25 Bank Street, Canary Wharf, London, E14 5JP
Authorised and regulated by the Financial Services Authority

[Signature Page for 2021 Warrants]

J.P.Morgan

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to J.P. Morgan Securities LLC, 383 Madison Ave, New York, NY 10179, and by email to EDG_Notices@jpmorgan.com and EDG_NY_Corporate_Sales_Support@jpmorgan.com

Very truly yours,

**J.P. Morgan Securities LLC, as agent for JPMorgan Chase Bank, National Association**

By: _____
Authorized Signatory
Name:

Accepted and confirmed
as of the Trade Date:

**Tesla Motors, Inc.**

By: _____
Authorized Signatory
Name:

JPMorgan Chase Bank, National Association
Organised under the laws of the United States as a National Banking Association.
Main Office 1111 Polaris Parkway, Columbus, Ohio 43240
Registered as a branch in England & Wales branch No. BR000746
Registered Branch Office 25 Bank Street, Canary Wharf, London, E14 5JP
Authorised and regulated by the Financial Services Authority

[Signature Page for 2021 Warrants]

**Annex A**

For each Component of the Transaction, the Number of Warrants and Expiration Date is set forth below.

| Component Number | Number of Warrants | Expiration Date |
|---|---|---|
| 1 | 41,682 | 1-Jun-21 |
| 2 | 41,682 | 2-Jun-21 |
| 3 | 41,682 | 3-Jun-21 |
| 4 | 41,682 | 4-Jun-21 |
| 5 | 41,682 | 7-Jun-21 |
| 6 | 41,682 | 8-Jun-21 |
| 7 | 41,682 | 9-Jun-21 |
| 8 | 41,682 | 10-Jun-21 |
| 9 | 41,682 | 11-Jun-21 |
| 10 | 41,682 | 14-Jun-21 |
| 11 | 41,682 | 15-Jun-21 |
| 12 | 41,682 | 16-Jun-21 |
| 13 | 41,682 | 17-Jun-21 |
| 14 | 41,682 | 18-Jun-21 |
| 15 | 41,682 | 21-Jun-21 |
| 16 | 41,682 | 22-Jun-21 |
| 17 | 41,682 | 23-Jun-21 |
| 18 | 41,682 | 24-Jun-21 |
| 19 | 41,682 | 25-Jun-21 |
| 20 | 41,682 | 28-Jun-21 |
| 21 | 41,682 | 29-Jun-21 |
| 22 | 41,682 | 30-Jun-21 |
| 23 | 41,682 | 1-Jul-21 |
| 24 | 41,682 | 2-Jul-21 |
| 25 | 41,682 | 6-Jul-21 |
| 26 | 41,682 | 7-Jul-21 |
| 27 | 41,682 | 8-Jul-21 |
| 28 | 41,682 | 9-Jul-21 |
| 29 | 41,682 | 12-Jul-21 |
| 30 | 41,682 | 13-Jul-21 |
| 31 | 41,682 | 14-Jul-21 |
| 32 | 41,682 | 15-Jul-21 |
| 33 | 41,682 | 16-Jul-21 |
| 34 | 41,682 | 19-Jul-21 |
| 35 | 41,682 | 20-Jul-21 |
| 36 | 41,682 | 21-Jul-21 |
| 37 | 41,682 | 22-Jul-21 |
| 38 | 41,682 | 23-Jul-21 |
| 39 | 41,682 | 26-Jul-21 |
| 40 | 41,682 | 27-Jul-21 |