**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                    :
JPMORGAN CHASE BANK, NATIONAL                       :
ASSOCIATION, LONDON BRANCH,                         :
                                                    :   Case No. 1:21-cv-09441-PGG
                    Plaintiff,                      :
                                                    :
                                                    :
            - against -                             :
                                                    :
TESLA, INC.,                                        :
                                                    :
                    Defendant.                      :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................4

    A.    The Warrants...............................................................................5

    B.    The Announcement Event Provisions.......................................5

    C.    The Announcement of Tesla's Consideration of a Going-Private
           Transaction and JPMorgan's First Adjustment........................7

    D.    The Announcement of the Abandonment of the Going-Private Plans and
           JPMorgan's Second Adjustment................................................8

    E.    Tesla Fails to Settle the Warrants in Full.................................8

    F.    Procedural History.....................................................................9

ARGUMENT .........................................................................................................9

I.    The Going-Private Announcements Were Announcement Events...................10

    A.    The August 7 Tweet Was an Announcement Event .............................10

           1.    The August 7 Tweet Publicly Announced a Merger Event
                  or Tender Offer .........................................................10

           2.    The August 7 Tweet Was an Announcement by Tesla of
                  Any Intention to Enter into a Merger Event or Tender Offer .......11

           3.    The August 7 Tweet Was an Announcement by Tesla of an
                  Intention to Explore a Strategic Alternative That May
                  Include a Merger Event or Tender Offer ................................12

           4.    JPMorgan's Purported Opinions About the Going-Private
                  Transaction Are Irrelevant .......................................13

    B.    The August 24 Blog Post Was an Announcement Event ......................14

II.    The Adjustments Were Made in Good Faith and in a Commercially Reasonable
    Manner ..................................................................................................14

i

A.       JPMorgan's Adjustment Methodology Is Undisputed and *Per Se* Reasonable ......................................................................................16

B.       Tesla Fails to Allege Bad Faith as a Matter of Law .................................18

C.       Tesla Fails to Allege the Adjustments Were Not Commercially Reasonable ..............................................................................................19

III.     Tesla's Meritless Counterclaims Should Be Dismissed ...................................22

A.       Tesla Fails to Plead Any Breach by JPMorgan .......................................22

B.       Tesla Fails to Plead Any Cognizable Damages .......................................24

C.       Tesla's Declaratory Judgment Claim Must Be Dismissed as Duplicative ............25

IV.    Tesla's Default Entitles JPMorgan to the Early Termination Amount .............25

CONCLUSION.....................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
    37 F.3d 996 (3d Cir. 1994) ...............................................................................12

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 301 (S.D.N.Y. 2010) ...............................................................25

*Arista Recs. LLC v. Lime Grp. LLC*,
    No. 06-cv-5936-KMW, 2011 WL 13257941 (S.D.N.Y. Jan. 7, 2011) ..............9-10

*Arista Recs. LLC v. Usenet.com., Inc.*,
    No. 07-cv-8822-HB, 2008 WL 4974823 (S.D.N.Y. Nov. 24, 2008) ...................25

*Bank of N.Y. v. First Millennium, Inc.*,
    607 F.3d 905 (2d Cir. 2010) ................................................................................4

*Beltway 7 & Properties, Ltd. v. Blackrock Realty Advisers, Inc.*,
    167 A.D.3d 100 (1st Dep't 2018) .......................................................................25

*Camatron Sewing Mach., Inc. v. F.M. Ring Assoc., Inc.*,
    179 A.D.2d 165 (1st Dep't 1992) .......................................................................24

*Citibank, N.A. v. Tormar Assocs. L.L.C.*,
    No. 15-cv-1932-JPO, 2015 WL 7288652 (S.D.N.Y. Nov. 17, 2015) ............16, 18

*Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*,
    No. 14-cv-8727-NRB, 2015 WL 4486335 (S.D.N.Y. July 23, 2015)...................15

*DeBlasio v. Merrill Lynch & Co.*,
    No. 07-cv-318-RJS, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ......................19

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
    100 N.Y.2d 525 (2003) ......................................................................................24

*ERE LLP v. Spanierman Gallery, L.L.C.*,
    94 A.D.3d 492 (1st Dep't 2012) .........................................................................24

*Gaia House Mezz L.L.C. v. State St. Bank & Tr. Co.*,
    720 F.3d 84 (2d Cir. 2013) ................................................................................19

iii

*Goldston v. Bandwidth Tech. Corp.*,
    52 A.D.3d 360 (1st Dep't 2008) ........................................................12

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010) ...............................................................4

*Kule-Rubin v. Bahari Grp. Ltd.*,
    No. 11-cv-2424-TPG, 2012 WL 691324 (S.D.N.Y. Mar. 5, 2012) ........5

*Lee v. Joseph E. Seagram & Sons, Inc.*,
    552 F.2d 447 (2d Cir. 1977) .............................................................15

*In re Lehman Bros. Holdings, Inc.*,
    No. 08-cv-13555-SCC, 2015 WL 7194609 (S.D.N.Y. Sept. 16, 2015) ............................ 3, 22

*Logical Operations, Inc. v. CompTIA, Inc.*,
    No. 6:20-cv-06238-EAW, 2021 WL 1099619 (W.D.N.Y. Mar. 23, 2021) ...........................9

*L-7 Designs, Inc. v. Old Navy, LLC*,
    No. 09-cv-1432, 2010 WL 157494 (S.D.N.Y. Jan. 19, 2010).............................1, 16

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ............................................................18

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,
    930 F. Supp. 2d 532 (S.D.N.Y. 2013) ............................................. 15-16

*Ross Stores, Inc. v. Lincks*,
    No. 13-cv-1876-SAS, 2013 WL 5629646 (S.D.N.Y. Oct. 4, 2013)........................24

*Sellers v. M.C. Floor Crafters, Inc.*,
    842 F.2d 639 (2d Cir. 1988) ...............................................................4

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
    441 F. Supp. 3d 1 (S.D.N.Y. 2020) ..................................................15

*Sports Med Properties, LLC v. Talib*,
    No. 3:19-cv-00082-FDW, 2019 WL 3403372 (W.D.N.C. July 26, 2019) ..............16

*Syracuse Supply Co. v. Vogel*,
    78 A.D.2d 991 (4th Dep't 1980)........................................................20

*In re Tesla Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020)...............................................11

*In re Tesla, Inc. Sec. Litig.*,
No. 18-cv-04865-EMC, 2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) .....................................7

*Toledo Fund, L.L.C. v. HSBC Bank USA, Nat. Ass'n*,
No. 11-cv-7686-KBF, 2012 WL 2850997 (S.D.N.Y. July 9, 2012) ................................20, 22

*Turner Network Sales, Inc. v. Dish Network L.L.C.*,
413 F. Supp. 3d 329 (S.D.N.Y. 2019) .....................................................................................25

*VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*,
594 F. Supp. 2d 334 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 507 (2d Cir. 2009) .......................4

*Veleron Holding, B.V. v. Morgan Stanley*,
117 F. Supp. 3d 404 (S.D.N.Y. 2015) .....................................................................................15

*V.S. Int'l, S.A. v. Boyden World Corp.*,
862 F. Supp. 1188 (S.D.N.Y. 1994) ...................................................................................... 23

