**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, LONDON BRANCH,

*Plaintiff*,

v.

TESLA, INC.,

*Defendant*.

---

Case No. 1:21-cv-09441-PGG

---

### DEFENDANT TESLA, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

Alex Spiro
Jonathan E. Pickhardt
Nathan Goralnik
Evan Hess
Jesse Bernstein

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Counsel for Tesla, Inc.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT .........................................................................1

BACKGROUND .............................................................................................3

    A.    Tesla's 2014 Convertible-Notes Offering Granted JPM More Than 1.9 Million Warrants On Tesla's Stock And Millions Of Dollars In Fees .............3

    B.    JPM's Obligations As The Warrants' Calculation Agent .......................4

    C.    Elon Musk And Certain Investors Briefly Consider Taking Tesla Private .............5

    D.    JPM—And No Other Dealer Bank—Hastily Adjusts The Strike Price .................6

    E.    JPM Fails To Reverse The First Adjustment ...........................................7

    F.    JPM Demands $162 Million Over The Billions Paid To It Under The Warrants .................8

    G.    Relevant Procedural History ...............................................................8

ARGUMENT ..................................................................................................9

I.    JPM Cannot Show It Is Entitled To Judgment On The Pleadings For Its Breach-Of-Contract Claim .................11

    A.    The Pleadings Do Not Establish That An "Announcement Event" Occurred ...........................................................................................12

        1.    Whether The August 7 Tweet Announced A Tender Offer Is A Disputed Fact .................12

        2.    Whether Tesla Announced Any Intention To Enter Into A Tender Offer Is A Disputed Fact ...............13

        3.    Whether Tesla Announced An Intention To Explore Strategic Alternatives Is A Disputed Fact .................13

        4.    Whether The August 24 Blog Post Was An Announcement Event Is A Disputed Fact ...............14

    B.    JPM Cannot Establish From The Pleadings That It Acted In Good Faith And A Commercially Reasonable Manner In Declaring An "Announcement Event" .................14

C.    JPM Cannot Establish From The Pleadings That Its Adjustment Calculations Complied With Its Contractual Obligations Under The Warrants ........................................................................................................17

II.    JPM Cannot Establish From The Pleadings That Tesla's Counterclaims Should Be Dismissed ..................................................................................................................21

     A.    Tesla Sufficiently Pleads JPM's Breach .................................................................21

     B.    Tesla's Defense Costs Are Cognizable Damages ...................................................23

     C.    The Voluntary-Payment Doctrine Does Not Bar Recovery ...................................24

     D.    JPM Fails To Show Tesla's Declaratory-Judgment Claim Is Duplicative ...........25

CONCLUSION.......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Affordable Aerial Photography, Inc. v. Abdelsayed*,
   2022 WL 1124795 (S.D. Fla. Apr. 15, 2022) ................................................... 10 n.2

*Arista Records LLC v. Lime Group LLC*,
   2011 WL 13257941 (S.D.N.Y. Jan 7, 2011) ........................................................ 11

*Awards.com, LLC v. Kinko's, Inc.*,
   42 A.D.3d 178 (1st Dep't 2007) ..................................................................... 22-23

*Beltway 7 & Properties, Ltd. v. Blackrock Realty Advisers, Inc.*,
   167 A.D.3d 100 (1st Dep't 2018) ................................................................... 24-25

*Catalano v. MarineMax*,
   --- F. Supp. 3d ---, 2022 WL 715465 (E.D.N.Y. Mar. 10, 2022) ................ 12, 18, 22

*Credit Suisse First Boston v. Utrecht-America Finance Co.*,
   80 A.D.3d 485 (1st Dep't 2011) ......................................................................... 20

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
   100 N.Y.2d 525 (2003) ..................................................................................... 24

*Erhart v. BofI Holding, Inc.*,
   387 F. Supp. 3d 1046 (S.D. Cal. 2019) ............................................................... 10

*Grewal v. Cuneo Gilbert & LaDuca LLP*,
   2018 WL 4682013 (S.D.N.Y. Sept. 28, 2018) ...................................................... 11

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*,
   2013 WL 1191895 (S.D.N.Y. Mar. 22, 2013) ...................................................... 15

*Holland Loader Co. v. FLSmidth A/S*,
   313 F. Supp. 3d 447 (S.D.N.Y. 2018) ................................................................. 15

*Integrated Marketing & Promotional Solutions, Inc. v. JEC Nutrition, LLC*,
   2006 WL 3627753 (S.D.N.Y. Dec. 12, 2006) ........................................................ 9

*Kenall Manufacturing Co. v. Cooper Lighting, LLC*,
   354 F. Supp. 3d 877 (N.D. Ill. 2018) .................................................................. 10

*Kondaur Capital Corp. v. Cajuste*,
   849 F. Supp. 2d 363 (E.D.N.Y. 2012) ............................................................... 9-10

*Lessambo v. PricewaterhouseCoopers, L.P.*,
   2009 WL 2170179 (S.D.N.Y. June 29, 2009) ...................................................... 11

*Lively v. WAFRA Investment Advisory Group, Inc.*,
  6 F.4th 293 (2d Cir. 2021) ....................................................... 9, 10, 11, 16 n.3, 22 n.5

*Living on the Edge, LLC v. Lee*,
  2015 WL 12661917 (C.D. Cal. Aug. 25, 2015).................................................. 10 n.2

*Logical Operations, Inc. v. CompTIA, Inc.*,
  2021 WL 1099619 (W.D.N.Y. May 23, 2021).................................................. 10-11

*MCDP Phoenix Services PTE. LTD. v. First Finanical International Bank Inc.*,
  2021 WL 4963370 (D.P.R. Oct. 26, 2021) ........................................................ 10 n.2

*Melnitzky v. Jones*,
  2008 WL 3884361 (S.D.N.Y. Aug. 21, 2008)........................................................... 9

*Munro v. Fairchild Tropical Botanic Garden, Inc.*,
  2021 WL 894380 (S.D. Fla. Mar. 3, 2021)....................................................... 10 n.2

*New York v. SCA Services, Inc.*,
  754 F. Supp. 995 (S.D.N.Y. 1991) ...................................................................... 10

*S.A. De Obras y Servicios, COPASA v. Bank of Nova Scotia*,
  170 A.D.3d 468 (1st Dep't 2019) ............................................................... 20-21 n.4

*In re Tesla, Inc. Securities Litigation*,
  477 F. Supp. 3d 903 (N.D. Cal. 2020) .................................................................. 13

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
  487 F.3d 89 (2d Cir. 2007) .................................................................... 14-15, 20

*Turner Network Sales, Inc. v. Dish Network*,
  413 F. Supp. 3d 329 (S.D.N.Y. 2019) .................................................................. 25

*United States v. 2366 San Pablo Ave.*,
  2013 WL 6774082 (N.D. Cal. Dec. 23, 2013) .................................................. 10 n.2

**Rules**

Fed. R. Civ. P. 12(c) .......................................................................................... 11

## PRELIMINARY STATEMENT

The stock warrants at issue in this case (the "Warrants") have already generated billions of dollars in value for Plaintiff JPMorgan Chase Bank, National Association, London Branch ("JPM").  JPM's massive payout resulted from the historic rise of Defendant Tesla, Inc.'s ("Tesla") stock price under Elon Musk's leadership.  But not content with these spectacular financial returns, JPM brought this opportunistic breach-of-contract action seeking to recover an additional windfall of $162 million, based solely upon JPM's own unilateral adjustment of the Warrants' strike price, made over Tesla's objections and in stark contrast to the conduct of every other dealer bank.  JPM now seeks to avoid reckoning with discovery that will show its bad faith and commercially unreasonable conduct, arguing that classic disputed fact questions about JPM's conduct in relation to industry standards and motives can be simply decided on the pleadings.

