UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JPMORGAN CHASE BANK, N.A.,
LONDON BRANCH,

                              Plaintiff,

            - against -

TESLA, INC.,

                              Defendant.

**MEMORANDUM**
**OPINION & ORDER**

21 Civ. 9441 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff JPMorgan Chase Bank, N.A. ("JPM") held warrants to purchase shares

in Defendant Tesla, Inc., and attempted to exercise the warrants in 2021.  After Tesla refused to

permit JPM to exercise the warrants, it brought this action, seeking damages for breach of

contract.  JPM has moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).  (Mot. (Dkt. No. 45))

For the reasons stated below, JPM's motion for judgment on the pleadings will be

denied.

## BACKGROUND

### I.    FACTS[1]

#### A.    The Parties and the 2017 Warrant Agreements

Plaintiff JPM is a national banking association headquartered in Columbus, Ohio.

(Cmplt. (Dkt. No. 1) ¶ 6; Answer and Counterclaim (Dkt. No. 17) at 27)  Defendant Tesla is a

---

[1]  Unless otherwise noted, the Court's factual statement is drawn from Defendant's Answer and
Counterclaim (Dkt. No. 17), from paragraphs of the Complaint that are admitted in the Answer,
and from the operative warrant agreements (Dkt. Nos. 30-1 to 30-5).  Well-pled "denials and
allegations" in Defendant's pleading are presumed true for purposes of resolving JPM's motion

Delaware corporation.[2]  (Cmplt. (Dkt. No. 1) ¶ 7; Answer and Counterclaim (Dkt. No. 17) at 27)

At all relevant times, Elon Musk was the chief executive officer of Tesla, the chair of its board of

directors, and the company's largest shareholder.  (Cmplt. (Dkt. No. 1) ¶ 20; Answer and

Counterclaim (Dkt. No. 17) at 29)

        In 2014, Tesla retained JPM to serve as the underwriter for Tesla in a financial

transaction.  (Answer and Counterclaim (Dkt. No. 17) at 7-8)

        On February 27, 2014 and March 28, 2014 – as part of the larger transaction –

JPM purchased stock warrants from Tesla.[3]  (Cmplt. (Dkt. No. 1) ¶ 12; Answer and

Counterclaim (Dkt. No. 17) at 8, 28)  JPM's warrants are governed by warrant agreements that

were executed on February 27, 2014 and March 28, 2014:  (1) the Base Warrant Confirmation,

dated February 27, 2014; and (2) the Additional Warrant Confirmation, dated March 28, 2014

---

for judgment on the pleadings.  Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 301,
305 (2d Cir. 2021) (accepting "the non-movant's pleading as true").  Where, as here, a plaintiff
has moved for judgment on the pleadings, courts consider the defendant's "answer, along with
any attached written instruments or other matters of which courts can take judicial notice."  Id. at
305.

[2] The Complaint alleges that Tesla has its principal place of business in Palo Alto, California.
(Cmplt. (Dkt. No. 1) ¶ 7)  The Answer denies this allegation.  (Answer and Counterclaim (Dkt.
No. 17) at 27)

[3]  Stock warrants authorize a buyer to purchase shares in a corporation, at a designated "strike
price," on a designated date or during a designated time period, in exchange for a premium paid
upfront.  (See Cmplt. (Dkt. No. 1) ¶ 13; Answer and Counterclaim (Dkt. No. 17) at 2, 28)  Here,
the warrants provide that if Tesla's stock price is greater than the strike price on the expiration
dates of the warrants – between June 1, 2021 and July 27, 2021 – Tesla is obligated to deliver
"cash" or "shares" of its stock equal to the difference in those prices.  (Feb. 27, 2014 Warrant
Agreement (Dkt. No. 30-4) § 2 at 7-8; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 2 at
7-8)  If Tesla's stock price is below the strike price, neither party owes anything to the other.
(See Cmplt. (Dkt. No. 1) ¶ 13)

(together, the "Warrant Agreements").[4]  (Answer and Counterclaim (Dkt. No. 17) at 8; Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4); Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5)) The Warrant Agreements give JPM the right to purchase Tesla stock at a designated strike price during the period between June 1, 2021 and July 27, 2021.  (Answer and Counterclaim (Dkt. No. 17) at 8)

In the Warrant Agreements, the strike price is set at $560.6388.  (See Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 2 at 3; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 2 at 3)  As a "[c]onsequence[] of [an] Announcement Event[]," however, the Warrant Agreements authorize JPM to make a "Modified Calculation Agent Adjustment [to the strike price] as set forth in Section 12.3(d) of the [ISDA] Equity Definitions."  (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 2 at 10; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 2 at 10; see 2002 ISDA Equity Definitions (Dkt. No. 30-2) § 12.3(d) at 53-54)

Section 2 of the Warrant Agreements defines the term "Announcement Event" as follows:

(1) an "announcement by [Tesla] of any intention to enter into a Merger Event or Tender Offer";

(2) a "public announcement by [Tesla] of an intention to solicit or to enter into, or to explore strategic alternatives or other similar undertaking that may include, a Merger Event or Tender Offer"; or

---

[4]  The Warrant Agreements incorporate form definitions set forth in the 2006 International Swaps and Derivatives Association ("ISDA") Definitions (the "ISDA Definitions") and the 2002 ISDA Equity Derivative Definitions (the "ISDA Equity Definitions").  (See Answer and Counterclaim (Dkt. No. 17) at 8; Pltf. Apr. 12, 2022 Ltr., Ex. C (ISDA Definitions) (Dkt. No. 30-3); id., Ex. B (ISDA Equity Definitions) (Dkt. No. 30-2))  The Warrant Agreements are also governed by the standard form ISDA Master Agreement.  (Id., Ex. A (ISDA Master Agreement) (Dkt. No. 30-1))  ISDA is a trade organization that publishes standardized contracts and definitions "regularly used to govern . . . derivatives transactions."  See, e.g., In re Lehman Bros. Holdings Inc., 970 F.3d 91, 96 n.3 (2d Cir. 2020).