## Statutes & Rules

Fed. R. Civ. P. 12(b)(6) .............................................................................................................4
Fed. R. Civ. P. 12(c) ..................................................................................................................4
N.Y. U.C.C. Law § 1-201(b)(20) ............................................................................................15
N.Y. U.C.C. Law § 9-507(2) .................................................................................................. 20

## Other Authorities

Frederick Rosenberg, *How to Evaluate Option Claims in Customer Disputes*,
27 PIABA B.J. 189 (2020) (attached as Exhibit F) ............................................................5

John C. Hull, Options, Futures & Other Derivatives (5th ed. 2003)
(excerpts attached as Exhibit G) ........................................................................................5, 8

Restatement (Third) of Agency § 1.03 (2006)..........................................................................12

v

## PRELIMINARY STATEMENT

This is a breach of contract action that Plaintiff JPMorgan Chase Bank, National Association, London Branch ("JPMorgan") was forced to bring in response to the failure by Defendant Tesla, Inc. ("Tesla") to fulfill its basic contractual obligations.  In 2014, JPMorgan and Tesla entered into a series of warrant transactions, under which Tesla was required to deliver either shares of its stock or cash to JPMorgan if Tesla's share price was above the contractual strike price when the Warrants expired.  The warrant agreements permitted JPMorgan to adjust the strike price if certain public announcements were made about potential significant Tesla transactions.  Two such announcements occurred in August 2018: first, when it was publicly announced that Tesla was considering going private and, second, when it was publicly announced that those plans were being abandoned.  Based on readily observable and direct market reactions to those announcements, JPMorgan made corresponding adjustments to the strike price of the Warrants. When the Warrants expired, Tesla refused to settle the Warrants in full at the adjusted strike price.

JPMorgan brought this action to compel full payment, and Tesla counterclaimed based on the same facts.  By asserting a mirror-image counterclaim, Tesla assumed an obligation to plead not only what adjustments JPMorgan made, but also facts plausibly establishing that they were made in bad faith and in a commercially unreasonable manner.  By failing to allege any reasons why JPMorgan's chosen methodology was wrong, and instead relying on alternative methodologies and after-the-fact events in asserting its counterclaims, Tesla has failed to meet its pleading burden and the undisputed facts demonstrate that JPMorgan is entitled to judgment as a matter of law.  *See L-7 Designs, Inc. v. Old Navy, LLC*, No. 09 Civ. 1432, 2010 WL 157494, at *6 (S.D.N.Y. Jan. 19, 2010) (Judgment on the pleadings is appropriate where "the non-moving party has failed to allege facts that would give rise to a plausible claim for relief."), *aff'd in part*, *vacated in part*, *rev'd in part*, 647 F.3d 419 (2d Cir. 2011).

First, the undisputed August 2018 going-private announcements constituted two "Announcement Events" under the unambiguous contract language.  An Announcement Event is defined as a public announcement of (1) "any Merger Event or Tender Offer," (2) "any intention

- 1 -

to enter into a Merger Event or Tender Offer," (3) "an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer," or (4) the abandonment of any such announced transaction or intention.  The announcement on August 7, 2018 that Tesla's Chief Executive Officer and then-Chairman, Elon Musk, planned to take the company private is an Announcement Event under any of the first three definitions. Tesla admits that Mr. Musk tweeted on a designated official channel that he was "**considering taking Tesla private at $420.  Funding secured.**"  Tesla further admits that other Tesla officers and directors publicly confirmed that Mr. Musk intended to take Tesla private and the board was exploring this strategic alternative.  Consequently, an Announcement Event occurred on August 7, 2018.  The announcement on August 24, 2018 that those plans were being abandoned explicitly constituted a second Announcement Event under the fourth definition.

Tesla argues that no Announcement Event occurred because going private was Mr. Musk's idle suggestion that Tesla never seriously considered.  That revisionist characterization is at odds with the plain language of the August 7, 2018 announcement, the market's real-time reaction, and Tesla's own contemporaneous statements confirming that both Mr. Musk and the company were seriously considering the proposal.  The announcement and its dramatic withdrawal 17 days later were so material to the market that the Securities and Exchange Commission immediately brought civil enforcement actions against Mr. Musk for securities fraud and against Tesla for failing to appropriately monitor Mr. Musk's public statements; both cases quickly settled for $20 million each and injunctive relief.  Indeed, contrary to Tesla's apparent position here, Mr. Musk recently moved to vacate his consent decree with the SEC because, "[m]y August 7, 2018 tweet was written at a time when I *was* in fact considering taking Tesla private at $420 a share, funding *was* secured, and there *was* investor support."[1]  Mr. Musk has made similar public statements.[2]

---

[1] Declaration of Elon Musk ¶ 3, *SEC v. Musk*, No. 1:18-cv-8865 (S.D.N.Y. Mar. 8, 2022) (ECF No. 72) (emphasis in original) (citing brief filed by Tesla and Mr. Musk in the related private Tesla securities litigation).  Mr. Musk's motion was denied on April 27, 2022.

[2] Dorothy Atkins, Law360, *Musk Slams SEC 'Bastards' for Allegedly Forcing 2018 Deal* (Apr. 14, 2022).

Second, when an Announcement Event occurs, the contract grants JPMorgan broad discretion to make adjustments to account for the resulting economic effects on the Warrants, subject only to its duty to act in good faith and in a commercially reasonable manner.  When ISDA provisions[3] grant broad "discretion and flexibility," as they do here, they are intended to promote the "clarity, certainty, and predictability" necessary to the efficient operation of the derivatives markets, where values can fluctuate drastically on a daily basis, and stave off the very type of second-guessing that Tesla attempts here.  *In re Lehman Bros. Holdings, Inc.*, No. 08-cv-13555-SCC, 2015 WL 7194609, at *11–12 (S.D.N.Y. Sept. 16, 2015).  JPMorgan stayed comfortably within the broad bounds of that discretion as a matter of law.  There is no dispute that JPMorgan made the adjustments based on the change in the average implied volatility that occurred in the market before and after each Announcement Event.  This methodology is expressly permitted by the contract and thus *per se* commercially reasonable.  JPMorgan's choice to use it could not have been in bad faith or unreasonable.

Tesla's allegations that JPMorgan designed its adjustments to obtain a windfall and was motivated by animosity toward Tesla do not conjure any material dispute of fact on these issues.  Even accepting those allegations as true, which they are not, JPMorgan's motives are irrelevant to the determination of good faith under Second Circuit precedent if JPMorgan's actions were permitted by the contract, which they were.  Tesla's griping that JPMorgan could have calculated more favorable adjustments if it had used different inputs is insufficient to show that the inputs JPMorgan used and the adjustments it made were unreasonable.  If such allegations sufficed, every disappointed counterparty would be encouraged to litigate these types of adjustments, which would eviscerate the Announcement Event protection they granted to dealers like JPMorgan and make it impossible for such dealers to dynamically hedge the transactions on a daily basis.  Counterparties do not pursue such a futile strategy because they plainly agreed to leave such determinations to the

---

[3] The International Swaps and Derivatives Association ("ISDA"), a global trade association, publishes standardized agreements and definitions, like the agreements here, to facilitate trades in the derivatives markets.  *See Lehman Bros.*, 2015 WL 7194609, at *1 n.1.

dealer's discretion. Tesla should not be allowed to drag this into a years-long litigation when it cannot even plead facts plausibly alleging bad faith or unreasonableness on the part of JPMorgan.