JPM is wrong, and its motion should be denied in its entirety.  This Court already suggested as much when it considered JPM's arguments and "conclude[d] that a motion for judgment on the pleadings is not likely to be successful."  As the Court reasoned, the parties' dispute over whether JPM acted in a "commercially reasonable manner" renders "expert testimony regarding the custom in the industry … necessary."  JPM's motion, filed despite the Court's observations, does nothing to address the Court's well-founded concerns and reveals still more reasons to deny JPM's motion.

*First*, JPM cannot establish from the pleadings that JPM properly determined that Mr. Musk's August 7, 2018 tweet was an "Announcement Event" under the Warrants' terms.  To the contrary, Tesla alleges well-pleaded facts showing that the August 7 tweet—which Mr. Musk expressly stated was made in his "personal capacity" as "a potential bidder"—was not a public announcement by Tesla of the limited events that qualify as an Announcement Event.  Even if JPM could overcome those allegations, Tesla will present expert testimony—supported by other dealer banks' uniform conduct—that JPM's self-serving Announcement Event determination,

1

made just days after the tweet, was not done "in a commercially reasonable manner," given the facts that JPM knew at the time and the nearly three years remaining on the Warrants' term.

*Second*, JPM cannot establish from the pleadings that the unilateral adjustments it made to the strike price complied with the Warrants' terms. The Warrants required that any adjustment be "appropriate to account for the economic effect" of an Announcement Event on the Warrants. In spite of this requirement, Tesla's well-pleaded allegations demonstrate that JPM's initial $135.98 and subsequent $59.69 per share adjustments to the Warrants' strike price bore no relationship to any economic effect of the purported announcements. Here too, expert testimony will establish that JPM's methodology—designed solely to secure JPM a windfall recovery—was neither "commercially reasonable" nor in "good faith." Although JPM's motion asserts that its calculations were "*per se* made in good faith and in a commercially reasonable manner" because they implemented a so-called "Agreed Model" discussed elsewhere in the Equity Definitions, the Agreed Model is mentioned nowhere in the pleadings. Nor did the parties ever, in fact, "agree" that it would govern JPM's calculations, as the Equity Definitions require for it to apply. Even more critically, Tesla's experts will show that JPM's *actual* methodology was *not* the Agreed Model that they now tout as market standard. To the contrary, JPM's methodology fundamentally changed the Agreed Model's assessment periods to inflate the strike-price adjustment in JPM's favor by over **_400%_**. Thus, if anything, JPM's newfound embrace of the Agreed Model demonstrates the *per se* commercial *un*reasonableness and *bad* faith of JPM's methodology.

*Third*, JPM fares no better in attempting to establish from the pleadings that Tesla's counterclaims should be dismissed. JPM's brand-new assertion that it properly calculated its $162 million cash demand as a "Close-out Amount" appears nowhere in the pleadings and is directly at odds with JPM's own representation to Tesla that "the Close-out Amount is zero."

JPM's attempt to avoid Tesla's damage claims based on Tesla's supposed waiver is completely foreclosed by the agreement's no-waiver provision, a provision that New York courts "uniformly enforce." Even further, JPM's contention that Tesla failed to provide adequate notice of JPM's default under the Warrants is contradicted by Tesla's numerous clear statements that JPM breached its duties under the agreement. Nor can JPM invoke the voluntary-payment doctrine here, as Tesla's claim that JPM breached the contract by failing to cancel the Warrants is alleged *in the alternative* to Tesla's position that no Announcement Event occurred. If, to the contrary, an Announcement Event is found to have occurred, then the voluntary-payment doctrine would be inapplicable because Tesla's prior payments would have been made under a mistake of fact or law. Finally, Tesla's declaratory-judgment claim is not duplicative because it addresses issues that will not necessarily be resolved by JPM's claim, including Tesla's entitlement to additional recoveries.

## BACKGROUND

### A.      Tesla's 2014 Convertible-Notes Offering Granted JPM More Than 1.9 Million Warrants On Tesla's Stock And Millions Of Dollars In Fees

Tesla hired JPM and several other dealer banks to underwrite an offering of convertible notes on February 27, 2014. Countercls. ¶ 14. JPM netted millions of dollars in investment-banking fees for the convertible-notes offering. *Id.* ¶ 15. In connection with this offering, Tesla also entered into transactions with JPM and the other dealer banks to hedge against potential dilution of Tesla's common stock upon conversion of the notes. *Id.*; Answer ¶ 12. Tesla paid an upfront $199 million premium to JPM for that bond-hedge transaction. Countercls. ¶ 15.

To partly offset the bond-hedge costs, Tesla also sold Warrants to JPM and the other dealer banks in the form of European-style call options on shares of Tesla's common stock. *Id.* ¶ 16; Answer ¶ 12. The Warrants issued to JPM were documented under confirmations that set forth their terms and conditions (the "Confirmation"), including the incorporation of the definitions and

provisions, as amended or modified, of the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), the 2002 ISDA Master Agreement (the "Master Agreement"), and other documents (collectively, the "Agreements").  Countercls. ¶ 17; Answer ¶ 12.  The Confirmation gave JPM the option to exercise the Warrants at a strike price of $560.6388 per share upon their expiration dates, spread over forty days between June 1, and July 27, 2021.  Countercls. ¶ 18; Answer ¶ 14.

## B.    JPM's Obligations As The Warrants' Calculation Agent

The Confirmation named JPM as the "Calculation Agent," responsible for certain actions and determinations.  Countercls. ¶ 19; Answer ¶ 18.  As Calculation Agent, the Confirmation required JPM to make "all determinations … in good faith and in a commercially reasonable manner."  Countercls. ¶ 23; Conf. § 3.  The Equity Definitions reiterate: "Whenever a Calculation Agent is required to act or to exercise judgment in *any way*, it will do so in good faith and in a commercially reasonable manner."  Equity Defs. § 1.40 (emphasis added); Countercls. ¶ 23.

The Calculation Agent's duties under the Agreements include determining whether certain extraordinary corporate events occur that could trigger certain actions by the Calculation Agent.  An "Announcement Event" is one such enumerated event, which arises in only four limited circumstances: (1) "[t]he public announcement of any Merger Event or Tender Offer";[1] (2) "the announcement by [Tesla] of any intention to enter into a Merger Event or Tender Offer"; (3) "the public announcement by [Tesla] of an intention to solicit or enter into, or to explore strategic alternatives …"; and (4) "any subsequent public announcement of a change to" the other three events.  Countercls. ¶ 21; Conf., at 9.