(3) "any subsequent public announcement of a change to a transaction or intention that is the subject of [such] announcement . . . (including . . . the announcement of a withdrawal from, or the abandonment of discontinuation of, such a transaction or intention); provided that, for the avoidance of doubt, the occurrence of an Announcement Event with respect to any transaction or intention shall not preclude the occurrence of a later Announcement Event with respect to such transaction or intention."

(Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 2 at 10; Mar. 28, 2014 Warrant Agreement

(Dkt. No. 30-5) § 2 at 10)

After an Announcement Event occurs, the ISDA Equity Definitions – as incorporated in the Warrant Agreements – authorize JPM to

(A) make such adjustment to the exercise, settlement, payment or any other terms of the [stock warrant transaction] as [JPM] determines appropriate to account for the economic effect on the [stock warrant transaction] of such [Announcement Event] and

(B) determine the effective date of that adjustment.

(ISDA Equity Definitions (Dkt. No. 30-2) § 12.3(d) at 53)

The Warrant Agreements and the ISDA Equity Definitions do not specify the methodology that JPM should use in making an adjustment to the terms of the stock warrants, including any adjustment to the strike price. The parties' agreements merely provide that "all determinations made by [JPM] shall be made in good faith and in a commercially reasonable manner." (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 3 at 12; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 3 at 12; see also ISDA Equity Definitions (Dkt. No. 30-2) § 1.40 at 18 (providing that "[w]henever [JPM] is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner"))

B.      **The Alleged "Announcement Events"**

The Complaint alleges that in August 2018 Tesla and Musk made several public statements expressing their intention to convert Tesla from a public to a private company.  (See Cmplt. (Dkt. No. 1) ¶¶ 19-24, 31; Answer and Counterclaim (Dkt. No. 17) at 10-11, 29-31)[5]

On August 7, 2018, at about 12:48 p.m. Eastern Daylight Time, Musk posted the following message on his Twitter account:  "Am considering taking Tesla private at $420. Funding secured."  (Pltf. Br., Ex. I (Dkt. No. 47-9); see also Answer and Counterclaim (Dkt. No. 17) at 10)

That same day, Musk sent an internal email to Tesla employees, in which he repeated that he was "considering taking Tesla private."  (Pltf. Br., Ex. K (Dkt. No. 47-11) at 1) That email – which was later posted on Tesla's website as a blog post entitled "Taking Tesla Private" – reads as follows:

> August 7, 2018
>
> The following email was sent to Tesla employees today:
>
> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share.  I wanted to let you know my rationale for this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. . . .
>
> Here's what I envision being private would mean for all shareholders, including all of our employees.
>
> First, I would like to structure this so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%).  My hope is for all shareholders to

---

[5]  Tesla does not dispute that Musk made these statements, but does dispute that all of Musk's statements can be attributed to Tesla.  (Answer and Counterclaim (Dkt. No. 17) at 29-31; Def. Opp. (Dkt. No. 48) at 17-18)

remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. . . .

Thanks,

Elon

(Id. at 1-2)

In a 3:36 p.m. tweet, Musk "elaborated on his plans to take Tesla private." He also stated that "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." (Pltf. Br., Ex. J (Dkt. No. 47-10)) At the bottom of the tweet, Musk provided a link to the "Taking Tesla Private" blog post on Tesla's website. (Id.)

After Musk issued these statements, Martin Viecha – "Tesla's head of investor relations" – received "inquiries," including from a Tesla investor. (Answer and Counterclaim (Dkt. No. 17) at 30) Viecha had the following exchange with the Tesla investor:

Viecha: Hey, I'm on a plane to NYC. I'm online though. Did you read our official blog post on this topic?

Investor: I did. Nothing on funding though?

> Viecha:  The very first tweet simply mentioned "Funding secured" which means there is a firm offer.  [Musk] did not disclose details of who the buyer is.
>
> Investor:  Firm offer means there is a commitment letter or is this a verbal agreement?
>
> Viecha:  I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets.

(Pltf. Br., Ex. L (Dkt. No. 47-12))

On August 8, 2018 – the next day – six members of Tesla's board of directors "issued a press release confirming that . . . [the board] had . . . begun exploring a plan to go private," and that it had done so even before Musk's August 7, 2018 tweet.  (Pltf. Br., Ex. M (Dkt. No. 47-13))  The Tesla Board's press release was posted on Tesla's website and reads as follows:

> Last week, Elon [Musk] opened a discussion with the board about taking the company private.  This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur.  The board has met several times over the last week and is taking the appropriate next steps to evaluate this.

(Id.)

In an August 13, 2018 tweet, Musk stated:  "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."  See @ElonMusk, X (Aug. 13, 2018, 9:02 PM), https://x.com/elonmusk/status/1029171381584314368.

That same day, Musk posted a message on Tesla's website stating that – as he had announced on August 7, 2018 – "he had been considering a potential take-private transaction," but had done so "in his 'personal capacity,'" and was "'speaking for [him]self as a potential

7

bidder.'" (Answer and Counterclaim (Dkt. No. 17) at 10 (quoting Musk's August 13, 2018 blog post))[6]

In an August 14, 2018 press release, Tesla's board of directors announced that it "formed a special committee . . . to act on behalf of [Tesla] in connection with Elon Musk's previously announced consideration of a transaction to take [Tesla] private." (Pltf. Br., Ex. W (Dkt. No. 47-23) at 1) The "special committee has the full power and authority of the Board of Directors . . . to evaluate and negotiate a potential [g]oing [p]rivate transaction and alternatives to any transaction proposed by [] Musk." (Id.)

### C.    **Strike Price Adjustments**

On August 17, 2018 – in response to Musk's August 7, 2018 tweet and the statements from Tesla's Board indicating that Musk and the Board were considering a going-private transaction – JPM reduced the strike price in its warrants from $560.6388 to $424.66. (Answer and Counterclaim (Dkt. No. 17) at 11)

To calculate the new strike price, JPM compared "the averages of implied volatility" of Tesla's stock over thirty business days prior to Musk's August 7 tweet to "the average implied volatility" of Tesla's stock over the seven business days that followed Musk's tweet.[7] (Cmplt. (Dkt. No. 1) ¶¶ 25, 28-29; Answer and Counterclaim (Dkt. No. 17) at 13-14)

---

[6] The parties have not submitted a copy of the August 13, 2018 blog post, nor is the blog post available on Tesla's website. Accordingly, this Court has relied on Tesla's characterization of the post. See Lively, 6 F.4th at 305 (where plaintiff is moving for judgment on the pleadings, this Court is to "consider the answer" and "draw[] all reasonable inferences in favor of the defendant[], who [is] the non-movant[]").