Third, the Court should dismiss Tesla's meritless counterclaims. Fundamentally, its breach of contract and declaratory judgment claims fail because JPMorgan committed no breach. Tesla also has no damages and no need for declaratory relief once JPMorgan's claim is resolved.

Finally, because JPMorgan's adjustments were consistent with the contract, Tesla was obligated to settle the Warrants in full at the adjusted strike price. It is undisputed that it did not, even after notice by JPMorgan. Tesla is therefore the Defaulting Party and liable for the full Early Termination Amount, plus interest and indemnification of JPMorgan's costs and attorneys' fees.

For all of the above reasons, JPMorgan is entitled to judgment in its favor on all claims.

## BACKGROUND

A Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6), which requires that the pleadings "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). Judgment will be granted "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

On a Rule 12(c) motion, the court considers "the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 339–40 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 507 (2d Cir. 2009) (quotation marks omitted). To the extent the factual allegations in Tesla's counterclaim are well-pleaded, they are accepted as true solely for purposes of the motion, but not "mere conclusory statements . . . [which] are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quotation omitted).

Similarly, factual allegations in JPMorgan's complaint that "the defendant's answer fails to deny" are also accepted as true. *Kule-Rubin v. Bahari Grp. Ltd.*, No. 11-cv-2424-TPG, 2012 WL 691324, at *3 (S.D.N.Y. Mar. 5, 2012). Accordingly, this motion rests on the facts admitted in Tesla's answer or alleged in its counterclaim, as well as the agreements and documents each incorporates by reference.

### A.    The Warrants

On February 27, 2014 and March 28, 2014, Tesla sold JPMorgan a series of stock warrants expiring in 2021 (the "Warrants"). Ans. (Ex. E) ¶ 12. The Warrants are subject to two substantially identical confirmations (each, a "Confirmation" or "Confirm'n"), which set forth the Warrants' terms and incorporate a form 2002 ISDA Master Agreement (each, a "Master Agreement") and the 2002 ISDA Equity Derivative Definitions (the "Equity Definitions" or "Defs.") (collectively, "the Agreements"). *Id.*; *see* Exs. A–D.

The Warrants were call options that gave JPMorgan, in exchange for an upfront cash payment to Tesla in 2014, the right to acquire Tesla stock at a contractually determined price (the "strike price") if Tesla's stock price exceeded that price at expiration. Countercl. (Ex. E) ¶ 18. The parties initially set the strike price at $560.6388 per share, subject to adjustment in certain circumstances, including in the event of defined Extraordinary Events.[4] Countercl. ¶ 20; *see* Confirm'n (Exs. A, B) § 2 at 8–9.

### B.    The Announcement Event Provisions

The Equity Definitions define certain Extraordinary Events, such as Merger Events and Tender Offers, that "can impact the volatility of the Shares of the target company," and provide

---

[4] The strike price is a key variable used to value options contracts, along with the underlying stock's volatility. *See* Ans. ¶ 25; *see also, e.g.*, Frederick Rosenberg, *How to Evaluate Option Claims in Customer Disputes*, 27 PIABA B.J. 189, 190 (2020) (Ex. F); John C. Hull, OPTIONS, FUTURES & OTHER DERIVATIVES 238 (5th ed. 2003) (Volatility is "a measure of [the] uncertainty about the returns provided by the stock") (Ex. G).

for adjustments to the transaction's terms to "account for this shift in values" and "eliminate any windfall gains or losses that arise from" such events.  User's Guide (Ex. H) § 12.7 at 53; *see* Defs. (Ex. D) §§ 12.1–12.3.  The Confirmation added "Announcement Events" as an additional type of Extraordinary Event.  *See* Confirm'n (Exs. A, B) § 2 at 9.  An Announcement Event is:

> (i) The public announcement of any Merger Event or Tender Offer or the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer,
>
> (ii) the public announcement by Issuer of an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer, or
>
> (iii) any subsequent public announcement of a change to a transaction or intention that is the subject of an announcement of the type described in clause (i) or (ii) of this sentence (including, without limitation, a new announcement relating to such a transaction or intention or the announcement of a withdrawal from, or the abandonment or discontinuation of, such a transaction or intention) (in each case, whether such announcement is made by Issuer or a third party); *provided* that, for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention.

Countercl. ¶ 21.  Thus, the Agreements clearly define what types of public announcements qualify as Announcement Events.  The "Consequences of Announcement Events" are the "Modified Calculation Agent Adjustment as set forth in Section 12.3(d) of the Equity Definitions," which the Confirmations modify to read:

> on or after the relevant date of the Announcement Event, the Issuer and the Shares will not change, but the Calculation Agent shall either (i)(A) make such adjustment to the exercise, settlement, payment or any other terms of the Transaction (including, without limitation, the spread) as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such Announcement Event (including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Announcement Event by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date of that adjustment, or (ii) if the Calculation Agent determines that no adjustment that it could make under (i) will produce a commercially reasonable result, notify the parties that the relevant consequence shall be the termination of the Transaction . . . .

Confirm'n (Exs. A, B) § 2 at 9; Defs. (Ex. D) § 12.3(d).  The Agreements thus provide the Calculation Agent with the right to make certain adjustments to the terms of the Warrants in the event of an Announcement Event.  As is customary, the parties agreed that JPMorgan—rather than Tesla or a third party—would be the Calculation Agent responsible for making such adjustments, provided that "all determinations made by the Calculation Agent must be made in good faith and in a commercially reasonable manner."  Confirm'n (Exs. A, B) § 3; Countercl. ¶ 19.

### C.    The Announcement of Tesla's Consideration of a Going-Private Transaction and JPMorgan's First Adjustment

On August 7, 2018, Tesla's CEO, then-Chairman, and largest shareholder, Elon Musk, announced through his Twitter account: "Am considering taking Tesla private at $420 per share.  Funding secured." Ans. ¶¶ 19–20; Ex. I.  That same day, Mr. Musk elaborated on his plans, tweeting: "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote." Ans. ¶ 21; Ex. J.[5]  Later that day, Tesla executives participated in the drafting of a communication from Mr. Musk relating to Mr. Musk's tweet, which detailed the plan to go private and was published on Tesla's blog.  *See* Ans. ¶ 21; Ex. K.  Tesla's head of investor relations also confirmed that it signified a "firm offer" to take Tesla private that was "as firm as it gets."  Ans. ¶¶ 19, 21, 29; Ex. L. Tesla's board of directors issued a press release the next day: "Last week, Elon opened a discussion with the board about taking the company private . . . [and] address[ed] the funding for this to occur.  The board has met several times over the last week and is taking the appropriate next steps to evaluate this."  Ans. ¶ 23; Ex. M.

---

[5] The Northern District of California, which is overseeing the related private securities litigation, granted partial summary judgment against Tesla, concluding that Mr. Musk's tweet was materially misleading and made with reckless disregard for its tendency to mislead.  *In re Tesla, Inc. Sec. Litig.*, No. 18-cv-04865-EMC, 2022 WL 1497559, at *21 (N.D. Cal. Apr. 1, 2022).