---

[1] "Tender Offer" is defined as "a takeover offer, tender offer, exchange offer, solicitation, or proposal or other event … that results in" the offeror "purchasing, or otherwise obtaining or having the right to obtain … [a required percentage] … of the outstanding voting shares of the Issuer, as determined by the Calculation Agent based upon the making of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant."  Equity Defs. § 12.1(d), *as modified by* Conf., at 8; Countercls. ¶ 22.

Once the Calculation Agent determines that an Announcement Event has occurred, alternative consequences may result.  On one hand, the Calculation Agent could "make such adjustment to the exercise, settlement, payment, or any other terms of the Transaction … as the Calculation Agent determines appropriate to account for the economic effect on the Transaction of such [Announcement Event] …."  Equity Defs. § 12.3(d); Countercls. ¶ 20.  On the other hand "[i]f the Calculation Agent determines that no adjustment that it could make … will produce a commercially reasonable result," then "the relevant consequence shall be the termination of the Transaction, in which case 'Cancellation and Payment' will be deemed to apply and any payment to be made by one party to the other shall be calculated in accordance with [Equity Definitions] Section 12.7."  Equity Defs. § 12.3(d); Countercls. ¶ 20.

### C.   Elon Musk And Certain Investors Briefly Consider Taking Tesla Private

On August 7, 2018, Mr. Musk informed fellow Tesla shareholders via Twitter that he was "considering taking Tesla private at $420."  Countercls. ¶ 25; Answer ¶ 19.  On August 13, 2018, Mr. Musk wrote in a blog post that he was considering the potential take-private transaction in his "*personal* capacity" and had been "speaking for [him]self as a potential bidder," not on behalf of Tesla.  Countercls. ¶ 26 (emphasis added).  Mr. Musk also stated that a special committee of the Board of Directors would undertake "an appropriate evaluation process" only "[*i*]*f and when* a final proposal is presented."  *Id.* ¶ 27 (emphasis added).  He emphasized that "it would be premature" to "present[] a detailed proposal to an independent board committee" because he was still having "discussions with a number of … investors."  *Id.*

Mr. Musk's personal deliberation never resulted in the announcement of an offer or proposal.  *Id.* ¶ 28.  Instead, just over two weeks later, Mr. Musk advised Tesla's Board of Directors that he believed Tesla should remain a public company.  *Id.*  Mr. Musk publicized his

intentions in a blog post on August 24, 2018, and the Board immediately dissolved the special committee. *Id.*; Answer ¶ 31.

**D.     JPM—And No Other Dealer Bank—Hastily Adjusts The Strike Price**

Ten days after Mr. Musk's tweet, JPM sent notice to Tesla stating that, "as a result of the public statements with respect to the Issuer and the Shares beginning on August 7, 2018," JPM had determined that a contractual "Announcement Event" had occurred and that "the appropriate adjustment to each 2021 Warrant Transaction [was] a reduction of the Strike Price from $560.6388 to $424.66," effective August 15, 2018.  Countercls. ¶ 30; Answer ¶¶ 29-30.

JPM's approximately $136 decrease to the strike price did not correspond to any commensurate economic effect on the Warrants.  Countercls. ¶ 37.  Under the Confirmation, the payments due under the Warrants were based on the excess of Tesla's volume-weighted average stock price over the strike price upon their exercise in 2021.  *Id.*  JPM purported to determine that a permanent decrease in the Warrants' value was appropriate to account for a momentary fluctuation in implied volatility in 2018, *three years before their expiration.*  *Id.*  JPM's purported methodology for calculating the adjustment also directly contradicted the contemporaneous market data.  *Id.* ¶ 38.  JPM's methodology took the simple averages of implied volatilities derived from standard call-option prices during the 30 business days before and 7 business days after August 7, 2018.  *Id.*  Through this averaging approach, JPM purportedly determined that implied volatility had fallen from approximately 47% to 35% after the August 7 tweet.  *Id.*  But even as of the date JPM sent Tesla its adjustment notice (August 17, 2018), Tesla's implied volatility was approximately 42%—over 7 percentage points higher than JPM's calculation.  *Id.*; *id.* ¶ 38 fig. 2.

At the same time, JPM's own equity-research department was telling the public that "any deal is potentially far from even being formally proposed" and that JPM had decided to "remove the 50% [probability] weighting [JPM] had briefly assigned to a going private transaction" because

no "formal proposal had been received," nor was Tesla's Board of Directors even "informally supportive" of any potential proposal. *Id.* ¶ 33.  Consistent with those views, no other dealer bank designated an Announcement Event based upon Mr. Musk's August 7 tweet.  *Id.* ¶ 35.

**E.      JPM Fails To Reverse The First Adjustment**

Even if JPM's first adjustment were proper (it was not), JPM should have reversed it after Mr. Musk's August 24 blog post, which came just days after JPM's first notice.  Countercls. ¶ 45.  Yet, when JPM notified Tesla of a second purported Announcement Event on August 29, it instead made a much smaller upward adjustment of approximately $60—to a new strike price of $484.35, still over $76 below the original agreed strike price.  *Id.* ¶ 46; Answer ¶¶ 34-35.

JPM's methodology for calculating the second adjustment was again not appropriate to account for the economic effect of Mr. Musk's decision that Tesla should remain public, which confirmed that there would be no ongoing economic effect from Mr. Musk's consideration of a potential take-private transaction.  Countercls. ¶¶ 48-49.  By design, however, the net effect of JPM's approach was to assume that Mr. Musk's brief consideration of a potential take-private transaction would have a permanent downward effect on the Warrants' value.  *Id.* ¶ 49.  But, in fact, there was no significant difference between Tesla's implied volatility in the weeks before Mr. Musk's August 7 tweet and the weeks after Mr. Musk announced that Tesla should stay public, less than three weeks later.  *Id.* ¶ 49; *id.* ¶ 10 fig. 1.  And with time, both Tesla's option-implied volatilities and its stock price soared to levels not seen during or before August 2018.  *Id.* ¶¶ 50-51.  By August 2020, the implied volatility observed in the Tesla options market exceeded 80%— approximately ***double*** the levels assumed by the second adjustment.  *Id.* ¶ 50 fig. 3; *id.* ¶ 51 fig. 4.  Yet as Calculation Agent, JPM stood by and made no further adjustments to the artificially deflated strike price.  *Id.* ¶ 52.