[7] The Complaint states that a "critical input" in the Black-Scholes model used to price warrants is the "[i]mplied volatility" of the stock at issue. According to the Complaint, "implied volatility measures the market's "expect[ation]" of a company's stock price "over the life of the [warrant]." (Cmplt. (Dkt. No. 1) ¶ 25 n.4) Tesla disputes JPM's characterization of the variables of the Black-Scholes model (Answer and Counterclaim (Dkt. No. 17) at 30) and – as discussed

According to JPM's analysis – which is premised on "certain call options on Tesla's stock" – the "implied volatility [of Tesla's stock] had fallen from approximately 47% to 35% after Mr. Musk's tweet on August 7, 2018. JPM then used the alleged drop in expected future volatility to rationalize its calculation of the purported First Adjustment in Strike Price." (Answer and Counterclaim (Dkt. No. 17) at 13-14)

In an August 17, 2018 letter, JPM notified Tesla that – "as a result of the public statements with respect to the Issuer and the Shares beginning on August 7, 2018" – an Announcement Event had occurred within the meaning of the Warrant Agreements, and that "the appropriate adjustment to each 2021 Warrant Transaction [was] a reduction of the Strike Price from $560.6388 to $424.66." (Id. at 11) (internal quotation marks omitted) According to Tesla, "[b]y drastically overestimating any alleged change in Tesla's implied volatility, JPM calculated a First Adjustment that was commensurately inflated." (Id. at 14)

In an August 24, 2018 blog post on Tesla's website that is entitled "Staying Public," Musk announced that "he believed Tesla should remain a public company," and that he had decided not to pursue "the take-private transaction." (Id. at 17) That blog post, in relevant part, reads as follows:

> Earlier this month, I announced that I was considering taking Tesla private. As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla. . . .
>
> After considering [many] factors, I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public. The Board indicated that they agree.

(Pltf. Br., Ex. N (Dkt. No. 47-14) at 2-3)

---

below – JPM's application of the implied volatility principle to its August 15, 2018 and August 29, 2018 adjustments.

On August 29, 2018 – in response to Musk's August 24, 2018 post – JPM again adjusted the strike price in its warrants, increasing the strike price from $424.66 to $484.35. (Answer and Counterclaim (Dkt. No. 17) at 17)  In making this second adjustment, JPM compared the average implied volatility of Tesla's stock for the nine days before the blog post to the average implied volatility of the stock for three days after the blog post.  (See id. at 17-18; Cmplt. (Dkt. No. 1) ¶¶ 33-34)  JPM claimed that the average implied volatility increased between "the days before and shortly after [Musk's] August 24, 2018" blog post.  (Id. at 17)

JPM made the second adjustment effective on August 29, 2018, and provided notice to Tesla of the adjustment that same day.  (Id.)

In a February 13, 2019 letter to JPM, Tesla objects to both of JPM's adjustments to the strike price.  (See Tesla Feb. 13, 2019 Ltr. (Dkt. No. 47-27) at 2)  Tesla claims that the adjustments "were unreasonably swift, and represented an opportunistic attempt to take advantage of changes in volatility in Tesla's stock."  (Id.)

D.    **Expiration of JPM's Warrants**

JPM's warrants expired in June and July 2021.  (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) at 29 (Annex A); Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) at 29 (Annex A))

Between 2014 and 2021 – the period that JPM held the stock warrants – Tesla's stock price rose substantially.  (Cmplt. (Dkt. No. 1) ¶ 41; Answer and Counterclaim (Dkt. No. 17) at 32)  Accordingly, when the warrants expired, Tesla's stock price was much greater than JPM's second adjusted strike price of $484.35.  (Answer and Counterclaim (Dkt. No. 17) at 17, 32) (admitting that "Tesla's stock price exceeded the strike price when the warrants expired") Under the Warrant Agreements, Tesla was required to deliver to JPM an amount of Tesla stock or cash equal to the difference between the strike price and the market price of Tesla stock when

the warrants expired.  (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 2 at 7; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 2 at 7)

Tesla provided JPM with Tesla stock in accordance with the Warrant Agreements, but did so based on the original strike price of $560.6388.  Tesla refused to settle additional shares calculated at JPM's adjusted strike price of $484.35.  (Answer and Counterclaim (Dkt. No. 17) at 21)  JPM objected, and informed Tesla that it had failed to deliver the requisite "additional shares."  (Id.)  JPM also declared that an "event of default" had occurred under the Warrant Agreements, and set an "Early Termination Date" of the Warrant Agreements for August 3, 2021.  (Id. at 22; see ISDA Master Agreement (Dkt. No. 30-1) § 5(a)(i) at 6, § 6(a) at 12 (defining an "[e]vent of [d]efault" as a "[f]ailure by the party to make, when due, any payment under this Agreement" and authorizing the non-defaulting party to designate an "Early Termination Date"))

JPM claims that it is owed an additional 228,775 shares of Tesla stock, with a market value of $162.2 million as of August 3, 2021.  (Cmplt. (Dkt. No. 1) ¶¶ 43, 46; Answer and Counterclaim (Dkt. No. 17) at 21-22)

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on November 15, 2021, and asserts a breach of contract claim.  (Cmplt. (Dkt. No. 1) ¶¶ 49-53)  JPM contends that Tesla owes it approximately $162 million under the Warrant Agreements.  (Id. at 19, ad damnum clause)

On January 24, 2022, Tesla filed its Answer, in which it asserts a breach of contract counterclaim, and seeks a declaratory judgment.  (See Answer and Counterclaim (Dkt. No. 17) at 23-25)  Tesla alleges that JPM "breached the [Warrant] Agreements" in determining "that an adjustment-triggering event occurred under the Warrant[] [Agreements] on August 7, 2018."  (Id. at 23)  In the alternative, Tesla contends that JPM breached the Warrant Agreements

11

by (1) adjusting the strike price of the warrants in bad faith and in a commercially unreasonable manner; and (2) "determin[ing] the fair market value" of the shares it claims it was owed at the market price on August 3, 2021, rather than at the market price at the time the warrants expired. (Id. at 23-24)  Tesla seeks a declaration that JPM "breached the parties' Agreements," as well as damages and an award of attorneys' fees and costs.  (Id. at 25-26)

On July 18, 2022, Plaintiff moved for judgment on the pleadings as to its breach of contract claim, as well as Tesla's breach of contract counterclaim and its request for a declaratory judgment.  (Mot. (Dkt. No. 45))

## DISCUSSION

## I.    LEGAL STANDARD

Judgment on the pleadings may be granted under Fed. R. Civ. P. 12(c) if "the movant clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." Rivera v. Schweiker, 717 F.2d 719, 722 n.1 (2d Cir. 1983) (citation omitted).