The implied volatility[6] of Tesla's options dropped substantially following the tweet.  *See* Countercl. at 6 fig. 1.  Because the August 7, 2018 announcement was an Announcement Event, JPMorgan adjusted the terms of the Warrants to account for the resulting economic effects. Countercl. ¶¶ 31, 37.  Tesla concedes that JPMorgan calculated that "the simple averages of implied volatilities derived from standard call option prices during a 30-day period before and a 7-day period after August 7, 2018" dropped from 47% to 35%, and reduced the strike price to $424.66 on that basis (the "First Adjustment").  Countercl. ¶ 38; *see also* Compl. ¶ 29.[7]

## D.   The Announcement of the Abandonment of the Going-Private Plans and JPMorgan's Second Adjustment

On August 24, 2018, Tesla published a blog post announcing that the going-private proposal was being abandoned, causing an increase in implied volatility.  Countercl. at 6 fig. 1, ¶ 45; Ex. N.  Because that post constituted a second Announcement Event, JPMorgan made a second adjustment to account for the resulting economic effects.  It determined that economic effect by "comparing the implied volatility of certain exchange-traded call options in the days before and shortly after August 24, 2018," and increased the strike price to $484.35 accordingly (the "Second Adjustment").  Countercl. ¶¶ 47–48.

## E.   Tesla Fails to Settle the Warrants in Full

The Warrants expired in June and July 2021 with Tesla's stock price above the strike price. Ans. ¶ 41.  Under the Agreements, Tesla was required to deliver to JPMorgan a number of Tesla shares equivalent in value to the difference between Tesla's stock price and the Warrants' strike price.  Countercl. ¶ 18.  Tesla "settled the undisputed number of shares" owed to JPMorgan based

---

[6] Implied volatilities are "the volatilities implied by option prices observed in the market" based on those options' known strike prices and maturities.  Hull, *supra* note 4, at 250.

[7] A drop in the implied volatility results in a reduction in the strike price because option pricing models "define[] implied volatility as a function of both the strike price and the time to maturity." Hull, *supra* note 4, at 336, 341.

on the original strike price but failed to deliver an additional 228,775 shares due using the lower adjusted strike price, even after receiving notice from JPMorgan that its deliveries were deficient. Ans. ¶¶ 41, 43; Countercl. ¶¶ 54–55; Exs. O, P.  As a result, JPMorgan declared an Early Termination Date for August 2, 2021, the first trading day following the last settlement date on July 29, 2021 and the expiration of Tesla's one-day cure period.  Ans. ¶ 45.  On August 4, 2021, JPMorgan notified Tesla that the Early Termination Amount due was $162,216,628.81, which represented the 228,775 shares Tesla failed to deliver, valued at the average price of $709.07 per share that JPMorgan paid on August 3, 2021 to acquire replacement shares on the open market to close out its short hedge position.  Ans. ¶ 46; Ex. Q.  Tesla refuses to pay that amount.  Ans. ¶ 47.

### F.    Procedural History

JPMorgan filed its breach of contract complaint on November 15, 2021.  Ex. R.  Tesla answered on January 24, 2022, and filed counterclaims for breach of contract and declaratory judgment.  Ex. E.  On February 21, 2022, JPMorgan answered the counterclaims.  Ex. S.

## ARGUMENT

Now that the pleadings are closed, the Court has everything necessary to enter judgment in JPMorgan's favor.  Tesla's answer and counterclaim establish that two Announcement Events occurred, and fail to plausibly allege that either JPMorgan's First or Second Adjustment (collectively, the "Adjustments") was made in bad faith or in a commercially unreasonable manner.  Tesla's counterclaim thus fails as a matter of law.  Judgment should be entered in JPMorgan's favor on all claims, but at a minimum, partial judgment can and should be granted as to the occurrence of the two Announcement Events and Tesla's meritless counterclaims.  *See Logical Operations, Inc. v. CompTIA, Inc.*, No. 6:20-cv-06238-EAW, 2021 WL 1099619, at *3 (W.D.N.Y. Mar. 23, 2021) ("It is not improper for Plaintiff to ask the Court to reach only some of the issues presented in [a] litigation" in a Rule 12(c) motion.) (citing *Arista Recs. LLC v. Lime*

*Grp. LLC*, No. 06-cv-5936-KMW, 2011 WL 13257941, at *2 (S.D.N.Y. Jan. 7, 2011)).

## I.       The Going-Private Announcements Were Announcement Events

The pleadings establish that two distinct Announcement Events occurred on August 7 and August 24, 2018 within the plain meaning of the contracts.  The occurrence of an Announcement Event is a question of contract interpretation that involves no discretion and is ripe for adjudication.

### A.       The August 7 Tweet Was an Announcement Event

The announcement by Mr. Musk on August 7 that he was "considering taking Tesla private at $420 per share.  Funding secured" was an Announcement Event.  Under the Agreements, Announcement Events include the announcements of: (i) "any Merger Event or Tender Offer"; (ii) "any intention to enter into a Merger Event or Tender Offer"; or (iii) "an intention to solicit or enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer."  Confirm'n (Exs. A, B) § 2 at 9.  Mr. Musk's announcement need only satisfy one of these definitions, and it meets all three as a matter of law.

#### 1.       *The August 7 Tweet Publicly Announced a Merger Event or Tender Offer*

Mr. Musk's August 7 tweet was "[t]he public announcement of *any* Merger Event or Tender Offer."  Confirm'n (Exs. A, B) § 2 at 9 (emphasis added).  Tesla admits that Mr. Musk made the August 7 tweet, which proposed a going-private tender offer of $420 per share.  This natural reading was also confirmed by: (i) a post on Tesla's official corporate blog laying out more details about his proposal; (ii) additional tweets on Mr. Musk's Twitter account, including "Investor Support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote"; and (iii) statements by Tesla's head of investor relations characterizing it as a "firm offer" that "is as firm as it gets."  Ans. ¶¶ 19, 21.  Tesla now contends that Mr. Musk's tweet merely reflected "Mr. Musk's personal consideration of a possible transaction to take Tesla private."  Countercl. ¶ 7.  But even Tesla's self-serving construction still amounts to an

- 10 -

Announcement Event, because the tweet was a "public announcement" of "***any***" Merger Event or Tender Offer, which by definition can be made "***by any entity or person.***"  *See* Defs. (Ex. D) § 12.1(b)(iii), (d) (emphasis added).

Tesla erroneously argues that a Tender Offer requires a formal offer made in "filings with government or self-regulatory agencies." *See* Ex. T at 2.  This argument ignores that the definition of "Tender Offer" expressly includes "***proposal[s]***" and not merely formal offers.  *See* Defs. (Ex. D) § 12(d) (emphasis added).  "[F]ilings with governmental or self-regulatory agencies" are consulted only to determine whether the offer would result in the offeror owning more than 10% of Tesla's outstanding stock.[8]  Those regulatory filings did exist for Mr. Musk and they disclosed that he already owned more than 21% of Tesla's stock, *see* Ex. U, and thus any offer he made would exceed the 10% threshold.