**F.     JPM Demands $162 Million Over The Billions Paid To It Under The Warrants**

When the Warrants began expiring on June 1, 2021, Tesla performed its contractual obligations in full by delivering a number of shares calculated based on the Warrants' strike price. *Id.* ¶ 54; Answer ¶ 43.  But JPM, relying on the improperly reduced strike price, demanded that Tesla deliver 228,775 additional shares.  Countercls. ¶ 55.  When Tesla refused, JPM purported to declare an Event of Default and to demand a $162 million cash payment from Tesla.  *Id.* ¶ 56; Answer ¶ 45.  JPM calculated the $162 million payment by valuing the demanded shares as of August 3, 2021, even though the Master Agreement required JPM to value them "as of the originally scheduled date for delivery," which had occurred in June and July 2021 when Tesla's share price was substantially lower.  Countercls. ¶ 57; Master Agmt. §§ 6(e), 14, at 27-28.  While JPM would later claim the August 3 valuation was appropriate due to the inclusion of a "Close-out Amount" in the calculation, its notice at the time stated the "Close-out Amount" in respect of the Event of Default was "*zero*."  Answer ¶ 46; Portnoy Decl. Ex. Q.

**G.     Relevant Procedural History**

JPM filed its $162 million lawsuit against Tesla, asserting one breach-of-contract claim based on Tesla's failure to deliver the additional 228,775 shares upon expiration of the warrants, on November 15, 2021.  ECF No. 1.  On January 24, 2022, Tesla answered JPM's complaint and counterclaimed for breach of contract and declaratory judgment.  ECF No. 17.  Tesla's breach-of-contract counterclaim asserts that JPM's adjustment to the strike price violated the Agreements because JPM failed to act in good faith and in a commercially reasonable manner to determine there was an Announcement Event and that JPM's adjustments were not made in good faith or in a commercially reasonable manner and did not appropriately account for the economic effect of any Announcement Event.  *See, e.g.*, Countercls. ¶ 64.  Tesla separately sought a declaratory judgment that: no Announcement Event occurred under the Confirmation on August 7, 2018;

JPM's breaches of the parties' Agreements each constituted an Event of Default under the ISDA Master Agreement; JPM's purported adjustment notices are null, void, and ineffective; and the strike price at the Warrants' expiration dates was not less, or significantly higher, than $112.12776 per share (*i.e.*, $560.6388 adjusted for Tesla's five-to-one stock split). *See, e.g.*, *id.* ¶ 69. JPM answered Tesla's counterclaims on February 21, 2022. ECF No. 22.

That same day, JPM filed a letter requesting a premotion conference. ECF No. 23. At the premotion conference, the Court expressed serious doubts about the merits of JPM's motion. The Court observed that "[JPM] has not cited any case suggesting that" the Court could "resolve as a matter of law, based on the pleadings, the issue of whether [JPM] did in fact act in good faith and in a commercially reasonable manner." Tr. 10:1-7, ECF No. 36. Those questions are ill suited for such resolution because, as the Court noted, "expert testimony regarding the custom in the industry appears necessary." *Id.* 11:10-23. "Given the parties' contentions regarding the commercial reasonableness of [JPM's] strike price adjustments, I believe that this issue is not susceptible to a motion for judgment on the pleadings." *Id.* 13:3:6. JPM nonetheless filed this motion.

## ARGUMENT

A plaintiff "is only entitled to judgment on the pleadings where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Melnitzky v. Jones*, 2008 WL 3884361, *7 (S.D.N.Y. Aug. 21, 2008). Judgment on the pleadings is "rarely granted and is not proper unless the movant clearly establishes that no material issue of fact remains to be resolved." *Integrated Mktg. & Promotional Sols., Inc. v. JEC Nutrition, LLC*, 2006 WL 3627753, *2 (S.D.N.Y. Dec. 12, 2006). "When a plaintiff is the movant, courts must accept all factual allegations in the answer and draw all reasonable inferences in favor of the defendants …." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021). Thus, "the plaintiff may not secure a judgment on the pleadings when the answer raises issues of

fact that, if proved, would defeat recovery." *Kondaur Capital Corp. v. Cajuste*, 849 F. Supp. 2d 363, 366 (E.D.N.Y. 2012). In respect of counterclaims, a motion for judgment on the pleadings must be denied if the pleading "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lively*, 6 F.4th at 301. Accordingly, the Court "must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Id*.

A Rule 12(c) motion is not appropriate to resolve issues forming only part of a claim or defense. *New York v. SCA Servs., Inc.*, 754 F. Supp. 995, 1000 (S.D.N.Y. 1991) ("Rule 12(f) 'serves as a pruning device' whereas Rule 12(c) is 'directed at gaining a final judgment on the merits'"). "That the Civil Rules explicitly provide for summary judgment on part of a claim under Rule 56(a) but not for judgment on part of a claim under Rule 12(c) counsels strongly against reading Rule 12(c) to implicitly permit such judgments." *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 894 (N.D. Ill. 2018). "Many courts," therefore, "have refused to entertain motions for judgment on the pleadings that seek to dispose of only a part of an individual claim or defense." *Erhart v. BofI Holding, Inc.*, 387 F. Supp. 3d 1046, 1063 (S.D. Cal. 2019).[2]

JPM's cursory case citations (Br. 9) are not to the contrary. In *Logical Operations, Inc. v. CompTIA, Inc.*, the court considered—and denied—a Rule 12(c) motion that requested a final declaratory judgment as to the plaintiff's rights and the defendant's alleged breach.

---

[2] *See, e.g.*, *Affordable Aerial Photography, Inc. v. Abdelsayed*, 2022 WL 1124795, *5 (S.D. Fla. Apr. 15, 2022) (declining to resolve parts of an issue or claim under Rule 12(c) because that rule, unlike Rule 56(a), does not "expressly allow[] for judgment on 'part of [a] claim or defense'"); *Living on the Edge, LLC v. Lee*, 2015 WL 12661917, at *4 (C.D. Cal. Aug. 25, 2015) (holding a party "cannot move for judgment on the pleadings with respect to less than a full cause of action"); *United States v. 2366 San Pablo Ave.*, 2013 WL 6774082, *1 (N.D. Cal. Dec. 23, 2013) (similar); *MCDP Phx. Servs. PTE. LTD. v. First Fin. Int'l Bank Inc.*, 2021 WL 4963370, *2 (D.P.R. Oct. 26, 2021) (similar); *Munro v. Fairchild Tropical Botanic Garden, Inc.*, 2021 WL 894380, *2 (S.D. Fla. Mar. 3, 2021) (similar).

2021 WL 1099619, *5 (W.D.N.Y. May 23, 2021).  In *Arista Records LLC v. Lime Group LLC*, the Court denied a Rule 12(c) motion, filed during the damages phase, because "the pleadings [we]re insufficient to establish all of the circumstances that might bear on" the damages award. 2011 WL 13257941, *2 (S.D.N.Y. Jan 7, 2011).  In *Lessambo v. PricewaterhouseCoopers, L.P.*, relied upon by *Arista*, the Court "granted *in its entirety*" a Rule 12(c) motion to dismiss several claims.  2009 WL 2170179, *1 (S.D.N.Y. June 29, 2009) (emphasis added).  These cases confirm that "a party may move for *judgment* on the pleadings," Fed. R. Civ. P. 12(c) (emphasis added), but not for piecemeal resolution of issues where "the pleadings are insufficient to establish all of the circumstances" necessary to enter judgment, *Arista*, 2011 WL 13257941, at *2.