Where, as here, plaintiff moves for judgment on the pleadings, the court is to accept the "defendant's denials and [the] allegations of the answer which are well pleaded," Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 305 (2d Cir. 2021) (internal quotation marks and citation omitted), as well as "the undenied facts alleged in the complaint." Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C., 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).  The court must "draw[] all reasonable inferences in favor of the defendant[], who [is] the non-movant[]." Lively, 6 F.4th at 305; see also Banker v. Moulton, No. 08 Civ. 122 (WKS), 2013 WL 5945800, at *1 (D. Vt. Nov. 6, 2013) (where "a plaintiff moves for judgment under Rule 12(c) on claims in [its] own pleading, allegations in that pleading that have been denied by the non-moving party are generally deemed to be false").  In

other words, "if a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted." Allstate Ins., 537 F. Supp. 3d at 545 (internal quotation marks and citation omitted). If, however, "there are material questions of fact presented by the pleadings, the motion for judgment on the pleadings must be denied." Shah v. New York State Dep't of Civ. Serv., No. 94 Civ. 9193 (RPP), 1996 WL 694340, at *2 (S.D.N.Y. Dec. 4, 1996) (plaintiff motion for judgment on the pleadings) (citing George C. Frey Ready-Mixed Con. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir. 1977).

In resolving a motion for judgment on the pleadings, a court may "consider the answer, along with any attached written instruments or other matters of which courts can take judicial notice," Lively, 6 F.4th at 305, as well as "the undenied facts alleged in the complaint." Allstate Ins., 537 F. Supp. 3d at 545.

## II.     ANALYSIS

### A.     Whether JPMorgan Has Demonstrated as a Matter of Law that it Acted in Good Faith and in a Commercially Reasonable Manner

For JPM to be entitled to judgment on the pleadings on its breach of contract claim, it must demonstrate as a matter of law that (1) Musk's August 7, 2018 tweet and/or Tesla's statements following that tweet constitute an "Announcement Event" under the Warrant Agreements; and (2) JPM acted "in good faith" and "in a commercially reasonable manner" in adjusting the strike price of the warrants. See Allstate Ins., 537 F. Supp. 3d at 545 (where "a plaintiff moves for judgment on the pleadings, the question for determination is whether on the

13

undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law").[8]

JPMorgan represents that – in making its first adjustment to the strike price– it compared the average "implied volatility" of Tesla's stock over the thirty business days preceding August 7, 2018 with the average implied volatility of Tesla stock over the seven business days after August 7, 2018.  (Cmplt. (Dkt. No. 1) ¶ 28)  "Based on these calculations, JPMorgan concluded that the average implied volatility dropped by . . . 26.4%."  (Id.)

> Following a methodology that takes into account the differences between the bespoke . . . Warrants and the listed Tesla options for which implied volatility data is publicly available . . . [,] JPMorgan [then] determined that the strike price had to be reduced from $560.6388 to $424.66 . . . to maintain the same fair value for the . . . Warrants as they had before the Announcement Event.

(Id. ¶ 29)  JPM represents that the approach it took in adjusting the strike price was "consistent with its standard practice" (id. ¶¶ 28-29), but JPM does not explain what its "standard practice" is or why it "looked at the average implied volatility [of Tesla's stock] over a period of time," rather than the "change in average implied volatility" on a particular date.  (See id. ¶ 28)

It is undisputed here that the Warrant Agreements authorize JPM to exercise discretion in adjusting the strike price in the warrants to account for the economic effect of an Announcement Event.  (See Answer and Counterclaim (Dkt. No. 17) at 8 (noting that the

---

[8]  In determining whether JPM has established its breach of contract claim as a matter of law, this Court will apply New York law.  Both sides rely on New York law (see Def. Opp. (Dkt. No. 48) at 16-17 (discussing the requirements for establishing a breach of contract claim "[u]nder New York law"); Pltf. Br. (Dkt. No. 46) at 30 (same)), and the Warrant Agreements provide that they are to be construed in accordance with New York law.  (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 8(r) at 25; Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 8(r) at 25) (providing that "[t]he [Warrant] Agreement, this Confirmation, and all matters arising in connection with the Agreement . . . shall be governed by . . . the laws of the State of New York") Given these circumstances, this Court applies New York law.  See Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 n.4 (2d Cir. 2005) (where the parties "cite only New York law," courts are free to "assume that New York law applies").

Warrant Agreements "enumerate" conditions in "which [JPM] may adjust the terms of the Warrants"); Cmplt. (Dkt. No. 1) ¶ 2 (asserting that the Warrant Agreements "granted" JPM "broad discretion to determine both how to measure these economic effects and what adjustments to make as a result"); ISDA Equity Definitions (Dkt. No. 30-2) § 12.3(d) at 53 ("make such adjustment to the exercise, settlement, payment or any other terms of the [stock warrant transaction] as [JPM] determines appropriate to account for the economic effect on the [stock warrant transaction]"))  The methodology that JPM is to use in determining the economic effect of an Announcement Event is limited only by its obligation to do so "in good faith and in a commercially reasonable manner."  (Feb. 27, 2014 Warrant Agreement (Dkt. No. 30-4) § 3 at 12 (providing that "all determinations made by the Calculation Agent" – JPM – "shall be made in good faith and in a commercially reasonable manner"); Mar. 28, 2014 Warrant Agreement (Dkt. No. 30-5) § 3 at 12 (same); ISDA Equity Definitions (Dkt. No. 30-2) § 1.40 at 18 ("Whenever a Calculation Agent" – JPM – "is required to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner."))