2.    ***The August 7 Tweet Was an Announcement by Tesla of Any Intention to Enter into a Merger Event or Tender Offer***

The tweet also satisfies the second definition because it was an "announcement by the Issuer [***i.e., by Tesla***] of any intention to enter into a Merger Event or Tender Offer."  Confirm'n (Exs. A, B) § 2 at 9.  The Court overseeing Tesla's related securities litigation has already concluded that "Mr. Musk's statements are actionable against Tesla" if, as merely alleged there, (i) Tesla designated Mr. Musk's Twitter account as an authoritative source of company information, and (ii) Tesla separately confirmed Mr. Musk's tweets.  *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 927 (N.D. Cal. 2020).  Tesla has admitted both factual allegations here.

First, Tesla admits filing a Form 8-K in 2013, which states that "we announce material information to the public about our company . . . through a variety of means, including . . . blogs

---

[8] The language about regulatory filings does not appear in the definition of Merger Event, which also applies to the proposed going-private transaction.  *See* Defs. (Ex. D) § 12.1(b)(iii).

and social media" and directs investors to "follow Elon Musk's and Tesla's Twitter accounts" for such information.  Ans. ¶ 20; Ex. V.  Mr. Musk's tweet is therefore attributable to Tesla, because Mr. Musk, as Tesla's CEO and Chairman, had actual and apparent authority to make such an announcement, *see Goldston v. Bandwidth Tech. Corp.*, 52 A.D.3d 360, 362 (1st Dep't 2008), and published it on a designated "channel of communications by which information about decisions made within the organization is communicated."  Restatement (Third) of Agency § 1.03 (2006); *see also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1005 (3d Cir. 1994).

Second, Tesla admits that its other officers and directors made statements within 24 hours of the August 7 tweet confirming the same intention.  Its Chief Financial Officer, its Vice President of Communications, and its General Counsel all "participated in the drafting of a communication" attributed to Mr. Musk that detailed the go-private proposal and was published the same day on Tesla's corporate blog, Ans. ¶ 21, another official channel for company information, Ex. V. Tesla's "head of investor relations received and responded to inquiries" about the tweet, confirming that "there is a firm offer."  Ans. ¶ 22; Ex. L.  And Tesla's board of directors issued a press release confirming that "Elon opened a discussion with the board about taking the company private" and "addressed the funding for this to occur."  Ans. ¶ 23; Ex. M.  This corroboration from multiple Tesla sources confirms that Mr. Musk's tweet was also an announcement by Tesla.

### 3. *The August 7 Tweet Was an Announcement by Tesla of an Intention to Explore a Strategic Alternative That May Include a Merger Event or Tender Offer*

The August 7 tweet also met the third definition of Announcement Event, because it was a "public announcement by Issuer of an intention . . . to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer."  Confirm'n (Exs. A, B) § 2 at 9. Mr. Musk's tweet, which was attributable to Tesla, and the statements published on Tesla's official corporate blog all indicate that, at a minimum, Tesla was seriously exploring a potential go-private

- 12 -

transaction.  Tesla's board confirmed as much in its own press release, noting that "Elon opened a discussion with the board about taking the company private," and the board "is taking the appropriate next steps to evaluate this."  Ex. M; Ans. ¶ 23.  These statements all confirm that the original tweet announced that ***Tesla itself*** was at least considering the possibility of going private.

Tesla argues that "the Board was merely preparing itself so it would be appropriately positioned to discharge its fiduciary duties to the company: to consider and respond to any proposal that might be announced" by Mr. Musk, but it was not "even 'informally supportive' of any potential proposal."  Countercl. ¶ 33.  It does not matter what the board privately thought, because it repeatedly and publicly confirmed it was exploring that possibility, including announcing the creation of a special committee to not only "***evaluate [but] negotiate*** a potential Going-Private Transaction ***and alternatives*** to any transaction proposed by Mr. Musk."  Ex. W (emphasis added); Countercl. ¶ 32.

### 4.  *JPMorgan's Purported Opinions About the Going-Private Transaction Are Irrelevant*

In an attempt to manufacture a factual dispute, Tesla alleges that JPMorgan's determination that an Announcement Event occurred was itself unreasonable and made in bad faith, because JPMorgan supposedly believed that a going-private transaction was unlikely.  *See* Ex. T at 3 (citing Defs. § 1.40).  These allegations are irrelevant.  Whether an announcement constitutes an Announcement Event is a matter of contract interpretation for the Court to decide.  The contract does not grant JPMorgan, the other warrant dealers, or anyone else responsibility for making that determination.  Rather, JPMorgan, as Calculation Agent, only has obligations *if* an Announcement Event occurs. *See* Confirm'n (Exs. A, B) § 2 at 9; Defs. (Ex. D) § 12.3(d).

In any event, the announcements were Announcement Events for the reasons explained above.  Even if JPMorgan had doubts about whether the going-private transaction would be

consummated,[9] the contract does not carve out transactions whose consummation is uncertain. Instead, it treats any "subsequent public announcement of . . . the abandonment or discontinuation of[] such a transaction or intention" as an additional Announcement Event.  Confirm'n (Exs. A, B) § 2 at 9.  JPMorgan faithfully applied these provisions by adjusting when the going-private transaction was initially announced, and again when it was abandoned.

## B. The August 24 Blog Post Was an Announcement Event

Tesla's August 24 blog post announcing the abandonment of the going-private plans was a second Announcement Event because "the abandonment or discontinuation of" a previously announced transaction or intention is itself a separate Announcement Event.  Confirm'n (Exs. A, B) § 2 at 9.  Tesla does not appear to dispute that conclusion if the August 7 tweet was itself an initial Announcement Event.  As explained above, it was.

## II. The Adjustments Were Made in Good Faith and in a Commercially Reasonable Manner

Once an Announcement Event occurred, JPMorgan was obligated to consider whether an adjustment was necessary to account for the economic effect on the transaction, or to terminate the transaction if no adjustment could achieve a commercially reasonable result.  Confirm'n (Exs. A, B) § 2 at 9; Defs. (Ex. D) § 12.3(d).  JPMorgan made this determination by measuring the economic effect resulting from the change in the average implied volatility before and after each Announcement Event occurred—a methodology that the Agreements envision and is thus *per se*

---

[9] Tesla mischaracterizes JPMorgan's equity research reports.  *See* Countercl. ¶ 33.  Tesla selectively quotes from an August 20, 2018 report, issued five days *after* the First Adjustment, and omits its conclusion that "Tesla does appear to be ***exploring a going private transaction***, but we now believe that such a process appears much less developed than we had earlier presumed." Ex. X (emphasis added).  This August 20, 2018 report references JPMorgan's August 8, 2018 equity research report, issued *before* the First Adjustment, which concluded that Mr. Musk's tweet "should be considered seriously" and which "weighted 50% in [its] valuation analysis a go-private scenario for which funding was at that time said to have been secured to take the company private at $420 per share."  *Id.*

reasonable.  In any event, Tesla fails to plausibly allege that the Adjustments were made in bad faith or were otherwise commercially unreasonable.

The Agreements provide the Calculation Agent with "[a] certain amount of flexibility," Defs. (Ex. D) at ix, and "broad discretion," User's Guide (Ex. H) § 1.40.  Here, the parties agreed that the consequence of an Announcement Event would be the Modified Calculation Agent Adjustment, which "affords a significant degree of flexibility," Defs. (Ex. D) at viii, and grants the Calculation Agent discretion "to account for the difference between the volatility" before and after the Extraordinary Event, User's Guide (Ex. H) § 12.2 at 47.  Confirm'n (Exs. A, B) § 2 at 8–9.  That discretion is limited only by an obligation to act "in good faith and in a commercially reasonable manner."[10]  Confirm'n (Exs. A, B) § 3; Defs. (Ex. D) § 1.40.