Finally, on a Rule 12(c) motion, the Court "should remain within the non-movant's pleading." *Lively*, 6 F.4th at 305.  Thus, "courts may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice." *Id.* at 306 (original emphasis).  JPM improperly relies on treatises (Portnoy Decl. Exs. F, G), its own pleadings (*id.* Exs. R, S), and other extrinsic materials (*e.g.*, *id.* Exs. L, M, O-X, AA, BB) in its motion that should be disregarded.

I.    **JPM Cannot Show It Is Entitled To Judgment On The Pleadings For Its Breach-Of-Contract Claim**

To establish a breach-of-contract claim, JPM must show (1) a valid contract, (2) JPM's performance of its contractual obligations, (3) Tesla's breach, and (4) damages.  *Grewal v. Cuneo Gilbert & LaDuca LLP*, 2018 WL 4682013, *4 (S.D.N.Y. Sept. 28, 2018).  "Under New York law, breach of contract claims present mixed questions of law and fact." *Id.*  Here, JPM is required to prove, among other things, that it properly declared an "Announcement Event," that it appropriately adjusted the strike price, and that it otherwise performed its contractual obligations.

### A.     The Pleadings Do Not Establish That An "Announcement Event" Occurred

The pleadings do not establish that Mr. Musk's August 7, 2018 tweet and related statements constituted an "Announcement Event."  The parties advance hotly disputed allegations as to whether the relevant statements on and after August 7, 2018, satisfy any of the four circumstances that qualify as an Announcement Event.  These disputed facts cannot be resolved on the pleadings.

### 1.     Whether The August 7 Tweet Announced A Tender Offer Is A Disputed Fact

JPM's principal argument—that the August 7 tweet is an Announcement Event because it announced a Tender Offer, Br. 10-11—fails because JPM never pleaded it.  The Complaint alleges only that the August 7 tweet was "*either* 'the announcement by the Issuer of any intention to enter into a Merger Event or Tender Offer,' *or* at the very least, certainly 'the public announcement by Issuer of an intention to solicit or enter into, or to explore strategic alternatives …,'" Compl. ¶ 26 (emphasis added), referencing prongs of the Announcement Event definition that come after the Tender Offer prong.  The Court should reject this argument on JPM's pleading deficiency alone. *Catalano v. MarineMax*, --- F. Supp. 3d ---, 2022 WL 715465, *10 (E.D.N.Y. Mar. 10, 2022) ("[A]ssertions made in briefing [on Rule 12(c) motion] are not properly before the Court.").

But even putting aside JPM's pleading failure, the parties' respective allegations do not establish that Mr. Musk's August 7 tweet announced a qualifying "offer," "solicitation," or "proposal," let alone one that "resulted in" Mr. Musk obtaining the Tesla shares required to fall within the Tender Offer definition.  Equity Defs. § 12.1(d), *as modified by* Conf., at 8.  To the contrary, Mr. Musk ***never*** made a take-private proposal, explaining in an August 13 blog post that doing so "would be premature."  Countercls. ¶ 27.  JPM thus chose to not allege a Tender Offer for good reason—it is plain that one never occurred.

### 2. Whether Tesla Announced Any Intention To Enter Into A Tender Offer Is A Disputed Fact

JPM likewise cannot establish on the pleadings that there was an "announcement by [Tesla] of any intention to enter into a Merger Event or Tender Offer."  Br. 11.  The parties hotly dispute whether Mr. Musk's statements were attributable to Tesla—not least because Mr. Musk made clear (**before** the first adjustment) that he was considering taking Tesla private in his "personal capacity," ***not*** on Tesla's behalf.  Countercls. ¶ 26.  The ruling in *In re Tesla, Inc. Securities Litigation*, 477 F. Supp. 3d 903, 927 (N.D. Cal. 2020), that it had been "sufficiently alleged, for purposes of [a] motion to dismiss" that Mr. Musk's August 7 statements were actionable against Tesla under the federal securities laws, does not establish as a matter of law that the statements pertained to *Tesla's* intentions rather than *Mr. Musk's* intentions.  Moreover, neither the pleadings in this case nor the *Tesla Securities Litigation* decision establish that Mr. Musk, or anyone else at Tesla, announced "any intention to ***enter into*** … a Tender Offer."  Countercls. ¶ 29 (emphasis added).  Tesla's head of investor relations' statements about a third party's "firm offer" of "***financing***" for a potential take-private transaction does not establish that Tesla announced an intention to enter into a Tender Offer.  Answer ¶ 22.  Tesla's directors' statement that Mr. Musk "opened a discussion with the board about taking the company private," *id.* ¶ 23, does not establish that Tesla announced an intention to enter into a Tender Offer.  Nor does help received from Mr. Musk's colleagues in drafting an email describing his reasons for considering taking Tesla private establish that Tesla announced an intention to enter into a Tender Offer.  *Id.* ¶ 21.

### 3. Whether Tesla Announced An Intention To Explore Strategic Alternatives Is A Disputed Fact

JPM also fails to establish on the basis of the pleadings that Mr. Musk's statements constituted an announcement by Tesla "of an intention to … explore strategic alternatives." Br. 13.  Once again, JPM cannot establish as an undisputed fact that any alternatives that Mr. Musk

was exploring—expressly in his "personal capacity"—reflected an intention attributable to Tesla itself.  As for Tesla's Board of Directors, it did ***not*** announce an intention to explore strategic alternatives but rather "was merely preparing itself so that it would be appropriately positioned to discharge its fiduciary duties to the company" in relation to "any proposal that might be announced," and only "[i]f and when a final proposal is presented."  Countercls. ¶¶ 32, 27.  Far from believing that Tesla intended to explore strategic alternatives that might involve a Tender Offer, JPM ***itself*** concluded that Tesla's Board of Directors was not "even 'informally supportive' of any potential proposal."  *Id.* ¶ 33.  These allegations foreclose a determination on the pleadings that Tesla announced an intention "to explore strategic alternatives or other similar undertaking that may include, a … Tender Offer."  *Id.* ¶ 21.

### 4. Whether The August 24 Blog Post Was An Announcement Event Is A Disputed Fact

The parties agree that the August 24 blog post was an Announcement Event only if it announced a "change to a transaction" that constituted a previous Announcement Event.  *See* Br. 14.  Because Tesla disputes whether the August 7 tweet was an Announcement Event, whether the August 24 blog post is an Announcement Event is also disputed.

### B. JPM Cannot Establish From The Pleadings That It Acted In Good Faith And A Commercially Reasonable Manner In Declaring An "Announcement Event"

As the Court recognized at the premotion conference, JPM "has not cited case law suggesting that [the Court] can resolve the issue of good faith and commercial reasonableness in the context of a motion for judgment on the pleadings."  Tr. 11:10-13.  JPM's motion still cites no such case, which is unsurprising as the good-faith and commercial-reasonableness standards are both fact-bound determinations.  The express duty of good faith "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,

487 F.3d 89, 98 (2d Cir. 2007) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). "[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.* (quotation omitted). Commercial reasonableness is measured by an "objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry." *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 472 (S.D.N.Y. 2018). "[Q]uestions of commercial reasonableness are necessarily fact intensive." *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 2013 WL 1191895, *11 (S.D.N.Y. Mar. 22, 2013). Evidence of particular industry practice is often presented through experts. *See Holland Loader*, 313 F. Supp. 3d at 473 (plaintiff established "the objective standard by which Defendant's efforts are to be judged" through expert testimony).