The Warrant Agreements do not define "good faith" and "commercially reasonable."  New York law instructs that – in such circumstances – the meaning of these terms is to be determined by reference to the "practices of the particular industry."  See 3DT Holdings LLC v. Bard Access Systems Inc., 17 Civ. 5463 (LJL), 2022 WL 409082, at *8 (S.D.N.Y. Feb. 10, 2022) (stating that an obligation to act in a "commercially reasonable fashion" "set[s] forth an objective standard for [a party's] conduct" that is to be measured by "the practices of the particular industry"); Holland Loader Co., LLC v. FLSmidth A/S, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018) ("When the term 'commercially reasonable efforts' is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to

establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry."), aff'd 768 F. App'x 40 (2d Cir. 2019).

Determining whether JPM's methodology for setting the necessary adjustment to the warrants' strike price is "commercially reasonable" and consistent with its duty of good faith is a "fact[-]intensive inquiry." See Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., No. 12 Civ. 2827 (NRB), 2013 WL 1191895, at *11 (S.D.N.Y. Mar. 22, 2013) ("questions of commercial reasonableness are necessarily fact intensive"; denying motion to dismiss contract claim that turned on questions of commercial reasonableness); Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 542 (S.D.N.Y. 2013) (noting that "[c]ourts have found that [determining whether a party to a contract has acted in a] commercially reasonable[]" manner "is often a fact-intensive inquiry"; denying motion to dismiss breach of contract counterclaim that turned on this issue); Lesser v. TD Bank, N.A., 463 F. Supp. 3d 438, 451 (S.D.N.Y. 2020) (denying motion to dismiss contract claim premised on defendant's failure to act in accordance with "industry practice" and "reasonable commercial standards"); Banco del Austro, S.A. v. Wells Fargo Bank, N.A., 215 F. Supp. 3d 302, 306 (S.D.N.Y. 2016) (stating in the context of a claim brought under the Uniform Commercial Code that the "fact-intensive nature of the commercial reasonableness inquiry" is "one that courts typically address at summary judgment," and not on a motion to dismiss); Seomi v. Sotheby's, Inc., 27 Misc. 3d 1231, 1231 n.3 (N.Y. Sup. Ct. 2010) (noting that the question of commercial reasonableness raises "issues of fact more appropriate for determination on a motion for summary judgment than on a motion to dismiss").

Indeed, because "good faith" and "commercial reasonableness" must be considered in the context of a particular industry and the customs that prevail in that industry,

expert testimony is often necessary.  See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 950 F. Supp. 2d 568, 617 (S.D.N.Y. 2013) (requiring expert evidence to define "commercially reasonable" investment manager practices); Alto v. Sun Pharm. Indus., Inc., No. 19-CV-09758 (GHW), 2021 WL 4803582, at *42 (S.D.N.Y. Oct. 13, 2021) (denying summary judgment where movant seeking to enforce "commercially reasonable manner" provision "declined to present an expert to establish an objective standard"); see also Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC, 706 F. Supp. 3d 409, 439 (S.D.N.Y. 2023) ("credit[ing]" expert testimony offered at bench trial in concluding that a party's efforts "were commercially reasonable").

Here, JPM contends that it acted in a commercially reasonable fashion, and in good faith, in determining the appropriate adjustment to the warrants' strike price by comparing the implied volatility of Tesla's stock during certain time periods before and after Musk's August 7 tweet.  According to JPM, this approach provides a basis on which to fairly "determine[] the economic effect of Tesla's announcement."  (Cmplt. (Dkt. No. 1) ¶¶ 27-29; see id. ¶ 29 (asserting that adjusting the strike price from $560.6388 to $424.66 "maintain[s] the same fair value of the . . . Warrants as they had before [Musk's August 7 tweet]"))  JPM further argues that the ISDA Equity Definitions permit JPM to "'determine[]'" the "'appropriate [adjustment] to account for the economic effect'" of Musk's August 7, 2018 tweet, "'including adjustments to account for changes in volatility . . . relevant to the [Tesla] [s]hares.'"  (Id. ¶ 17 (quoting ISDA Equity Definitions (Dkt. No. 30-2) § 12.3(d) at 53-54)  Finally, JPM argues that the methodology it employed in adjusting the strike price is  "consistent with its standard practice."  (Id. ¶¶ 28-29)

Tesla contends that JPM calculated the adjustment to the warrants' strike price in "bad faith" and in a "commercially unreasonable" fashion, and did so in order to obtain an enormous "windfall" amounting to more than $162 million.  (Answer and Counterclaim (Dkt.

No. 17) at 1-3; <u>see also</u> <u>id.</u> at 11-13 (arguing that JPM's approach is "self-serving" and "unsupported by existing market data")

As an initial matter, Tesla points out that Musk's August 7, 2018 Twitter post about possibly taking Tesla private took place "nearly three years before the Warrants' exercise dates [in 2021]," and that Musk announced a mere three weeks later that Tesla would remain a public company. (<u>Id.</u> at 2-3) According to Tesla – given the quick turnaround between Musk's suggestion of a possible going private deal and his announcement that Tesla would remain a public company, JPM should have "reverse[d] its initial 'adjustment' of the Strike Price, as any reasonable party would have done." (<u>Id.</u> at 3) But instead "JPM raised the Strike Price only modestly, [from $424.66 per share] to $484.35 per share, thereby purporting to maintain a Strike Price substantially below the level [of $560.6388 that] the parties had agreed to." (<u>Id.</u>)

According to Tesla, in adjusting the Strike Price in this fashion, JPM engaged in "self-dealing [that] was commercially unreasonable and carried out in bad faith":

> The undisputable reality is that, in August 2018, the Warrants were years away from their 2021 exercise dates, making Mr. Musk's brief consideration of a potential take-private offer immaterial to their economic value. Although JPM purported to assume that the Warrants would exhibit reduced volatility from August 2018 forward, this assertion had no support in contemporaneous market date or common sense. On the contrary, JPM pocketed enormous profits as Tesla's stock price, and the Warrants' implied volatility, soared to unprecedented heights through the Warrants' expiration dates in 2021.