"The standard for satisfying commercial reasonability under New York law is a fairly lenient one" and "does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result."  *Shane Campbell Gallery, Inv. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y 2020).   Although "commercial reasonableness . . . is often a fact-intensive inquiry," allegations that a party "could have traded differently and more judiciously" fail even on the pleadings because one party "is not

---

[10] Although this phrase is not expressly defined in the Agreements, it is well understood in the law, *see, e.g.,* N.Y. U.C.C. § 1-201(b)(20) (defining "good faith" as "honesty in fact in the transaction or conduct concerned"), and the Equity Definitions and related User's Guide illustrate a commercially reasonable methodology for making adjustments.  The Agreements, which are mostly form agreements used throughout the derivatives industry, are thus not illusory.  *See Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, No. 14 CIV. 8727 NRB, 2015 WL 4486335, at *4 (S.D.N.Y. July 23, 2015) ("New York courts avoid an interpretation that renders a contract illusory[.]"); *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 454 (2d Cir. 1977) (discretionary term "did not render the agreement illusory"); *see also Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 418 n.4 (S.D.N.Y. 2015) ("[T]he [ISDA] master agreement governs many thousands of . . . transactions between counterparties and includes provisions applicable to all swap transactions.").

required . . . to choose the most beneficial trading strategy for" its counterparty.  *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 541 (S.D.N.Y. 2013).  Courts thus are able to grant judgment on the pleadings where the counterparty fails to allege facts that could plausibly establish bad faith or commercial unreasonableness as a matter of law.  *See Sports Med Properties, LLC v. Talib*, No. 3:19-cv-00082-FDW, 2019 WL 3403372, at *3 (W.D.N.C. July 26, 2019) (granting judgment on the pleadings because counterclaim-plaintiff failed to plausibly allege commercial unreasonableness); *Citibank, N.A. v. Tormar Assocs. LLC*, No. 15-cv-1932-JPO, 2015 WL 7288652, at *6–7 (S.D.N.Y. Nov. 17, 2015) (same for failure to plead good faith); *L-7 Designs, Inc.*, 2010 WL 157494, at *6 (similar); *see also VCG Special Opportunities Master Fund*, 594 F.Supp.2d at 345–46 & n.8 (S.D.N.Y. 2008) (granting judgment on pleadings despite issues of good faith and commercial reasonableness).

Here, the Court similarly needs nothing but the pleadings and documents incorporated by reference to grant judgment in JPMorgan's favor.  The methodology that JPMorgan employed is undisputed and well within its discretion, because the contract identifies it as one commercially reasonable way to calculate the economic effect of an Extraordinary Event.  Tesla does not dispute the accuracy of the inputs utilized by JPMorgan, but critiques JPMorgan's choices of inputs.  Those critiques fail to plausibly establish bad faith or commercial unreasonableness as a matter of law.

## A.  JPMorgan's Adjustment Methodology Is Undisputed and *Per Se* Reasonable

Tesla concedes that JPMorgan adjusted based on the change in the average implied volatility over the days before and after each Announcement Event.[11]  *See* Countercl. ¶¶ 38, 46–

---

[11] According to Tesla's own allegations, JPMorgan's First Adjustment "relied on the simple averages of implied volatilities derived from standard call option prices during a 30-day period before and a 7-day period after August 7, 2018," Countercl. ¶ 38; *cf.* Compl. ¶¶ 28–29, and the Second Adjustment "purport[ed] to measure the 'economic effect' of Mr. Musk's statement by

48; *cf.* Compl. ¶¶ 28–29, 33–34.  While the contract does not mandate any particular methodology, it expressly endorses the practice of adjusting based on changes in average volatility before and after an event.  As the User's Guide explains, "[a]n Extraordinary Event can impact the volatility of the Shares of the target company," and thus the Equity Definitions "allow[] the parties to adjust for volatilities that occur pre- and post-Extraordinary Event and [to] eliminate any windfall gains or losses that arise from them."  User's Guide (Ex. H) § 12.7 at 53; *see also* Confirm'n (Exs. A, B) § 2 at 8–9 (adding Announcement Events as a type of Extraordinary Event).  The User's Guide then provides examples of how that impact might be measured in different scenarios.  For example, in the context of a Merger Event, the User's Guide illustrates that "[s]uch adjustments could be made, for example, to account for the difference between the volatility of (i) the original Shares prior to the Announcement Date and (ii) the volatility of the New Shares . . . following the closing date of the Merger Event."  User's Guide (Ex. H) § 12.2 at 47.  In the context of an Extraordinary Event resulting in termination, the Agreements also set forth an "Agreed Model" for "mak[ing] an adjustment based on the change in value of that Option Transaction on the Announcement Date of the Extraordinary Event as a result of a change in the level of implied volatility of the underlying Shares," User's Guide (Ex. H) § 12.7 at 53, as measured by the difference in a "volatility equal to the average of the Implied Volatilities of the relevant Shares" for a period "ending on but excluding the Announcement Date," and for a period "commencing on and including the Announcement Date." Defs. (Ex. D) § 12.7(b)(i)(B)(1)(a), (b)(i)(B)(2).  This methodology "determin[es] how much the value of the Option Transaction changed as a result of the announcement of the

---

comparing the implied volatility of certain exchange-traded call options in the days before and shortly after August 24, 2018," Countercl. ¶¶ 46–48; Compl. ¶¶ 33–34.

Extraordinary Event."  User's Guide (Ex. H) § 12.7 at 53–54.[12]

While JPMorgan was not bound to follow these guidelines, by doing so, its resulting Adjustments were *per se* made in good faith and in a commercially reasonable manner. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (adopting Black's Law Dictionary's definition of "commercially reasonable manner" as "a transaction conducted . . . in accordance with commonly accepted commercial practice").  Because the Agreements provide for an accepted commercial practice, it is unnecessary to resort to expert testimony to determine whether the Adjustments were reasonable, unless the pleadings reveal facts that could plausibly allege bad faith or commercial unreasonableness.

### B.  Tesla Fails to Allege Bad Faith as a Matter of Law

Because JPMorgan had a contractual right to make the Adjustments and did so in a manner consistent with the contract, Tesla cannot establish bad faith.  "Under New York law, the duty of good faith prohibits parties from exercising their contract rights [only] as part of a 'scheme to deprive the other party of the fruit of its bargain.'"  *Citibank*, 2015 WL 7288652, at *7 (citation omitted).  No such scheme has been or could be plausibly alleged because JPMorgan had no control over whether announcements were made about Tesla going private, or the market reaction that determined the size of the adjustments.  ***Tesla*** created the conditions giving JPMorgan the right to adjust, and it fails to provide any reason why JPMorgan was obligated to stay its hand.