JPM seeks to sidestep the vigorous factual disputes over whether it acted in good faith and in a commercially reasonable manner by contending that "the contract does not grant [JPM] … responsibility for making th[e] determination" whether an Announcement Event occurred. Br. 13. But JPM is wrong. When the Warrants provide that JPM may perform a Modified Calculation Agent Adjustment, that presupposes that JPM has determined that an Announcement Event to have occurred. *See* Conf., at 9 ("Consequences of Announcement Events"). And, indeed, JPM is expressly tasked with making determinations as to the existence of certain types of Announcement Events, which makes no sense if it is not equally tasked with determining the others as well. *See* Equity Defs. § 12.1(d) (defining Tender Offer as an event resulting in acquisition of certain percentage of outstanding shares "as determined by the Calculation Agent"), *as modified by* Conf., at 9. Moreover, whenever JPM "is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner." Equity Defs. § 1.40. This mandate is

certainly broad enough to encompass JPM's decision to make a precipitous determination that an Announcement Event had occurred rather than simply waiting to see how the rapidly developing events around Mr. Musk's consideration of a take-private transaction played out.  By pleading that "JPM did not have a good faith belief" at the time of the first adjustment notice that the take-private statements were Announcement Events because JPM had concluded that "any deal is potentially far from even being formally proposed" (Countercls. ¶¶ 33-34), Tesla has raised a factual dispute that precludes finding at this stage that JPM made the first adjustment in good faith.

But even further, Tesla alleges that JPM's rush to declare an Announcement Event was not commercially reasonable given the substantial uncertainty over whether any take-private transaction would be pursued and given that the Warrants were long-dated and would not mature for nearly three years.  Countercls. ¶ 37.  In that regard, as the Court anticipated in noting that "I suspect expert discovery will be necessary before the parties' dispute can be resolved," Tesla expects to proffer the expert testimony of Steven Halperin, the former Americas Head of Equity-Linked and Hybrid Solutions at Barclays Capital, one of the dealer banks holding Tesla warrants. Halperin Aff. ¶ 7.[3]  As Mr. Halperin is anticipated to testify, JPM's rush to declare an Announcement Event was inconsistent with custom and practice in the equity-derivatives market and it would have instead been customary for JPM to have taken a wait-and-see approach—as Mr. Halperin and Barclays, in fact, did.  Id. ¶¶ 3(a), 23.  Mr. Halperin's opinion will be further supported by Tesla's allegations that no other dealer bank holding the same or similar Tesla warrants designated Mr. Musk's tweet as an Announcement Event, notwithstanding that each of the dealer banks had the same Calculation Agent duties as JPM.  Countercls. ¶ 35.

---

[3] As noted above, the record on a Rule 12(c) motion is limited to the documents that qualify as part of Tesla's pleading.  *See Lively*, 6 F.4th at 306.  If, however, the Court considers extrinsic material, it should also consider Mr. Halperin's affidavit.

The fact that JPM acted too precipitously is also demonstrated, somewhat ironically, by its own newfound embrace of the "Agreed Model," which presumes (as discussed further below) that no Announcement Event calculations will be performed sooner than "15 Exchange Business Days" after the event at issue.  Equity Defs. § 12.7(b)(i)(B)(2).  Had JPM simply waited the 15 business days that the model it claims to be market standard presumes, JPM would have known that Tesla would remain public before any calculations were performed, thus eliminating any reason for an adjustment at all.  Each of these factual disputes render JPM unable to establish on the pleadings that its determination of an Announcement Event was in good faith and commercially reasonable.

### C.    JPM Cannot Establish From The Pleadings That Its Adjustment Calculations Complied With Its Contractual Obligations Under The Warrants

Similarly, JPM cannot show on the pleadings that it performed its obligations to make an adjustment that appropriately accounts for the economic effect of any Announcement Event on the Warrants or that it did so in good faith and in a commercially reasonable manner.

*First*, the Warrants require that any adjustment by JPM be "appropriate to account for the economic effect on the Transaction" of the related Announcement Event.  Equity Defs. § 12.3(d). Here, JPM cannot show that its adjustment appropriately accounted for any economic effect of the take-private statements because Tesla plausibly alleges that economic effect was nil.

As Tesla alleges, under the Confirmation, the economic value of the Warrants was based on the excess of Tesla's volume-weighted average stock price in 2021 compared to the strike price. Countercls. ¶ 37.  This was not impacted by any brief alleged fluctuations in volatility three years earlier.  *Id.*  Indeed, there was no significant difference in Tesla's implied volatility in the weeks before the August 7 tweet and its implied volatility in the weeks after the August 24 blog post.  *Id.* ¶ 49; *see also id.* ¶ 10 fig. 1.  Given that Tesla's implied volatility returned to near-identical levels soon after the take-private statements, Tesla has presented well-pleaded allegations that JPM's

17

near-$80 net adjustment to the strike price bore no relationship to any actual "economic effect" on the Warrants from the take-private statements.  Countercls. ¶ 40.  These allegations are not, as JPM contends (Br. 20-21), mere quibbles that JPM "could have looked at different data points from after the Adjustments were made."  To the contrary, these facts show that the momentary dip in volatility had no long-term impact on the Warrants.

*Second*, JPM again tries to avoid the plain factual dispute over its good faith and commercially reasonable conduct by asserting that the Agreements set forth an "accepted commercial practice"—the "Agreed Model"—that JPM followed.  Br. 17-18.  But that brand-new assertion cannot resolve these questions on the pleadings for several reasons.  To begin, JPM nowhere even mentions the Agreed Model in its Complaint, let alone it being the basis for JPM's calculation.  Instead, JPM pleaded only that its calculation was "consistent with *its* standard practice," (Compl. ¶¶ 28-29) (emphasis added), which Tesla denies (Answer ¶¶ 28-29).  Though it appears (for reasons that discovery may reveal) that JPM is now distancing itself from those allegations, JPM cannot rely on the unpled assertion—that its calculations were implementing the Agreed Model—to support a judgment on the pleadings.  *Catalano*, 2022 WL 715465, *10.

In any event, the Agreed Model does not apply here because it applies only "if 'Agreed Model' is specified in the related Confirmation."  Equity Defs. § 12.7(b)(i).  The Confirmation here makes no such specification.  And even when the Agreed Model is specified, it applies only to a particular type of calculation for "Cancellation and Payment," which is not at issue here.  *See id.* § 12.7(a).  But even if JPM were correct that the Agreed Model set out the methodology that JPM was supposed to follow, the pleadings show that JPM did not follow it.  For example, JPM's brief artfully elides the required evaluation time period applicable under the Agreed Model.  JPM states that the Agreed Model measures changes in volatility based on

> the difference in "a volatility equal to the average of the Implied Volatilities of the relevant Shares" *for a period* "ending on but excluding the Announcement Date, and *for a period* "commencing on and including the Announcement Date."