(<u>Id.</u> at 3) "[W]hen JPM ultimately exercised the Warrants in 2021, it purported to do so at a reduced Strike Price. JPM demanded hundreds of thousands of additional [Tesla] shares – and later $162.2 million in cash – on the basis of a non-existent 'economic effect' of a buyout offer that [] Musk considered years earlier but never made." (<u>Id.</u> at 3-4)

Tesla also asserts that the implied volatility time periods that JPM employed – averages premised on the thirty business days before August 7, 2018 and the seven business days

after that date – were "cherrypicked time periods that have no reference to an objective standard," and were chosen to enable JPM to overstate the implied volatility of Tesla's stock. (Def. Opp. (Dkt. No. 48) at 24; Answer and Counterclaim (Dkt. No. 17) at 5-6, fig. 1 (indicating that shortly after August 24, 2018, Tesla's stock "traded at implied volatilities similar to the levels seen shortly before August 7, 2018"); id. at 13 (arguing that any "fluctuations in volatility" were "short-term")) Tesla also argues that JPM's methodology "guaranteed that the [f]irst [a]djustment [on August 15, 2018] would not be reversed" when Tesla later announced that it would remain a public company, because JPM's methodology "measured only the marginal change in implied volatility." (Answer and Counterclaim (Dkt. No. 17) at 17-18)

Tesla contends that the implied volatility periods should be made up of a uniform number of days before and after August 7, 2018, and suggests that fifteen business days – before and after – would be appropriate. (Def. Opp. (Dkt. No. 48) at 24) When this methodology is applied, Tesla says that the strike price would be adjusted from $560.6388 to $547, rather than the $424.66 figure set by JPM in making its first adjustment. (Id.; see Answer and Counterclaim (Dkt. No. 17) at 2, 11)

Tesla further complains that JPMorgan should include in its data set the implied volatility on August 17, 2018, when it notified Tesla of the first adjustment. (Answer and Counterclaim (Dkt. No. 17) at 14) According to Tesla, including August 17, 2018 as a data point would demonstrate that the volatility of Tesla's stock returned to levels similar to those seen before Musk's August 7 tweet. (Id. at fig. 2)

In sum, Tesla argues that – in "significantly reducing the Strike Price in response to a short-term fluctuation in option prices" – JPM "secured an increase in the value of its trading

position in the Warrants that was out of proportion with any alleged 'economic effect'" of

Musk's August 7, 2018 tweet.  (Id. at 15)

The dispute between JPM and Tesla as to appropriate methodology and

commercial reasonableness cannot be resolved at this stage of the proceedings as a matter of law.

As discussed above, JPM's assertion that it acted in a commercially reasonable manner must be

measured against the "practices of the particular industry" of which it is a part, see 3DT

Holdings LLC, 2022 WL 409082, at *8, and expert testimony will be required concerning that

issue.  See MBIA, 950 F. Supp. 2d at 617 (requiring expert evidence to define "commercially

reasonable" investment manager practices); Holland Loader Co., 313 F. Supp. 3d at 473

(requiring "the party seeking to enforce the [commercially reasonable] provision to establish the

objective standard by which the breaching party's efforts are to be judged, in the context of the

particular industry"); Peak Ridge Master, 930 F. Supp. 2d at 542 (explaining that determining

commercial reasonableness "is often a fact-intensive inquiry"); Lesser, 463 F. Supp. 3d at 451

(denying motion to dismiss contract claim premised on defendant's alleged failure to act in

accordance with "industry practice" and "reasonable commercial standards").  And JPM's

unsupported claim that its methodology for adjusting the strike price was "consistent with its

standard practice" (see Cmplt. (Dkt. No. 1) ¶¶ 28-29), is not dispositive on the issue of industry

practice.

Citibank, N.A. v. Tormar Assocs. LLC, No. 15 Civ. 1932 (JPO), 2015 WL

7288652 (S.D.N.Y. Nov. 17, 2015) and Sports Med Properties, LLC v. Talib, No. 19 Civ. 82

(FDW), 2019 WL 3403372 (W.D.N.C. July 26, 2019) – cited by JPM (Pltf. Br. (Dkt. No. 46) at

21-22) – are not to the contrary.

In Tormar, 2015 WL 7288652 (S.D.N.Y. Nov. 17, 2015), the court granted plaintiff judgment on the pleadings on its breach of contract claim. Id. at *8. But that case did not turn on whether a particular analysis used was commercially reasonable. While the brokerage contracts at issue in Tormar provided that "'all calculations, valuations and determinations made by either party[] will be made in good faith and in a commercially reasonable manner'" (see id. at *6), defendant – unlike Tesla here – did not argue that plaintiff's "calculations, valuations and determinations" were commercially unreasonable. Instead, the parties' dispute arose from a disagreement about whether the "commercially reasonable" requirement in the brokerage contracts extended beyond "calculations, valuations and determinations" to include "the manner in which Citibank conducted its transactions with Tormar." Id.

In Sports Med Properties, 2019 WL 3403372 (W.D.N.C. July 26, 2019), the court granted plaintiff's motion to dismiss defendant's counterclaim, in which defendant alleged that plaintiff's "failure to use commercially reasonable efforts . . . in the performance of its duties . . . 'led to [a third party] design[ing] and construct[ing a project] . . . that was unusable for its intended purpose.'" Id. at *3-4. In granting the motion to dismiss, the court cited contractual language stating that plaintiff "'will not be liable for design techniques or procedures employed by any third party.'" Id. at *3. Given this unambiguous language, the court found that the contract "does not impose liability on [plaintiff] for said defects," and dismissed defendant's counterclaim. Id.