In opposing JPMorgan's request for a pre-motion conference, Tesla argued that it has pled a bad faith scheme to "deprive[] Tesla of the benefit of its bargain," by stringing together

---

[12] The Agreed Model only applies if the agreement must be terminated, and even then, JPMorgan's determination "may, but need not, be based on factors" in the Agreed Model because the parties chose "Calculation Agent Determination" when the consequence is Cancellation and Payment.  *See* Confirm'n (Exs. A, B) § 2 at 8; Defs. (Ex. D) § 12.7(a), (b)(ii).

allegations that the Adjustments "purported to eliminate much of the Call Spread payoff that Tesla had paid for in 2014," Countercl. ¶ 41, with its allegation that JPMorgan employed "a classic 'heads I win, tails you lose' scheme" by not increasing the strike price further when Tesla's volatility eventually increased long after August 2018, Countercl. ¶ 53. This argument is meritless because it would not be bad faith even if JPMorgan had exercised its adjustment right to increase its own profits at Tesla's expense. *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (A party is "entitled to act in its own self-interest . . . even if such action lessened [the other party's] anticipated profits."). And JPMorgan did not have any contractual authority to make further adjustments to the strike price after August 2018 simply because Tesla's volatility subsequently increased for reasons unrelated to the announcements.

Tesla falsely alleges that JPMorgan acted out of spite or a desire to obtain a windfall. Even if these allegations are true, which they are not, they are irrelevant. "The principle of good faith constrains a party's actions, not a party's motives for those actions." *Gaia House Mezz LLC*, 720 F.3d at 93–94 n.5. In *Gaia*, the district court had ruled that a party acted in bad faith after finding its "motives in enforcing the Agreement were retaliatory." *Id.* The Second Circuit reversed "as a matter of law," because the party's "motives in enforcing its valid contract are irrelevant" to whether the party acted in bad faith. *Id*. Courts in this district have consistently held that "acting in [one's] own self-interest consistent with [one's] rights under a contract" and "seeking to maximize . . . profits" does not amount to bad faith. *DeBlasio v. Merrill Lynch & Co.*, No. 07-cv-318-RJS, 2009 WL 2242605, at *38 (S.D.N.Y. July 27, 2009) (citation omitted). Tesla's motive allegations are thus irrelevant.

## C.   Tesla Fails to Allege the Adjustments Were Not Commercially Reasonable

Tesla also alleges the Adjustments were not made in a commercially reasonable manner, including because they are "unsupported by the market data" and "out of proportion with any

alleged 'economic effect.'"  Countercl. ¶¶ 39–40.  But Tesla does not allege there were errors in the market data JPMorgan used or that its calculations were erroneous.  On the contrary, Tesla includes various graphs demonstrating **there is** market data supporting JPMorgan's determinations that the August 7 announcement caused a large drop in implied volatility and that the August 24 announcement only caused a more modest increase:



Countercl. at 6 fig. 1.  These graphs must be accepted as true for purposes of this motion.

Tesla's remaining allegations are nothing more than complaints that JPMorgan could have looked at *different* data points from *after* the Adjustments were made.  None is sufficient to plausibly show that the inputs JPMorgan chose or the Adjustments are commercially unreasonable. *See Toledo Fund, LLC. v. HSBC Bank USA, Nat. Ass'n*, 2012 WL 2850997, at *8  (S.D.N.Y. July 9, 2012) ("[W]hether the manner in which [the Calculation Agent] performed [] could have been done differently . . . even better—that does not raise a triable issue."); *Syracuse Supply Co. v. Vogel*, 78 A.D.2d 991, 992 (4th Dep't 1980) ("The fact that a better price could have been obtained by a sale at a different time or in a different method . . . is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.") (quoting N.Y. U.C.C. § 9-507(2)).

First, Tesla alleges that the Adjustments were unreasonable in failing to predict or account for increases in volatility following the effective dates of the First and Second Adjustments, which Tesla concedes were August 15 and August 28, 2018, respectively.  Countercl. ¶¶ 30, 38, 46, 52.

But JPMorgan was permitted to make the adjustment "*on* or after the relevant date of the Announcement Event."   Defs. (Ex. D) § 12.3(d); Confirm'n (Exs. A, B) § 2 at 9.   Given that JPMorgan could have made the Adjustments "on" August 7 and "on" August 24, when the volatility swings would have resulted in adjustments even less favorable to Tesla, Tesla fails to explain why it was commercially unreasonable to make them one to two weeks later.   Thus, Tesla's argument that the First Adjustment, effective August 15, failed to account for a volatility increase on August 17 is irrelevant.   Countercl. ¶¶ 30, 38.   So, too, is Tesla's argument that the Second Adjustment, effective August 29, "completely ignored the large increase in implied volatility of Tesla options that was observed in the market after August 2018."   Countercl. ¶¶ 46, 52.   JPMorgan could not have predicted any of these increases when it made the Adjustments, which never caused the strike price to fall below Tesla's then-current stock price or below Mr. Musk's $420 offer price. Tesla cannot plausibly allege that JPMorgan knew Tesla's stock price would exceed the $484.35 adjusted strike price at maturity when Mr. Musk himself declared publicly that Tesla was worth just $420 per share—*$64 less than the adjusted strike price*—at that time.

Second, Tesla alleges that JPMorgan's Second Adjustment was unreasonable for not completely reversing the First Adjustment.   Essentially, Tesla argues that JPMorgan should have assumed the economic effects of the two announcements were equal but opposite, but Tesla ignores the more dramatic drop following the first Announcement Event that is plainly visible in Tesla's own chart, Countercl. at 6 fig. 1, and cites nothing requiring JPMorgan simply to reverse the First Adjustment.   Rather, the contract specifies that, "for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention," and JPMorgan shall determine "the economic effect on the Transaction of **such**

- 21 -

*Announcement Event*."  Confirm'n (Exs. A, B) § 2 at 9 (emphasis added); Defs. (Ex. D) § 12.3(d).

Accordingly, the contract requires adjustments based on the economic effect of *each* Announcement Event individually.  Tesla concedes that comparing just the "marginal change in implied volatility" following each Announcement Event separately "guaranteed that the First Adjustment would not be reversed," because the second change was smaller than the first. Countercl. ¶ 48.  Because the contract requires such an individualized assessment, the Second Adjustment cannot be unreasonable simply because it did not undo the First Adjustment.

Finally, Tesla argues that JPMorgan's Adjustments were unreasonable because three other dealer banks allegedly made no adjustments to their warrants.  Countercl. ¶ 35.  As demonstrated above, the facts establish that two Announcement Events did occur, and JPMorgan's methodology for measuring the effect on the Warrants was *per se* reasonable.  The other dealers' unexplained decisions to ultimately make no net adjustment cannot, on their own, create a material dispute of fact about whether JPMorgan's well-supported Adjustments were commercially reasonable.  *See Toledo Fund*, 2012 WL 2850997, at *8; *Lehman Bros.*, 2015 WL 7194609, at *19–24 (concluding that multiple methodologies could be applied "reasonably and in good faith," and there was not only one that was "correct").

## III.   Tesla's Meritless Counterclaims Should Be Dismissed

Attempting to deflect from its own wrongdoing, Tesla asserts two fatally flawed counterclaims: a mirror image breach of contract claim and a claim for declaratory judgment.  Both fail because Tesla has not alleged any breach by JPMorgan.  Even if it had, Tesla has not alleged any injury on its breach of contract claim and has no need for declaratory relief.