Br. 17 (quoting Equity Defs. § 12.7(b)(i)(A)(1)(a), (B)(1)(a)) (emphasis added).  But what the

Equity Definitions actually state is that changes in volatility are measured by determining

> the difference in "a volatility equal to the average of the Implied Volatilities of the relevant shares *on each of the 15 Exchange Business days* ending on and including the Closing Date" and "*on each of the 15 Exchange Business Days* ending on but excluding the Announcement Date"

Equity Defs. § 12.7(b)(i)(A)(1)(a), (B)(1)(a).   Here, JPM did *not* measure volatility over

15 Exchange Business Day periods.  Instead, for the first adjustment, JPM compared implied

volatility over a 30-business-day period before (and excluding) August 7 with a 7-business-day

period after (and including) August 7.  Countercls. ¶ 38; Compl. ¶ 28; Halperin Aff. ¶ 32.  For the

second adjustment, JPM compared Tesla's implied volatility over a 7-business-day period before

(and including) August 24 with a 3-business-day period after (and excluding) August 24.

Countercls. ¶ 48; Compl. ¶ 33; Halperin Aff. ¶ 32.  JPM thus chose a hodgepodge of cherrypicked

time periods that have no reference to an objective standard.  This difference is meaningful, as

Tesla expects to show through Mr. Halperin's expert testimony that changing the JPM

methodology to use the 15-business-day time periods in the Agreed Model would have resulted in

an adjusted strike price of approximately $547 (an approximately $14 or 2.5% reduction in the

original strike price).  Halperin Aff. ¶ 33.  JPM's methodology with its cherrypicked time periods,

by comparison, produced a final strike price of $484.35 (an approximately $76 or 13.5% reduction

in the original strike price).   Countercls. ¶ 47.  JPM's modification of the Agreed Model in a

manner that inflated the change in strike price by over 400% itself demonstrates the JPM's

adjustments were neither in good faith nor commercially reasonable.

By the same token, JPM's contention that "there is market data supporting [JPM's] determinations" (Br. 20) presents a classic fact dispute.  Tesla plausibly alleges that the same market data shows no economic effect on the Warrants.  And, ultimately, whether it was the practice in the industry for a calculation agent like JPM to isolate a short-lived fluctuation in volatility years before the Warrants' expiration to permanently reduce the strike price is not answered by JPM's disputed assertion that the market data supported its position.  *See* Tr. 11:14-15 ("[E]xpert testimony regarding the custom in the industry appears necessary.").

As for questions about JPM's good faith, JPM fails to identify any undisputed facts that would defeat Tesla's claim that JPM engaged in a "scheme to deprive [Tesla] of the fruit of its bargain."  Br. 18-19.  Whether JPM had "control over whether announcements were made" or "the market reaction that determined the size of the adjustments," Br. 18, does not matter.  What matters is that JPM controlled when it made the adjustment and what it determined to be the "economic effect" reflected by the adjustment.  And when JPM took those actions to "unilaterally reduc[e] the Strike Price in 2018," "JPM deprived Tesla of the benefit of its bargain" by "eliminat[ing] much of the Call Spread payoff that Tesla had paid for in 2014."  Countercls. ¶ 41.  JPM is wrong that its motive is irrelevant (Br. 19): whether a party acted in good faith "necessitates examination of a state of mind."  *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485, 487 (1st Dep't 2011); *Tractebel Energy*, 487 F.3d at 100 n.8 ("[W]hether [defendant] acted in good faith … is an issue entirely tied to motive.").[4]

---

[4] JPM's authority (Br. 19) is not to the contrary.  *Gaia House Mezz LLC v. State Street Bank & Trust Co.* stands for the unremarkable principle that the implied covenant of good faith and fair dealing may not impose an obligation that would be inconsistent with other terms in the contract. Thus, an improper motive cannot convert a valid exercise of a contract right into a breach.  But where, as here, the right itself expressly can be exercised only if done in good faith, state of mind is not just relevant, but critical.  *See S.A. De Obras y Servicios, COPASA v. Bank of N.S.*,

II.     **JPM Cannot Establish From The Pleadings That Tesla's Counterclaims Should Be Dismissed**

JPM is equally unable to show on the pleadings that Tesla's counterclaims should be dismissed.  JPM's assertions that (i) Tesla fails to allege any breach by JPM, (ii) fails to allege any injury, and (iii) has no need for declaratory relief are each meritless.

A.     **Tesla Sufficiently Pleads JPM's Breach**

As addressed *supra*, JPM has not met its burden to demonstrate as a matter of law that an Announcement Event occurred, that its adjustments appropriately accounted for the economic effects on the Warrants, or that it acted in good faith and in a commercially reasonable manner. JPM's remaining arguments that Tesla fails to plead breach are similarly unfounded.

*Inflating the Early Termination Amount*.  JPM seeks to introduce extraneous and disputed facts to argue that Tesla has not sufficiently pleaded that JPM's inflation of the Early Termination Amount breached the Warrants.  Br. 23.  Even assuming that Tesla owed JPM an additional 228,775 shares when the Warrants expired (it did not), the Master Agreement required that JPM value the undelivered shares as "of the originally scheduled date for delivery."  Countercls. ¶ 58; Master Agmt. §§ 6(e), 14, at 27-28.  Instead, JPM improperly valued all of the undelivered shares as of August 3, 2021, exploiting a significant rise in Tesla's share price after the delivery dates. Countercls. ¶ 58.  Based on these facts, Tesla alleges that JPM's $162.2 million cash demand breached the parties' agreement.  *Id.*

For the first time in its Rule 12(c) motion, JPM asserts that this $162.2 million was not improperly inflated but rather included a "Close-out Amount" in respect of the additional cost to

170 A.D.3d 468, 474 (1st Dep't 2019) ("The question of whether a party has negotiated in good faith, which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment.").

JPM in acquiring the shares on August 3.[5]   Once again, JPM cannot rely on unpled assertions—
*i.e.,* that its calculation included a Close-out Amount—in its  motion for judgment on the pleadings.
*Catalano*, 2022 WL 715465, *10.  If the Court were to consider this assertion, however, it is flatly
contradicted by JPM's August 4, 2021 notice explaining its calculation of the Early Termination
Amount.  In that notice, JPM stated unequivocally, "[a]s the Warrant Transactions have expired,
Dealer, as Determining Party, has determined that ***the Close-out Amount is zero***" (and conversely
that the entirety of the $162.2 million had been "determined" to be "Unpaid Amounts").  Portnoy
Decl. Ex. Q. (emphasis added).   JPM now tries to explain this flat contradiction, without any
factual support, as mere "inadverten[ce]."   Br. 23  n.13.   But, of course, whether JPM's
representation that the Close-out Amount was zero was inadvertence or rather reflective of JPM's
actual determination is a classic question of disputed fact that cannot be resolved on the pleadings.