Nothing in Tormar or in Sports Med Properties suggests that this Court could properly grant judgment on the pleadings to JPM – either as to JPM's breach of contract claim or Tesla's counterclaims.[9]

### B.    Partial Judgment on the Pleadings

JPM argues that – even if this Court concludes that it is not entitled to judgment on the pleadings with respect to its breach of contract claim – the Court should, "at a minimum," grant it "partial judgment" on the issue of whether Musk's statements constitute an "Announcement Event" under the Warrant Agreements. (Pltf. Br. (Dkt. No. 46) at 15; see also Pltf. Reply (Dkt. No. 50) at 9-10 (asking the Court to "resolv[e] the Announcement Event issue on the pleadings")) According to JPM, "'reach[ing] only some of the issues presented'" is appropriate here, even if its breach of contract claim cannot be resolved in its entirety at this stage of the proceedings. (Pltf. Br. (Dkt. No. 46) at 15) (quoting Logical Operations, Inc. v. CompTIA, Inc., No. 20 Civ. 6238 (EAW), 2021 WL 1099619, at *3 (W.D.N.Y. Mar. 23, 2021))

Tesla responds that a "Rule 12(c) motion is not appropriate to resolve issues forming only part of a claim or defense." (Def. Opp. (Dkt. No. 48) at 15 & n.2) (collecting cases)

Judgment on the pleadings may only be entered where the relief that is granted "result[s] in a judgment," that is, "'a decree and any order from which an appeal lies.'" Meisels v. Meisels, No. 19 Civ. 4767 (EK), 2021 WL 1924186, at *7 (E.D.N.Y. May 13, 2021) (quoting

---

[9] JPM's motion for judgment on the pleadings as to Tesla's counterclaims for breach of contract and for a declaratory judgment turn on whether JPM has demonstrated as a matter of law that it adjusted the strike price in good faith and in a commercially reasonable manner. (See Pltf. Br. (Dkt. No. 46) at 28-31; Answer and Counterclaim (Dkt. No. 17) at 23-25) Accordingly, JPM's motion concerning Tesla's counterclaims fails for the same reason as its motion concerning its own breach of contract claim.

Fed. R. Civ. P. 54(a)); see id. at *8 (ruling that where the requested relief "would not result in a judgment [resolving a claim or defense], Rule 12(c) is an improper vehicle for seeking the requested relief"); see also Rivera, 717 F.2d at 722 n.1 (noting that a judgment on the pleadings "is designed to provide a means of disposing of cases when the material facts are not in dispute") (citation omitted). Rule 12(c) does not permit "'piecemeal judgment on part of a claim' – i.e., 'some but not all elements of a single claim.'" Meisels, 2021 WL 1924186, at *7 (emphasis in original) (quoting Kenall Mfg. Co. v. Cooper Lighting LLC, 354 F. Supp. 3d 877, 893 (N.D. Ill. 2018)); Allstate, 537 F. Supp. 3d at 548 ("if there is any legal or factual basis" to find against movant on one issue in a claim, then the Rule 12(c) "motion must be denied").

In short, claims in a complaint are each considered as a whole in determining whether a party is entitled to judgment on the pleadings as to that claim. Claims are not dissected into sub-parts in deciding whether the motion for judgment on the pleadings should be granted or denied.

In Kenall Mfg. Co. v. Cooper Lighting, LLC, 354 F. Supp. 3d 877 (N.D. Ill. 2018), for example, the court rejected plaintiff's argument that "Rule 12(c) permits the entry of judgment on some but not all elements of a single claim." Id. at 893. In so holding, the court found that the text of Rule 12(c)

> forecloses the entry of a . . . judgment on part of a claim. . . . The rule's text does not explicitly authorize courts to carve up claims or defenses on a motion for judgment on the pleadings. See 10A Wright & Miller, Federal Practice & Procedure § 2713 (4th ed. 2018) (noting that "there is no provision in the rules" for "a motion for a partial judgment on the pleadings").

Id. at 894.

Numerous courts across the country have adopted the Kenall court's reasoning. See, e.g., Hartstein v. Hyatt Corp., No. 20 Civ. 4874 (DSF), 2021 WL 2497926, at *2 (C.D. Cal. Mar. 19, 2021) ("a motion for judgment on the pleadings cannot be directed to just a portion of a

claim"); <u>Munro v. Fairchild Tropical Botanic Garden, Inc.</u>, No. 20 Civ. 20079 (RS), 2021 WL

894380, at *2 (S.D. Fla. Mar. 3, 2021) (ruling that "partial judgment on the pleadings . . . [was]

not appropriate . . . because it would not dispose of any single claim"); <u>Erhart v. BofI Holding,</u>

<u>Inc.</u>, 387 F. Supp. 3d 1046, 1063 (S.D. Cal. 2019) (denying movant's "request for judgment on

the pleadings as to only parts of [plaintiff's] claim[]," and collecting cases for the proposition

that courts "refuse[] to entertain motions for judgment on the pleadings that seek to dispose of

only a part of an individual claim or defense"); <u>Alpha Tech Pet Inc. v. LaGasse, LLC</u>, No. 16

Civ. 4321, 2017 WL 5069946, at *9 (N.D. Ill. Nov. 3, 2017) (noting that it is "procedurally

improper for [courts] to award judgment on the pleadings on part of a claim"), <u>aff'd</u> <u>sub</u> <u>nom.</u>

<u>Brodsky v. HumanaDental Ins. Co.</u>, 910 F.3d 285 (7th Cir. 2018); <u>Living on the Edge, LLC v.</u>

<u>Lee</u>, No. 14 Civ. 5982 (MWF), 2015 WL 12661917, at *4 (C.D. Cal. Aug. 25, 2015) ("[movant]

cannot move for judgment on the pleadings with respect to less than a full cause of action," as to

"just one portion of Plaintiff's claim for breach of the guaranty"); <u>United States v. Real Property</u>

<u>and Improvements Located at 2366 San Pablo Avenue, Berkeley, California</u>, No. 13 Civ. 2027

(JST), 2013 WL 6774082, at *1 (N.D. Cal. Dec. 23, 2013) ("Though courts have often

entertained motions for partial judgment on the pleadings with respect to a particular cause of

action or affirmative defense, the Court is aware of no case in which a court has granted partial

judgment on the pleadings with respect to less than a full cause of action."); <u>see</u> <u>also</u> <u>BBL, Inc. v.</u>

<u>City of Angola</u>, 809 F.3d 317, 324-25 (7th Cir. 2015) (finding "reason to question" the district

court's decision to "split a single claim into multiple components" and grant a Rule 12(c) motion

"on certain elements of that single claim").