### A.   Tesla Fails to Plead Any Breach by JPMorgan

Tesla's counterclaims fail to allege any breach by JPMorgan.  JPMorgan was entitled to adjust the strike price because two Announcement Events *did* occur, and those Adjustments *were*

- 22 -

commercially reasonable and made in good faith. Tesla's other breach allegations also fail.

First, Tesla alleges that JPMorgan "inflated" the Early Termination Amount "by millions of dollars" by valuing the undelivered shares as of August 3, 2021—the date that JPMorgan acquired replacements shares on the open market—instead of the value "as of the originally scheduled date for delivery," as required by the definition of Unpaid Amounts. Countercl. ¶ 58; *see also* Master Agm't (Ex. C) §§ 6(e), 14. But the Early Termination Amount comprises both the Unpaid Amount **and any Close-Out Amount**. The Close-Out Amount may include "any loss or cost incurred in connection with its terminating, liquidating, or re-establishing any hedge related to a Termination Transaction." Master Agm't (Ex. C) §§ 6(e)(i), 14. In this case, JPMorgan maintained a short position as a hedge on the Warrants and Tesla's breach forced JPMorgan to acquire replacement shares to close out that hedge position. Compl. ¶ 46. JPMorgan is entitled to include the additional cost of Tesla's shares on August 3 in the Early Termination Amount.[13]

Second, Tesla vaguely suggests that JPMorgan might have terminated the Warrants in August 2018, purportedly because no adjustment could have reached a commercially reasonable result. That argument is frivolous. If it truly believed that, Tesla could have noticed an Event of Default after receiving notice of the adjustment and terminated the Agreement itself, long before delivering $5 billion in stock to JPMorgan when it partially settled the Warrants in 2021. Tellingly, it did not, and thus has waived any right to demand termination now. *See V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994) ("[E]lect[ing] to continue the contract, he may not at a later time renounce his election and seek to terminate based on the prior breach."). In any event, it is "*the Calculation Agent* [who] determines that no adjustment that it could

---

[13] It is immaterial that the valuation notice inadvertently characterizes the full Early Termination Amount as an Unpaid Amount. *See* Ex. Q; Ex. T at 5. The full amount was recoverable as part of the Early Termination Amount, and the notice satisfies the minimum contractual requirements of identifying that amount and the supporting calculations "in reasonable detail." Master Agm't (Ex. C) § 6(d)(i).

make . . . will produce a commercially reasonable result."   Defs. (Ex. D) § 12.3(c) (emphasis added).  JPMorgan never reached that determination, which renders Tesla's assertion meritless.

**B.    Tesla Fails to Plead Any Cognizable Damages**

Tesla's breach of contract counterclaim is also fatally deficient because "it does not demonstrate how the . . . alleged breach of the . . . agreement caused [Tesla] any injury."  *ERE LLP v. Spanierman Gallery, LLC*, 94 A.D.3d 492, 493 (1st Dep't 2012) (quotation marks omitted); *accord Ross Stores, Inc. v. Lincks*, No. 13 CIV. 1876 SAS, 2013 WL 5629646, at *3 (S.D.N.Y. Oct. 4, 2013).  Tesla's only alleged injuries are its defense costs, *see* Countercl. ¶ 65, and the undisputed shares it voluntarily delivered to JPMorgan.  Neither constitutes cognizable damages.

First, defense costs are not recoverable as damages "[a]bsent some contractual or statutory right thereto."  *Camatron Sewing Mach., Inc. v. F.M. Ring Assocs., Inc.*, 179 A.D.2d 165, 169 (1st Dep't 1992).  Tesla relies on Section 11 of the Master Agreement as providing such right, Countercl. ¶ 65, but that provision only obligates ***Defaulting Parties*** to provide indemnity.  JPMorgan is not a Defaulting Party because it committed no breach.  Regardless, a breach of contract only amounts to an Event of Default "if such failure is not remedied within 30 days ***after notice*** of such failure is given to the party."  Master Agm't (Ex. C) § 5(a)(ii)(1) (emphasis added).  Tesla provided no such notice, so no Event of Default could have occurred on JPMorgan's part.

Second, Tesla's "multibillion-dollar payout" when it partially settled the Warrants at the original strike price is completely unrecoverable.  The voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law."  *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003).  Tesla knew since 2018 of JPMorgan's assertion that Announcement Events had occurred and of the Adjustments JPMorgan had made, but never protested settling the undisputed shares.  *See* Exs. Y-BB; Ans. at ¶¶ 30, 40 (admitting existence of letters).  On the

contrary, it was *Tesla* who offered to settle "the number of shares that are ***not in dispute***."  Compl. at ¶ 41; Ans. at ¶ 41; Ex. BB.  As "a sophisticated party that either understood its rights or had the wherewithal to learn them in relatively short order," Tesla cannot recover the undisputed shares. *Beltway 7 & Properties, Ltd. v. Blackrock Realty Advisers, Inc.*, 167 A.D.3d 100, 105 (1st Dep't 2018); *accord Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329, 340–41 (S.D.N.Y. 2019) ("mistaken understanding of its obligations under the contract" is insufficient).

### C.    Tesla's Declaratory Judgment Claim Must Be Dismissed as Duplicative

Tesla's declaratory judgment claim seeks relief on the same issues raised by JPMorgan's complaint and serves no purpose.  *See Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311–12 (S.D.N.Y. 2010); *Arista Recs. LLC v. Usenet.com., Inc.*, No. 07-cv-8822-HB, 2008 WL 4974823, at *3 (S.D.N.Y. Nov. 24, 2008).  It should be dismissed as duplicative.

### IV.      Tesla's Default Entitles JPMorgan to the Early Termination Amount

For the foregoing reasons, Tesla was obligated to settle the Warrants at the adjusted strike price.  Tesla did not, despite JPMorgan's numerous deficiency notices. Countercl. ¶¶ 54–56; Compl. ¶ 44; Ans. ¶ 44; Exs. O, P.  Tesla therefore committed an Event of Default, *see* Master Agm't (Ex. C) § 5(a)(i), which gave JPMorgan the right to designate an Early Termination Date and demand the Early Termination Amount.  *See id.* §§ 6(a), 6(d), 9(h)(i)(2), 9(h)(ii); Exs. P, Q. The Court should therefore enter judgment in favor of JPMorgan in the full Early Termination Amount, plus interest from the date the shares were due, and indemnification of JPMorgan's "reasonable out-of-pocket expenses, including legal fees . . . incurred by [JPMorgan] by reason of the enforcement and protection of its rights under this Agreement . . . including, but not limited to, costs of collection."  *See* Master Agm't (Ex. C) §§ 9(h)(i)(2), (ii), 11.

### <u>CONCLUSION</u>

For all these reasons, this Court should enter judgment in JPMorgan's favor.

- 25 -

Dated:   New York, New York       DAVIS POLK & WARDWELL LLP
          May 23, 2022

By:   */s/ Lawrence Portnoy*
      Lawrence Portnoy
      Greg D. Andres
      Sheila R. Adams
      Craig T. Cagney
      Michael V. Pucci

450 Lexington Avenue
New York, New York 10017
(212) 450-4000
lawrence.portnoy@davispolk.com
greg.andres@davispolk.com
sheila.adams@davispolk.com
craig.cagney@davispolk.com
michael.pucci@davispolk.com

*Attorneys for JPMorgan Chase Bank,*
*National Association, London Branch*

- 26 -