     ***Failure To Terminate The Warrants***.  JPM offers two cursory arguments (Br. 23-24) in
response to Tesla's allegations in the alternative that, if the Court finds JPM to have properly
designated an Announcement Event, then JPM breached the parties' agreement by failing to
determine that no adjustment would reach a commercially reasonable result.  Both arguments fail
to demonstrate as a matter of law that Tesla has failed to state a claim.

     *First*, JPM asserts that Tesla waived any right to bring this claim by not noticing an Event
of Default.  Br. 23.  This ignores the agreement's clear no-waiver provision, which states that "[a]
failure or delay in exercising any right, power or privilege in respect of this Agreement will not be
presumed  to  operate  as  a  waiver…."   Master  Agmt. § 9(f).   Under  New  York  law,  an

---

[5] JPM cites to paragraph 46 of its Complaint to support this assertion.  Not only is JPM's Complaint
not properly considered on this motion (*see Lively*, 6 F.4th, at 306), paragraph 46 does not allege
that any amounts were a Close-out Amount.  *See* Compl. ¶ 46.  And the August 4, 2021 notice
expressly stated that the Close-out Amount was zero.  *See* Portnoy Decl. Ex. Q.

"unambiguous non-waiver clause … [is] uniformly enforced." *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007).  Thus, JPM's waiver argument fails.

*Second*, JPM offers the circular argument that JPM could not have breached its obligation to notify Tesla that "no adjustment that [JPM] could make … will produce a commercially reasonable result" because it is the Calculation Agent that makes that determination in the first place and "JPMorgan never reached that determination."  Br. 23-24.  But, whatever views JPM did or did not form in respect of the commercial reasonableness of its adjustments cannot be established on the pleadings.  And, Tesla has more than sufficiently alleged that JPM had reason to believe that its adjustments were not commercially reasonable, thus presenting a disputed issue of fact precluding dismissal of Tesla's breach claim.  *See* Countercls.  ¶¶ 42-44 (alleging JPM "believed that it was 'premature' to make any adjustment" and "knew when it issued the First Adjustment Notice that any adjustment it could make would only deliver a commercially reasonable windfall to JPM").

### B.    Tesla's Defense Costs Are Cognizable Damages

JPM also fails to demonstrate on the pleadings that Tesla's claim for payment of its defense costs are not cognizable.  Br. 24.  Because JPM breached the Agreements, it is a Defaulting Party under the Master Agreement and is therefore required to indemnify Tesla for all reasonable out-of-pocket expenses, including legal fees and costs of collection.  *See* Countercls. ¶ 65.  JPM's assertion (Br. 24) that it is not liable for indemnity because it did not receive notice of its breach is factually wrong.  In fact, Tesla has repeatedly informed JPM that its adjustments were in breach of the Warrants' terms.  Countercls. ¶ 59 ("Since August 2018, Tesla has disputed JPM's purported adjustments to the Strike Price and has given JPM numerous opportunities to provide a satisfactory explanation for its actions or to cure its breaches of the Agreements."); *see also* Answer ¶¶ 38-40 (discussing various Tesla communications to JPM).  Because JPM failed to cure its breach

following these notices—and instead cynically sought to extract a further windfall by manipulating the Early Termination Date—JPM is a defaulting party and liable for Tesla's defense costs. *See* Master Agmt. § 5(a)(ii)(1) (failure to remedy breach within 30 days of notice puts party in default); *id.* § 11 ("A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees ….").

### C.  The Voluntary-Payment Doctrine Does Not Bar Recovery

JPM also fails to establish on the pleadings that Tesla's claim in the alternative for breach is barred by the voluntary-payment doctrine. Br. 24-25. That doctrine "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003). Here, Tesla paid shares to JPM upon expiration of the Warrants based on the belief that there was no Announcement Event. If the Court finds (contrary to Tesla's belief) that an Announcement Event occurred, then Tesla will seek to establish in the alternative that JPM was obligated to terminate the Warrants because no adjustment JPM could have made would have produced a "commercially reasonable result." *See* Equity Defs. § 12.3(d). Under that scenario, the voluntary-payment doctrine would not preclude Tesla's claim, as Tesla's payment of shares to JPM would have been made under the *mistaken* belief that no Announcement Event had occurred.

JPM offers nothing to support why Tesla's payment based on the belief there was no Announcement Event would not constitute a material mistake of fact or law. Instead, JPM appears to argue that because Tesla is a "sophisticated party," no circumstances would permit it to avoid the voluntary-payment doctrine based on a mistake. That is not the law, and JPM's authority is not to the contrary. In *Beltway 7 & Properties, Ltd. v. Blackrock Realty Advisers, Inc.*, the First Department disposed of the plaintiff's mistake theory "fairly easily" because it was inconsistent with plaintiff's allegations that it had timely protested the payment and because plaintiff had failed

to allege sufficient facts to support its position.  167 A.D.3d 100, 105 (1st Dep't 2018).  JPM makes neither argument here.  Likewise, in *Turner Network Sales, Inc. v. Dish Network*, this court applied the voluntary-payment doctrine where plaintiff "has for years remitted voluntary payments pursuant to an understanding of its legal obligations" so that its "lack of diligence in determining what its contractual rights were preclude[d] recoupment of the voluntarily remitted funds."  413 F. Supp. 3d 329, 340-41 (S.D.N.Y. 2019) (quotation omitted).  Again, JPM does not contend that Tesla made payments for years or that there was otherwise any "lack of diligence" in Tesla's consideration of whether an Announcement Event occurred.

### D.      JPM Fails To Show Tesla's Declaratory-Judgment Claim Is Duplicative

JPM offers no explanation why it contends that Tesla's declaratory-judgment claim is "duplicative" of its Complaint.  Br. 25.  JPM's breach claim seeks to recover for the Early Termination Amount of $162,216,628.81.    Tesla's declaratory-judgment claim seeks determinations that may not be resolved by JPM's breach claim.  For example, Tesla's declaratory-judgment claim seeks a determination that "the Strike Price at the Warrants' expiration dates was not less, or significantly higher, than $112.12776 per share (*i.e.*, $560.6388 adjusted for Tesla's five-to-one stock split)."  Countercls. ¶ 69.  The determination of the final strike price could entitle Tesla to additional recoveries.  The Court may resolve JPM's breach claim without ever reaching the strike price if, for example, the Court determines that there was no Announcement Event.  Because resolving JPM's breach claim will not necessarily settle one or more of the issues for which Tesla seeks declaratory judgment, dismissal based on duplication is unwarranted.

### **<u>CONCLUSION</u>**

For all these reasons, JPM's motion for judgment on the pleadings should be denied.

Dated: New York, New York
   June 23, 2022

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP

By: _____

Alex Spiro
Jonathan E. Pickhardt
Nathan Goralnik
Evan Hess
Jesse Bernstein

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

alexspiro@quinnemanuel.com
jonpickhardt@quinnemanuel.com
nathangoralnik@quinnemanuel.com
evanhess@quinnemanuel.com
jessebernstein@quinnemanuel.com

*Counsel for Tesla, Inc.*