        In arguing that this Court should grant JPM "partial judgment . . . as to the

occurrence of the two Announcement Events," Plaintiff relies on <u>Logical Operations</u>, 2021 WL

1099619, at *3, which in turn cites <u>Arista Records LLC v. Lime Grp. LLC</u>, No. 06 Civ. 5936

(KMW), 2011 WL 13257941, at *2 (S.D.N.Y. Jan. 7, 2011).  (Pltf. Br. (Dkt. No. 46) at 15-16)

Plaintiff also cites to <u>Bradley v. Fontaine Trailer Co.</u>, No. 06 Civ. 62 (WWE), 2009 WL 763548

(D. Conn. Mar. 20, 2009), for the proposition that it may move for partial judgment on the

pleadings as to an element of its breach of contract claim.  (<u>Id.</u> at 9-10)

    <u>Arista Records</u>, 2011 WL 13257941, provides no support for JPM's argument

here, and arises in an entirely different procedural context.  That case involved copyright claims

regarding more than 10,000 sound recordings.  <u>Id.</u> at *1.  After granting plaintiff's motion for

summary judgment on its secondary copyright infringement claims, the court went on to consider

the issue of damages.  Plaintiff sought a statutory damage award as to each of the more than

10,000 songs.  Defendant moved for judgment on the pleadings as to plaintiff's statutory damage

claims, arguing that many of the songs had appeared in compilations, and that accordingly a

statutory damage award should be premised on each album, rather than on each song.  <u>Id.</u>  It was

in this context that the court stated that "[c]ourts are permitted to, and do, grant 12(c) motions for

partial judgment on the pleadings," <u>id.</u> at *2 – in turn citing <u>Lessambo v.

Pricewaterhousecoopers, L.P.</u>, No. 08 Civ. 6272 (WHP), 2009 WL 2170179 (S.D.N.Y. 2009),

where the court dismissed certain of plaintiff's discrimination claims in their entirety, while

allowing other discrimination claims to proceed to trial.[10]  The <u>Arista Records</u> court went on to

deny defendant's motion for judgment on the pleadings, holding that defendant had not

established as a matter of law that the songs at issue were all distributed in compilations.  <u>Arista</u>,

---

[10]  In <u>Lessambo</u>, 2009 WL 2170179, the court granted defendant's motion for judgment on the
pleadings as to five of plaintiff's discrimination claims.  <u>Id.</u> at *1.  The court did not grant
judgment on the pleadings as to certain elements of plaintiff's claims, but instead addressed each
of plaintiff's discrimination claims as a whole.

2011 WL 13257941, at *2.  In sum, Arista Records arises in an entirely different procedural

posture and is not on point here.

Likewise, in Logical Operations, 2021 WL 1099619 (W.D.N.Y. Mar. 23, 2021),

the court addressed "partial" judgment on the pleadings in connection with plaintiff's application

for declaratory relief.  The parties had entered into an agreement by which plaintiff acted as

defendant's exclusive manufacturer.  Id. at *1-2.  The complaint alleged that defendant had

breached the agreement by contracting with another manufacturer and sought, inter alia, a

declaration that the plaintiff had the exclusive right to manufacture defendant's products.  (See

Logical Operations, 20 Civ. 6238 (EAW) (W.D.N.Y.), Dkt. No. 1 (Cmplt.) ¶¶ 34-46)  Plaintiff

moved for judgment on the pleadings, seeking a declaration that it had "the exclusive right to

manufacture and deliver [defendant's products]" subject to a certain exception, thereby

narrowing the relief sought in the complaint.  Logical Operations, 2021 WL 1099619, at *2.  In

rejecting defendant's argument that the motion should be denied – because plaintiff's

"request[ed] relief" in its Rule 12(c) motion "is different than the relief request[ed] in its

[complaint]" (see Logical Operations, 20 Civ. 6238 (EAW) (W.D.N.Y.), Dkt. No. 18 (Def. Br.)

at 2-3) – the court stated that "[i]t is not improper for [p]laintiff to ask the [c]ourt to reach only

some of the issues presented in this litigation."  Logical Operations, 2021 WL 1099619, at *3

(citing Arista, 2011 WL 13257941, at *2).  The court explained that – if it determined that

declaratory relief was appropriate – the court would be free to prescribe the scope and wording

of the relief it granted.  Id. (citing LiveIntent, Inc. v. Naples, 293 F. Supp. 3d 433, 446 (S.D.N.Y.

2018)).  The Logistical Operations court ultimately concluded, however, that plaintiff was not

entitled to declaratory relief in any form.  Id. at *4.  In sum, the narrowed declaratory relief

sought in <u>Logistical Operations</u> is not comparable to the "element of a claim" circumstances at issue here.

 <u>Bradley</u>, 2009 WL 763548 is likewise not on point.  In that case, plaintiff moved for judgment on the pleadings as to three of defendant's affirmative defenses.  <u>Id.</u> at *1-2.  The court granted plaintiff's motion as to one of defendant's affirmative defenses and denied plaintiff's motion as to the other two affirmative defenses.  <u>Id.</u> at *6.  In doing so, the court did not address any particular element or sub-part of each affirmative defense, but instead considered each affirmative defense as a whole.

 In sum, judgment on the pleadings is appropriate where it "resolves at least an entire cause of action or affirmative defense."  <u>Erhart</u>, 387 F. Supp. 3d at 1062-63.  Judgment on the pleadings is not appropriate where it "dispose[s] of only a part of an individual claim or defense."  <u>Id.</u> at 1063 (collecting cases); <u>see also</u> <u>Kenall</u>, 354 F. Supp. 3d at 896 (Rule 12(c) "forecloses the entry of a . . . judgment on part of a claim"; courts are not authorized to "carve up claims or defenses").  Accordingly, to the extent that JPM seeks a partial judgment on the pleadings, its application will be denied.

## **CONCLUSION**

 For the reasons stated above, Plaintiff JPMorgan's motion for judgment on the pleadings (Dkt. No. 45) is denied.  The Clerk of Court is directed to terminate the motion.

Dated:  New York, New York
  September 12, 2024     SO ORDERED.

                Paul G. Gardephe
                United States District Judge